FILED

DEC 1 9 2022

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

STATE OF WEST VIRGINIA

COUNTY OF MONONGALIA, TO-WIT:

1:22CV155

I, Jean Friend, Clerk of the Circuit Court of Monongalia County, State

aforesaid, hereby certify that the foregoing are copies of the original papers

filed, and a complete record of the proceedings had in the within action of

**HEIMO RIEDEL**

vs.            Civil Action No.  19-C-190

**WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS**

lately pending in said Circuit Court.

Given under my hand and the seal of said Circuit Court on this 16th

day of December, 2022.

Circuit Clerk of Monongalia Co., WV

CASE#: **19-C-190**  Sub Code: Date Opened: 06/28/2019
Date Printed: 12/16/2022

JUDGE: CINDY S. SCOTT

vs

Plaintiff: **HEIMO RIEDEL**

Defendant: **WV UNIVERSITY BOARD OF GOVERNORS**

Pro Attorney: DAVID M. GRUNAU

Def Attorney: JULIE A. MOORE

| Page | Date | Memorandum | Account# | Earned | Collected | Balance |
|---|---|---|---|---|---|---|
| 1 | 06/28/2019 | Complaint Filed | | 200.00 | 200.00 | .00 |
| 2 | 06/28/2019 | Process held per atty | | .00 | .00 | .00 |
| 3 | 10/23/2019 | Clerk fee | 1010 | 5.00 | 5.00 | .00 |
| 4 | 10/23/2019 | Process issued - S/S | NotCollected | 20.00 | .00 | 20.00 |
| 5 | 11/06/2019 | S/S accepted service on behalf of WVU Bd of Gov on 10/29/19 | | .00 | .00 | .00 |
| 6 | 11/08/2019 | Notice of Bona Fide Defense (Julie Moore/S. Richardson for def.) | | .00 | .00 | .00 |
| 7 | 01/06/2020 | Defs' Notice of Attorney Change of Law Firm and Address (Julie Moore | | .00 | .00 | .00 |
| 8 | 01/06/2020 | to Bowles Rice) | | .00 | .00 | .00 |
| 9 | 03/10/2020 | Answer of Def. WVU Bd of Governors (Julie Moore) | | .00 | .00 | .00 |
| 10 | 04/20/2020 | Court's Notice of Scheduling Conference (telephonically at 3:30 | | .00 | .00 | .00 |
| 11 | 04/20/2020 | 4/27/20) | | .00 | .00 | .00 |
| 12 | 04/29/2020 | SCHEDULING ORDER: dates/specifics for pretrial activities; pretrial | | .00 | .00 | .00 |
| 13 | 04/29/2020 | conf-11 am 5/4/21; trial-7/20-23, 21/21 | | .00 | .00 | .00 |
| 14 | 07/01/2020 | c/s Def's 1st Set of Interr. & Req. for Prod. | | .00 | .00 | .00 |
| 15 | 11/23/2020 | *c/s Pl's Response to Interr. & Req. for Prod. | | .00 | .00 | .00 |
| 16 | 01/11/2021 | AGREED AMENDED SCHEDULING ORDER: final pretrial conf-5/3/22 at 11 | | .00 | .00 | .00 |
| 17 | 01/11/2021 | am; dates/specifics for pretrial activities established | | .00 | .00 | .00 |
| 18 | 03/12/2021 | *c/s Pl's 1st Set of Interr. & Req. for Prod. to Def. WVU | | .00 | .00 | .00 |
| 19 | 12/08/2021 | amended c/s Def's Answers & Responses to Pl's 1st Set of Combined | | .00 | .00 | .00 |
| 20 | 12/08/2021 | Interr. & Req. for Prod. | | .00 | .00 | .00 |
| 21 | 12/08/2021 | c/s Def's Answers & Responses to Pl's 1st Set of Combined Interr. & | | .00 | .00 | .00 |
| 22 | 12/08/2021 | Req. for Prod. | | .00 | .00 | .00 |
| 23 | 12/08/2021 | Privilege Log Regarind WVUBOG's Responses to Pl's 1st Set of Req. | | .00 | .00 | .00 |
| 24 | 12/08/2021 | for Production of Documents to Def. | | .00 | .00 | .00 |

CASE#:  **19-C-190**          Sub Code:                                    Date Opened:  06/28/2019

                                                                          Date Printed:  12/16/2022

JUDGE:   CINDY S. SCOTT

vs

Plaintiff:    **HEIMO RIEDEL**

Defendant:    **WV UNIVERSITY BOARD OF GOVERNORS**

Pro Attorney:  DAVID M. GRUNAU

Def Attorney:  JULIE A. MOORE

| Page | Date | Memorandum | Account# | Earned | Collected | Balance |
|------|------|-----------|----------|--------|-----------|---------|
| 25 | 01/31/2022 | AMENDED SCHEDULING ORDER:  dates/specifics for pretrial activities | | .00 | .00 | .00 |
| 26 | 01/31/2022 | established; pretrial conf-2:30 pm 1/4/23 | | .00 | .00 | .00 |
| 27 | 04/12/2022 | *Pl's First Motion to Amended Complaint | | .00 | .00 | .00 |
| 28 | 04/13/2022 | *Def's Notice of Intent to Respond to Pl's 1st Motion to Amend | | .00 | .00 | .00 |
| 29 | 04/13/2022 | Complaint and Request to Defer Ruling on Motion | | .00 | .00 | .00 |
| 30 | 04/15/2022 | Def WVU Bd of Govs' Notice of Intent to Respond to Pl's 1st Motion | | .00 | .00 | .00 |
| 31 | 04/15/2022 | to Amend Complaint & Request to Defer Ruling on Motion | | .00 | .00 | .00 |
| 32 | 04/21/2022 | *Pl's Supplement to Pl's 1st Motion to Amend Complaint | | .00 | .00 | .00 |
| 33 | 05/03/2022 | AGREED ORDER GRANTING PLAINTIFF LEAVE TO FILE FIRST AMENDED | | .00 | .00 | .00 |
| 34 | 05/03/2022 | COMPLAINT:  Pl. & WVUBoG agreed to entry of order allowing pl | | .00 | .00 | .00 |
| 35 | 05/03/2022 | to file amended complaint; WVUBoG has until 5/23/22 to answer | | .00 | .00 | .00 |
| 36 | 05/03/2022 | same | | .00 | .00 | .00 |
| 37 | 05/09/2022 | AGREED ORDER GRANTING PLAINTIFF LEAVE TO FILE FIRST AMENDED | | .00 | .00 | .00 |
| 38 | 05/09/2022 | COMPLAINT:  Pl & WVUBoG agree to entry of order allowing pl to | | .00 | .00 | .00 |
| 39 | 05/09/2022 | file amended complaint & WVUBoG has until 5/23/22 to answer same | | .00 | .00 | .00 |
| 40 | 05/11/2022 | Pl's First Amended Complaint | | .00 | .00 | .00 |
| 41 | 05/16/2022 | Stipulation (WVUBoG has until 5/31/22 to answer 1st Amended Complaint) | | .00 | .00 | .00 |
| 42 | 05/31/2022 | *Stipulation (def has until 6/7/22 to answer or respond) | | .00 | .00 | .00 |
| 43 | 06/10/2022 | Def's Motion to Dismiss | | .00 | .00 | .00 |
| 44 | 06/10/2022 | Def's Memo of Law in Support of Def's Motion to Dismiss | | .00 | .00 | .00 |
| 45 | 07/11/2022 | Def's Notice of Hearing (9 am 9/19/22 - motion to dismiss) | | .00 | .00 | .00 |
| 46 | 09/16/2022 | *Pl's Response in Opposition to Def's Motion to Dismiss | | .00 | .00 | .00 |
| 47 | 11/07/2022 | ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANT'S MOTION TO | | .00 | .00 | .00 |
| 48 | 11/07/2022 | DISMIS AND SETTING AMENDED SCHEDULING ORDER FOR DEADLINES: | | .00 | .00 | .00 |

CASE#:   **19-C-190**     Sub Code:                                      Date Opened:  06/28/2019

                                                                        Date Printed:  12/16/2022

JUDGE:   CINDY S. SCOTT

vs

Plaintiff:   **HEIMO RIEDEL**

Defendant:   **WV UNIVERSITY BOARD OF GOVERNORS**

Pro Attorney:  DAVID M. GRUNAU

Def Attorney:  JULIE A. MOORE

| Page | Date | Memorandum | Account# | Earned | Collected | Balance |
|---|---|---|---|---|---|---|
| 49 | 11/07/2022 | Count I & II & V dismissed with prejudice; denies def's motion | | .00 | .00 | .00 |
| 50 | 11/07/2022 | to dismiss as to count III & pl file second amended complaint & | | .00 | .00 | .00 |
| 51 | 11/07/2022 | serve same within 10 d & def have 30 d to file answer; | | .00 | .00 | .00 |
| 52 | 11/07/2022 | scheduling order amended; pretrial conf-10:30 am 5/8/24 | | .00 | .00 | .00 |
| 53 | 12/06/2022 | *Pl's Second Amended Complaint (with c/s) | | .00 | .00 | .00 |
| 54 | 12/16/2022 | Notice of Filing of Notice of Removal | | .00 | .00 | .00 |
| 55 | 12/16/2022 | REMOVED TO FEDERAL COURT | | .00 | .00 | .00 |
| | | **Totals** | | **225.00** | **205.00** | **20.00** |

**CIVIL CASE INFORMATION STATEMENT**

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

Plaintiff(s)

**HEIMO RIEDEL**

Case Number: 19-C- 190
                    DS

v.

| | Days to Answer | Type of Service (Personal, Certified Mail, Secretary of State, Private Process) |
|---|---|---|

Defendant(s)

**WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS**
**P.O. Box 6201**
**Morgantown, WV 26506**

30                    **SERVICE WITHHELD**

Original Complaint and 1 Copy Furnished Herewith.

**FILED**

JUN 28 2019

**JEAN FRIEND, CLERK**

| PLAINTIFF: HEIMO RIEDEL | CASE NO:  19-C- |
|---|---|
| DEFENDANTS:  WVU BOARD OF GOVERNORS | |

## II.    TYPE OF CASE:

| TORTS | OTHER | CIVIL |
|---|---|---|
| [ ] Asbestos | [ ] Adoption | [ ] Appeal from Magistrate Court |
| [ ] Professional Malpractice | [X Contract | [ ] Petition for Modification-Magistrate |
| [] Personal Injury | [ ] Real Property | [X] Miscellaneous Civil |
| [ ] Product Liability | [ ] Mental Health | |
| [X] Other Tort | [ ] Appeal of Administrative Agency | |

## III.    JURY DEMAND:    [X]  Yes    []  No

Case will be ready for trial by (month/year):  12/2020

## IV. DO YOU OR ANY OF YOUR CLIENTS OR WITNESSES IN THIS CASE REQUIRE SPECIAL ACCOMMODATIONS DUE TO A DISABILITY OR AGE? [ ] Yes    [X] No

[  ]    Wheelchair accessible hearing room and other facilities

[  ]    Interpreter or other auxiliary aid for the hearing impaired

[  ]    Reader or other auxiliary aid for the visually impaired

[  ]    Spokesperson or other auxiliary aid for the speech impaired

Attorney Name:    David M. Grunau          Representing:   [X] Plaintiff    [ ] Defendant
Firm:               Grunau Law Offices
State Bar ID#:      9197
Address:            244 Pleasant Street
                    Morgantown, WV 26505
Telephone:          (304) 291-6166
Facsimile:          (304) 291-6266

_____            DATED:  June 28, 2019
Signature
[  ] Check here if Pro Se

## IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

*Plaintiff,*

v.                                                Civil Action No.: 19-C-190

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS for and on behalf of**
**WEST VIRGINIA UNIVERSITY**

*Defendant.*

### COMPLAINT

Comes now the Plaintiff, by and through counsel, David M. Grunau, and for his Complaint alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      The Plaintiff, Heimo Riedel, is, and at all times relevant to this Complaint was, a resident of Monongalia County, West Virginia, and a contract employee of West Virginia University as a tenured faculty member.

2.      West Virginia University Board of Governors ("BOG") is the governing body for West Virginia University, and is responsible for the control, supervision and management of the financial, business, education and other policies and affairs of West Virginia University ("WVU").

3.      All acts and omissions alleged in this Complaint occurred in Monongalia County in violation of West Virginia State statutes and common law, no federal question is raised, no diversity exists, and therefore this Court has proper and exclusive jurisdiction.

FILED

JUN 28 2019

JEAN FRIEND, CLERK

4.      Venue is proper before the Monongalia Circuit Court pursuant to W. Va. Code § 56-1-1 et seq.

5.      As used in this complaint, "Defendants" or "West Virginia University Board of Governors" or "WVU" refers also to all agents and representatives of West Virginia University acting in the scope of their employment, apparently and/or actually.  The doctrine of *respondeat superior* is hereby invoked and alleged. Accordingly, the Defendants are liable for the acts and omissions of all such employees, agents and/or representatives, and those acting under their command or at their behest, apparently and/or actually.

6.      WVU is not immune from suit in this case because the Plaintiff seeks no recovery of state funds, but instead seeks recovery under and up to the policy limits of the state's liability insurance policy in accordance with the mandates of Pittsburgh Elevator Co. v. West Virginia Board of Regents, 172 W.Va.743, 310 S.E.2d 675 (1983).

7.      All conditions precedent to the bringing of this action, including placing WVU and the West Virginia Attorney General on notice pursuant to W.Va. Code §55-17-3, have been performed, waived, or excused.

## FACTS COMMON TO ALL COUNTS

The Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

8.      The Plaintiff was a tenured professor at WVU with contract and other rights to employment.

9.      Implied in WVU's contract with Professor Riedel is the covenant of good faith and fair dealing.

2

10.     In addition, because of Professor Riedel's tenure, the University owed him a fiduciary duty of good faith and fair dealing concerning matters of salary, other monetary compensation, and other matters affecting his employment.

11.     In June of 2017, Professor Riedel received a letter from Joyce McConnell, Provost and Vice President of WVU, notifying him that his employment was being terminated effective June 30, 2017. This termination was based on allegations set forth in a letter of Intent to Terminate instigated by Professor Riedel's Department Chair. In doing so, the Chair misapplied or misinterpreted policies, discriminatorily applied unwritten policies, and intentionally acted in bad faith. These acts constituted a breach of contract and breach of fiduciary duty.

12.     As a result, Professor Riedel was wrongfully terminated from his position as tenured professor as of June 30, 2017.

## COUNT I:  BREACH OF CONTRACT

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

13.     The Plaintiff worked for WVU as a tenured, contract employee.

14.     The decision to terminate the Plaintiff was made in bad faith and breached the employment contract's implied covenant of good faith and fair dealing.

15.     Moreover, WVU violated its written employment policies in wrongfully terminating the Plaintiff and did so in bad faith.

16.     These breaches were material.

17.     These breaches led to foreseeable damages, including the substantial loss of income.

3

18.     The Plaintiff demands all sustained damages occasioned by WVU's breach of the contract, including lost income and pre and post judgment interest.

### COUNT II:  BREACH OF FIDUCIARY DUTY

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

19.     WVU owed the Plaintiff, as a tenured full professor, a fiduciary duty to act in his best interests and to refrain from taking bad faith, capricious actions which harm the Plaintiff financially and otherwise.

20.     The Department Chair's decision to seek the Plaintiff's dismissal was made in bad faith and breached the fiduciary duty owed the Plaintiff.

21.     This breach was material.

22.     The breach led to foreseeable damages, including the substantial loss of income.

23.     The Plaintiff demands all sustained damages occasioned by WVU's breach of the fiduciary duty, including lost income, attorney fees, punitive damages, general damages for emotional suffering, and pre and post judgment interest.

### COUNT III:  RETALIATORY DISCHARGE

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

24.     At the time of his wrongful termination, the Plaintiff had grievances active against WVU, and had filed grievances previously.

25.     A public employee subject to grievance procedures under W. Va. Code § 18-29-1 cannot be fired while the grievance procedures are ongoing. *Wounaris v. West Virginia State College,* 588 S.E.2d 406 (W. Va. 2003).

4

26.     Professor Riedel was a public employee and he was fired while grievance procedures were ongoing.

27.     On information and belief, Professor Riedel was fired, at least in part, in retaliation for his having filed grievances against WVU.

28.     The Plaintiff's wrongful, retaliatory discharge led to foreseeable damages, including the substantial loss of income.

29.     The Plaintiff demands all sustained damages occasioned by WVU's retaliatory discharge, including lost income, attorney fees, punitive damages, general damages for emotional suffering, and pre and post judgment interest.

## COUNT IV:  VIOLATION OF THE WEST VIRGINIA HUMAN RIGHTS ACT

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

30.     The Plaintiff is in a protected class under the Human Rights Act, namely age.

31.     On information and belief, the Plaintiff would not have been terminated based on the allegations made by his Department Chair had he been a younger tenured professor.

30.     Thus Professor Riedel's age was an improper consideration in the decision to terminate him.

31.     Professor's termination on age-related grounds violates the Human Rights Act.

32.     The Plaintiff's wrongful, retaliatory discharge in violation of the Human Rights Act led to foreseeable damages, including the substantial loss of income.

33.     The Plaintiff demands all sustained damages occasioned by WVU's wrongful retaliatory discharge in violation of the Act, including lost income, attorney fees, punitive damages, general damages for emotional suffering, and pre and post judgment interest.

5

## HE PLAINTIFF DEMANDS A TRIAL BY JURY

David Grunau, Esq.
[WV State Bar ID # 9197]
244 Pleasant Street
Morgantown, WV 26505
304.291.6166 Telephone
304.291.6266 Facsimile
***Counsel for Plaintiff***

6

# CIVIL CASE INFORMATION STATEMENT

## IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**Plaintiff(s)**

**HEIMO RIEDEL**

**Case Number:  19-C-190**

**v.**

| | Days to Answer | Type of Service (Personal, Certified Mail, Secretary of State, Private Process) |
|---|---|---|

**Defendant(s)**

**WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS**
**P.O. Box 6201**
**Morgantown, WV 26506**

| | Days to Answer | Type of Service |
|---|---|---|
| | 30 | **SECRETARY OF STATE** |

**FILED**

OCT 23 2019

JEAN FRIEND, CLERK

Two Copies of Complaint Furnished Herewith.

| PLAINTIFF: HEIMO RIEDEL<br><br>DEFENDANTS: WVU BOARD OF GOVERNORS | CASE NO: 19-C-190 |
|---|---|

## II.    TYPE OF CASE:

| TORTS | OTHER | CIVIL |
|---|---|---|
| [ ] Asbestos | [ ] Adoption | [ ] Appeal from Magistrate Court |
| [ ] Professional Malpractice | [X Contract | [ ] Petition for Modification-Magistrate |
| [] Personal Injury | [ ] Real Property | [X] Miscellaneous Civil |
| [ ] Product Liability | [ ] Mental Health | |
| [X] Other Tort | [ ] Appeal of Administrative Agency | |

## III.    JURY DEMAND:    [X] Yes    [] No

Case will be ready for trial by (month/year): 12/2020

## IV. DO YOU OR ANY OF YOUR CLIENTS OR WITNESSES IN THIS CASE REQUIRE SPECIAL ACCOMMODATIONS DUE TO A DISABILITY OR AGE? [ ] Yes    [X] No

[ ]    Wheelchair accessible hearing room and other facilities

[ ]    Interpreter or other auxiliary aid for the hearing impaired

[ ]    Reader or other auxiliary aid for the visually impaired

[ ]    Spokesperson or other auxiliary aid for the speech impaired

Attorney Name:    David M. Grunau          Representing:  [X] Plaintiff    [ ] Defendant
Firm:              Grunau Law Offices
State Bar ID#:     9197
Address:           244 Pleasant Street
                   Morgantown, WV 26505
Telephone:         (304) 291-6166
Facsimile:         (304) 291-6266

Signature                              DATED: October 22, 2019

[ ] Check here if Pro Se

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E.
Charleston, WV 25305



**Mac Warner**
Secretary of State
State of West Virginia
**Phone:** 304-558-6000
886-767-8683
**Visit us online:**
www.wvsos.com

Jean Friend
Monongalia County Courthouse
75 HIGH STREET, SUITE 12
Morgantown, WV 26505-5427

**Control Number:** 247530

**Defendant:** WEST VIRGINIA BOARD OF
GOVERNORS FOR AND ON BEHALF
OF WEST VIRGINIA UNIVERSITY
PO BOX 6201
MORGANTOWN, WV 26506 US

**County:** Monongalia

**Civil Action:** 19-C-190

**Certified Number:** 92148901125134100002605121

**Service Date:** 10/29/2019

I am enclosing:

**1 summons and complaint**

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted
service of process in your name and on your behalf.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of
process in your name and on your behalf as your attorney-in-fact. Please address any questions about this document
directly to the court or the plaintiff's attorney, shown in the enclosed paper, not to the Secretary of State's office.*

Sincerely,

*Mac Warner*

Mac Warner
Secretary of State

FILED

NOV - 6 2019

JEAN FRIEND, CLERK



# SUMMONS

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL**

**PLAINTIFF(S),**

**VS.**                                        **CIVIL ACTION NO.  19-C-190**

**WEST VIRGINIA BOARD OF GOVERNORS**
**for and on behalf of WEST VIRGINIA UNIVERSITY**
**P O Box 6201**
**Morgantown WV  26506**

**DEFENDANT(S).**

To the above-name Defendants:

IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby summoned and required to serve upon

**DAVID GRUNAU,** whose address is **244 Pleasant Street, Morgantown WV  26505** an answer

including any related counterclaim you may have to the complaint filed against you in the above-styled civil

action, a true copy of which is herewith delivered to you.  You are required to serve your answer within **20**

days after service of this summons upon you, exclusive of the date of service.  If you fail to do so, judgment

by default will be taken against you for the relief demanded in the complaint and you will be thereafter

barred from asserting in another action any claim you may have which must be asserted by counterclaim

in the above-styled action.

DATED: **OCTOBER 23, 2019**

*Jean Friend*

JEAN FRIEND, CLERK
MONONGALIA CO. CIRCUIT COURT

BY *Susan Trowbridge*

DEPUTY CLERK

# FOR RETURN

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

     *Plaintiff,*

    v.                                            **Civil Action No. 19-C-190**
                                                   **Hon. Debra Scudiere**

**WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS
for and on behalf of WEST
VIRGINIA UNIVERSITY,**

     *Defendant.*

## NOTICE OF BONA FIDE DEFENSE

     PLEASE TAKE NOTICE that, pursuant to W. Va. Code § 55-17-4(1), Defendant, West Virginia University Board of Governors for and on behalf of West Virginia University, will respond to Plaintiff's Complaint within sixty (60) days of the date of service of such Complaint, and that its Answer or other response to Plaintiff's Complaint shall be filed on December 30, 2019.

     Dated November 6, 2019.

STEPTOE & JOHNSON PLLC
   Of Counsel

                          Julie A. Moore (W. Va. Bar No. 11315)
                          Shaina L. Richardson (W. Va. Bar No. 12685)
                          1085 Van Voorhis Road, Suite 400
                          P.O. Box 1616
                          Morgantown, WV 26507-1616
                          (304) 598-8000

                          *Counsel for Defendant West Virginia University*
                          *Board of Governors for and on behalf of West*
                          *Virginia University*

**FILED**

NOV -8 2019

JEAN FRIEND, CLERK

10488345.1

# IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

      *Plaintiff,*

   v.

**WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS
for and on behalf of WEST
VIRGINIA UNIVERSITY,**

      *Defendant.*

**Civil Action No. 19-C-190
Hon. Debra Scudiere**

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2019, I served the foregoing *"Notice of Bona Fide Defense"* upon counsel of record by first class mail, postage prepaid, in envelopes addressed as follows:

David Grunau, Esq.
244 Pleasant Street
Morgantown, WV 26505

STEPTOE & JOHNSON PLLC
Of Counsel

Julie A. Moore (W. Va. Bar No. 11315)
Shaina L. Richardson (W. Va. Bar No. 12685)
1085 Van Voorhis Road, Suite 400
P.O. Box 1616
Morgantown, WV 26507-1616
(304) 598-8000

*Counsel for Defendant West Virginia University Board of Governors for and on behalf of West Virginia University*

10488345.1

# IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

     *Plaintiff,*

     **v.**

**WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS
for and on behalf of WEST
VIRGINIA UNIVERSITY,**

     *Defendant.*

**Civil Action No. 19-C-190
Honorable Debra Scudiere**

## NOTICE OF ATTORNEY CHANGE OF LAW FIRM AND ADDRESS

Please take notice that the law firm and address at which Julie A. Moore, Esquire is to receive notices and service of papers in these proceedings on behalf of Defendant, **WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS for and on behalf of WEST VIRGINIA UNIVERSITY** has changed. The updated law firm and address is as follows:

Julie A. Moore, Esquire
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26501
Phone: (304) 285-2524
Fax: (304) 285-2575
Email: jamoore@bowlesrice.com

Dated this 3rd day of January, 2020.

Julie A. Moore (WVSB #11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26501
Telephone: (304) 285-2524
Fax: (304) 285-2575
*Counsel for Defendants, The West Virginia
University Board of Governors, for and on
Behalf of West Virginia University*

F I L E D

JAN – 6 2020

JEAN FRIEND, CLERK

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

       *Plaintiff,*

    v.                              **Civil Action No. 19-C-190**
                                          **Honorable Debra Scudiere**

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS
for and on behalf of WEST
VIRGINIA UNIVERSITY,

       *Defendant.*

## CERTIFICATE OF SERVICE

        I hereby certify that on the 3rd day of January, 2020, I served a true and exact copy of the foregoing "Notice of Attorney Change of Law Firm and Address" upon counsel of record via U.S. Postal Service as follows:

                    David Grunau, Esquire
                    244 Pleasant Street
                    Morgantown, WV  26505

                    *Counsel for Plaintiff*

                    Julie A. Moore (WVSB #11315)
                    Bowles Rice LLP
                    125 Granville Square, Suite 400
                    Morgantown, WV  26501
                    Telephone:  (304) 285-2524
                    Fax:  (304) 285-2575
                    *Counsel for Defendants, The West Virginia*
                    *University Board of Governors, for and on*
                    *Behalf of West Virginia University*

11556281.1

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

     *Plaintiff,*

v.

                                             **Civil Action No. 19-C-190**
                                             **Honorable Debra Scudiere**

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS
for and on behalf of
WEST VIRGINIA UNIVERSITY,

     *Defendant.*

## ANSWER OF
## DEFENDANT WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS

COMES NOW, Defendant West Virginia University Board of Governors ("WVUBOG"), by and through its undersigned counsel, and answers Plaintiff's Complaint as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Regarding the allegations set forth in paragraph 1 of the Complaint, WVUBOG admits only that Plaintiff was employed by West Virginia University as a tenured faculty member during the time period relevant to the Complaint. WVUBOG is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning Plaintiff's residency. Any and all remaining allegations are denied

2.    WVUBOG admits the allegations contained in paragraph 2 of Plaintiff's Complaint.

3.    Regarding the allegations set forth in paragraph 3 of the Complaint, WVUBOG admits only that this Court has proper jurisdiction. WVUBOG denies all remaining allegations contained in Paragraph 3 of Plaintiff's Complaint.

4.    WVUBOG admits the allegations contained in paragraph 4 of Plaintiff's Complaint.

10411719.1

-1-

**FILED**

MAR 10 2020

JEAN FRIEND, CLERK

5.      Paragraph 5 of Plaintiff's Complaint consists of legal conclusions to which no response is required. To the extent a response is required, any and all allegations are denied.

6.      Paragraph 6 of Plaintiff's Complaint consists of legal conclusions to which no response is required. To the extent a response is required, any and all allegations are denied.

7.      WVUBOG denies the allegations contained in paragraph 7 of Plaintiff's Complaint. To the extent a response is required, WVUBOG admits only that Plaintiff provided pre-suit notice. Any remaining allegations are denied.

## FACTS COMMON TO ALL COUNTS

WVUBOG incorporates by reference all of the foregoing responses contained in its Answer as if fully set forth verbatim herein.

8.      With regards to paragraph 8, WVUBOG admits only that Plaintiff was a tenured professor at WVU. WVUBOG denies all remaining allegations contained in Paragraph 8 of Plaintiff's Complaint.

9.      WVUBOG denies all allegations set forth in paragraph 9 of Plaintiff's Complaint.

10.     With regards to paragraph 10, WVUBOG admits only that Plaintiff held tenure at WVU. The remaining allegations contained in paragraph 10 of Plaintiff's Complaint consist of legal conclusions to which no response is required. To the extent a response is required, any and all allegations are denied.

11.     Regarding the allegations set forth in paragraph 11, WVUBOG admits that Plaintiff received a letter from Joyce McConnell, Provost and Vice President for Academic Affairs, dated June 5, 2017, notifying him that his faculty appointment/employment with WVU was terminated effective June 30, 2017. Further, WVUBOG admits the termination was based upon information

-2-

set forth in the Intent to Terminate letter of dated May 12, 2017, and the materials cited therein. WVUBOG denies all remaining allegations contained in paragraph 11 of Plaintiff's Complaint.

12.    WVUBOG denies the allegations contained in paragraph 12 of Plaintiff's Complaint.

## COUNT I:  BREACH OF CONTRACT

WVUBOG incorporates by reference all of the foregoing responses contained in its Answer as if fully set forth verbatim herein.

13.    Regarding the allegations set forth in paragraph 13, WVUBOG admits only that Plaintiff worked for WVU as a tenured faculty member.  All remaining allegations are denied.

14.    WVUBOG denies the allegations contained in paragraph 14 of Plaintiff's Complaint.

15.    WVUBOG denies the allegations contained in paragraph 15 of Plaintiff's Complaint.

16.    WVUBOG denies the allegations contained in paragraph 16 of Plaintiff's Complaint.

17.    WVUBOG denies the allegations contained in paragraph 17 of Plaintiff's Complaint.

18.    WVUBOG denies the allegations contained in paragraph 18 of Plaintiff's Complaint.

## COUNT II:  BREACH OF FIDUCIARY DUTY

WVUBOG incorporates by reference all of the foregoing responses contained in its Answer as if fully set forth verbatim herein.

10411719.1

19.     With regards to paragraph 19 of Plaintiff's Complaint, WVUBOG admits only that Plaintiff was a tenured professor.  The remaining allegations contained in paragraph 19 are legal conclusions to which no response is required by WVUBOG.  To the extent a response is required, any and all allegations are denied.

20.     WVUBOG denies the allegations contained in paragraph 20 of Plaintiff's Complaint.

21.     WVUBOG denies the allegations contained in paragraph 21 of Plaintiff's Complaint.

22.     WVUBOG denies the allegations contained in paragraph 22 of Plaintiff's Complaint.

23.     WVUBOG denies the allegations contained in paragraph 23 of Plaintiff's Complaint.

## COUNT III:  RETALIATORY DISCHARGE

WVUBOG incorporates by reference all of the foregoing responses contained in its Answer as if fully set forth verbatim herein.

24.     Regarding the allegations set forth in paragraph 24, WVUBOG admits only that Plaintiff had filed various grievances against WVU prior to the end of his employment.  All remaining allegations are denied.

25.     Paragraph 25 of Plaintiff's Complaint consists of legal conclusions to which no response is required.  To the extent a response is required, any and all allegations are denied.

26.     WVUBOG denies the allegations contained in paragraph 26 of Plaintiff's Complaint.

-4-

27.   WVUBOG denies the allegations contained in paragraph 27 of Plaintiff's Complaint.

28.   WVUBOG denies the allegations contained in paragraph 28 of Plaintiff's Complaint.

29.   WVUBOG denies the allegations contained in Paragraph 29 of Plaintiff's Complaint.

**COUNT IV:  VIOLATION OF THE WEST VIRGINIA HUMAN RIGHTS ACT**

WVUBOG incorporates by reference all of the foregoing responses contained in its Answer as if fully set forth verbatim herein.

30.   WVUBOG admits the allegations contained in paragraph 30 of Plaintiff's Complaint only to the extent that, upon information and belief, Plaintiff was over the age of forty. All remaining allegations are denied.

31.   WVUBOG denies the allegations contained in paragraph 31 of Plaintiff's Complaint.

32.   (30. *sic*) WVUBOG denies the allegations contained in paragraph 32 of Plaintiff's Complaint.

33.   (31. *sic*) WVUBOG denies the allegations contained in paragraph 33 of Plaintiff's Complaint.

34.   (32. *sic*) WVUBOG denies the allegations contained in paragraph 34 of Plaintiff's Complaint.

35.   (33. *sic*) WVUBOG denies the allegations contained in paragraph 35 of Plaintiff's Complaint.

WVUBOG denies any and all allegations not expressly admitted herein.

10411719.1

## AFFIRMATIVE DEFENSES

Without waiving or excusing Plaintiff's burden of proof or admitting that Defendant has any burden of proof, WVUBOG asserts the following defenses:

### FIRST DEFENSE

Plaintiff's Complaint fails to state a claim, in whole or in part, upon which relief may be granted.

### SECOND DEFENSE

Plaintiff's claims are barred by the applicable statute of limitations and/or the doctrine of laches.

### THIRD DEFENSE

Plaintiff's damages, if any, are barred or reduced by his failure to take reasonable steps in mitigation.

### FOURTH DEFENSE

Plaintiff's claim for punitive damages is barred by W. Va. Code § 55-17-4(3); because WVUBOG did not act with malice, willfulness, recklessness, or any other conduct which could support an award of punitive damages; and because such a claim violates the Due Process Clause of the United States and West Virginia Constitutions.

### FIFTH DEFENSE

All employment decisions relating to Plaintiff were made on the basis of legitimate, non-discriminatory, non-retaliatory reasons.

### SIXTH DEFENSE

To the extent required to do so, Plaintiff failed to exhaust his administrative remedies with respect to the claims advanced herein.

10411719.1

### SEVENTH DEFENSE

WVUBOG acted at all times in good faith and with reasonable grounds for believing that its actions did not violate West Virginia law.

### EIGHTH DEFENSE

Notwithstanding Plaintiff's allegations of an illegal animus, WVUBOG would have, nevertheless, made the same employment decisions with respect to Plaintiff.

### NINTH DEFENSE

Any damages allegedly sustained by Plaintiff are due solely to his own actions, and he is estopped from asserting otherwise.

### TENTH DEFENSE

Plaintiff's alleged lost wage damages, if any, should be reduced by the value of any interim earnings.

### ELEVENTH DEFENSE

To the extent Plaintiff seeks unmitigated recovery of past and future wages and benefits, W. Va. Code § 55-7E-1, *et seq.*, explicitly precludes recovery of the same.

### TWELFTH DEFENSE

W. Va. Code § 55-7E-3(b) provides the trial court with exclusive authority to determine the appropriate amount of front pay, if any, to be awarded to Plaintiff.

### THIRTEENTH DEFENSE

Plaintiff's claims and/or all or part of Plaintiff's requested relief are barred by the doctrines of sovereign and/or qualified immunity.

10411719.1

FOURTEENTH DEFENSE

To the extent that investigation or discovery reveals dischargeable misconduct by Plaintiff, WVUBOG will rely upon the doctrine of after-acquired evidence to limit Plaintiff's claims for damages.

FIFTEENTH DEFENSE

WVUBOG owed no fiduciary duty or duty of good faith and fair dealing to Plaintiff.

SIXTEENTH DEFENSE

As a tenured faculty member, Plaintiff cannot maintain a common law retaliatory discharge claim against WVUBOG under *Harless* and its progeny.

RESERVATION OF DEFENSES

Not being adequately advised as to all the facts and circumstances surrounding the allegations set forth in the Complaint, WVUBOG hereby reserves each and every affirmative defense available to it under federal and state constitutional, statutory, regulatory, and common law, including, but not limited to, any and all affirmative defenses listed in Rule 8(c) of the West Virginia Rules of Civil Procedure, which discovery might reveal to be appropriate, and reserves the right to assert additional defenses as Plaintiff's claims are clarified during the course of this litigation.

WVUBOG requests a trial by jury on all issues so triable.

WHEREFORE, WVUBOG requests that Plaintiff's Complaint be dismissed with prejudice, that WVUBOG be awarded fees and costs it incurred in defending the same, and that WVUBOG be awarded any other relief that the Court deems equitable and just.

-8-

10411719.1

Respectfully submitted on January 24, 2020.

Julie A. Moore (WV Bar # 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26505
304-285-2524
304 285-2575 fax
jamoore@bowlesrice.com

*Counsel for Defendant West Virginia University*
*Board of Governors,*
*for and on behalf of West Virginia University*

10411719.1

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

     *Plaintiff,*

     v.

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS
for and on behalf of
WEST VIRGINIA UNIVERSITY,

     *Defendant.*

Civil Action No. 19-C-190
Honorable Debra Scudiere

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2020, I served the foregoing *"Answer of Defendant West Virginia University Board of Governors"* by U.S. Mail upon the following counsel of record:

David Grunau, Esq.
244 Pleasant Street
Morgantown, WV 26505

*Counsel for Plaintiff*

Julie A. Moore (WV Bar # 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26505
304-285-2524
304 285-2575 fax
jamoore@bowlesrice.com

*Counsel for Defendant West Virginia University*
*Board of Governors,*
*for and on behalf of West Virginia University*

-10-

10411719.1

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

     *Plaintiff,*

     v.                                     **Civil Action No. 19-C-190**
                                                 **Hon. Cindy Scott, Judge**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

     *Defendant.*

## CERTIFICATE OF SERVICE

     I hereby certify that on the 3rd day of December, 2021, I served a true and exact copy of the foregoing *"Defendant's Answers and Responses to Plaintiff's First Set of Combined Interrogatories and Requests for Production"* upon the following counsel of record via U.S. Postal Service as follows:

David Grunau, Esq.
244 Pleasant Street
Morgantown, WV 26505

Julie A. Moore (WVSB #11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26501
T:  (304) 285-2524
F:  (304) 285-2575
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV 25325
T: 304-347-1128
F: 304-347-1746
lgainer@bowlesrice.com

*Counsel for Defendant, West Virginia*
*University Board of Governors, for and on*
*behalf of West Virginia University*

**F I L E D**

DEC − 8 2021

JEAN FRIEND, CLERK

35

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

      *Plaintiff,*

      v.

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS
for and on behalf of
WEST VIRGINIA UNIVERSITY,

      *Defendant.*

Civil Action No. 19-C-190
Hon. Cindy Scott, Judge

## PRIVILEGE LOG REGARDING WVUBOG'S RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT

| Date | Bates No. | Sender/Author | Recipient/ Description | Privilege Claimed |
|---|---|---|---|---|
| 7/18/2016 | WVUBOG001191 | Michael Schaller | Drew Shiemki, Heather Billings, Steven Hardy; cc: Carol Marunich, Esq. (in-house counsel), Louise Veselicky | Attorney-client privilege |
| 7/18/2016 | WVUBOG001192 | Drew Shiemke | Michael Schaller, Heather Billing, Steven Hardy, cc: Louise Veselicky - Email regarding conversation with Carol Marunich, Esq. (in-house counsel) | Attorney-client privilege |

Dated this 3rd day of December, 2021.

*Julie A. Moore*

Julie A. Moore (WV Bar No. 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26505
T: 304-285-2524
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
Post Office Box 1386
Charleston, WV 25325
T: 304-347-1128
lgainer@bowlesrice.com

*Counsel for Defendant*
*West Virginia University Board of Governors*

13289323.1

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA
DIVISION NO. 2

HEIMO RIEDEL,
          Plaintiff,

vs.                                    CIVIL ACTION NO.  19-C-190

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS, for and
on behalf of West Virginia University,
          Defendant.

## **AMENDED SCHEDULING ORDER**

On the 31st day of January, 2022, came the Plaintiff, Heimo Riedel, by his counsel,

David Grunau, and the Defendant, West Virginia University Board of Governors, by its counsel,

Julie Moore, respectively, for a telephonic scheduling conference with regard to further

proceedings herein.  Having met with the Court and pursuant to Rule 16(b) of the West Virginia

Rules of Civil Procedure, the following schedule and procedures were adopted and ORDERED by

the Court:

          1.      All medical examination/inspections, if any, shall be completed on or before

the 1st day of October, 2022.

          2.      The Plaintiff shall disclose the names of all of the Plaintiff's expert trial

witnesses on or before the 1st day of August, 2022.  The Defendant shall disclose the names of all

the Defendant's expert trial witnesses on or before the 1st day of October, 2022.  At the time of

identifying such expert witness, the party shall disclose the specialty of such expert and furnish

the opposing party with copies of all reports with regard to this case which have been submitted

by such expert witness, or, if no such reports have been submitted, a detailed summary of the

substance of the contemplated testimony of such expert witness.

3.　　　An objection to any interrogatory, notice of deposition, request for admission, or production of documents and/or reports shall be filed within 30 days after service of the same.  Any such objection not filed within 30 days shall be waived.  Any such objection shall not extend the time in which the objecting party must otherwise appear or respond to any discovery matters to which no objection was filed.  If a party fails to answer an interrogatory or a request for production of documents, or fails to produce a document or disclose anything required herein and does not file an objection thereto, then the person seeking such information shall timely file a motion to compel.  If the party seeking such information fails to file a motion to compel, the request for such information from the other party shall be deemed waived.

4.　　　In any event, all discovery shall be completed on or before the 2nd day of December, 2022.

5.　　　All pre-trial motions including, but not limited to, motions to dismiss, motions for summary judgment or motions in limine shall be filed on or before the 9th day of December, 2022.  Hearing on all such motions shall be set with the Court with notice of hearing thereon served on opposing counsel at the time of filing of the motion.  WVRE 103(c) contemplates that all motions in limine should be determined prior to trial.  Accordingly, unless a matter could not have been reasonably anticipated by a party, the Court will not as a general rule consider motions in limine at or during the time of trial.  All dispositive motions shall be scheduled so that they can be heard and resolved well in advance of the trial.

6.　　　Pursuant to Rule 25 of the West Virginia Trial Court Rules, the parties' counsel shall submit this case to mediation, said mediation shall be completed by the pretrial conference date.

7.     Final Witness and Exhibit Lists shall be filed on or before the 9th day of December, 2022.

8.     A pre-trial conference shall be held with the Court on the 4th day of January, 2023, at 2:30 p.m. at which time lead trial counsel shall appear fully prepared to discuss all aspects of the case.  At least two days prior to the pre-trial hearing, the parties shall prepare and provide the Court and opposing counsel with pre-trial memoranda to include at least the following:

(a)     Statement of the case, including a brief summary of the material facts and theory of liability or defense;

(b)     Itemized statement of damages;

(c)     Stipulation of uncontested facts;

(d)     General statement of contested issues of law and in particular, those contested issues of law requiring court ruling before commencement of trial;

(e)     List of the names and addresses of all witnesses, and, if any expert witness, the purpose of the testimony and whether the qualifications of the expert are to be stipulated;

(f)     Legal authorities to be relied upon;

(g)     For each party, a list of depositions and exhibits to be offered as evidence at trial, indicating as to each whether there are objections to either authenticity or relevancy (if there are objections, the lines and pages of depositions being objected to must be identified), and

a statement that copies of exhibits have been exchanged by counsel or that opposing counsel have examined the exhibits;

(h)      Settlement possibilities.

9.      In accordance with West Virginia Rules of Civil Procedure 16(f), the Court will impose the full spectrum of sanctions authorized by the West Virginia Rules of Civil Procedure if a party or party's counsel fails to obey this Order.

The Clerk is directed to forward a copy of this Order to all counsel of record.

ENTER:   *January 31, 2022*

_____

CINDY S. SCOTT, JUDGE

ENTERED: *Jan 31, 2022*

DOCKET LINE ___*25*___. Jean Friend, Clerk

4

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

<i>Plaintiff,</i>

v.                                                              Civil Action No.: 19-C-190

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS,

<i>Defendant.</i>

<u>PLAINTIFF'S FIRST MOTION TO AMEND COMPLAINT</u>

Comes now the Plaintiff, and move this Honorable Court, pursuant to Rule 15 of the West Virginia Rules of Civil Procedure, for leave to amend the Complaint in this action. In support of this Motion, it is represented as follows:

1.     This Court recently entered an Amended Scheduling Order only a little over 60 days ago; the Amended Scheduling Order's deadlines give the parties ample time for pre-trial litigation concerning all facts and claims set forth in any amended complaint. For example, Discovery does not close until December, 2022.

2.     Rule 15 of the West Virginia Rule of Civil Procedure requires liberal construction in directing a court to grant leave to amend a complaint, and indeed mandates that leave *shall* be freely given when justice so requires. Leave to amend is to be *so* freely given, in fact, that the West Virginia Supreme Court ruled that a "trial court did not err in permitting plaintiff to amend his complaint in order to assert an additional claim two weeks before trial and six and one-half years after the action was begun, as leave to amend pleadings shall be freely given when justice so requires." <u>Dzinglski v. Weirton Steel Corp.</u>, 191 W. Va. 278, 445 S.E.2d 219, 1994 W. Va. LEXIS 63 (1994).

3      "Motions to amend should always be granted under this rule when: (1) The

**FILED**

APR 1 2 2022

JEAN FRIEND, CLERK

amendment permits the presentation of the merits of the action; (2) the adverse party is not prejudiced by the sudden assertion of the subject of the amendment; and (3) the adverse party can be given ample opportunity to meet the issue." Rosier v. Garron, Inc., 156 W. Va. 861, 199 S.E.2d 50, 1973 W. Va. LEXIS 282 (1973); *see also* Plum v. Mitter, 157 W. Va. 773, 204 S.E.2d 8, 1974 W. Va. LEXIS 213 (1974); State ex rel. Board of Educ. v. Spillers, 164 W. Va. 453, 259 S.E.2d 417, 1979 W. Va. LEXIS 439 (1979); Farmer v. L.D.I., Inc., 169 W. Va. 305, 286 S.E.2d 924, (1982).

5.    Consistent with Rule 15 and the cases cited above, the requested amendment would permit the presentation of the merits of the action by allowing the Plaintiff to clarify the nature and basis of his wrongful discharge claims, and the relief sought.

6.    The Defendant cannot and would not be prejudiced (i.e. unable to meet and defend the issues presented), given the expanded discovery time the Amended Scheduling Order sets forth.

7.    The Plaintiff would file the Amended Complaint promptly once granted leave to do so.

Respectfully Submitted,
Heimo Riedel
By Counsel,

David M. Grunau, Esq.
[WV State # 9197]
244 Pleasant Street
Morgantown, WV 26505
304.291.6166 Telephone
304.291.6266 Facsimile
grunaulaw@gmail.com

Case 1:22-cv-00155-TSK   Document 3   Filed 12/19/22   Page 39 of 314  PageID #: 359

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

*Plaintiff,*

v.                                                                    Civil Action No.: 19-C-190

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS,

*Defendant.*

## CERTIFICATE OF SERVICE

I, David M. Grunau, Counsel for the Plaintiff, hereby certify that on this, the 12th day of April 2021, I served the *Plaintiff's First Motion to Amend Complaint* via email, upon the following:

Julie Moore, Esq.
Bowles Rice LLP
University Town Center
125 Granville Square
Morgantown, WV 26501

David M. Grunau, Esq.
WV State Bar # 9197
244 Pleasant Street
Morgantown, WV 26505
304.291.6166 Telephone
304.291.6266 Facsimile

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

     *Plaintiff,*

     v.                          **Case No. 19-C-190**
                                     **Honorable Cindy S. Scott, Judge**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

     *Defendant.*

### DEFENDANT WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS' NOTICE OF INTENT TO RESPOND TO PLAINTIFF'S FIRST MOTION TO AMEND COMPLAINT AND REQUEST TO DEFER RULING ON MOTION

Defendant, West Virginia University Board of Governors for and on behalf of West Virginia University ("WVUBOG"), by counsel, and hereby notifies the Court of its intention to respond Plaintiff's pending Motion to Amend his Complaint and requests that this Honorable Court defer its ruling on such motion until WVUBOG has had an opportunity to do so. In support, WVUBOG states as follows:

    1.    On April 12, 2022, Plaintiff filed and served a Motion to Amend his Complaint.

    2.    Plaintiff's motion fails to set forth the grounds or proposed amendments to the Complaint which prevents WVUBOG from being able to evaluate and respond to the motion. Moreover, WVUBOG cannot assess whether Plaintiff's proposed amendments to the Complaint will inflict prejudice upon it because Plaintiff has failed to provide any information as to the nature and basis for amending the Complaint in his motion.

**F I L E D**

APR 13 2022

JEAN FRIEND, CLERK

3.    By communications on April 12, 2022, the undersigned requested that counsel for

Plaintiff provide a copy of his proposed Amended Complaint, and Plaintiff's counsel has agreed

to do so.

4.    Accordingly, WVUBOG hereby notifies the Court of its intention to respond to

Plaintiff's Motion to Amend – potentially in opposition thereto – and requests that this Honorable

Court defer ruling on Plaintiff's motion until WVUBOG has an opportunity to file any necessary

response after receiving a copy of Plaintiff's proposed Amended Complaint.

Dated April 13, 2022

Julie A. Moore (WV Bar No. 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV  26501
T:  (304) 285-2524
F:  (304) 285-2575
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV  25325
T: 304-347-1128
F: 304-347-1746
lgainer@bowlesrice.com

*Counsel for Defendant, West Virginia
University Board of Governors, for and on
behalf of West Virginia University*

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

     *Plaintiff,*

    v.

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

     *Defendant.*

**Case No. 19-C-190**
**Honorable Cindy S. Scott, Judge**

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2022, I served the foregoing *"Defendant West Virginia University Board of Governors' Notice of Intent to Respond to Plaintiff's Motion to Amend Complaint and Request to Defer Ruling on Motion"* upon counsel of record by first class mail, postage prepaid, in an envelope addressed as follows:

David M. Grunau, Esquire
Grunau Law Offices PLLC
244 Pleasant Street
Morgantown, WV 26505

Julie A. Moore (WV Bar No. 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26501
T: (304) 285-2524
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV 25325
T: 304-347-1128
lgainer@bowlesrice.com

*Counsel for Defendant, West Virginia University Board of Governors, for and on behalf of West Virginia University*

13604819.1

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

    *Plaintiff,*

    v.

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS
for and on behalf of
WEST VIRGINIA UNIVERSITY,

    *Defendant.*

Case No. 19-C-190
Honorable Cindy S. Scott, Judge

### DEFENDANT WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS' NOTICE OF INTENT TO RESPOND TO PLAINTIFF'S FIRST MOTION TO AMEND COMPLAINT AND REQUEST TO DEFER RULING ON MOTION

Defendant, West Virginia University Board of Governors for and on behalf of West Virginia University ("WVUBOG"), by counsel, and hereby notifies the Court of its intention to respond Plaintiff's pending Motion to Amend his Complaint and requests that this Honorable Court defer its ruling on such motion until WVUBOG has had an opportunity to do so. In support, WVUBOG states as follows:

1.    On April 12, 2022, Plaintiff filed and served a Motion to Amend his Complaint.

2.    Plaintiff's motion fails to set forth the grounds or proposed amendments to the Complaint which prevents WVUBOG from being able to evaluate and respond to the motion. Moreover, WVUBOG cannot assess whether Plaintiff's proposed amendments to the Complaint will inflict prejudice upon it because Plaintiff has failed to provide any information as to the nature and basis for amending the Complaint in his motion.

**F I L E D**

APR 1 5 2022

JEAN FRIEND, CLERK

3.      By communications on April 12, 2022, the undersigned requested that counsel for Plaintiff provide a copy of his proposed Amended Complaint, and Plaintiff's counsel has agreed to do so.

4.      Accordingly, WVUBOG hereby notifies the Court of its intention to respond to Plaintiff's Motion to Amend – potentially in opposition thereto – and requests that this Honorable Court defer ruling on Plaintiff's motion until WVUBOG has an opportunity to file any necessary response after receiving a copy of Plaintiff's proposed Amended Complaint.

Dated April 13, 2022

Julie A. Moore (WV Bar No. 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26501
T:  (304) 285-2524
F:  (304) 285-2575
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV 25325
T: 304-347-1128
F: 304-347-1746
lgainer@bowlesrice.com

*Counsel for Defendant, West Virginia University Board of Governors, for and on behalf of West Virginia University*

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

     *Plaintiff,*

v.

                                  **Case No. 19-C-190**
                                  **Honorable Cindy S. Scott, Judge**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

     *Defendant.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2022, I served the foregoing *"Defendant West Virginia University Board of Governors' Notice of Intent to Respond to Plaintiff's Motion to Amend Complaint and Request to Defer Ruling on Motion"* upon counsel of record by first class mail, postage prepaid, in an envelope addressed as follows:

David M. Grunau, Esquire
Grunau Law Offices PLLC
244 Pleasant Street
Morgantown, WV 26505

Julie A. Moore (WV Bar No. 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26501
T: (304) 285-2524
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV 25325
T: 304-347-1128
lgainer@bowlesrice.com

*Counsel for Defendant, West Virginia University Board of Governors, for and on behalf of West Virginia University*

13604819.1

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA
DIVISION NO. 2

HEIMO RIEDEL,
       Plaintiff,

vs.                            CIVIL ACTION NO.  19-C-190

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS, for and
on behalf of West Virginia University,
       Defendant.

## NOTICE OF SCHEDULING CONFERENCE

This action was filed in the Circuit Court of Monongalia County on the 28th day

of June, 2019, and assigned to Judge Debra Scudiere.  You are hereby notified that a Scheduling

Conference will be held in this case on the 27th day of April, 2020, at 3:30 p.m., pursuant to

Rule 16 of the Rules of Civil Procedure.

This conference **WILL BE HELD TELEPHONICALLY.**  Please refer to the

attachment hereto, for information, which will permit you to participate by telephone on the day

and time listed above.

A copy of this Notice was sent by first class mail to the following:

David Grunau, Esq.                Julie A. Moore, Esq.
244 Pleasant Street               125 Granville Square, Suite 400
Morgantown, WV 26505          Morgantown, WV 26505

ENTER: *April 20, 2020*

*Debra Scudiere*
DEBRA SCUDIERE, CHIEF JUDGE

**F I L E D**

APR 20 2020

JEAN FRIEND, CLERK

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA
DIVISION NO. 2

HEIMO RIEDEL,
        Plaintiff,

vs.                                                                    CIVIL ACTION NO.  19-C-190

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS, for and
on behalf of West Virginia University,
        Defendant.

## SCHEDULING ORDER

On the 27th day of April, 2020, came the Plaintiff, Heimo Riedel, by his counsel, David Grunau, and the Defendant, West Virginia University Board of Governors, by its counsel, Julie Moore, respectively, for a telephonic scheduling conference with regard to further proceedings herein.  Having met with the Court and pursuant to Rule 16(b) of the West Virginia Rules of Civil Procedure, the following schedule and procedures were adopted and ORDERED by the Court:

1.      All medical examinations/inspections, if any, shall be completed on or before the 1st day of February, 2021.

2.      The Plaintiff shall disclose the names of all of the Plaintiff's expert trial witnesses on or before the 1st day of December, 2020.  The Defendant shall disclose the names of all the Defendant's expert trial witnesses on or before the 1st day of February, 2021.  At the time of identifying such expert witness, the party shall disclose the specialty of such expert and furnish the opposing party with copies of all reports with regard to this case which have been submitted by such expert witness, or, if no such reports have been submitted, a detailed summary of the substance of the contemplated testimony of such expert witness.

1

3.    An objection to any interrogatory, notice of deposition, request for admission, or production of documents and/or reports shall be filed within 30 days after service of the same.  Any such objection not filed within 30 days shall be waived.  Any such objection shall not extend the time in which the objecting party must otherwise appear or respond to any discovery matters to which no objection was filed.  If a party fails to answer an interrogatory or a request for production of documents, or fails to produce a document or disclose anything required herein and does not file an objection thereto, then the person seeking such information shall timely file a motion to compel.  If the party seeking such information fails to file a motion to compel, the request for such information from the other party shall be deemed waived.

4.    In any event, all discovery shall be completed on or before the 1st day of April, 2021.

5.    All pre-trial motions including, but not limited to, motions to dismiss, motions for summary judgment or motions in limine shall be filed on or before the 8th day of April, 2021.  Hearing on all such motions shall be set with the Court with notice of hearing thereon served on opposing counsel at the time of filing of the motion.  WVRE 103(c) contemplates that all motions in limine should be determined prior to trial.  Accordingly, unless a matter could not have been reasonably anticipated by a party, the Court will not as a general rule consider motions in limine at or during the time of trial.  All dispositive motions shall be scheduled so that they can be heard and resolved well in advance of the trial.

6.    Counsel are instructed to engage in early settlement discussions and report the status of those discussions to the Court on or before August 1, 2020.

2

7.    Pursuant to Rule 25 of the West Virginia Trial Court Rules, the parties' counsel shall submit this case to mediation, said mediation to be completed by the pretrial conference date.

8.    Final Witness and Exhibit Lists shall be filed on or before the 8th day of April, 2021.

9.    A pre-trial conference shall be held with the Court on the 4th day of May, 2021, at 11:00 a.m. at which time lead trial counsel shall appear fully prepared to discuss all aspects of the case.  At least two days prior to the pre-trial hearing, the parties shall prepare and provide the Court and opposing counsel with pre-trial memoranda to include at least the following:

(a)    Statement of the case, including a brief summary of the material facts and theory of liability or defense;

(b)    Itemized statement of damages;

(c)    Stipulation of uncontested facts;

(d)    General statement of contested issues of law and, in particular, those contested issues of law requiring court ruling before commencement of trial;

(e)    List of the names and addresses of all witnesses, and, if any expert witness, the purpose of the testimony and whether the qualifications of the expert are to be stipulated;

(f)    Legal authorities to be relied upon;

(g)    For each party, a list of depositions and exhibits to be offered as evidence at trial, indicating as to each whether there are objections

3

to either authenticity or relevancy (if there are objections, the lines and pages of depositions being objected to must be identified), and a statement that copies of exhibits have been exchanged by counsel or that opposing counsel have examined the exhibits;

(h)     Settlement possibilities.

10.     This action has been set for trial from July 20, 2021, through July 23, 2021, and will resume on July 27, 2021, at 9:00 a.m.  Five days are deemed sufficient time for said trial.  A jury trial is demanded.

11.     In accordance with West Virginia Rules of Civil Procedure 16(f), the Court will impose the full spectrum of sanctions authorized by the West Virginia Rules of Civil Procedure if a party or party's counsel fails to obey this Order.

The Clerk is directed to forward a copy of this Order to all counsel of record.

ENTER:  *April 29, 2020*

*Debra Scudiere*
DEBRA SCUDIERE, CHIEF JUDGE

ENTERED: *April 29, 2020*
DOCKET LINE ___29___, Jean Friend, Clerk

4

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

     *Plaintiff,*

v.

                                          Civil Action No. 19-C-190
                                          Honorable Debra Scudiere

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS
for and on behalf of
WEST VIRGINIA UNIVERSITY,

     *Defendant.*

### CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of June, 2020, I served the foregoing *"Defendant's First Set of Interrogatories and Requests for Production of Documents to Plaintiff"* upon the following counsel of record via facsimile and email as follows:

David Grunau, Esq.
244 Pleasant Street
Morgantown, WV 26505
304.291.6266
grunaulaw@gmail.com
*Counsel for Plaintiff*

Julie A. Moore (WV Bar # 11315)

24

**F I L E D**

JUL – 1 2020

# IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

*Plaintiff,*

v.                                                                 Civil Action No.: 19-C-190

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS,**

*Defendant.*

## CERTIFICATE OF SERVICE

I, David M. Grunau, Counsel for the Plaintiff, The Plaintiff, hereby certify that on this, the

___18th___ day of November 2020, I served the *PLAINTIFF'S RESPONSE TO*

*INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS* via facsimile,

upon the following:

Julie Moore, Esq.
Bowles Rice LLC
125 Granville Square Suite 400
Morgantown, WV 26505

*Via Facsimile to: 304.285.2575*

                                        David M. Grunau, Esq.
                                        WV State Bar # 9197
                                        244 Pleasant Street
                                        Morgantown, WV 26505
                                        304.291.6166 Telephone
                                        304.291.6266 Facsimile

FILED

NOV 23 2020

JEAN FRIEND, CLERK

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

     **Plaintiff,**

 v.             Civil Action No.: 19-C-190

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS,**

    *Defendant.*

## AGREED AMENDED SCHEDULING ORDER

  On a previous date came the Plaintiff and moved this Honorable Court to amend the current scheduling order. There being no objection by the Defendant\, the schedule is hereby ORDERED as follows:

  1. All medical examinations/inspections, if any, shall be completed on or before the 1st day of February, 2022.

  2. The Plaintiff shall disclose the names of all of the Plaintiff's expert trial witnesses on or before the 1st day of December, 2021. The Defendant shall disclose the names of all the Defendant's expert trial witnesses on or before the 1st day of February, 2022. At the time of identifying such expert witness, the party shall disclose the specialty of such expert and furnish the opposing party with copies of all reports with regard to this case which have been submitted by such expert witness, or, if no such reports have been submitted, a detailed summary of the substance of the contemplated testimony of such expert witness.

  3. An objection to any interrogatory, notice of deposition, request for admission, or production of documents and/or reports shall be filed within 30 days after service of the same. Any such objection not filed within 30 days shall be waived. Any such objection shall

1

not extend the time in which the objecting party must otherwise appear or respond to any discovery matters to which no objection was filed. If a party fails to answer an interrogatory or a request for production of documents, or fails to produce a document or disclose anything required herein and does not file an objection thereto, then the person seeking such information shall timely file a motion to compel. If the party seeking such information fails to file a motion to compel, the request for such information from the other party shall be deemed waived.

4.     In any event, all discovery shall be completed on or before the 1st day of April, 2022.

5.     All pre-trial motions including, but not limited to, motions to dismiss, motions for summary judgment or motions in limine shall be filed on or before the 8th day of April, 2022. Responses shall be filed on or before April 22, 2022 and any replies shall be filed on or before May 6, 2022. Hearings on all such motions shall be set with the Court with notice of hearing thereon served on opposing counsel at the time of filing of the motion. WVRE 103(c) contemplates that all motions in limine should be determined prior to trial. Accordingly, unless a matter could not have been reasonably anticipated by a party, the Court will not as a general rule consider motions in limine at or during the time of trial. All dispositive motions shall be scheduled so that they can be heard and resolved well in advance of the trial.

6.     Counsel are instructed to engage in early settlement discussions and report the status of those discussions to the Court on or before August 2, 2021.

7.     Pursuant to Rule 25 of the West Virginia Trial Court Rules, the parties' counsel shall submit this case to mediation, said mediation shall be completed by the pretrial conference date.

2

8.      Final Witness and Exhibit Lists shall be filed on or before the 8th day of April, 2022.

9.      A pre-trial conference shall be held with the Court on the **3rd day of May, 2022, at 11:00 a.m.** at which time lead trial counsel shall appear fully prepared to discuss all aspects of the case.  At least two days prior to the pre-trial hearing, the parties shall prepare and provide the Court and opposing counsel with pre-trial memoranda to include at least the following:

(a)      Statement of the case, including a brief summary of the material facts and theory of liability or defense;

(b)      Itemized statement of damages;

(c)      Stipulation of uncontested facts;

(d)      General statement of contested issues of law and in particular, those contested issues of law requiring court ruling before commencement of trial;

(e)      List of the names and addresses of all witnesses, and, if any expert witness, the purpose of the testimony and whether the qualifications of the expert are to be stipulated;

(f)      Legal authorities to be relied upon;

(g)      For each party, a list of depositions and exhibits to be offered as evidence at trial, indicating as to each whether there are objections to either authenticity or relevancy (if there are objections, the lines and pages of depositions being objected to must be identified), and

a statement that copies of exhibits have been exchanged by counsel or that opposing counsel have examined the exhibits;

(h)    Settlement possibilities.

10.    This action shall be set for trial at the pretrial hearing.    A jury trial is demanded.

11.    In accordance with West Virginia Rules of Civil Procedure 16(f), the Court will impose the full spectrum of sanctions authorized by the West Virginia Rules of Civil Procedure if a party or party's counsel fails to obey this Order.

The Clerk is directed to forward a copy of this Order to all counsel of record or self-represented parties.

ENTER: *January 11, 2021*

_____
CINDY S. SCOTT, CHIEF JUDGE

Prepared by:

/s/ *David M. Grunau*
David M. Grunau, Counsel for Plaintiff

ENTERED: *Jan 11, 2021*
DOCKET LINE _____ *16* _____, Jean Friend, Clerk

Approved by:

/s/ *Julie A. Moore w/ permission by DMG*
Julie A. Moore, Counsel for Defendant

4

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

                    *Plaintiff,*

v.                                    Civil Action No.: 19-C-190

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS,

                    *Defendant.*

### CERTIFICATE OF SERVICE

I, David M. Grunau, Counsel for the Plaintiff, hereby certify that on this, the 12th day of March

2021, I served the *Plaintiff's First Set of Interrogatories and Requests for Production of Documents*

*to Defendant WVU* via facsimile, upon the following:

Julie Moore, Esq.
Bowles Rice LLP
University Town Center
125 Granville Square
Morgantown, WV 26501

David M. Grunau, Esq.
WV State Bar # 9197
244 Pleasant Street
Morgantown, WV 26505
304.291.6166 Telephone
304.291.6266 Facsimile

FILED

MAR 12 2021

JEAN FRIEND, CLERK

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

       *Plaintiff,*

      v.

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS
for and on behalf of
WEST VIRGINIA UNIVERSITY,

       *Defendant.*

Civil Action No. 19-C-190
Hon. Cindy Scott, Judge

## AMENDED CERTIFICATE OF SERVICE

    I hereby certify that on the 6th day of December, 2021, I served a true and exact copy of the foregoing "*Defendant's Answers and Responses to Plaintiff's First Set of Combined Interrogatories and Requests for Production*" upon the following counsel of record via electronic mail as follows:

David Grunau, Esq.
244 Pleasant Street
Morgantown, WV 26505
grunaulaw@gmail.com

Julie A. Moore (WVSB #11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26501
T: (304) 285-2524
F: (304) 285-2575
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV 25325
T: 304-347-1128
F: 304-347-1746
lgainer@bowlesrice.com

*Counsel for Defendant, West Virginia*
*University Board of Governors, for and on*
*behalf of West Virginia University*

**F I L E D**

DEC - 8 2021

JEAN FRIEND, CLERK

13294708.1

04/21/2022 THU 13:08  FAX      Mon Circuit Clerk                    @001/011

# IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

> *Plaintiff,*

v.                                                    Civil Action No.: 19-C-190

**WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS,**

> *Defendant.*

## SUPPLEMENT TO PLAINTIFF'S FIRST MOTION TO AMEND COMPLAINT

Comes now the Plaintiff, having previously moved, pursuant to Rule 15 of the West

Virginia Rules of Civil Procedure, for leave to amend the Complaint in this action, and provides

a draft of the Amended Complaint he intends to file with the Court's leave, if granted.

Respectfully Submitted,
Heimo Riedel
By Counsel,

David M. Grunau, Esq.
[WV State # 9197]
244 Pleasant Street
Morgantown, WV 26505
304.291.6166 Telephone
304.291.6266 Facsimile
grunaulaw@gmail.com

**FILED**

APR 21 2022

JEAN FRIEND, CLERK

## IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

        *Plaintiff,*

v.                            Civil Action No.: 19-C-190

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS,**

        *Defendant.*

### CERTIFICATE OF SERVICE

    I, David M. Grunau, Counsel for the Plaintiff, hereby certify that on this, the 21st day of April 2021, I served the *Plaintiff's First Motion to Amend Complaint* via email, upon the following:

    Julie Moore, Esq.
    Bowles Rice LLP
    University Town Center
    125 Granville Square
    Morgantown, WV 26501

                              David M. Grunau, Esq.
                              WV State Bar # 9197
                              244 Pleasant Street
                              Morgantown, WV 26505
                              304.291.6166 Telephone
                              304.291.6266 Facsimile

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

         *Plaintiff,*

v.                                     Civil Action No.:


WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS for and on behalf of
WEST VIRGINIA UNIVERSITY

         *Defendant.*

### PLAINTIFF'S FIRST AMENDED COMPLAINT

    Comes now the Plaintiff, by and through counsel, David M. Grunau, and for his Complaint alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

    1.    The Plaintiff, Heimo Riedel, is, and at all times relevant to this Complaint was, a resident of Monongalia County, West Virginia, and a contract employee of West Virginia University as a tenured faculty member.

    2.    West Virginia University Board of Governors ("BOG") is the governing body for West Virginia University, and is responsible for the control, supervision and management of the financial, business, education and other policies and affairs of West Virginia University ("WVU").

    3.    All acts and omissions alleged in this Complaint occurred in Monongalia County in violation of West Virginia State statutes and common law, no federal question is raised, no diversity exists, and therefore this Court has proper and exclusive jurisdiction.

1

4.      Venue is proper before the Monongalia Circuit Court pursuant to <u>W. Va. Code §</u> <u>56-1-1 et seq.</u>

5.      As used in this complaint, "Defendants" or "West Virginia University Board of Governors" or "WVU" refers also to all agents and representatives of West Virginia University acting in the scope of their employment, apparently and/or actually. The doctrine of *respondeat superior* is hereby invoked and alleged. Accordingly, the Defendants are liable for the acts and omissions of all such employees, agents and/or representatives, and those acting under their command or at their behest, apparently and/or actually.

6.      WVU is not immune from suit in this case because the Plaintiff seeks no recovery of state funds, but instead seeks recovery under and up to the policy limits of the state's liability insurance policy in accordance with the mandates of <u>Pittsburgh Elevator Co. v. West Virginia</u> <u>Board of Regents</u>, 172 W.Va.743, 310 S.E.2d 675 (1983).

7.      All conditions precedent to the bringing of this action, including placing WVU and the West Virginia Attorney General on notice pursuant to W.Va. Code §55-17-3, have been performed, waived, or excused.

### FACTS COMMON TO ALL COUNTS

The Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

8.      The Plaintiff was a tenured professor at WVU with contract and other rights to employment, and an unblemished disciplinary record.

9.      Implied in WVU's contract with Professor Riedel is the covenant of good faith and fair dealing.

10.    In addition, because of Professor Riedel's tenure, the University owed him a duty of good faith and fair dealing concerning matters of salary, monetary compensation, and other matters affecting his employment.

12.    Moreover, WVU disregarded and violated established law prohibiting the termination of tenured professors during the pendency of an active grievance, as Professor Riedel was pursuing a grievance or grievances at the time of his discharge.

13.    Finally, the Plaintiff's tenure represented a recognized property right protected under the Constitutions of the United States and the State of West Virginia.

14.    In June of 2017, Professor Riedel received a letter from Joyce McConnell, Provost and Vice President of WVU, notifying him that his employment was being terminated effective June 30, 2017. This termination was based on allegations set forth in a letter of Intent to Terminate instigated by Professor Riedel's Department Chair. In doing so, the Chair misapplied or misinterpreted policies, discriminatorily applied unwritten policies, and intentionally acted in bad faith. These acts constituted a breach of contract and breach of fiduciary duty.

15.    As a result, Professor Riedel was wrongfully terminated from his position as tenured professor as of June 30, 2017. Any alleged shortcomings on the part of the Plaintiff were not dischargeable in nature, and indeed were manufactured by WVU via a calculated, intentional campaign to set the Plaintiff up for failure. WVU regarded the Plaintiff as a nuisance due to his willingness to resort to the grievance process to force WVU to follow its own rules and policy, and for this reason had already decided to find a way to fire the Plaintiff, even on pretext if necessary.

3

16.     Professor Riedel did not voluntarily retire in lieu of termination.  He submitted no retirement/resignation letter, informed no one at WVU, in writing or orally, of any intent to retire or resign, and in fact continued to pursue his active grievances regarding the termination announced in Provost McConnell's June 2017 termination letter.

### COUNT I:  BREACH OF CONTRACT

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

17.     The Plaintiff worked for WVU as a tenured, contract employee.

18.     The decision to terminate the Plaintiff was made in bad faith and breached the employment contract's implied covenant of good faith and fair dealing.

19.     Moreover, WVU violated its written employment policies in wrongfully terminating the Plaintiff and did so in bad faith.

20.     These breaches were material.

21.     These breaches led to foreseeable damages, including the substantial loss of income.

22.     The Plaintiff demands all sustained damages occasioned by WVU's breach of the contract, including lost income and pre and post judgment interest.

### COUNT II:  BREACH OF FIDUCIARY DUTY

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

23.     WVU owed the Plaintiff, as a tenured full professor, a fiduciary duty to act in his best interests and to refrain from taking bad faith, capricious actions which harm the Plaintiff financially and otherwise.

4

24.     The Department Chair's decision to seek the Plaintiff's dismissal was made in bad faith and breached the fiduciary duty owed the Plaintiff.

25.     This breach was material.

26.     The breach led to foreseeable damages, including the substantial loss of income.

27.     The Plaintiff demands all sustained damages occasioned by WVU's breach of the fiduciary duty, including lost income, attorney fees, punitive damages, general damages for emotional suffering, and pre and post judgment interest.

## COUNT III:  RETALIATORY DISCHARGE IN VIOLATION OF STATUTE

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

28.     At the time of his wrongful termination, the Plaintiff had grievances active against WVU, and had filed grievances previously.

29.     A public employee subject to grievance procedures under W. Va. Code § 18-29-1 cannot be fired while the grievance procedures are ongoing. *Wounaris v. West Virginia State College,* 588 S.E.2d 406 (W. Va. 2003).

30.     Professor Riedel was a public employee and he was fired while grievance procedures were ongoing.

31.     On information and belief, Professor Riedel was fired, at least in part, in retaliation for his having filed grievances against WVU.

32.     The Plaintiff's wrongful, retaliatory discharge led to foreseeable damages, including the substantial loss of income.

5

33.    The Plaintiff demands all sustained damages occasioned by WVU's retaliatory discharge, including lost income, attorney fees, general damages for emotional suffering, and pre and post judgment interest.

## COUNT IV:  VIOLATION OF THE WEST VIRGINIA HUMAN RIGHTS ACT

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

34.    The Plaintiff is in a protected class under the Human Rights Act, namely age.

35.    On information and belief, the Plaintiff would not have been terminated based on the trivial allegations made by his Department Chair had he been a younger tenured professor.

36.    Thus Professor Riedel's age was an improper consideration in the decision to terminate him.

37.    Professor's termination on age-related grounds violates the Human Rights Act.

38.    The Plaintiff's wrongful, retaliatory discharge in violation of the Human Rights Act led to foreseeable damages, including the substantial loss of income.

39.    The Plaintiff demands all sustained damages occasioned by WVU's wrongful retaliatory discharge in violation of the Act, including lost income, attorney fees, general damages for emotional suffering, and pre and post judgment interest.

## COUNT V: PUBLIC POLICY WRONGFUL DISCHARGE

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

40.    "The Due Process Clause, Article III, Section 10 of the West Virginia Constitution, requires procedural safeguards against State action which affects a liberty or

6

property interest." Syllabus point 1, *Waite v. Civil Service Commission,* 161 W. Va. 154, 241 S.E.2d 164 (1977).

41.     "A ***tenured*** teacher has a protected property interest in his/her position, which raises constitutional due process considerations when a teacher is faced with ***termination*** of his/her employment. W. Va. Const. art. III, § 10." Syllabus Point 4, *Trimble v. W. Va. Bd. of Dirs.,* 209 W. Va. 420 (2001) (emphasis in original).

42.     "Constitutional due process principles may be used to determine whether disciplinary action taken by a public higher educational institution against a ***tenured*** teacher is too severe for the infraction occasioning such discipline. W. Va. Const. art. III, § 10." Syllabus Point 5, *Trimble v. W. Va. Bd. of Dirs.,* 209 W. Va. 420 (2001) (emphasis in original).

43.     Constitutional due process is denied when a ***tenured*** public higher education teacher, who has a previously unblemished record, is immediately ***terminated*** for an incident of insubordination that is minor in its consequences. Under such circumstances, due process requires the educational institution to impose progressive disciplinary sanctions in an attempt to correct the teacher's insubordinate conduct before it may resort to ***termination***. W. Va. Const. art. III, § 10. Syllabus Point 6, *Trimble v. W. Va. Bd. of Dirs.,* 209 W. Va. 420 (2001) (emphasis in original).

44.     The Plaintiff was a tenured professor with a previously unblemished record and an established property interest in his tenured status.

45.     The West Virginia Constitution, Due Process clause, and the cases above interpreting it, provide a clear source of substantial West Virginia public policy with respect to the discipline and termination of tenured professors.

7

46.     WVU ignored and violated this substantial public policy by terminating the Plaintiff on contrived grounds, including alleged insubordination that was trivial in nature, even as alleged—and by failing to impose progressive disciplinary measures before terminating.

47.     Furthermore, whether an act of insubordination alleged against a tenured professor is sufficient to justify dismissal is not measured subjectively by the employer institution itself, or in terms of hypothetical consequences. Instead, pursuant to W. Va. Const. art. III, § 10 and Syllabus Point 6, *Trimble v. W. Va. Bd. of Dirs.*, 209 W. Va. 420, a signed opinion constituting mandatory legal authority, such insubordination must actually cause more than minor consequences to the terminating institution.

48.     Professor Riedel's alleged insubordination had no consequences, which of course was to be expected since no subordination occurred.

49.     The rule that an employer has the right to discharge an at will employee has been tempered by the principle that where the discharge contravenes some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge. *Syllabus, Harless v. First National Bank in Fairmont*, 162 W. Va. 116, 246 S.E.2d 270 (1978).

50.     Professor Riedel was not even an at-will employee, but a tenured professor, so certainly he is entitled to even greater protections. In any event, Plaintiff Riedel's termination directly contravened public policy articulated by the legal authority set forth above, and gave rise to a private cause of action under *Harless*.

51.     WVU's abrupt termination of Professor Riedel, despite his tenured status and without any progressive discipline whatsoever, also directly violated the rule announced by Trimble.

8

52.     As the direct and proximate result of his wrongful discharge in violation of public policy, the Plaintiff suffered, and continued to suffer, foreseeable harm including lost wages and other financial detriment, emotional distress, attorney fees, and other damages which are hereby demanded in compensation.

### HE PLAINTIFF DEMANDS A TRIAL BY JURY

David Grunau, Esq.
[WV State Bar ID # 9197]
244 Pleasant Street
Morgantown, WV 26505
304.291.6166 Telephone
304.291.6266 Facsimile
*Counsel for Plaintiff*

9

# IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

     *Plaintiff,*

     v.                          **Case No. 19-C-190**
                                     **Honorable Cindy S. Scott, Judge**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

     *Defendant.*

## AGREED ORDER GRANTING PLAINTIFF
## LEAVE TO FILE FIRST AMENDED COMPLAINT

     Plaintiff, Heimo Riedel, by counsel, and Defendant, West Virginia University Board of Governors for and on behalf of West Virginia University ("WVUBOG"), by counsel, (collectively the "Parties"), hereby jointly AGREE to the entry of this Order allowing Plaintiff leave to file an Amended Complaint in the above referenced matter.

     WVUBOG does not assent to the allegations of the Amended Complaint and reserves the right to file contested pleadings along with any other motions involving said Amended Complaint. Further, the Parties agreed that WVUBOG shall have until May 23, 2022, to answer or otherwise respond including filing a motion pursuant to Rule 12 of the West Virginia Rules of Civil Procedure.

     The Parties have agreed to this Order pursuant to W.Va. R. Civ. P. 15 which governs the filing of an amended complaint by a party.

Entered: _May 3, 2022_

                                            _____
                                          **Honorable Cindy S. Scott, Judge**

ENTERED: _May 3 2022_
DOCKET LINE __34__
                              , Jean Friend, Clerk

Prepared and agreed to by:

_Lindsay M. Gainer_

Julie A. Moore (WV Bar No. 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26501
T:  (304) 285-2524
F:  (304) 285-2575
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV  25325
T: 304-347-1128
F: 304-347-1746
lgainer@bowlesrice.com
*Counsel for Defendant, West Virginia University
Board of Governors, for and on
behalf of West Virginia University*

Agreed to by:

_David Grunau by LMG w/ permission_

David M. Grunau (WV Bar No. 9197)
Grunau Law Offices PLLC
244 Pleasant Street
Morgantown, WV  26505

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

       *Plaintiff,*

    v.                               **Case No. 19-C-190**
                                           **Honorable Cindy S. Scott, Judge**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

       *Defendant.*

## AGREED ORDER GRANTING PLAINTIFF
## LEAVE TO FILE FIRST AMENDED COMPLAINT

       Plaintiff, Heimo Riedel, by counsel, and Defendant, West Virginia University Board of

Governors for and on behalf of West Virginia University ("WVUBOG"), by counsel, (collectively

the "Parties"), hereby jointly AGREE to the entry of this Order allowing Plaintiff leave to file an

Amended Complaint in the above referenced matter.

       WVUBOG does not assent to the allegations of the Amended Complaint and reserves the

right to file contested pleadings along with any other motions involving said Amended Complaint.

Further, the Parties agreed that WVUBOG shall have until May 23, 2022, to answer or otherwise

respond including filing a motion pursuant to Rule 12 of the West Virginia Rules of Civil

Procedure.

       The Parties have agreed to this Order pursuant to W.Va. R. Civ. P. 15 which governs the

filing of an amended complaint by a party.

Entered: _May 9, 2022_

                                                 _____

                                         **Honorable Cindy S. Scott, Judge**

ENTERED: _May 9, 2022_
DOCKET LINE _38_
                 , Jean Friend, Clerk

Prepared and agreed to by:

_Lindsay M. Gainer_

Julie A. Moore (WV Bar No. 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26501
T: (304) 285-2524
F: (304) 285-2575
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV 25325
T: 304-347-1128
F: 304-347-1746
lgainer@bowlesrice.com
*Counsel for Defendant, West Virginia University*
*Board of Governors, for and on*
*behalf of West Virginia University*

Agreed to by:

_David Grunau by LMG w/ permission_

David M. Grunau (WV Bar No. 9197)
Grunau Law Offices PLLC
244 Pleasant Street
Morgantown, WV 26505

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

           *Plaintiff,*

v.                                              Civil Action No.: 19-C -190

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS for and on behalf of
WEST VIRGINIA UNIVERSITY

           *Defendant.*

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Comes now the Plaintiff, by and through counsel, David M. Grunau, and for his Complaint alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      The Plaintiff, Heimo Riedel, is, and at all times relevant to this Complaint was, a resident of Monongalia County, West Virginia, and a contract employee of West Virginia University as a tenured faculty member.

2.      West Virginia University Board of Governors ("BOG") is the governing body for West Virginia University, and is responsible for the control, supervision and management of the financial, business, education and other policies and affairs of West Virginia University ("WVU").

3.      All acts and omissions alleged in this Complaint occurred in Monongalia County in violation of West Virginia State statutes and common law, no federal question is raised, no diversity exists, and therefore this Court has proper and exclusive jurisdiction.

1

4.     Venue is proper before the Monongalia Circuit Court pursuant to <u>W. Va. Code §</u> <u>56-1-1 et seq.</u>

5.     As used in this complaint, "Defendants" or "West Virginia University Board of Governors" or "WVU" refers also to all agents and representatives of West Virginia University acting in the scope of their employment, apparently and/or actually.  The doctrine of *respondeat superior* is hereby invoked and alleged. Accordingly, the Defendants are liable for the acts and omissions of all such employees, agents and/or representatives, and those acting under their command or at their behest, apparently and/or actually.

6.     WVU is not immune from suit in this case because the Plaintiff seeks no recovery of state funds, but instead seeks recovery under and up to the policy limits of the state's liability insurance policy in accordance with the mandates of <u>Pittsburgh Elevator Co. v. West Virginia Board of Regents</u>, 172 W.Va.743, 310 S.E.2d 675 (1983).

7.     All conditions precedent to the bringing of this action, including placing WVU and the West Virginia Attorney General on notice pursuant to W.Va. Code §55-17-3, have been performed, waived, or excused.

## FACTS COMMON TO ALL COUNTS

The Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

8.     The Plaintiff was a tenured professor at WVU with contract and other rights to employment, and an unblemished disciplinary record.

9.     Implied in WVU's contract with Professor Riedel is the covenant of good faith and fair dealing.

2

05/11/2022 WED 0:46 FAX   ɔɔɔ Mon Circuit Clerk                    ☑003/011

10.    In addition, because of Professor Riedel's tenure, the University owed him a duty of good faith and fair dealing concerning matters of salary, monetary compensation, and other matters affecting his employment.

12.    Moreover, WVU disregarded and violated established law prohibiting the termination of tenured professors during the pendency of an active grievance, as Professor Riedel was pursuing a grievance or grievances at the time of his discharge.

13.    Finally, the Plaintiff's tenure represented a recognized property right protected under the Constitutions of the United States and the State of West Virginia.

14.    In June of 2017, Professor Riedel received a letter from Joyce McConnell, Provost and Vice President of WVU, notifying him that his employment was being terminated effective June 30, 2017. This termination was based on allegations set forth in a letter of Intent to Terminate instigated by Professor Riedel's Department Chair. In doing so, the Chair misapplied or misinterpreted policies, discriminatorily applied unwritten policies, and intentionally acted in bad faith. These acts constituted a breach of contract and breach of fiduciary duty.

15.    As a result, Professor Riedel was wrongfully terminated from his position as tenured professor as of June 30, 2017. Any alleged shortcomings on the part of the Plaintiff were not dischargeable in nature, and indeed were manufactured by WVU via a calculated, intentional campaign to set the Plaintiff up for failure.  WVU regarded the Plaintiff as a nuisance due to his willingness to resort to the grievance process to force WVU to follow its own rules and policy, and for this reason had already decided to find a way to fire the Plaintiff, even on pretext if necessary.

3

16.     Professor Riedel did not voluntarily retire in lieu of termination.  He submitted no retirement/resignation letter, informed no one at WVU, in writing or orally, of any intent to retire or resign, and in fact continued to pursue his active grievances regarding the termination announced in Provost McConnell's June 5, 2017 termination letter—something no one with the genuine intent to retire would do.

17.     Indeed, a representative of the WVU even emailed the Plaintiff to obtain confirmation of the supposed retirement, and the Plaintiff declined to confirm it despite having a clear opportunity to do so if that had truly been his decision. Significantly, on June 28, 2017— two days before the effective termination date, WVU extended the following offer to the Plaintiff: *"WVU will allow you to resign and retire in lieu of termination (the termination letter would be rescinded upon submission of the resignation/retirement)."* Had the Plaintiff actually resigned and retired, as WVU has claimed and is expected to continue to claim, he would have received notice that the termination had been rescinded. Such notice never came; the termination was never officially rescinded. The Plaintiff did not retire.

18.     It is hereby alleged that the Plaintiff was directly and actually discharged, but it is also hereby expressly alleged that, even had the Plaintiff retired or resigned in the face of the termination announced by the June 2017 letter from Joyce McConnell, such separation would have been involuntary in nature and would constitute a constructive discharge. All of the following causes of action are hereby expressly intended to encompass both termination scenarios, actual and constructive—as the Plaintiff's separation from employment was strictly involuntary regardless of technical legal characterization.

4

## COUNT I:  BREACH OF CONTRACT

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

19.    The Plaintiff worked for WVU as a tenured, contract employee.

20.    The decision to terminate the Plaintiff was made in bad faith and breached the employment contract's implied covenant of good faith and fair dealing. These breaches were material.

21.    Moreover, WVU violated its written employment policies in wrongfully terminating the Plaintiff and did so in bad faith.

22.    These breaches led to foreseeable damages, including the substantial loss of income.

23.    The Plaintiff demands all sustained damages occasioned by WVU's breach of the contract, including lost income and pre and post judgment interest.

## COUNT II:  BREACH OF FIDUCIARY DUTY

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

24.    WVU owed the Plaintiff, as a tenured full professor, a fiduciary duty to act in his best interests and to refrain from taking bad faith, capricious actions which harm the Plaintiff financially and otherwise.

25.    The Department Chair's decision to seek the Plaintiff's dismissal was made in bad faith and breached the fiduciary duty owed the Plaintiff.

26.    This breach was material.

27.    The breach led to foreseeable damages, including the substantial loss of income.

5

28.     The Plaintiff demands all sustained damages occasioned by WVU's breach of the fiduciary duty, including lost income, attorney fees, general damages for emotional suffering, and pre and post judgment interest.

## COUNT III:  RETALIATORY DISCHARGE IN VIOLATION OF STATUTE

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

29.     At the time of his wrongful termination, the Plaintiff had grievances active against WVU, and had filed grievances previously.

30.     A public employee subject to grievance procedures under W. Va. Code § 18-29-1 cannot be fired while the grievance procedures are ongoing. *Wounaris v. West Virginia State College*, 588 S.E.2d 406 (W. Va. 2003).

31.     Professor Riedel was a public employee and he was fired while grievance procedures were ongoing.

32.     On information and belief, Professor Riedel was fired, at least in part, in retaliation for his having filed grievances against WVU.

33.     The Plaintiff's wrongful, retaliatory discharge led to foreseeable damages, including the substantial loss of income.

34.     The Plaintiff demands all sustained damages occasioned by WVU's retaliatory discharge, including lost income, attorney fees, general damages for emotional suffering, and pre and post judgment interest.

## COUNT IV:  WRONGFUL DISCHARGE (ACTUAL AND/OR CONSTRUCTIVE) IN VIOLATION OF THE WEST VIRGINIA HUMAN RIGHTS ACT

6

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

35.    The Plaintiff is in a protected class under the Human Rights Act, namely age.

36.    On information and belief, the Plaintiff would not have been terminated based on the trivial allegations made by his Department Chair had he been a younger tenured professor.

37.    Thus Professor Riedel's age was an improper consideration in the decision to terminate him.

38.    Professor's termination on age-related grounds violates the Human Rights Act.

39.    The Plaintiff's wrongful, retaliatory discharge in violation of the Human Rights Act led to foreseeable damages, including the substantial loss of income.

40.    The Plaintiff demands all sustained damages occasioned by WVU's wrongful retaliatory discharge in violation of the Act, including lost income, attorney fees, general damages for emotional suffering, and pre and post judgment interest.

### COUNT V: PUBLIC POLICY WRONGFUL DISCHARGE (ACTUAL AND/OR CONSTRUCTIVE)

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

41.    "The Due Process Clause, Article III, Section 10 of the West Virginia Constitution, requires procedural safeguards against State action which affects a liberty or property interest." Syllabus point 1, *Waite v. Civil Service Commission*, 161 W. Va. 154, 241 S.E.2d 164 (1977).

42.    "A *tenured* teacher has a protected property interest in his/her position, which raises constitutional due process considerations when a teacher is faced with *termination* of

7

his/her employment. W. Va. Const. art. III, § 10." Syllabus Point 4, *Trimble v. W. Va. Bd. of Dirs.*, 209 W. Va. 420 (2001) (emphasis in original).

43.    "Constitutional due process principles may be used to determine whether disciplinary action taken by a public higher educational institution against a ***tenured*** teacher is too severe for the infraction occasioning such discipline. W. Va. Const. art. III, § 10." Syllabus Point 5, *Trimble v. W. Va. Bd. of Dirs.*, 209 W. Va. 420 (2001) (emphasis in original).

44.    Constitutional due process is denied when a ***tenured*** public higher education teacher, who has a previously unblemished record, is immediately ***terminated*** for an incident of insubordination that is minor in its consequences. Under such circumstances, due process requires the educational institution to impose progressive disciplinary sanctions in an attempt to correct the teacher's insubordinate conduct before it may resort to ***termination***. W. Va. Const. art. III, § 10. Syllabus Point 6, *Trimble v. W. Va. Bd. of Dirs.*, 209 W. Va. 420 (2001) (emphasis in original).

45.    The Plaintiff was a tenured professor with a previously unblemished record and an established property interest in his tenured status. He committed no acts of insubordination or substantial or manifest neglect of duty—and certainly none of the allegations against him, as set forth in by the Department Chair and reiterated by the Promotion and Tenure Committee, rose to such level, even if assumed true for the sake of argument. Moreover, WVU itself never claimed that the Plaintiff's alleged misconduct had *any* discernable—let alone significant—consequences for the University, the School of Medicine, or the Biochemistry Department.

46.    The West Virginia Constitution, Due Process clause, and the cases above interpreting it, provide a clear source of substantial West Virginia public policy with respect to the discipline and termination of tenured professors.

8

47.    WVU ignored and violated this substantial public policy by terminating the Plaintiff on contrived grounds, including alleged insubordination that was trivial in nature, even as alleged—and by failing to impose progressive disciplinary measures before terminating.

48.    Furthermore, whether an act of insubordination alleged against a tenured professor is sufficient to justify dismissal is not measured subjectively by the employer institution itself, or in terms of hypothetical consequences. Instead, pursuant to W. Va. Const. art. III, § 10 and Syllabus Point 6, *Trimble v. W. Va. Bd. of Dirs.*, 209 W. Va. 420, a signed opinion constituting mandatory legal authority, such insubordination must actually cause more than minor consequences to the terminating institution.

49.    Professor Riedel's alleged insubordination had no consequences, which of course was to be expected since no subordination occurred.

50.    The rule that an employer has the right to discharge an at will employee has been tempered by the principle that where the discharge contravenes some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge. *Syllabus, Harless v. First National Bank in Fairmont*, 162 W. Va. 116, 246 S.E.2d 270 (1978).

51.    Professor Riedel was not even an at-will employee, but a tenured professor, so certainly he is entitled to even greater protections. In any event, Plaintiff Riedel's termination directly contravened public policy articulated by the legal authority set forth above, and gave rise to a private cause of action under *Harless*.

52.    WVU's abrupt termination of Professor Riedel, despite his tenured status and without any progressive discipline whatsoever, also directly violated the rule announced by Trimble.

9

53.    As the direct and proximate result of his wrongful discharge in violation of public

policy, the Plaintiff suffered, and continued to suffer, foreseeable harm including lost wages and

other financial detriment, emotional distress, attorney fees, and other damages which are hereby

demanded in compensation.

### THE PLAINTIFF DEMANDS A TRIAL BY JURY

David Grunau, Esq.
[WV State Bar ID # 9197]
244 Pleasant Street
Morgantown, WV 26505
304.291.6166 Telephone
304.291.6266 Facsimile
*Counsel for Plaintiff*

10

05/11/2022 WED 6:47 FAX → Mon Circuit Clerk                    @012/011

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

                    *Plaintiff,*

v.                                             Civil Action No.: 19-C-190

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS,

                    *Defendant.*

### CERTIFICATE OF SERVICE

I, David M. Grunau, Counsel for the Plaintiff, hereby certify that on this, the 11th day of

May 2022, I served the *Plaintiff's First Amended Complaint* via email, upon the following:

Julie Moore, Esq.
Lindsay Gainer, Esq.
BOWLES RICE LLP
University Town Center
125 Granville Square
Morgantown, WV 26501
Fax: (304) 347-1746

                                    David M. Grunau, Esq.
                                    WV State Bar # 9197
                                    244 Pleasant Street
                                    Morgantown, WV 26505
                                    304.291.6166 Telephone
                                    304.291.6266 Facsimile

11

**IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA**

**HEIMO RIEDEL,**

      *Plaintiff,*

      **v.**                                     **Case No. 19-C-190**
                                                  **Honorable Cindy S. Scott, Judge**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

      *Defendant.*

## STIPULATION

      Plaintiff, Heimo Riedel, and Defendant, West Virginia University Board of Governors ("WVUBOG"), by their respective counsel identified below, and pursuant to West Virginia Trial Court Rule 23.05 and Rule 6 of the West Virginia Rules of Civil Procedure, hereby **STIPULATE** and **AGREE** that WVUBOG shall have an extension of time up to and including **May 31, 2022,** by which to answer or otherwise respond, including filing a motion pursuant to Rule 12 of the West Virginia Rules of Civil Procedure, to Plaintiff's First Amended Complaint.

Dated: May 12, 2022.

Stipulated and Agreed to by:

Julie A. Moore (WV Bar No. 11315)          David M. Grunau (WV Bar No. 9197)
Bowles Rice LLP                           Grunau Law Offices PLLC
125 Granville Square, Suite 400         244 Pleasant Street
Morgantown, WV  26501             Morgantown, WV  26505
T:  (304) 285-2524
F:  (304) 285-2575
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP

**FILED**

MAY 16 2022

JEAN FRIEND, CLERK

600 Quarrier Street
Post Office Box 1386
Charleston, WV  25325
T: 304-347-1128
F: 304-347-1746
lgainer@bowlesrice.com
*Counsel for Defendant, West Virginia University*
*Board of Governors, for and on*
*behalf of West Virginia University*

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

       *Plaintiff,*

    v.                                      **Case No. 19-C-190**
                                               **Honorable Cindy S. Scott, Judge**

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS
for and on behalf of
WEST VIRGINIA UNIVERSITY,

       *Defendant.*

## CERTIFICATE OF SERVICE

    I hereby certify that on the **12th day of May, 2022**, I served a true and exact copy of the foregoing *"Stipulation"* upon the following counsel of record, via United States Mail, postage prepaid, as follows:

David M. Grunau (WV Bar No. 9197)
Grunau Law Offices PLLC
244 Pleasant Street
Morgantown, WV  26505
*Counsel for Plaintiff*

Lindsay M. Gainer (WV Bar No. 12046)

13675249.1

05-31-2022 12:51 PM  Bowles Rice LLP  304-291-7273  pg 3 of 5

# IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

     *Plaintiff,*

    **v.**

**WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS
for and on behalf of
WEST VIRGINIA UNIVERSITY,**

     *Defendant.*

**Case No. 19-C-190
Honorable Cindy S. Scott, Judge**

## STIPULATION

    Plaintiff, Heimo Riedel, and Defendant, West Virginia University Board of Governors ("WVUBOG"), by their respective counsel identified below, and pursuant to West Virginia Trial Court Rule 23.05 and Rule 6 of the West Virginia Rules of Civil Procedure, hereby **STIPULATE** and **AGREE** that WVUBOG shall have an extension of time up to and including **June 7, 2022,** by which to answer or otherwise respond, including filing a motion pursuant to Rule 12 of the West Virginia Rules of Civil Procedure, to Plaintiff's First Amended Complaint.

Dated: May 31, 2022.

Stipulated and Agreed to by:

_____
Julie A. Moore (WV Bar No. 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26501
T: (304) 285-2524
F: (304) 285-2575
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP

David Grunau / CVB (WVSB 11447) with permission
David M. Grunau (WV Bar No. 9197)
Grunau Law Offices PLLC
244 Pleasant Street
Morgantown, WV 26505

**FILED**

MAY 31 2022

**JEAN FRIEND, CLERK**

600 Quarrier Street
Post Office Box 1386
Charleston, WV  25325
T: 304-347-1128
F: 304-347-1746
lgainer@bowlesrice.com
*Counsel for Defendant, West Virginia University*
*Board of Governors, for and on*
*behalf of West Virginia University*

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

     *Plaintiff,*

v.

                             **Case No. 19-C-190**
                             **Honorable Cindy S. Scott, Judge**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

     *Defendant.*

## CERTIFICATE OF SERVICE

     I hereby certify that on the **31st day of May, 2022**, I served a true and exact copy of the foregoing "***Stipulation***" upon the following counsel of record, via United States Mail, postage prepaid, as follows:

David M. Grunau (WV Bar No. 9197)
Grunau Law Offices PLLC
244 Pleasant Street
Morgantown, WV 26505
*Counsel for Plaintiff*

                                                       Julie A. Moore (WV Bar No. 11315)

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

> *Plaintiff,*

v.

> **Case No. 19-C-190**
> **Honorable Cindy S. Scott, Judge**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

> *Defendant.*

## <u>DEFENDANT'S MOTION TO DISMISS</u>

COMES NOW, Defendant, West Virginia University Board of Governors ("WVUBOG"), for and on behalf of West Virginia University ("WVU"), by its counsel, Julie A. Moore, Esq. and Lindsay M. Gainer, Esq., and hereby moves to dismiss *Plaintiff's First Amended Complaint* pursuant to Rules 12(b)(1) and (6) of the West Virginia Rules of Civil Procedure.

As discussed more fully in the accompanying *Memorandum of Law in Support of Defendant's Motion to Dismiss*, all of Plaintiff's claims, which rely upon allegations that his employment with WVU was terminated (either actually or constructively), are barred by the doctrine of collateral estoppel. The West Virginia Public Employees Grievance Board and the Circuit Court of Kanawha County have already rendered a final determination finding that Plaintiff voluntarily retired from his employment from WVU and was not involuntarily terminated. Thus, collateral estoppel bars Plaintiff from relitigating the nature of his separation and contending that he was involuntarily discharged. Since each of Plaintiff's claims rely upon allegations that he was involuntarily terminated, and it has been finally and irreversibly determined that he was not, in fact, involuntarily discharged, all of Plaintiff's claims must be dismissed based upon the application of collateral estoppel.

**FILED**

JUN 1 0 2022

JEAN FRIEND, CLERK

1

Moreover, even if Plaintiff's claims are not barred by prior adjudication, various of his claims are, nevertheless, subject to dismissal for failure to state a claim upon which relief may be granted and/or lack of subject matter jurisdiction. More specifically, dismissal of Plaintiff's claim for breach of contract in Count I is required on the grounds that such claim is barred by the sovereign immunity afforded by Article VI, Section 35 of the West Virginia Constitution, since the State's policy of insurance expressly excludes such claims. Plaintiff's claim in Count II for breach of fiduciary duty must be dismissed because West Virginia law does not recognize the existence of a fiduciary duty flowing from an institution of higher education as an employer to its tenured faculty as employees. Finally, Plaintiff's claims in Counts III and V fail to state a claim upon which relief may be granted because the *Harless* cause of action is only available to at-will employees, and Plaintiff expressly alleges that he was not an at-will employee but, instead, a tenured professor.

WHEREFORE, WVUBOG respectfully requests that this Court grant its motion pursuant to West Virginia Rules of Civil Procedure 12(b)(1) and (6) and dismiss *Plaintiff's First Amended Complaint* in its entirety, with prejudice.

Dated this 6th day of June 2022.

Julie A. Moore (WVSB #11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26501
T: (304) 285-2524
F: (304) 285-2575
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV  25325
T: 304-347-1128
F: 304-347-1746
lgainer@bowlesrice.com

*Counsel for Defendant, West Virginia
University Board of Governors, for and on
behalf of West Virginia University*

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

      *Plaintiff,*

    v.

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS
for and on behalf of
WEST VIRGINIA UNIVERSITY,

      *Defendant.*

Case No. 19-C-190
Honorable Cindy S. Scott, Judge

### CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of June 2022, I served a true and exact copy of the foregoing "***Defendant's Motion to Dismiss***" upon counsel of record via U.S. Postal Service as follows:

        David M. Grunau, Esquire
        Grunau Law Offices PLLC
        244 Pleasant Street
        Morgantown, WV  26505
        grunaulaw@gmail.com

        Julie A. Moore (WVSB #11315)
        Lindsey M. Gainer (WV Bar No. 12046)

        *Counsel for Defendant, West Virginia University Board of Governors, for and on behalf of West Virginia University*

13682236.1

4

**IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA**

**HEIMO RIEDEL,**

       *Plaintiff,*

    **v.**                               **Case No. 19-C-190**
                                        **Honorable Cindy S. Scott, Judge**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

       *Defendant.*

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**</u>

       COMES NOW, Defendant, West Virginia University Board of Governors ("WVUBOG"),

for and on behalf of West Virginia University ("WVU"), through its undersigned counsel, and

submits this *Memorandum of Law* in support of its *Motion to Dismiss.*

## I.      STATEMENT OF THE CASE

       Heimo Riedel ("Riedel" or "Plaintiff") is a former tenured professor in the Department of

Biochemistry within the School of Medicine ("SOM") of WVU.[1]  The West Virginia University

Board of Governors ("WVUBOG") is the governing body for WVU.[2]

       By memorandum dated January 30, 2017, Department Chair, Dr. Michael Schaller,

recommended that Riedel's faculty employment be terminated under WVUBOG Policy 2, section

12.1.3 (insubordination by refusal to abide by legitimate reasonable directions of administrators)

and section 12.1.5 (substantial and manifest neglect of duty).[3]   Specifically, Dr. Schaller

---

[1] *See* PL. FIRST AM. COMPL. at ¶ 1.

[2] *Id.* at ¶ 2.

[3] *Id.* at ¶ 14; *see also*, **Exhibit A**, *Memorandum re: Termination of Dr. Heimo Riedel's Appointment* dated January 30, 2017.  It is well established that, when evaluating a motion to dismiss, a court may consider a document attached to the moving party's motion without converting such motion to one for summary judgment if: (1) the pleading implicitly or explicitly refers to the document; (2) the document is integral to the pleading's allegations; and (3) no party questions the authenticity of the document. *Mountaineer Fire & Rescue Equip., LLC v. City Nat'l Bank of W.*

FILED

JUN 1 0 2022

JEAN FRIEND, CLERK

recommended that Riedel's appointment be terminated due to his failure and refusal to carry out directives set forth within an assignment letter dated August 5, 2016, to: (a) create and serve as coordinator of a section of BIOC531 for the spring 2017 semester, which entailed developing and delivering fifty-two lectures and coordinating six clinical correlations, and (b) review, select, and revise four cases for the MSI PBL (Problem-Based Learning) course, with the goal of revising at least one case by the end of the fall semester 2016 and revise the remaining cases (up to four total) by the end of spring semester 2017.

Subsequently, by memorandum dated March 3, 2017, Dr. Laura Gibson, Associate Dean for Research at the WVUSOM, acting as the Dean's designee, endorsed Dr. Schaller's recommendation to terminate Riedel's faculty appointment.[4]

Thereafter, on May 12, 2017, the Provost and Vice President of Academic Affairs, Joyce McConnell ("Provost McConnell"), issued a memorandum to Riedel, notifying him of her intention to terminate his faculty appointment and advising him that a due process meeting would be held on May 25, 2017.[5]  Following such meeting, Provost McConnell issued a memorandum on June 5, 2017, informing Riedel of her decision to proceed with terminating his faculty appointment, effective June 30, 2017.[6]

Significantly, on June 23, 2017, a week prior to the effective date of his termination, Riedel executed and submitted paperwork to WVU to enroll in retiree health and basic life insurance

---

*Virginia*, 244 W. Va. 508, 528, 854 S.E.2d 870, 890 (2020).  The memo attached as Exhibit A is implicitly referenced in ¶ 14 of *Plaintiff's First Amended Complaint*.

[4] **Exhibit B**, *Memorandum re: Faculty Appointment of Heimo Riedel, Ph.D.* dated March 3, 2017.

[5] **Exhibit C**, *Memorandum re: Intent to Terminate Faculty Appointment/Employment* dated May 12, 2017.

[6] **Exhibit D**, *Memorandum re: Intent to Terminate Faculty Appointment/Employment* dated June 5, 2017.

coverage.[7]  Such paperwork was received by WVU on June 26, 2017, and Plaintiff's separation was processed as a retirement.

At the time Riedel received the memorandum from Provost McConnell on June 5, 2017, notifying him of her intention to terminate his employment effective June 30, 2017, he had twelve (12) grievances pending against WVU which had been consolidated at Level III under Docket No. 2015-1774-CONS and set for hearing on September 27, 2017.[8]  Prior to the consolidated Level III hearing in Docket No. 2015-1774-CONS, WVU filed a motion to dismiss, arguing that Riedel's grievances must be dismissed in light of his retirement.  On October 31, 2017, Administrative Law Judge, Ronald L. Reece, with the West Virginia Public Employees Grievance Board, entered a *Dismissal Order*, granting WVU's motion, finding that Riedel had, indeed, retired from WVU, and holding that all pending grievance proceedings were thereby rendered moot.  *See* Exhibit F.

---

[7] **Exhibit E**, *Retirement Health Benefits and Basic Life Insurance Enrollment Form.*

[8] Specifically:

- On March 30, 2015, Riedel filed a grievance challenging the ratings given to him by the Chair of the Department of Biochemistry in his most recent annual review.
- On April 24, 2015, Riedel filed a second grievance assigned Docket No. 2015-1194-WVU, which alleged retaliation, harassment, and discrimination.
- On May 7, 2015, Riedel filed a third grievance assigned Docket No. 2015-1246-WVU, which alleged retaliation and denial of academic freedom.
- On August 7, 2015, Riedel filed a fourth grievance assigned Docket No. 2016-0124-WVU, which alleged retaliation when his Department Chair required that he follow directives related to teaching.
- On August 10, 2015, Riedel filed a fifth grievance assigned Docket No. 2016-0115-WVU, which alleged retaliation when Riedel was questioned about the contents of his leave form.
- On November 10, 2015, Riedel filed a sixth grievance assigned Docket No. 2016-0838-WVU, which alleged retaliation related to teaching issues.
- On November 11, 2015, Riedel filed a seventh grievance assigned Docket No. 2016-0839-WVU, which alleged retaliation related to a photography assignment.
- On December 16, 2015, Riedel filed an eighth grievance assigned Docket No. 2016-1031-WVU, which alleged retaliation pursuant to the request for him to limit repetitive use of exam questions.
- On March 17, 2016, Riedel filed a ninth grievance assigned Docket No. 2016-1440-WVU, which alleged retaliation and harassment pursuant to an issue regarding his teaching.
- On March 21, 2016, Riedel filed a tenth grievance assigned Docket No. 2016-1455-WVU, which alleged retaliation in relation to an evaluation received by his Department Chair.
- On April 12, 2016, Riedel filed an eleventh grievance assigned Docket No. 2016-1530-WVU, which again alleged retaliation pursuant to teaching issues.
- On April 19, 2016, Riedel filed a twelfth grievance assigned Docket No. 2016-1568-WVU, which alleged that WVU failed to notify his Department Chair that he had filed another grievance against him.

*See* **Exhibit F**, *Dismissal Order* dated Oct. 31, 2017 by ALJ Reece in Docket No. 2015-1774-CONS.

On December 6, 2017, Riedel appealed the *Dismissal Order* in Docket No. 2015-1774-CONS to the Circuit Court of Kanawha County, and the matter was docketed before Circuit Judge Carrie Webster at Civil Action No. 17-AA-94.[9]

While such appeal was pending before Judge Webster, Riedel commenced yet another grievance related to his separation from employment with WVU, which was filed on June 23, 2018, assigned Docket No. 2017-2469-WVU.[10]  WVU filed a motion to dismiss this grievance. On July 20, 2018, Administrative Law Judge Joshua Fraenkel, with the West Virginia Public Employees Grievance Board, entered a *Dismissal Order* in Docket No. 2017-2469-WVU, ruling that Riedel was collaterally estopped from relitigating the issue of whether he retired or was terminated from his employment with WVU. *See* Exhibit H.  Riedel appealed the *Dismissal Order* in Docket No. 2017-2469-WVU to the Circuit Court of Kanawha County.  The matter was docketed as Civil Action No. 18-AA-235 and assigned to the Honorable Judge Tera Salango.[11]

On July 19, 2019, Judge Salango entered a *Final Order* in Civil Action No. 18-AA-235, finding that Riedel "voluntarily retired on June 23, 2018" and affirming ALJ Fraenkel's decision in Docket No. 2017-2469-WVU. *See* Exhibit I.  On May 20, 2020, Judge Webster entered a *Final Order* in Civil Action No. 17-AA-94, similarly finding that Riedel voluntarily retired from his employment with WVU via his execution and submission of the *Retirement Health Benefits and Basic Life Insurance Enrollment Form* dated June 23, 2017, and affirming ALJ Reece's decision in Docket No. 2015-1774-CONS. *See* Exhibit G.  Notably, in her decision, Judge Webster noted that the *Retirement Health Benefits and Basic Life Insurance Enrollment Form* dated June 23, 2017, was received on June 26, 2017 at 2:35 p.m., was fully filled out in Riedel's own handwriting

---

[9] **Exhibit G**, *Final Order* dated May 20, 2020 by Judge Webster in Civil Action No. 17-AA-94.

[10] **Exhibit H**, *Dismissal Order* dated July 20, 2018 by ALJ Fraenkel in Docket No. 2017-2469-WVU.

[11] **Exhibit I**, *Final Order* dated July 19, 2019 by Judge Salango in Civil Action No. 18-AA-235.

and bears his signature, and that Riedel does not contest the validity of such document or contend

that it was a forgery. *Id.* at fn. 1.

## II.    LEGAL STANDARD

Under Rule 12(b)(1) of the West Virginia Rules of Civil Procedure, dismissal is required

if the Court lacks jurisdiction over the Plaintiff's claim.  Pertinent to the instant motion, Rule

12(b)(1) is the appropriate procedural mechanism by which to raise the doctrine of sovereign

immunity as a basis for dismissal at the commencement of litigation.  *See, e.g., Wrenn v.*

*W. Virginia Dep't of Transp., Div. of Highways*, 224 W. Va. 424, 686 S.E.2d 75 (2009) (affirming

circuit court's granting of motion to dismiss under W. Va. R. Civ. P. 12(b)(1) on the basis of

sovereign immunity).  When evaluating a motion to dismiss under Rule 12(b)(1), the Court may

properly consider materials outside the plaintiff's complaint, and doing so "does not convert the

motion into a Rule 56 summary judgment motion." Franklin D. Cleckley, Robin Jean Davis and

Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure*, § 12(b)(2),

p. 336-37 (5th ed. 2017); *see also, Lowe v. Richards*, 234 W. Va. 48, 51 n.6, 763 S.E.2d 64, n.6

(2014).

Similarly, under Rule 12(b)(6) of the West Virginia Rules of Civil Procedure, dismissal is

proper where "it appears beyond doubt that the plaintiff can prove no set of facts in support of

[her] claim which would entitle [her] to relief." Syl. pt. 3, *Chapman v. Kane Transfer Co., Inc.*,

160 W. Va. 530, 236 S.E.2d 207 (1977) (*citing Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct.

99, 102 (1957)).  The purpose of Rule 12(b)(6) is to test the formal sufficiency of the complaint.

*Collia v. McJunkin*, 178 W. Va. 158, 159, 358 S.E.2d 242, 243 (1987).  "A motion to dismiss

under Rule 12(b)(6) enables a circuit court to weed out unfounded suits." *State ex rel. McGraw v.*

*Scott Runyan, Pontiac–Buick, Inc.*, 194 W. Va. 770, 776, 461 S.E.2d 516, 522 (1995). *See also,*

*Dimon v. Mansy*, 198 W. Va. 40, 4 n.5, 479 S.E.2d 339, 347 n.5 (1996) ("Thus, the singular purpose of a Rule 12(b)(6) motion is to seek a determination whether the plaintiff is entitled to offer evidence to support the claims made in the complaint."). "[I]f it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations contained within the pleadings," a party is entitled to dismissal. *Kopelman & Assoc., L.C. v. Collins*, 196 W. Va. 489, 493, 473 S.E.2d 910, 914 (1996). "A complaint need not have detailed factual allegations, but the plaintiff must set forth the basis for entitlement to relief, which requires more than labels, conclusions, and mere recitations of the elements of the causes of action." *W. Virginia Bd. of Educ. v. Croaff*, No. 16-0532, 2017 WL 2172009, at *3 (W. Va. May 17, 2017) (memorandum opinion). "[M]ere sketchy generalizations of a conclusive nature unsupported by operative facts" do not set forth a cause of action. *Fass v. Nowsco Well Serv., Ltd.*, 177 W. Va. 50, 52-53, 350 S.E.2d 562, 563-64 (1986).

### III.   ARGUMENT

**A.   ALL OF PLAINTIFF'S CLAIMS, WHICH ARE PREMISED UPON ALLEGATIONS THAT HE WAS INVOLUNTARILY TERMINATED FROM WVU OR, AT LEAST, CONSTRUCTIVELY DISCHARGED, MUST BE DISMISSED, BASED UPON COLLATERAL ESTOPPEL.**

Each of Plaintiff's claims in his *First Amended Complaint* is premised upon allegations that he was involuntarily terminated from WVU or, at least, that he was constructively discharged, *i.e.*, that his retirement was not voluntary.[12]  Indeed, within the "Facts" section of his Complaint in ¶ 18, Plaintiff avers:

[12] A constructive discharge cause of action arises when the employee claims that because of age, race, sexual, or other unlawful discrimination, the employer has created a hostile working climate which was so intolerable that the employee was forced to leave his or her employment. Where a constructive discharge is claimed by an employee in a retaliatory discharge case, the employee must prove sufficient facts to establish the retaliatory discharge. In addition, the employee must prove that the intolerable conditions that caused the employee to quit were created by the employer and were related to those facts that gave rise to the retaliatory discharge. In order to prove a constructive discharge, a plaintiff must establish that working conditions created by or known to the employer were so intolerable that a reasonable person would be compelled to quit. It is not necessary, however, that a plaintiff prove that the employer's actions were taken with a specific intent to cause the plaintiff to quit.

It is hereby alleged that the Plaintiff was directly and actually discharged, but it is also hereby expressly alleged that, even had the Plaintiff retired or resigned in the face of the termination announced by the June 2017 letter from Joyce McConnell, such separation would have been involuntary in nature and would constitute a constructive discharge. All of the following causes of action are hereby expressly intended to encompass both termination scenarios, actual and constructive – as the Plaintiff's separation from employment was strictly involuntary regardless of technical legal characterization.

In Count I, Plaintiff alleges in ¶ 20 that he was terminated. In Count II, Plaintiff avers in ¶ 25 that he was dismissed. In Count III, Plaintiff alleges in ¶ 29 that he was wrongfully terminated, and in ¶ 32, he avers that he was fired. In Count IV, Plaintiff alleges in ¶ 36 that he was terminated. Finally, in Count V, Plaintiff alleges in ¶ 47 that he was terminated.

As set forth above, the West Virginia Public Employees Grievance Board and the Circuit Court of Kanawha County have already ruled – *twice* – that Plaintiff voluntarily retired from his employment with WVU and was <u>not</u> involuntarily terminated. Collateral estoppel bars Plaintiff from relitigating the nature of his separation from employment and contending that he was involuntarily discharged.

"Collateral estoppel is designed to foreclose re-litigation of issues in a second suit which have been litigated in the earlier suit even through there may be a difference in the cause of action between the parties of the first and second suit." Syl. Pt. 2, *Conley v. Spillers*, 171 W. Va. 584, 301 S.E.2d 216 (1983). "Collateral estoppel will bar a claim if four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a prior action; and (4) the party against whom the

---

Syl. pt. 4, 5, and 6, *Slack v. Kanawha Cnty. Hous. & Redevelopment Auth.*, 188 W. Va. 144, 423 S.E.2d 547 (1992).

doctrine is raised had a full and fair opportunity to litigate the issue in the prior action." Syl. Pt. 1, *State v. Miller,* 194 W. Va. 3, 459 S.E.2d 114 (1995).

Here, all elements of collateral estoppel are satisfied.  First, in both this civil action and Plaintiff's prior grievances before the West Virginia Public Employees Grievance Board and related appeals to the Circuit Court of Kanawha County, a key issue was and is whether Riedel was involuntarily terminated from his employment with WVU or if, instead, he voluntarily retired. Thus, the issues are identical.  Second, there was a final adjudication on the merits in Riedel's prior grievances and related appeals.  Indeed, in both instances, the Circuit Court of Kanawha County entered final orders to dispose of Riedel's appeals, finding that Riedel had voluntarily retired and was not involuntarily terminated.  Thus, there has been a final adjudication on the merits as to the nature of Riedel's separation.  The third element is plainly satisfied inasmuch as Riedel is a party to this civil action, and he was a party to his prior grievances and the related appeals to the Circuit Court of Kanawha County.  Finally, Riedel had a full and fair opportunity to litigate the issue of the nature of his separation from employment with WVU in his prior grievances and the related appeals to the Circuit Court of Kanawha County.  Again, Riedel was a party to his prior grievances and the related appeals to the Circuit Court of Kanawha County. The issue regarding the nature of his separation was brought before the Grievance Board in Docket Nos. 2015-1774-CONS and 2017-2469-WVU via motions to dismiss filed by WVU, to which Riedel had a full and fair opportunity to respond.  Accordingly, the final required element is clearly established.

Because collateral estoppel applies, Plaintiff is barred from relitigating the nature of his separation and contending that he was involuntarily discharged.  The rulings by the Grievance Board in Docket Nos. 2015-1774-CONS and 2017-2469-WVU, as affirmed via *de novo* reviews

by the Circuit Court of Kanawha County in Civil Action Nos. 17-AA-94 and 18-AA-235, finding that Plaintiff's employment with WVU ended via voluntary retirement and not involuntary termination, preclude Plaintiff from proceeding with his claims in this case. Thus, all of Plaintiff's claims must be dismissed with prejudice.

**B.    ALTERNATIVELY, VARIOUS OF PLAINTIFF'S CLAIMS MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION AND/OR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.**

Even if Plaintiff's claims are not barred by prior adjudication, various of his claims are nevertheless subject to dismissal for failure to state a claim upon which relief may be granted and/or lack of subject matter jurisdiction, as discussed herein.

**1.    *Plaintiff's Claim for Breach of Contract in Count I is Barred by Sovereign Immunity.***

In Count I of his *First Amended Complaint*, Plaintiff avers that he worked for WVU as a tenured contract employee, and that "[t]he decision to terminate the Plaintiff was made in bad faith and breached the employment contract's implied covenant of good faith and fair dealing," as well as various "written employment policies." *See* FIRST AM. COMPL. at ¶¶ 19-23.

Plaintiff's claim for breach of contract must be dismissed on the basis that such claim is barred by sovereign immunity. The State's immunity from suit is derived from Article VI, Section 35 of the West Virginia Constitution, which provides:

> "The State of West Virginia shall never be made a defendant in any court of law or equity, except the State of West Virginia, including any subdivision thereof, or any municipality therein, or any officer, agent, or employee thereof, may be made defendant in any garnishment or attachment proceeding, as garnishee or suggestee."

W. Va. Const. Art VI, §35. "This constitutional grant of immunity is absolute and . . . cannot be waived by the legislature or any other instrumentality of the State." *Mellon-Stuart Co. v. Hall*, 178 W. Va. 291, 296, 359 S.E.2d 124, 129 (1987) (citations omitted). "[T]he policy which underlies

sovereign immunity is to prevent the diversion of state monies from legislatively appropriate purposes. Thus, where monetary relief is sought against the State treasury for which a proper legislative appropriation has not been made, sovereign immunity raises a bar to suit." *Id.* (citations and footnote omitted).

Sovereign immunity "relates not only to the State of West Virginia but extends to an agency of the State to which it has delegated performance of certain of its duties." *Hesse v. State Soil Conservation Comm.*, 153 W. Va. 111, 115, 168 S.E.2d 293, 295 (1969). As the governing body of West Virginia University, WVUBOG is a state agency that enjoys the protections of sovereign immunity. Indeed, in *City of Morgantown v. Ducker*, 153 W. Va. 121, 168 S.E.2d 298 (1969), our Supreme Court held: "The Board of Governors of West Virginia University is a State agency, and, as such, is an arm of the State and, under Article VI, Section 35 of the Constitution of West Virginia, is immune from suit to enforce payment of a claim against such board." Syl. Pt. 1, *Ducker.* In reaching its conclusion that WVUBOG is entitled to the protections of sovereign immunity, the Court rationalized that, "the judgment which the plaintiff would seek in a suit against the board of governors, if satisfied, would be paid from funds in the treasury of the State." *Id.*, 153 W. Va. at 131, 168 S.E.2d at 304. *See also, Univ. of W. Virginia Bd. of Trustees ex rel. W. Virginia Univ. v. Graf*, 205 W. Va. 118, 122, 516 S.E.2d 741, 745 (1998) (recognizing that the West Virginia University Board of Governors is a state agency and is, thus, entitled to sovereign immunity).

Despite being regarded as absolute, the Supreme Court of Appeals has recognized a limited exception to sovereign immunity, based upon West Virginia Code § 29-12-5(a), which authorizes the State Board of Risk and Insurance Management (BRIM) to procure liability insurance on

In authorizing BRIM to procure liability insurance on behalf of the State within West Virginia Code § 29-12-5(a), the Legislature also vested BRIM with "considerable latitude to fix the scope of coverage and contractual exceptions to that coverage by regulation or by negotiation of the terms of particular applicable insurance policies." *Parkulo*, 199 W. Va. at 163, 483 S.E.2d at 509. Specifically, West Virginia Code § 29-12-5(a)(3) and (4) contain the following provisos:

> (3) The board is *not* required to provide insurance for every state property, activity or responsibility.
>
> (4) Any policy of insurance purchased or contracted for by the board shall provide that the insurer shall be barred and estopped from relying upon the Constitutional immunity of the State of West Virginia against claims or suits: ***Provided, That nothing herein shall bar a state agency or state instrumentality from relying on the Constitutional immunity granted the State of West Virginia against claims or suits arising from or out of any state property, activity or responsibility not covered by a policy or policies of insurance***: [ . . . ]

W. Va. Code § 29-12-5(a)(3) & (4) (emphasis added). In analyzing and applying such statutory provisions, the Supreme Court of Appeals has recognized that "BRIM is not required to provide insurance for every state property, activity or responsibility, and nothing bars the State or its agencies from replying on its constitutional immunity against claims or suits arising from or out of any state property, activity or responsibility not covered by a policy or policies of insurance." *Phillips v. W. Virginia Dep't of Health & Human Res.*, No. 19-0610, 2020 WL 3408421, at *4 (W. Va. June 18, 2020) (internal quotations omitted). Succinctly stated, " [t]o the extent that certain categories of claims are not covered by the BRIM policy, immunity has not been waived." *Johnson v. C.J. Mahan Const. Co.*, 210 W. Va. 438, 443, 557 S.E.2d 845, 850 (2001). Where the State's insurance policy contains a clear and unambiguous exclusion of coverage for the Plaintiff's claims, our Supreme Court has held that sovereign immunity applies and bars such claim. *See, e.g., Phillips, supra* (affirming the circuit court's grant of motion to dismiss based upon sovereign

immunity grounds where plaintiff's claims against the DOH fell within enumerated exceptions to State's insurance policy's coverage); *Wrenn, supra* (same).

Here, the applicable policy of insurance is Policy No. GL 379-66-63 for the policy period of July 1, 2016 to July 1, 2017, which is attached hereto as **Exhibit J** (hereinafter "the Policy").[14] The Policy contains an exclusion to the Wrongful Act Liability Insurance, which provides as follows:

    **COVERAGE E. WRONGFUL ACT LIABILITY INSURANCE**

    \*\*\*

    **2.**    **Exclusions**

    This insurance does not apply to:

    \*\*\*

    H.    To any claim(s) made against the **"insured"** for damages attributable to wages, salaries and benefits.

    I.    To any claim(s) based upon or attributable to any allegations or claims that the **"insured"** breached the terms of any type or any form of contract, either express or implied, written or oral.

*See* Exhibit J at pp. 14-15.

Such provision plainly and unambiguously excludes from the scope of the State's insurance coverage Plaintiff's claims for breach of contract in Count I.[15]  *See* FIRST AM. COMPL., COUNT I.

_____

[14] The Supreme Court of Appeals has directed litigants to ensure that the record clearly sets forth the scope of the State's insurance coverage and its exceptions. Syl. Pt. 3, *Parkulo, supra*. Accordingly, WVUBOG appends the applicable policy, Policy GL 379-66-63, including its endorsement and exclusions to this motion and memorandum of law. Since WVUBOG's motion to dismiss on the basis of sovereign immunity is being pursued under West Virginia Rule of Civil Procedure 12(b)(1), such policy may be properly considered without converting the motion to one for summary judgment.

[15] The Supreme Court of Appeals of West Virginia has made it clear that "[l]anguage in an insurance policy should be given its plain, ordinary meaning." Syl. Pt. 5, *Bland v. State*, 230 W. Va. 263, 737 S.E.2d 291 (2012) (*quoting* Syl. Pt. 1, *Soliva v. Shand, Morahan & Co., Inc.*, 176 W. Va. 430, 345 S.E.2d 33 (1986), *overruled on other grounds by National Mut. Ins. Co. v. McMahon & Sons*, 177 W. Va. 734, 356 S.E.2d 488 (1987)). Moreover, "[w]here the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or

Indeed, the Supreme Courts of Appeals has held that contract-based claims against State entities such as WVUBOG are excluded from insurance coverage, and, thus, are barred by sovereign immunity. *See, e.g., Davari v. W. Virginia Univ. Bd. of Governors*, 245 W. Va. 95, 857 S.E.2d 435 (2021) (ruling that professor's claims for breach of contract, quantum meruit, and unjust enrichment fell within two exclusions of State's insurance policy for claims made "for damages attributable to wages, salaries and benefits," and for claims that State "breached the terms of any type or any form of contract," and, thus, professor's claims were barred by sovereign immunity).

In the absence of insurance coverage for Plaintiff's contractual claim, he cannot invoke the insurance exception to sovereign immunity recognized in *Pittsburgh Elevator*. Instead, WVUBOG remains cloaked in the immunity afforded by Article VI, Section 35 of the West Virginia Constitution and, thus, is shielded from the obligation to defend against Plaintiff's claims for breach of contract. Accordingly, Count I of Plaintiff's *First Amended Complaint* must be dismissed, with prejudice.

2. ***Plaintiff's Claim for Breach of Fiduciary Duty in Count II Fails to State a Claim Upon Which Relief May be Granted, as West Virginia Law Does Not Recognize the Existence of a Fiduciary Relationship Between an Educational Institution as an Employer and a Tenured Professor as an Employee.***

Plaintiff's claim in Count II for breach of fiduciary duty must be dismissed because no fiduciary duty has been recognized under West Virginia law as between an educational institution employer and its tenured faculty members.

It is well established that: "[t]he fiduciary duty is '[a] duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person. It is the highest standard of duty implied by law [.]'" *Elmore v. State Farm Mut. Auto. Ins. Co.,* 202 W. Va. 430, 435, 504

---

interpretation, but full effect will be given to the plain meaning intended." *Id.* at Syl. Pt. 6 (*quoting* Syl. Pt., *Keffer v. Prudential Ins. Co.*, 153 W. Va. 813, 172 S.E.2d 714 (1970)).

behalf of the State.[13]  Indeed, in *Pittsburgh Elevator Co. v. W. Virginia Bd of Regents*, 172 W. Va. 743, 310 S.E.2d 675 (1983), the Supreme Court of Appeals held that: "[s]uits which seek no recovery from State funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State." *Id.*, 172 W. Va. at 744, 310 S.E.2d at 676, Syl. Pt. 2.  *See also*, Syl. Pt. 1, *Eggleston v. W. Virginia Dep't of Highways*, 189 W. Va. 230, 429 S.E.2d 636 (1993) (holding that West Virginia Code § 29-12-5(a) provides an exception for the State's constitutional immunity found in Section 35 of Article VI of the West Virginia Constitution).

Here, Plaintiff seeks to invoke this insurance exception created by West Virginia Code § 29-12-5(a) and recognized in *Pittsburgh Elevator* by expressly pleading that he seeks recovery only up to the limits of the State's insurance policy. *See* FIRST AM. COMPL. at ¶ 6.  As discussed herein, the problem with Plaintiff's attempt to invoke the insurance exception to the sovereign immunity bar is that no insurance coverage exists under the State's insurance policy for Plaintiff's claim for breach of contract.  Indeed, the State's insurance policy expressly and unambiguously ***excludes*** coverage for such claims.  Thus, in the absence of insurance coverage for such claims, WVUBOG's cloak of sovereign immunity remains in full force.

---

[13] As succinctly explained in *Johnson v. C.J. Mahan Const. Co.*, 210 W. Va. 438, 557 S.E.2d 845 (2001):

> The Legislature created The State Board of Insurance [Risk and Insurance Management] (BRIM) to supervise the State's liability insurance plans.  W. Va. Code 29-12-1, et seq.  Pursuant to this responsibility, BRIM established the equivalent of a self-insurance program administered by, but not funded by, a private insurance company, American International Group (AIG).  The "premium" in the BRIM arrangement is a fund set aside by the State from which the claims are paid.  The determination of which claims should be paid and which denied is governed by the "policy," which, like an ordinary insurance policy, states coverages and exclusions from coverage.  Since public funds, rather than ordinary insurance, pay the claims, this system constitutes the legislative waiver of a degree of sovereign immunity as to those claims covered by the program, but only to such claims.

*Johnson*, 210 W. Va. at 443, 557 S.E.2d at 850.

S.E.2d 893, 898 (1998) (quoting Black's Law Dictionary 625 (6th ed. 1990)).  Furthermore, our Court has explained that: "[a]s a general rule, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship." *Elmore,* 202 W. Va. at 436, 504 S.E.2d at 899 (citing 36A C.J.S. *Fiduciary,* p. 385 (1961).  For a cause of action for breach of fiduciary duty, the following elements must be established: (1) a fiduciary duty exists; (2) the fiduciary duty has been breached; and (3) the plaintiff has suffered damages as a result of this breach.  *State ex rel. Affiliated Const. Trades Foundation v. Vieweg*, 205 W. Va. 687, 701-702, 520 S.E.2d 854, 868-69 (1999) (Maynard, J., concurring).  The determination of whether there is a duty is a question of law to be decided by the court as a matter of law and not a question of fact for the jury.  *See Miller v. Whitworth*, 193 W. Va. 262, 265, 455 S.E.2d 821, 824 (1995). *See also*, Syl. Pt. 5, *Aikens v. Debow,* 208 W. Va. 486, 541 S.E.2d 576 (2000)("The determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law.").

Our Supreme Court has recognized the existence of a fiduciary duty in only a handful of circumstances – none of which apply here.  Of course, it is well recognized that lawyers owe a fiduciary duty to their clients. *See, e.g., Taylor v. Robert W. Ackerman, P.C.*, No. 14-0961, 2015 WL 3875763, at *7 (W. Va. June 22, 2015).  Similarly, it is well recognized that a trustee owes a fiduciary duty to the trust beneficiaries. *See, e.g., Tilhance Creek Invs., LLC v. BCBank, Inc.*, No. 12-0290, 2013 WL 1286130, at *8 (W. Va. Mar. 29, 2013).  Likewise, the personal representative of the estate of a deceased acts in a fiduciary capacity.  *See, e.g., Owens v. Owens,* 196 Va. 966, 86 S.E.2d 181 (1953); *Virginia Trust Co. v. Evans,* 193 Va. 425, 69 S.E.2d 409 (1952).  Finally, it

-15-

has been held that officers and directors of a corporation owe a fiduciary duty to shareholders, and in the context of a close corporation, majority shareholders owe a fiduciary duty to minority shareholders. *See* Syl. Pts. 2, 3, and 4, *Masinter v. WEBCO Co.*, 164 W. Va. 241, 246, 262 S.E.2d 433, 437 (1980). Notably, in all of these scenarios, it is the *agent* who owes the fiduciary duty to the *principal*, not the other way around. Generally, in the employment context, there is no widely recognized fiduciary duty flowing from an *employer* to an *employee*, although courts have sometimes recognized a fiduciary duty running from an *employee* to his *employer* on an agency theory.

In Count II, Plaintiff baldly asserts that "WVU owed the Plaintiff, as a tenured full professor, a fiduciary duty to act in his best interests and to refrain from taking bad faith, capricious actions which harm the Plaintiff financially and otherwise." First Am. Compl. at ¶ 24. No case law has been located in which our Supreme Court of Appeals has held that institutions of higher education owe a fiduciary duty to their tenured faculty or otherwise recognized a cause of action for breach of fiduciary duty in such a context. Moreover, in other jurisdictions, courts have held that the affiliation between an educational institution as employer and a tenured professor as employee does <u>not</u> create a cognizable fiduciary relationship. *See, e.g.*, *Maas v. Cornell Univ.*, 245 A.D.2d 728, 666 N.Y.S.2d 743 (1997); *Lasher v. Albion Cent. Sch. Dist.*, 38 A.D.3d 1197, 1198, 833 N.Y.S.2d 791, 792 (2007). Further, at least one decision by the United States Court of Appeals for the Fourth Circuit has been interpreted as holding that the relationship between an institution of higher education and its faculty does <u>not</u> give rise to a fiduciary duty. *See Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 196 n. 6 (M.D.N.C. 1997) (interpreting Fourth Circuit's decision in *Sabet v. Eastern Virginia Medical Authority*, 775 F.2d 1266 (4th Cir. 1985), as holding that the relationship between an institution of higher education and its faculty does not give rise to a

fiduciary duty and ruling that, although *Sabet* was decided under Virginia law, there "is no reason to think North Carolina law would call for a different result.").

To borrow from the district court's verbiage and rationale in *Breeden*, there is no reason to think that West Virginia law would call for a different result than New York law, Virginia law, or North Carolina law as set forth in *Mass* and *Lasher*, *Breeden*, or *Sabet*.[16]  In the absence of a recognized fiduciary duty between an institution of higher education and its tenured faculty, Plaintiff's claim in Count II for breach of fiduciary duty fails to state a claim upon which relief may be granted and, thus, must be dismissed.

### 3. *Plaintiff's Claim for Retaliatory Discharge in Violation of Statute in Count III Fails to State a Claim Upon Which Relief May be Granted.*

In Count III of *Plaintiff's First Amended Complaint*, he advances a cause of action that he labels as one for retaliatory discharge in violation of statute.  Despite being labeled as such, it appears that Plaintiff is really attempting to assert a common law *Harless* claim for wrongful discharge with the statutory provisions of the West Virginia Public Employees Grievance Procedure serving as the allegedly implicated source of substantial public policy in reliance upon the Supreme Court's decision in *Wounaris v. W. Virginia State Coll.*, 214 W. Va. 241, 588 S.E.2d 406 (2003).[17]  Indeed, in ¶ 30 of his *First Amended Complaint*, Plaintiff asserts that *Wounaris* stands for the proposition that "[a] public employee subject to grievance procedures under W. Va. Code § 18-29-1,[18] cannot be fired while the grievance procedures are ongoing."  In actuality, the Court's holding in *Wounaris* is not nearly as broad as Plaintiff contends it is.

---

[16] Copies of these cases are attached hereto as **Exhibit K**.

[17] The statutory provisions of the Grievance Procedure do not contain a prohibition against terminating an employee while a grievance is pending. *See* W. Va. Code § 6C-2-1, *et seq.*  Thus, Plaintiff's claim is not a statutory claim but, instead, a common law claim.

[18] This statutory provision was repealed effective March 7, 2007.  The West Virginia Public Employees Grievance Procedure is now set forth at W. Va. Code § 6C-2-1, *et seq.*

In *Wounaris*, the plaintiff was an at-will employee of West Virginia State College, a public educational institution. 214 W. Va. at 244-45, 588 S.E.2d at 409-10.  Three days after complaining internally about what he perceived to be "reverse racial discrimination" and demanding a new job title, a raise of $20,000, and significant changes in his job duties, the plaintiff was terminated from his employment with the College, effective immediately. *Id.*, 214 W. Va. at 245, 588 S.E.2d at 410.  Thereafter, the plaintiff filed a grievance and was ultimately awarded reinstatement, among other relief, by an Administrative Law Judge via order dated May 18, 1999, after a finding that the College had defaulted in timely responding to the grievance. *Id.*  The very next day, the College terminated the plaintiff's employment for a second time, notwithstanding the reinstatement order. *Id.*  The College also commenced an appeal of the ALJ's order of reinstatement. *Id.* In response to his second termination, the plaintiff filed another grievance, and he also commenced a civil action in which he asserted that such discharge was an act of retaliation by the College in response to him filing the first grievance. *Id.*, 214 W. Va. at 245-46, 588 S.E.2d at 410-11.  The lawsuit proceeded to a jury trial, which resulted in a verdict for the College. *Id.*  After receiving the adverse verdict, the plaintiff moved for a new trial, which the circuit court denied. *Id.*  An appeal followed, in which the plaintiff challenged the instructions given to the jury on his retaliation claim. *Id.*

On appeal, the Supreme Court reversed.  The Court ruled:

> We believe that the actions of the College in this case, <u>where an ALJ ordered Mr. Wounaris' reinstatement, and in response the College re-hired him and then immediately terminated him even before the appeals process had run its course</u>, present a clear violation of public policy. Because we have determined that an employer, <u>under these circumstances and in the absence of some significant, novel reason,</u> cannot terminate an employee in the middle of a grievance proceeding, we must reverse the decision of the lower court.  <u>To hold otherwise would be to make a mockery of the grievance process and leave an employee who had won reinstatement with a Pyrrhic victory, at best.</u>

*Id.*, 214 W. Va. at 250, 588 S.E.2d at 415 (emphasis added).   The Court went on to state:

> Having said this, <u>we are not holding that any employee who has filed a grievance or alleged a wrongful discharge is immune from termination</u>. Obviously, as the College and the trial court noted, <u>there are hypothetical circumstances under which an employer could terminate an employee before the grievance process has concluded</u>, even in the face of an order of reinstatement. We leave it to the fertile imaginations of future litigants what those circumstances might be. However, we note that the reasons an employer must supply for discharging a public employee, <u>in spite of a reinstatement order and before the termination of the grievance process</u>, must be extremely persuasive.

*Id.*, 214 W. Va. at 250–51, 588 S.E.2d at 415–16.

Again, as set forth above, the Court's holding in *Wounaris* is not nearly as broad as Plaintiff depicts it to be. The Court did <u>not</u> rule that a public employee "cannot be fired while grievance procedures are ongoing," as Plaintiff alleges in ¶ 30 of his *First Amended Complaint*. Rather, the Court's ruling was much narrower. The Court ruled that, in the circumstances presented – *i.e.*, where an employee files a grievance challenging his termination, is awarded reinstatement in the grievance process, and is subsequently terminated a second time notwithstanding the reinstatement order and while the grievance process is still pending – the employee will have a valid claim against his employer for retaliatory discharge in violation of the public policy espoused by the Grievance Procedure, unless there is some significant and novel reason that justifies his discharge. Based upon the emphasized portions of the Court's holding, quoted above, it is abundantly clear that such ruling is tethered to the factual circumstances presented in *Wounaris* – a termination following a reinstatement order.

The Court's ruling in *Wounaris* is inapplicable here inasmuch as there is no allegation that Provost McConnell's decision to terminate Riedel's faculty appointment as communicated in her memorandum dated June 5, 2017 violated any reinstatement order by the Grievance Board. *See generally*, PL. FIRST. AM. COMPL. Thus, Count III of Plaintiff's *First Amended Complaint* fails to

state a claim upon which relief may be granted under the narrow cause of action created by the Supreme Court in *Wounaris*.

Moreover, there is an even more compelling reason why Plaintiff's allegations in Count III fails to state a claim upon which relief may be granted: the *Harless* cause of action is not available to Plaintiff because, per his own allegations, he was a tenured faculty member, not an at-will employee. *See* PL. FIRST AM. COMPL. at ¶¶ 1, 8, 10, 13, 15, 19, 24, 45, 51, 52.

At-will employees are those who serve at the will and pleasure of their employers and may be discharged at any time, with or without cause. *See Wright v. Standard Ultramarine and Color Co.,* 141 W. Va. 368, 382, 90 S.E.2d 459, 468 (1955) (recognizing that at-will employees serve at the will and pleasure of their employers and may be discharged at any time, with or without cause). In *Harless v. First National Bank,* 162 W. Va. 116, 246 S.E.2d 270 (1978), our Supreme Court created an exception to the common law doctrine of at-will employment.[19] That exception provides:

> The rule that an employer has an absolute right to discharge an at-will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge.

*Id.* at 116, 246 S.E.2d at 271, syllabus. *Accord* Syl. Pt. 2, *Stanley v. Sewell Coal Co.,* 169 W. Va. 72, 285 S.E.2d 679 (1981); Syl. Pt. 1, *Shanholtz v. Monongahela Power Co.,* 165 W. Va. 305, 270 S.E.2d 178 (1980).

---

[19] In *Harless*, the plaintiff alleged that he was discharged from his at-will employment at a bank because he brought to the attention of his superiors that the bank had intentionally and illegally overcharged customers on prepayment of their installment loans and intentionally did not make proper rebates in violation of state and federal consumer credit protection laws. *Id.*, 162 W. Va. at 118, 246 S.E.2d at 272. The Court ruled that the doctrine of at-will employment "giving the employer the absolute right to discharge an at will employee must be tempered by the further principle that where the employer's motivation for the discharge contravenes some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by the discharge." *Id.* at 124, 246 S.E.2d at 275. These types of common law claims have come to be known as "*Harless*-style claims" or claims for "wrongful/retaliatory discharge in violation of public policy."

Because Plaintiff was not an at-will employee, he cannot bring a common law claim for wrongful/retaliatory discharge under *Harless* and its progeny.  Thus, Count III must be dismissed for failure to state a claim upon which relief may be granted.

### 4. *Plaintiff's Claim for Public Policy Wrongful Discharge (Actual and/or Constructive) in Count V Fails to State a Claim Upon Which Relief May be Granted.*

In Count V of *Plaintiff's First Amended Complaint*, he purports to advances another *Harless* claim for wrongful discharge – this time with the Due Process Clause of the West Virginia Constitution[20] serving as the alleged source of substantial public policy.  Again, as set forth above, *Harless* claims are only available to at-will employees, which Plaintiff was not. *See* PL. FIRST AM. COMPL. at ¶¶ 1, 8, 10, 13, 15, 19, 24, 45, 51, 52.  Thus, Count V must be dismissed for failure to state a claim upon which relief may be granted.

## IV.    CONCLUSION

WHEREFORE, WVUBOG respectfully requests that this Honorable Court grant its Motion pursuant to West Virginia Rules of Civil Procedure 12(b)(1) and 12(b)(6) and dismiss *Plaintiff's First Amended Complaint* in its entirety, with prejudice, and grant WVUBOG any and all such other relief that the Court deems just and proper.

Dated this 6th day of June 2022.

Julie A. Moore (WVSB #11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV  26501
T:  (304) 285-2524
F:  (304) 285-2575
jamoore@bowlesrice.com

---

[20] Article III, Section 10.

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV  25325
T: 304-347-1128
F: 304-347-1746
lgainer@bowlesrice.com

*Counsel for Defendant, West Virginia University Board of Governors, for and on behalf of West Virginia University*

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

       *Plaintiff,*

    v.                                    **Case No. 19-C-190**
                                                    **Honorable Cindy S. Scott, Judge**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

       *Defendant.*

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that on the 6th day of June 2022, I served a true and exact copy of the foregoing *"Memorandum of Law in Support of Defendant's Motion to Dismiss"* upon counsel of record via U.S. Postal Service as follows:

                David M. Grunau, Esquire
                Grunau Law Offices PLLC
                244 Pleasant Street
                Morgantown, WV  26505
                grunaulaw@gmail.com

                *Julie A. Moore*

                Julie A. Moore (WVSB #11315)
                Lindsay M. Gainer (WV Bar No. 12046)

                *Counsel for Defendant, West Virginia University Board of Governors, for and on behalf of West Virginia University*

 WestVirginiaUniversity.

SCHOOL OF MEDICINE

January 30, 2017

## MEMORANDUM

**TO:**      Clay B. Marsh, M.D.
            Vice President and Executive Dean, WVU School of Medicine

**FROM:**    Michael D. Schaller, Ph.D.
            Professor and Chair of Biochemistry

**RE:**      Termination of Dr. Heimo Riedel's Appointment
            Professor of Biochemistry

I have considered Dr. Riedel's performance in the academic year 2015-2016 and his actions during the Fall 2016 academic semester and I recommend **termination of his appointment** as Professor of Biochemistry under section 12.1.3 of the Board of Governor's Policy 2 for insubordination by refusal to abide by legitimate reasonable directions of administrators, and section 12.1.5 substantial and manifest neglect of duty.

## HISTORY

When I became Chair of Biochemistry (August, 2008), it was obvious that there was a contentious history between Dr. Riedel and previous chairs and other WVU administrators, although I was unaware of any of the details. With new leadership, I considered this an opportunity for a fresh start for Dr. Riedel and believed that engagement and support of all the existing faculty was essential to successfully build a strong department, recognizing that the roles of individual faculty might have to evolve. With this philosophy, I gave different assignments to Dr. Riedel to enhance the success of his research (initially) and alternative scholarly activity (subsequently) and to identify the best role for him in the teaching mission. To enhance the success of his research, I strongly supported a yearlong sabbatical leave in a lab in Germany (2010-2011) in an effort to reinvigorate his research program. I advocated for his sabbatical in a discussion with the Chancellor. At a meeting with Cancer Center leaders I argued for continued support of a Research Assistant Professor in Dr. Riedel's lab during his absence on sabbatical, to maximize the likelihood of success of Dr. Riedel's program. When these efforts to support his research program did not succeed, I gave Dr. Riedel two assignments in research and scholarly activity (assignment letters 2012-2016). First, in the area of research, I instructed Dr. Riedel to seek and develop collaborative research opportunities with other investigators. Second, I assigned Dr. Riedel the task of developing and publishing medical school Problem Based Learning (PBL) cases as an alternative scholarly activity related to education. This was only partially successful. In the teaching mission, I assigned him the task of developing a graduate level cell biology course to offer our graduate students in fall of their second year (assignment letter June 1, 2012). He created and organized the course, and lined up a number of faculty to participate in the course, although it was not offered since only one student signed up for the course. This experience provided the impetus for Biochemistry to align with Cancer Cell Biology to offer a joint course for students in both

DEPARTMENT OF BIOCHEMISTRY

PO Box 9142 | Robert C. Byrd Health Sciences Center
Morgantown, WV 26506-9142
304.293.2494   304.293.6846                                    Equal Opportunity/Affirmative

EXHIBIT
A

2

programs, Biochemical and Oncogenic Signal Transduction (CCB701/BIOC791E) and Dr. Riedel was assigned as a co-block leader with Jun Liu in the new course (assignment letter June 30, 2013). As Dr. Riedel's independent research program remained in decline and collaborative research efforts were slow to emerge, he was assigned an increased load in the professional teaching mission. He was initially assigned to facilitate in the PBL course for first year medical school students (MSI PBL), which went well until recently. He was also assigned to participate in teaching Human Function at Oman Medical College. I assured the Dean of the Oman Medical College that the Department would provide full support to prepare Dr. Riedel for this assignment and I outlined how we would support him in Dr. Riedel's assignment letter (assignment letter June 30, 2013). Dr. Riedel did not utilize the mechanisms outlined to prepare for the assignment, but rather prepared on his own (he did consult with several faculty members who had experience teaching in Oman). While Dr. Riedel prepared for the assignment it was never completed due to an unfortunate fall on some ice (several weeks prior to his first scheduled lecture). Dr. Riedel informed Ashley Boateng about the fall and instructed her not to make travel arrangements as he was not sure that he could go to Oman. Chris Martin informed Oman Medical College and alternative arrangements for teaching the course were made. Some days prior to the first lecture in Oman, Dr. Riedel came to my office to inform me he was ready to go to Oman. When I told him that alternative arrangements were likely in place, Dr. Riedel blamed Chris Martin for the failure of the assignment, since Chris had canceled the plans. When Chris Martin informed me that teaching at Oman Medical College would not be an opportunity for Dr. Riedel in the future, I assigned Dr. Riedel to participate in an undergraduate biochemistry course, BIOC339, to replace Steve Graber, who had retired (assignment letter July 1, 2014).

In my interactions with Dr. Riedel, it quickly became apparent that he did not like to be criticized and that he deflects criticism by assigning responsibility for outcomes of his assignments to others. This presented a challenge to manage and provide counsel, since Dr. Riedel would dispute who was responsible for shortcomings on assignments. For example, in a discussion of student evaluations for PBL, Dr. Riedel argued that the evaluations were invalid since only 5/8 students provided evaluations and that the problem was with the coordinators who could not get evaluations from all of the students. As he would not recognize specific student recommendations for his improvement, I provided him with evaluations for three of the top facilitators, hoping that positive comments to them would provide an example of how he could improve (July 1, 2014). A second example was a discussion about collaborative research and how slow it was developing. Dr. Riedel stated that he felt the outcomes of collaborations are out of his control. I advised him that he could seize control of these collaborations if he went back to the bench and started doing experiments himself (assignment letter July 1, 2014). This never happened. While interactions with Dr. Riedel initially posed a modest challenge, this has become extreme over the last few years and most evaluatory comments and instructions to Dr. Riedel are met with a hostile, argumentative response and an attempt to engage in a long contentious series of email exchanges.

## RESEARCH ACTIVITIES 2015/2016 ACADEMIC YEAR

Dr. Riedel does not have an independent research program, and in my view will never re-establish an independent research program. His best opportunity to do so was following his sabbatical in 2010-2011. Thus, his assignment in research was to perform collaborative research with Yon Rojanasakul in the school of pharmacy. Dr. Riedel co-authored a review that was

published during the 2015/2016 academic year. I have discussed Dr. Riedel's efforts on this collaboration with Dr. Rojanasakul and Yon indicated that Dr. Riedel was very engaged and was diligently providing intellectual input into projects in the laboratory. Dr. Riedel also submitted applications to the Gates Foundation twice. Dr. Riedel published the first PBL case that he was assigned to develop on MedPortal. He was also assigned the task of developing and publishing a second PBL case that he had initiated in the previous academic year. The development of this case lead to two conflicts between the PBL coordinators and Dr. Riedel, which are described below.

## SERVICE ACTIVITIES 2015/2016 ACADEMIC YEAR

Dr. Riedel has modest service responsibilities in the Department and performs as expected. He also performs some editorial and review service in his field and some outreach in the community.

## TEACHING ACTIVITIES 2015/2016 ACADEMIC YEAR

Dr. Riedel's teaching assignment for the academic year was to participate in team teaching in a graduate level course, CCB701/BIOC791E in Fall 2015 and in an introductory undergraduate biochemistry course, BIOC339. In addition, he was to serve as facilitator in MSI PBL in both fall and spring semesters. Based upon student evaluations, Dr. Riedel performed reasonably well in the classroom, and the Departmental P&T committee's evaluation is based upon these evaluations and his quantity of teaching. However, based upon his interactions with other faculty in BIOC339 and MSI PBL, Dr. Reidel was re-assigned for Fall 2016. The Departmental P&T Committee was unaware of these facts, and thus my view of his performance differs from that of the Committee. These interactions are described below.

BIOC339 – Early in 2015, the BIOC339 faculty met to debrief following the BIOC339 course offering in Fall 2014 and plan improvements for the course for Fall 2015 (Dr. Riedel attended). As co-coordinator of the course, I followed up with emails in spring 2015 to remind faculty of actions required before implementation of the course in Fall 2015. Dr. Riedel responded to my email to question every action and this resulted in an exchange of a series of emails where he argued against implementation of these changes intended to improve the course. I concluded the argument and asked if he would work with the other faculty to implement these changes (in two separate emails – (April 30, 2015 and May 11, 2015)). Dr. Riedel did not respond to these emails and took annual leave from May 11 to ~ June 19, which was during the time I was required to finalize plans for teaching assignments. Although I was uncertain if Dr. Riedel would follow the instructions of the co-coordinators of the course I assigned him to teach in BIOC339 in Fall 2015, with the explicit instruction that he follow specific directions of the course coordinators regarding lecture, quiz and exam format etc., and work with the other faculty to improve the course and quality of exams (assignment letter July 21, 2015). He participated in the course, but did not follow specific directions of the coordinators. We had major disagreements over the use of exam questions taken from the internet, implementation of changes discussed in spring 2015, feedback on his lectures that I attempted to provide and creating a pool of exam questions as opposed to using the same questions every year. This was very disruptive to management of the course and took considerable time and energy to try and get Dr. Riedel to comply. Thus, this assignment was not performed as assigned. Dr. Riedel was formally notified on March 23, 2016 that he would no

4

longer be assigned to teach in BIOC339, due to the difficulty in working with him as course co-coordinator. Dr. Rajendran and I picked up most of Dr. Riedel's lectures for Fall 2016.

MSI PBL – Dr. Riedel's assignment letter of July 1, 2014 instructed him to develop a second PBL case following consultation with the PBL coordinators to define an appropriate case. The coordinators advised against creating a second cancer case and suggested a case on whooping cough or anaphylaxis, but Dr. Riedel moved forward to create a cancer case. The coordinators indicated support for the concept and Dr. Riedel proceeded to develop the case, but did not follow the coordinators' recommendation to discuss the case with faculty who teach anatomy and could provide relevant information and additional connections to other components of the curriculum. He provided a draft to the coordinators and asked for feedback. They failed to respond for many months. Dr. Riedel brought this to my attention and I recommended that he talk with the coordinators individually to encourage them to assist. In October 2015, several MSI students performed poorly on a Human Function exam and Norm Ferrari reached out through the PBL coordinators to the PBL facilitators asking them how these students appeared to be doing, in general, and particularly if anything appeared out of the ordinary. In MSI, the PBL facilitators are the main faculty members who meet with the students in small groups on a regular basis, and thus might be aware of confounding issues that might affect their performance on the exam. Dr. Riedel initially refused to respond to this request until the PBL coordinators provided comments on the case. Dr. Riedel did later respond to Dr. Ferrari, although I understand that his response was uninformative. The PBL coordinators did review the case in ~ a week. In their view the case needed considerable work to be ready for implementation in the course. In Dr. Riedel's view the case was complete and ready for implementation, and the coordinators were retaliating against him by stating that it needed major revisions. Dr. Riedel asked me to negotiate with the coordinators to implement the case, but the only outcome acceptable to Dr. Riedel was implementation of the case following minor changes, and this failed. The second conflict with the PBL coordinators was communicated to me by the coordinators in May 2016. Apparently, students complained to the coordinators that Dr. Riedel recruited them to participate in an extracurricular PBL case, the case he had developed. Dr. Riedel was implementing the case so he could proceed and publish the case. This additional extracurricular activity concerned the coordinators. They requested Dr. Riedel not be assigned to MSI PBL in the future. I recommended that they take their concern to Drs. Ferrari and Cottrell. Dr. Cottrell effectively sent Dr. Riedel a cease and desist email. I asked the coordinators if they were satisfied and they responded that they still did not want Dr. Riedel assigned to PBL. Dr. Riedel was on leave during this time. In July 2016 I suggested that Dr. Riedel meet with the coordinators to try and rebuild their relationship and advised Dr. Riedel that he might have to be proactive at the meeting. At Dr. Riedel's request, I did not attend the meeting, but Tom Patrick (from the WVU College of Law) and Dr. Cottrell attended. I understand that the meeting was contentious and did not succeed in rebuilding relationships. The coordinators again asked that Dr. Riedel not be assigned to PBL and I complied with their request.

## INSUBORDINATION AND NEGLECT OF DUTY

As I did not assign Dr. Riedel to teach in BIOC339 (~10 contact hours), due to conflicts with myself as the co-course coordinator, and did not assign Dr. Riedel to facilitate MSI PBL (~46 contact hours), at the request of the PBL coordinators, I considered options for other teaching assignments. I believe that his teaching commitment should be similar to the commitments of

Drew Shiemke and Mike Gunther. Both serve as coordinators/co-coordinators of several courses and lecture in multiple courses with >70 contact hours each. I considered the teaching efforts of other tenure-track/tenured faculty in other departments in the School of Medicine. In the Medical Microbiology and Exercise Physiology undergraduate programs, some faculty (even tenure-track/tenured faculty) are assigned a full, semester-long course to teach on their own. The Department of Biochemistry offers a course that is actually two courses that were merged many years ago, BIOC531/705. BIOC531 is a 4-credit introductory biochemistry course and BIOC705 is a 5-credit introductory biochemistry course for the dental students. There are 4 hours of joint lectures for BIOC531/705 students each week and an additional 1 hour of lecture of dental relevant material for the BIOC705 students per week. Dr. Riedel was assigned to create and serve as coordinator of a separate section of BIOC531 to be offered in the Spring 2017 semester. He was assigned as the major lecturer for the course and expected to deliver ~50 lectures and recruit a few additional faculty to provide clinical correlations (assignment letter August 5, 2016). I consulted Mike Gunther who coordinates BIOC531/705 and he agreed that it was a reasonable expectation for any faculty member in a biochemistry department to have sufficient expertise to teach any material in this course at the depth required. The detailed template for Dr. Riedel's course was the existing BIOC531. Dr. Riedel has experience creating courses at WVU (the graduate level cell biology course) and he has experience teaching a complete semester-long course on his own when he was on the faculty at Wayne State University. The timing of the assignment allowed 5 full months to prepare for the first lecture. Dr. Riedel's assignment letter provides instruction for the support of development of the course. Support for content was available from Dr. Gunther or other Biochemistry colleagues who teach in the course and administrative support was available from Gina Mazzetti. Based upon these facts, I believe that this was a reasonable assignment for Dr. Riedel. I emailed Dr. Riedel in August to inform him that Gina was taking requests from faculty for classrooms for Spring 2017. On January 10, 2017 (classes started on the 9th), I asked him for an update on the new section of BIOC531 that he was to teach and Dr. Riedel responded that he had not heard anything further on this topic and therefore had nothing to update. The class was to begin on January 9th, and all of the students registered for BIOC531 were being taught by Mike Gunther in BIOC531/705. This is insubordination, since he refused to follow legitimate and reasonable directions clearly provided in his assignment letter of August 5, 2016. In refusing to follow these administrative directions he has not performed his assignment and therefore has demonstrated substantial and manifest neglect of duty.

A second assignment for Dr. Riedel was to revise old PBL cases for MSI PBL (assignment letter August 5, 2016). His specific instructions were to review the cases for errors or updates on the basic facts of the case, expand short cases by addition of confounding factors, and importantly update treatments for the disease. This task will require identification of a clinician with appropriate expertise to assist in updating, particularly with respect to treatments. Dr. Riedel was then to incorporate updates into the case. Dr. Riedel was given his choice of cases to update and was to complete one case by the end of the Fall 2016 semester and up to three other cases by the end of the Spring 2017 semester. Based upon Dr. Riedel's experience in publishing one PBL case and working to develop a second, this is a reasonable assignment. In August, Dr. Riedel contacted Drew Shiemke, informing the PBL coordinators that in order to complete this assignment he will need the coordinators to provide a list of specific issues that need to be revised for each case and a suggestion of clinicians who could help with the revisions. In my view, he is asking the PBL coordinators to do the heavy lifting of the assignment and I communicated with Dr. Riedel that I

expected him to complete his assignment independently of the PBL coordinators (August 18, 2016). On January 10, 2017, I asked him for an update on this assignment and he responded that he was unable to proceed since the PBL coordinators had not provided him the information he had requested. This is insubordination since he refused to follow legitimate and reasonable administrative directions clearly provided in his assignment letter of August 5, 2016. In refusing to follow these directions he has not performed his assignment and therefore has demonstrated substantial and manifest neglect of duty.

In summary, during the 2015/2016 academic year, Dr. Riedel had significant conflicts with the coordinators of BIOC339 and MSI PBL, and therefore was not given these assignments moving forward. In their place, Dr. Riedel was given two assignments that he could readily achieve based upon his expertise and experience. Dr. Riedel has not performed these assignments as directed. Through his actions (or rather inaction) Dr. Riedel has refused to abide by the legitimate and reasonable administrative directions provided by his chair in the August 5, 2016 assignment letter. His refusal to follow these directions is insubordination and failure to perform these assignments is substantial and manifest neglect of duty. Therefore, I provide my strongest recommendation that Dr. Riedel's appointment be terminated for cause, for insubordination and substantial and manifest neglect of duty.



West Virginia University
SCHOOL OF MEDICINE

August 5, 2016

**MEMORANDUM**

**TO:**      Dr. Heimo Riedel
             Professor of Biochemistry

**FROM:**    Mike Schaller, Ph.D.
             Professor & Chair of Biochemistry

**RE:**      Assignment for 2016-2017 Academic Year

**RESEARCH/SCHOLARSHIP ASSIGNMENT –**
IN GENERAL - A very important activity in the research/scholarly and training mission of the Department is the exchange of ideas. The Departmental seminar series and Research Forum are two main venues where this occurs and it is expected that all faculty will make every effort to attend these events.

I direct you to continue development of the collaborative project with Yon Rojanasakul. I understand that you are fully engaged in lab meetings and are making efforts to engage individuals and their projects. Continue these efforts and work with Yon to move these projects forward toward publication. Based upon manuscripts you have indicated are in preparation, you should deliver two collaborative research publications in the next academic year, at a minimum.

**TEACHING ASSIGNMENT –**
IN GENERAL - It is expected that all faculty will fully engage in their teaching assignments, participate with their colleagues to fulfill all obligations related to the assignment, give their best efforts and strive to improve their performance in the education mission.

I direct you to continue your participation in CCB701 Biochemical and Oncogenic Signal Transduction (~9 contact hours - with Jun Liu)

I direct you to develop a section of BIOC531, which will be offered in the spring semester, 2017. You will serve as the coordinator of this section of the course. The course should contain the same content as BIOC705 (Dental Biochem), except your section should not contain the dental specific Friday sessions in BIOC705. There are 52 lectures and 6 clinical correlations in the schedule. You will develop and deliver the lectures, but should recruit other individuals for the clinical correlations.
       Support for development of this section – Mike Gunther will be a useful consultant for developing the section. Your colleagues, who teach in BIOC531/BIOC705 will be useful

Department of Biochemistry

Robert C. Byrd Health Sciences Center
PO Box 9142
Morgantown, WV 26506-9142

Phone: 304-293-2494
Fax: 304-293-6846

Equal Opportunity/Affirmative Action Institution

consultants for development of specific lectures, if necessary. Ask them if you require assistance. Gina will provide administrative support, as necessary. Consult Gina immediately regarding any paperwork required in advance of offering this section in spring 2017.

Evaluation of teaching performance in this assignment – It is important that an objective mechanism of evaluation of your teaching is put in place. As you know these are typically student and peer evaluation of teaching. I direct you to collect student evaluations in your BIOC531 section and arrange for at least two peers (mutually agreed upon between you and I) to provide evaluations on your teaching. All these evaluations should be submitted to the office for inclusion in your P&T file. If you have ideas for additional mechanisms to evaluate your teaching, I would be glad to discuss.

MSI PBL has a number of cases that require revision, and based upon your experience in PBL and developing cases, you are well qualified to make these revisions. There are 10-12 cases that require revision. All cases will be provided through Gina. I direct you to review the cases, select 4 cases and revise them in the next academic year. Revise at least one case by the end of fall semester 2016 and revise the remaining cases (up to 4 total) by the end of spring semester 2017.

Specific directions for revision of MSI PBL cases – review the cases for errors/updates on the basic facts of the case, e.g. epidemiological data, out-of-date diagnostic tools and out-of-date diagnostic tests. Some cases may be simple, 2 week long cases. These should be expanded with additional content to become 3 week long cases, e.g. by addition of confounding factors in diagnosis or treatment that requires additional knowledge/research to solve the case. An important area for update is treatment of disease. Identify one or more clinicians in the SOM, who would be a resource for each case. Contact the clinician(s) and ask him/her to review the case and update, particularly with respect to course of treatment. Incorporate updates into each case and return to Gina. The cases will be returned to you for further revision, if necessary.

PLANS FOR FUTURE TEACHING – Unless otherwise specifically stated, all teaching assignments made to the faculty are intended for the long term. Likewise, the intent is that this section of BIOC531 that you are charged to develop will be a long term assignment for you. There may be additional PBL cases to revise in future. Next year we will review the effort required to sustain the new BIOC531 section. Some additional teaching may be assigned in the future.

**SERVICE ASSIGNMENT –**
Continue service on the Non-human use of Radiation and Radionucleotides Committee

Departmental Website Committee – Continue service in this role. As you know, WVU/HSC/SoM is rolling out a new format for all websites. This will require modification of the design and content of our web site. Some of the information on the website requires updating in the very near future, and updates should be made at least once a semester.

Department Photographer – Continue service in this role. You are tasked with photographing professional events involving our faculty and staff and providing photos for our website and newsletter.

**Department of Biochemistry**

Robert C. Byrd Health Sciences Center
PO Box 9142
Morgantown, WV 26506-9142

Phone: 304-293-2494
Fax: 304-293-6846

Equal Opportunity/Affirmative Action Institution



West Virginia University
SCHOOL OF MEDICINE

July 1, 2014

**MEMORANDUM**

**TO:**     Dr. Heimo Riedel
            Professor of Biochemistry

**FROM:**   Mike Schaller, Ph.D.
            Professor & Chair of Biochemistry

**RE:**     Assignment for 2014-2015 Academic Year

**RESEARCH/SCHOLARSHIP ASSIGNMENT – 35%**
IN GENERAL -  A very important activity in the research/scholarly and training mission of the Department is the exchange of ideas.  The Departmental seminar series and Research Forum are two main venues where this occurs and it is expected that all faculty will make every effort to attend these events.

The development of collaborative efforts are the most realistic way that you can re-establish an active research program.  As we discussed, the progress of collaborative efforts are not completely within your control.  With few resources of your own and no personnel in the lab, establishing and gaining control of a collaborative project will require a hands on effort from you, and this will be most effective in your collaborators laboratory.  Your collaboration with Jing is the most likely to be fruitful.

The development of the PBL case in lung cancer has been completed and offered this past spring.  You should make every effort to submit this case for publication in this academic year.

You should develop an additional PBL case in the next academic year.  I have discussed case development with Drew and he agrees that development of another case would be beneficial to the PBL curriculum.  You should discuss ideas for a case with Drew, Heather and Steve, since they will provide valuable insight into the type of case to develop.

**TEACHI NG ASSIGNMENT – 60%**
IN GENERAL -  It is expected that all faculty will fully engage in their teaching assignments, participate with their colleagues to fulfill all obligations related to the assignment, give their best efforts and strive to improve their performance in the education mission.

MSI PBL – serve as facilitator in both the fall and spring semesters (~46 contact hrs)

Department of Biochemistry

Robert C. Byrd Health Sciences Center
Phone: 304-293-2494   PO Box 9142
Fax: 304-293-6846      Morgantown, WV 26506-9142          Equal Opportunity/Affirmative Action Institution

Participate in BIOC791E/CCB701 Biochemical and Oncogenic Signal Transduction (~9 contact hours)

Participate in BIOC339 in the fall semester (11 contact hours)

**SERVICE ASSIGNMENT – 5%**
Continue service on the following committees
Non-human use of Radiation and Radionucleotides Committee
Departmental Website Committee and Department Photographer

**Department of Biochemistry**

Robert C. Byrd Health Sciences Center
PO Box 9142
Phone: 304-293-2494     Morgantown, WV 26506-9142
Fax 304-293-6846

Equal Opportunity/Affirmative Action Institution



West Virginia University
SCHOOL OF MEDICINE

June 30, 2013

**MEMORANDUM**

TO:     Dr. Heimo Riedel
        Professor of Biochemistry

FROM:   Mike Schaller, Ph.D.
        Professor & Chair of Biochemistry

RE:     Assignment for 2013-2014 Academic Year


**RESEARCH/SCHOLARSHIP ASSIGNMENT – 35%**
IN GENERAL -  A very important activity in the research/scholarly and training mission of the Department is the exchange of ideas.  The Departmental seminar series and Research Forum are two main venues where this occurs and it is expected that all faculty will make every effort to attend these events.

Continue to seek collaborative opportunities for research using your expertise in stem cells and work toward development of collaborative grant applications as co-investigator

Lead development of online Masters in Medical Biochemistry program.

**TEACHING ASSIGNMENT – 60%**
IN GENERAL -  It is expected that all faculty will fully engage in their teaching assignments, participate with their colleagues to fulfill all obligations related to the assignment, give their best efforts and strive to improve their performance in the education mission.

Participate in teaching in the Human Function course at Oman Medical College (~20 contact hours).  This is a considerable new teaching effort.  Drew has considerable experience in Human Function and should be used as a resource in the development of these lectures.  A number of faculty teach these lectures at WVU, including Drs. Hummel, Ivanov, Pugacheva and Harris.  It would be very beneficial to sit in these lectures this fall to aid in the preparation of your lectures for spring.

MSI PBL – serve as facilitator in both the fall and spring semesters (~46 contact hrs)

Participate in BIOC791E/CCB701 Biochemical and Oncogenic Signal Transduction (~15 contact hours)

Continue participation in CCB teaching as required

**Department of Biochemistry**

Robert C. Byrd Health Sciences Center
PO Box 9142
Morgantown, WV 26506-9142

Phone: 304-293-2494
Fax: 304-293-6846

Equal Opportunity/Affirmative Action Institution

**SERVICE ASSIGNMENT – 5%**
Continue service on the following committees
Non-human use of Radiation and Radionucleotides Committee
Departmental Website Committee and Department Photographer

**Department of Biochemistry**

Robert C. Byrd Health Sciences Center
PO Box 9142
Morgantown, WV 26506-9142

Phone: 304-293-2494
Fax: 304-293-6846

Equal Opportunity/Affirmative Action Institution

**West Virginia University**
SCHOOL OF MEDICINE

June 30, 2013

**MEMORANDUM**

**TO:**     Dr. Heimo Riedel
            Professor of Biochemistry

**FROM:**   Mike Schaller, Ph.D.
            Professor & Chair of Biochemistry

**RE:**     Assignment for 2012-2013 Academic Year

**RESEARCH/SCHOLARSHIP ASSIGNMENT – 35%**
IN GENERAL - A very important activity in the research/scholarly and training mission of the Department is the exchange of ideas. The Departmental seminar series and Research Forum are two main venues where this occurs and it is expected that all faculty will make every effort to attend these events.

Continue to seek collaborative opportunities for research using your expertise in stem cells and work toward development of collaborative grant applications as co-investigator

Lead development of online Masters in Medical Biochemistry program.

**TEACHING ASSIGNMENT – 60%**
IN GENERAL - It is expected that all faculty will fully engage in their teaching assignments, participate with their colleagues to fulfill all obligations related to the assignment, give their best efforts and strive to improve their performance in the education mission.

Participate in teaching in the Human Function course at Oman Medical College (~20 contact hours). This is a considerable new teaching effort. Drew has considerable experience in Human Function and should be used as a resource in the development of these lectures. A number of faculty teach these lectures at WVU, including Drs. Hummel, Ivanov, Pugacheva and Harris. It would be very beneficial to sit in these lectures this fall to aid in the preparation of your lectures for spring.

MSI PBL – serve as facilitator in both the fall and spring semesters (~46 contact hrs)

Participate in BIOC791E/CCB701 Biochemical and Oncogenic Signal Transduction (~15 contact hours)

Continue participation in CCB teaching as required

**Department of Biochemistry**

Robert C. Byrd Health Sciences Center
PO Box 9142
Morgantown, WV 26506-9142

Phone: 304-293-2494
Fax: 304-293-6846

Equal Opportunity/Affirmative Action Institution

EXHIBIT
B



**West Virginia University.**

RESEARCH AND GRADUATE EDUCATION

March 3, 2017

MEMORANDUM

To:     Joyce E. McConnell, JD, LLM
        Provost and Vice President for Academic Affairs

From:   Laura F. Gibson, Ph.D.
        Associate Dean for Research, School of Medicine
        Senior Associate Vice President for Research and Graduate Education; Acting as Dean's Designee

Re:     Faculty Appointment of Heimo Riedel, Ph.D.

        The purpose of this communication is to make a recommendation for your consideration regarding Dr. Michael Schaller's request for termination of the faculty appointment of Professor Heimo Riedel. Dr. Schaller, Professor and Chair of Biochemistry, has put forth this request based on his evaluation of Dr. Riedel's actions as characteristic of insubordination and manifest neglect of duty. After careful review of all the documentation provided by both parties I concur with Dr. Schaller's evaluation and recommend termination of Dr. Riedel's faculty appointment for cause.

        In the annual performance evaluation of Dr. Riedel (dated January 30, 2017) Dr. Schaller provides a detailed account of a series of incidents, spanning approximately five years, in which Dr. Riedel has refused to perform his teaching duties as assigned and rejected directives to improve his teaching effectiveness. Moreover, Dr. Reidel's response to various requests from his Chair has resulted in contentious challenges to his authority to direct his activities as well as contentious interactions with course coordinators who are charged with oversight of course content and quality. One specific example that was provided was Dr. Riedel's unwillingness to follow instructions from course coordinators in an Introduction to Biochemistry course (BIOC 339) regarding lecture, quiz and examination formats and his repeated challenge of several changes intended to improve the course. Managing the situation became problematic resulting in Dr. Riedel being removed from the teaching faculty for this course. Dr. Riedel also became embroiled in conflict in an additional teaching assignment in a Problem Based Leaning (PBL) module for first year medical students. In addition to serving as facilitator for one section of PBL, his July 2014 assignment was to develop a new clinical case in consultation with PBL coordinators. Dr. Riedel ignored the advice of the PBL coordinators in developing the case, and subsequently implemented the unapproved case as an extracurricular assignment to a group of students, in violation of School of Medicine policy. This resulted in a cease and desist directive from the Associate Dean for Student Services and Curriculum, and subsequently the PBL coordinators formally requested that Dr. Riedel be removed from the PBL teaching faculty. Following a series of challenges Dr. Schaller tried unsuccessfully to chart a mutually acceptable path to keep Dr. Riedel in the class. In an effort focused on resolution Dr. Riedel engaged the Director of WVU's Dispute Resolution Skills Institute as a mediator but the meeting was noted to be contentious and did not succeed in rebuilding relationships. As a result, Dr. Riedel was no longer assigned to PBL.

OFFICE OF THE SENIOR ASSOCIATE VICE PRESIDENT
Research and Graduate Education
PO Box 9104 / 2267 Health Sciences South
Morgantown, WV 26506-9104
■304.293.7206 ■304.293.7038

MAR -8 2017

hsc.wvu.edu/resoff
Equal Opportunity/Affirmative Action Institution

Given that Dr. Riedel did not have an independently funded research program, Dr. Schaller identified opportunities for Dr. Riedel to maintain an active teaching profile. This is consistent with the general approach in the WVU HSC basic science departments in which it is entirely at the Chair's discretion to balance work load based on status of a PI's laboratory (in terms of both funding and productivity). Assignments are not "formula driven" per se but rather take into account rank (with junior faculty often being "protected" while establishing a laboratory in the early years of appointment) and overall performance, in what are dynamic portfolios of teaching, research and service commitments. Changes to assignment are typical for all faculty across the course of one's academic career. In his assignment dated August 5, 2016, Dr. Riedel was given two assignments; the first being to coordinate a General Biochemistry course (BIOC 531) to be offered in Spring 2017, providing approximately 50 lectures himself and recruiting a few colleagues to deliver clinical correlations. The assignment letter provided instruction for course development, indicating that support for the course content was available from identified departmental colleagues and committing administrative support personnel in the Department office. Dr. Riedel indicates that this particular assignment is consistent with other faculty in the department who, like Dr. Riedel, do not oversee active research laboratories. Moreover, Dr. Schaller confirmed with other educators in the department that Dr. Riedel has the experience and knowledge to teach this material at the depth required. On January 10, 2017, the day after the Spring semester began, Dr. Riedel notified Dr. Schaller that he did not prepare for the course. The graduate students (PhD and Masters level) were instead taught by other faculty members in a combined Biochemistry course (BIOC 531/705 that includes dental students). In Dr. Schaller's view, Dr. Riedel's inaction is a clear demonstration of substantial and manifest neglect of duty.

Dr. Riedel's other teaching assignment around this same time period (August 2016 letter) was to review previously utilized PBL cases for errors and possible revisions to the clinical scenarios based on current knowledge, to expand short cases by adding confounding factors, and to update the cases to include new treatment strategies. He was given his choice of cases, and tasked to complete one review/update by the end of the Fall 2016 semester and up to three case updates by the end of the Spring 2017 semester. Despite the fact that Dr. Riedel was instructed to complete this assignment independently, he insisted that the PBL coordinators needed to provide a detailed list of specific issues to be revised for each case and identify clinical faculty to assist in the revision of treatment strategies. While these collaborative efforts to update the cases are quite logical, the responsibility for completion of the task was firmly with Dr. Riedel. He failed to produce the Fall semester case update and informed Dr. Schaller on January 10th, 2017 that, absent the information he requested from the PBL coordinators, he was unable to proceed. Dr. Schaller believes this failure to complete a clear and reasonable directive represents another example of substantial and manifest neglect of duty. Taken together, these collective occurrences form the basis for Dr. Schaller's recommendation to terminate Professor Riedel's faculty appointment for cause.

In exercising his right of appeal, Dr. Riedel provided a number of documents for my review. Specifically, I have examined his initial summary appeal to the dean (February 22, 2017) and its subsequent revision (February 24th, 2017). I also considered the myriad accompanying electronic correspondences and memoranda, including his most recent departmental promotion and tenure committee evaluation (dated January 31st, 2017). Review of these documents very carefully was warranted as I completely respect the magnitude of this recommendation and it is essential to rigorously, and fairly, consider both perspectives.

Dr. Riedel asserts that he has never been insubordinate or negligent in any of his assigned duties, and provides as supportive evidence his departmental promotion and tenure committee evaluation ranking him as "good" in all three mission areas and recommending his reappointment. His view appears to be that Dr. Schaller has orchestrated a multi-year plot to fabricate escalating charges in order to justify his eventual termination. Specifically, Dr. Riedel indicates that beginning in 2012 he has been tasked with repeated unreasonable and unfeasible projects that were essentially doomed to fail. Furthermore, he views the cancellation of his major teaching assignments as a hostile act perpetrated to force him into new tasks that represented what he characterizes as "death march projects". Also implied is that Dr. Schaller's aggressive posture toward him represents, in large part, retaliation for the numerous formal grievances Dr. Riedel has filed against Dr. Schaller. Moreover, he claims that despite his provision of numerous documents that illustrate the chair's adverse and retaliatory actions and disregard of proper procedure, the Dean and his delegates have failed to address his complaints.

Dr. Riedel rebuts the two most serious allegations against him as follows: He believes his new assignment to coordinate and deliver ~ 52 lectures in BIOC 531 is "absurd, unreasonable and unfeasible" because the assignment is excessive, unnecessary, and relies on background that he does not possess. Regarding the assignment to revise old PBL cases, Dr. Riedel insists that his directive to work independently, his lack of clinical expertise, and the failure of communication and unprofessional attitude of the PBL coordinators toward him earmarked this task, again, as a "death march".

My review of all the documentation provided does not support this perspective or Dr. Riedel's conclusions. Dr. Schaller has advocated for Dr. Riedel in many circumstances, including approval of his yearlong sabbatical leave in 2010-2011 and supporting a Research Assistant Professor to sustain productivity in Dr. Riedel's laboratory during his sabbatical. Dr. Schaller has made consistently reasonable and equitable teaching assignments, and his evaluations of Dr. Riedel over the past several years have been generally positive. It is important to note that the role of the promotion and tenure committee is not to address the type of issues that are central to the current discussion (insubordination and neglect of duty) but rather overall evaluation of performance and productivity as it relates to manuscripts, grants, student evaluations in the courses in which a faculty member participates and engagement in service. It is not expected that the committee will comment on, or even have access to, many of the details that underpin this request from Dr. Schaller or my recommendation. As such, with all due respect to the promotion and tenure process and the faculty engaged in annual reviews, the indication of "good" performance or satisfactory ratings are not key factors in the current discussion. A debate over whether Dr. Riedel did or did not perform well in a specific course is misguided in this context.

Finally, Dr. Schaller has made a consistent effort to resolve conflicts between Dr. Riedel and his colleagues as well as between himself and Dr. Riedel and I believe there have been points at which Dr. Riedel also sought to improve a working relationship that had become contentious and challenging for both parties. However, this is again, not the fundamental issue. There is clear and well documented evidence of insubordination and neglect of duty that result in my recommendation of support for Dr. Schaller's request that Dr. Heimo Riedel's appointment as tenured Professor of Biochemistry be terminated for cause effective June 30, 2017. It is my understanding that Dr. Riedel has the opportunity to appeal this recommendation for termination within 10 working days of your receipt of this message, and that any appeal should be directed to you as the Provost.

cc:    Dr. Michael Schaller
       Dr. Clay Marsh
       Carol Marunich
       Dr. Heimo Riedel

**West Virginia University**
OFFICE OF THE PROVOST AND VICE PRESIDENT FOR ACADEMIC AFFAIRS

**Certified Mail**
**Restricted Delivery**
**Return Receipt Requested;**
**First Class Mail; and**
**Electronic Mail**

**TO:**     Heimo Riedel, Ph.D.
            Professor, Department of Biochemistry

**FROM:**   Joyce McConnell, JD, LLM
            Provost and Vice President for Academic Affairs

**DATE:**   May 12, 2017

**RE:**     Intent to Terminate Faculty Appointment/Employment

The purpose of this memorandum is to inform you of the intention to terminate your faculty appointment/employment with West Virginia University effective June 30, 2017. You will be given an opportunity to discuss this intended action with us before a final decision is made. This intent to terminate your faculty appointment/employment is based upon the information outlined below:

- The information contained in Michael Schaller's request for termination of your faculty appointment.
- The information contained in Laura Gibson's recommendation for termination of appointment for cause.
- The information you provided to Dr. Schaller, Dr. Gibson and to the Provost's Office.

After being given directives from your Chair, you continuously failed to improve and the evidence is that you are insubordinate and have shown a continued neglect of duty as a tenured faculty member in Biochemistry.

BOG policy 2, Section 12.1, states in relevant part:

> Causes for Dismissal: The dismissal of a faculty member shall be effected only pursuant to the procedures provided in these policies and only for one or more of the following causes:

EXHIBIT
C

**12.1.3.**
**Insubordination by refusal to abide by legitimate reasonable directions of administrators; and**

**12.1.5.**
**Substantial and manifest neglect of duty.**

**If you would like to discuss this intended termination of faculty appointment/employment and to present any information that you feel may influence this decision, you must do so at a meeting to be held on May 25, 2017 at 1:30 p.m, Room 208 Stewart Hall.**

**C:    Clay Marsh**
**Laura Gibson**
**Louise Veselicky**
**Michael Schaller**

# West Virginia University

OFFICE OF THE PROVOST AND VICE PRESIDENT FOR ACADEMIC AFFAIRS

**Certified Mail
Restricted Delivery
Return Receipt Requested;
First Class Mail; and
Electronic Mail**

**TO:**     Heimo Riedel, Ph.D.
Professor, Department of Biochemistry

**FROM:**   Joyce McConnell, JD, LLM
Provost and Vice President
for Academic Affairs

**DATE:**   June 5, 2017

**RE:**     Notification of Termination of Employment

After consideration of the information you provided at the meeting held on Thursday, May 25, 2017, at which we discussed my intent to terminate your faculty appointment/employment, I must inform you of my decision to terminate your employment. The effective date of your termination is June 30, 2017. This decision is based upon the information that was outlined for you in the letter of Intent to Terminate Faculty Appointment/Employment and in consideration of the information that you provided at the meeting held on May 25, 2017.

The Public Employees Insurance Agency (PEIA) will be notified that your employment with West Virginia University will be terminated effective June 30, 2017. Because your employment with WVU is being terminated involuntarily, you are eligible for a three (3) month extension of your PEIA health insurance benefits at your current employee premium rate. If you would like to take advantage of this extension of benefits, please contact the WVU Benefits Office within two (2) weeks of the date of this letter to initiate your extension of benefits and set up a payment arrangement.

PEIA's third party administrator, HealthSmart, will send information regarding your right to continue your benefits under the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA). You would be responsible for the payment of insurance premiums should you decide to continue these benefits. If you have any questions regarding your benefits, please contact our Benefits Office at (304) 293-5700 ext. 4.

PO Box 6203   Room 206 Stewart Hall
Morgantown, WV 26506-6203
304.293.7119   304.293.7554

http://provost.wvu.edu
Equal Opportunity/Affirmative Action Institution

EXHIBIT
**D**

On or before June 30, 2017, please return your WVU ID badge, keys, parking permit (if applicable), P-Card, and any other University property either in person or mail to:

West Virginia University
Division of Human Resources
Room G111B/HSC North
Morgantown, WV  26506-9028

cc:    Clay Marsh, M.D.
       Michael Schaller, Ph.D.
       Louise Veselicky, DDS, MDS, MED
       Laura Gibson, Ph.D.
       WVU HR /Benefits

(W0059771)

26 JUN 2017 PM 2:35

## State of West Virginia - Public Employees Insurance Agency
## Retirement Health Benefits and Basic Life Insurance Enrollment Form

RET

Please read and follow the instructions included with this form when completing it. Use this form to enroll for health and basic life insurance coverage as a retiree. You must complete this form to continue your benefits as a retiree. This is a 2-page form. You must submit both pages for your enrollment to be valid. Incomplete forms will be returned and may delay your enrollment. Complete all sections of the form except the last section, "AGENCY", and return the completed form to your benefit coordinator.

**RETIREE**

| Name (Last) | (First) | (MI) | Generation – Jr., Sr. III) | Social Security Number | Medicare ID Number |
|---|---|---|---|---|---|
| RIEDEL | HEIMO | | | ▓▓▓-3878 | N A |

| Street Address | County of Residence | Home Phone |
|---|---|---|
| 760 NORTHWEST DRIVE | USA | (304) 599-6339 |

| City | State | Zip |
|---|---|---|
| MORGANTOWN | WV | 26505 |

| Date of Birth (mm/dd/yyyy) | Sex (Check One) M / F | I decline participation in any health or life insurance coverage. |
|---|---|---|
| 05/07/1955 | ☑M ☐F | Signature _____ Date _____ |

**FAMILY INFORMATION**

1) Provide the date when you were or when you will be entitled to Medicare coverage. Effective Date: MAY 1, 2020. Please provide a copy of your Medicare ID Card if and when you are eligible for Medicare.

2) Provide the name of your last employer and your last day worked: WVU, JUNE 30, 2017

3) Complete the following information for all dependents who will be covered under your plan.

| Name (Last, First, MI, Generation) | Address (if different from above) | Relationship (Circle One) | Sex (Circle One) | Birth Date (mm/dd/yyyy) | Social Security Number |
|---|---|---|---|---|---|
| RIEDEL, NORA | | SP CH | M F | 09/25/1955 | ▓▓▓-5652 |
| | | SP CH | M F | | |
| | | SP CH | M F | | |
| | | SP CH | M F | | |

**BASIC LIFE BENEFICIARY**

| Beneficiary Name (Last, First, MI, Generation) | Beneficiary Address (Street, City, State, Zip) | Social Security Number | Relationship to the Insured | Distribution % (Total Must Equal 100%) |
|---|---|---|---|---|
| RIEDEL, NORA | 760 NORTHWEST DRIVE MORGANTOWN WV 26505 | 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 | SPOUSE | 100 % |
| | | | | |
| | | | | |

**COVERAGE**

**COVERAGE SELECTION (Select One)**
I am enrolling for:

☐ Policyholder Only Health and Life Print the name of the plan you choose here:

☐ Family Health and Life Print the name of the plan you choose here:

☒ Life Insurance Only (NO health benefits)

☐ Life Insurance Only (health benefits under spouse's PEIA plan)

☐ Health Insurance Only (NO life insurance benefits)

**EARNED EXTENDED BENEFITS**
(Sick and/or Annual Leave Credits)
Complete if you have sick and/or annual leave credits.
I choose to use my credits to:

☐ Extend my employer-paid insurance coverage. Please be aware that if the policyholder dies while using this benefit, survivors may continue coverage, but may not use any remaining accrued leave.

☐ Increase my annuity amount (Complete proper forms from CPRB).

Please be aware that if you submit conflicting documents regarding the use of your leave credits, the document you file with the CPRB will take precedence.

**DEDUCTION AUTHORITY**

☐ I authorize annuity deduction for any required premium beginning immediately after my earned extended coverage ends.

☐ I authorize annuity deduction for any required premium. I am not taking leave credit for insurance.

☐ I DO NOT authorize annuity deduction. I request that my coverage terminate at the end of my earned extended coverage.

This form is continued on page 2. You must complete and return both pages of the form for it to be valid. Please continue.

**EXHIBIT E**

## Retirement Health Benefits and Basic Life Insurance Enrollment Form
### Page 2

**AFFIDAVITS**

**Tobacco Affidavit:** Mark which members of the family (if any) use tobacco and sign the acceptance box below. If no one enrolled on your PEIA coverage uses tobacco, you will receive a premium discount on any PEIA PPB Plan health coverage and/or optional life insurance. I acknowledge by signing the Acceptance box below that WVPEIA or its agents have access to my medical records to check my tobacco use status.

Who uses tobacco: ☐ Policyholder  ☐ Dependent (spouse and/or children)  ☒ No Tobacco Users within the last six (6) months

**Living Will Affidavit:** PEIA offers a premium discount to health policyholders who have executed a Living Will/Advance Directive. If you have a valid living will, please check the box beside the statement below and sign the button in the Acceptance box below.

☐ By checking this box, I acknowledge that I have executed a valid Living Will or advance directive, and that I have discussed its contents with the appropriate parties, including my family and my health care provider.

**ACCEPTANCE**

I hereby accept the group coverage I have indicated on this form. I understand that the PEIA may change the types or levels of benefits or the amount of contribution, and that the choices I have made may affect my contributions. I certify that the above information is true and correct and understand that providing false information on this form is illegal and that those who provide false information may be prosecuted. I hereby consent, for myself and my covered dependents, to the release to PEIA and to the health care plan I have selected, of all medical and prescription drug information needed to process claims, determine coverage, review utilization, investigate complaints, assess quality of care, evaluate plan performance or any other process involved in my treatment, payment of claims or health care operations.

Signature: _Heinz Riedel_    Date: 06 / 23 / 2017

### Employer Information -- TO BE COMPLETED BY AGENCY BENEFIT COORDINATOR

**AGENCY**

Active Account Number: 8 8 6 1 0 7 2 0 4    Retiree Account Number: T I A A

Does the retiree remain on the Active Account? ☒ Yes  ☐ No

Agency Name (optional): _WVU Retiree_

Last Date of Active Employment: 06 / 30 / 2017    Effective Date of Retirement: 07 / 01 / 2017    _LBP1 only_

Hire Date: 08 / 18 / 2003    Effective Date of Retiree Insurance Coverage: 07 / 01 / 2017

Number of days of accrued sick and annual leave for which the employee was not paid when employment ceased. _N/A_ [ ][ ][ 0 ]

Number of months of earned extended insurance coverage  (2 days = 1 month single; 3 days = 1 month family coverage). Partial months are not allowed. _N/A_ [ ][ ][ ]

Total WV State Government credited years of service: 1 3

Higher Education Faculty Only Total years of extended coverage (in months): [ ][ ][ ]
3-1/3 years service = 1 year single coverage; 5 years service = 1 year family coverage

Member Retirement from: ☒ TIAA-CREF  ☐ TRS  ☐ TDC  ☐ PERS

I hereby certify that, to the best of my knowledge, the information contained herein is accurate. I further certify that the applicant meets the minimum eligibility requirements for the Public Employees Insurance Plan.

Authorized Signature: _Sandra Verna_    Date: 6-26-17

Revised October 2012

**THE WEST VIRGINIA PUBLIC EMPLOYEES
GRIEVANCE BOARD**

**HEIMO RIEDEL,**
      **Grievant,**

**v.**                                      **Docket No. 2015-1774-CONS**

**WEST VIRGINIA UNIVERSITY,**
      **Respondent.**

### DISMISSAL ORDER

Grievant, Dr. Heimo Riedel, was employed by Respondent, West Virginia University. On or about March 30, 2015, Grievant filed this action challenging his ratings by the chairman of the Department of Biochemistry in his most recent annual review.  Grievant disagrees with the good rating provided by his Chair in the areas of teaching and service. Thereafter, Grievant filed multiple actions alleging retaliation, harassment and discrimination.  In addition, he filed grievances in which he continued to allege retaliation against the Chair of his department.  An Order Denying Default was entered by the undersigned on October 13, 2016.  All grievances were Ordered consolidated and to be set at Level Three of the grievance process.

Prior to the Level Three hearing scheduled for September 28, 2017, Respondent filed a Motion to Dismiss due to Grievant's retirement effective June 30, 2017.  Grievant provided a response to this motion on September 18, 2017.   Notwithstanding Respondent's submission of Grievant's retirement paperwork, Dr. Reidel did not concede that he had retired, but indicated that he was in "the process of setting up a legal response to the termination to result in his full reinstatement and compensation for any resulting

EXHIBIT
**F**

losses and damages which would make the sought relief available again." No such response was provided by Dr. Riedel or his representative. The record of this case established that Dr. Riedel retired from employment with West Virginia University and was not terminated from employment. On the request of Grievant, the Level Three hearing was cancelled and the parties were notified that the undersigned would issue a ruling on the motion. Grievant appeared *pro se*. Respondent appeared by its counsel, Samuel R. Spatafore, Assistant Attorney General.

## Synopsis

Grievant was a Professor in the Department of Biochemistry of West Virginia University's School of Medicine. Grievant disagrees with the good rating provided by the Chair of his department in the areas of teaching and service. Subsequently, Grievant filed numerous grievances disputing the actions of his Department Chair. After filing his grievance, Dr. Riedel retired. Respondent asserts the grievance is now moot because Grievant retired and failed to state a claim upon which relief can be granted. Respondent proved Grievant's claims are either moot due to his retirement or a remedy that is unavailable is requested from the Grievance Board. Accordingly, the grievance is dismissed.

The following Findings of Fact are based upon the record created in this case.

## Findings of Fact

1.     Grievant was a Professor in the Department of Biochemistry of West Virginia University's School of Medicine.

2

2.      On March 30, 2015, Grievant filed an action challenging the ratings given to him by the chairman of the Department of Biochemistry in his most recent annual review. Grievant disagrees with the good ratings provided by his chairman in the areas of teaching and service.

3.      On April 24, 2015, Grievant filed his second grievance assigned Docket No. 2015-1194-WVU which alleged retaliation, harassment and discrimination.  A Level One hearing was scheduled for May 13, 2015.

4.      On May 7, 2015, Grievant filed his third grievance assigned Docket No. 2015-1246-WVU which alleged retaliation and denial of academic freedom.

5.      On August 7, 2015, Grievant filed his fourth grievance assigned Docket No. 2016-0124-WVU which alleged retaliation when his Department Chair required that he follow directives related to teaching.

6.      On August 10, 2015, Grievant filed his fifth grievance assigned Docket No. 2016-0115-WVU which alleged retaliation when Grievant was questioned about the contents of his leave form.

7.      On November 10, 2015, Grievant filed his sixth grievance assigned Docket No. 2016-0838-WVU which alleged retaliation related to teaching issues.

8.      On November 11, 2015, Grievant filed his seventh grievance assigned Docket No. 2016-0839-WVU which alleged retaliation related to a photography assignment.

9.      On December 16, 2015, Grievant filed his eighth grievance assigned Docket No. 2016-1031-WVU which alleged retaliation pursuant to the request for him to limit repetitive use of exam questions.

3

10.      On February 16, 2016, the parties and the hearing examiner met for a pre-hearing conference on the above grievances.  During the conference, Grievant's request that he be allowed to conduct extensive discovery prior to scheduling a hearing was denied.  Grievant's refusal to accept the ruling made further progress in the procedure unattainable.  Grievant was advised on February 16, 2016, that the grievances would be waived to the Grievance Board.  Grievant stated no objection to the waiver at that time.

11.      At the conclusion of the pre-hearing conference, grievances one through eight were waived to Level Three on February 24, 2016.

12.      On March 17, 2016, Grievant filed his ninth grievance assigned Docket No. 2016-1440-WVU which alleged retaliation and harassment pursuant to an issue regarding his teaching.

13.      On March 21, 2016, Grievant filed his tenth grievance assigned Docket No. 2016-1455-WVU which alleged retaliation in relation to an evaluation received by his Department Chair.

14.      On March 23, 2016, grievances nine and ten were waived to Level Three.

15.      On March 25, 2016, grievances one through ten were consolidated at Level Three by the Grievance Board with the above docket number.

16.      On April 12, 2016, Grievant filed his eleventh grievance assigned Docket No. 2016-1530-WVU which again alleged retaliation pursuant to teaching issues.  A hearing was scheduled for May 3rd and was continued on Grievant's request, dated April 26th.

17.      On April 19, 2016, Grievant filed his twelfth grievance assigned Docket No. 2016-1568-WVU which alleged Respondent failed to notify his Department Chair that Grievant had filed another grievance against him.

4

18.    Both the April 12th and April 19th grievances were consolidated into the current grievance.

19.    A Level Three hearing was scheduled before the undersigned on September 28, 2017, on all the above-referenced issues consolidated in the current grievance.

20.    On June 23, 2017, Grievant submitted paperwork to retire from employment. Grievant is now retired.

## Discussion

"Grievances may be disposed of in three ways: by decision on the merits, nonappealable dismissal order, or appealable dismissal order." W. VA. CODE ST. R. § 156-1-6.19. "Nonappealable dismissal orders may be based on grievances dismissed for the following: settlement, withdrawal; and, in accordance with Rule 6.15, a party's failure to pursue." W. VA. CODE ST. R. § 156-1-6.19. 2. "Appealable dismissal orders may be issued in grievances dismissed for all other reasons, including, but not limited to, failure to state a claim or a party's failure to abide by an appropriate order of an administrative law judge. Appeals of any cases dismissed pursuant to this provision are to be made in the same manner as appeals of decisions on the merits." W. VA. CODE ST. R. § 156-1-6.19. 3. "A grievance may be dismissed, in the discretion of the administrative law judge, if no claim upon which relief can be granted is stated or a remedy wholly unavailable to the grievant is requested." W. VA. CODE ST. R. § 156-1-6.11. "Any party asserting the application of an affirmative defense bears the burden of proving that defense by a preponderance of the evidence." W. VA. CODE ST. R. § 156-1-3.

All the issues in the instant matter relate to Grievant's allegations against his chair and requests as relief that the actions cease.   Grievant retired on June 30, 2017.

5

Therefore, all the issues are moot and any decision rendered by the undersigned would merely be an advisory opinion.  "Moot questions or abstract propositions, the decisions of which would avail nothing in the determination of controverted rights of persons or property, are not properly cognizable [issues]."  *Pritt, et al., v. Dep't of Health & Human Res.*, Docket No. 2008-0812-CONS (May 30, 2008). The Grievance Board will not hear issues that are moot. *Cobb, et al., v. Div. of Highways*, Docket No. 2009-1017-CONS (Dec. 31, 2009).

Based upon the above, no claim upon which relief can be granted is stated and the remedy requested is wholly unavailable to the Grievant; these facts present no case in controversy.  When there is no case in controversy, the Grievance Board will not issue advisory opinions. *Brackman v. Div. of Corr./Anthony Corr. Center,* Docket No. 02-CORR-104 (Feb. 20, 2003); *Gibb v. W. Va. Div. of Corr.*, Docket No. 98-CORR-152 (Sept. 30, 1998).

The following Conclusions of Law support the dismissal of this grievance.

## Conclusions of Law

1.      "A grievance may be dismissed, in the discretion of the administrative law judge, if no claim on which relief can be granted is stated or a remedy wholly unavailable to the grievant is requested."  Procedural Rules of the Public Employees Grievance Board, 156 C.S.R. 1 § 6.11 (2008).

2.      As defined by statute, a grievance must allege "a violation, a misapplication or a misinterpretation of the statutes, policies, rules or written agreements applicable to the employee."  W. Va. Code § 6C-2-2(g)(1).

6

3.    The scope of the authority of the Grievance Board is limited to that set forth in the Grievance statutes.  *Skaff v. Pridemore*, 200 W. Va. 700, 490 S.E.2d 787 (1997).

4.    "Because it is not possible for any actual relief to be granted, any ruling issued by the undersigned regarding the question raised by this grievance would merely be an advisory opinion. 'This Grievance Board does not issue advisory opinions. *Dooley v. Dep't of Transp.,* Docket No. 94-DOH-255 (Nov. 30, 1994); *Pascoli & Kriner v. Ohio County Bd. of Educ.,* Docket No. 91-35-229/239 (Nov. 27, 1991).' *Priest v. Kanawha County Bd. of Educ.,* Docket No. 00-20-144 (Aug. 15, 2000)." *Smith v. Lewis County Bd. of Educ.*, Docket No. 02-21-028 (June 21, 2002).

5.    This grievance presents no claim upon which relief can be granted and a remedy wholly unavailable is requested.

Accordingly, this grievance is **DISMISSED**.

Any party may appeal this Order to the Circuit Court of Kanawha County. Any such appeal must be filed within thirty (30) days of receipt of this Order.  *See* W. VA. CODE § 6C-2-5. Neither the West Virginia Public Employees Grievance Board nor any of its Administrative Law Judges is a party to such appeal and should not be so named. However, the appealing party is required by W. Va. Code § 29A-5-4(b) to serve a copy of the appeal petition upon the Grievance Board. The Civil Action number should be included so that the certified record can be properly filed with the circuit court.  *See also* 156 C.S.R. 1 § 6.20 (2008).

**Date: October 31, 2017**                         _____

                                                    **Ronald L. Reece**
                                                    **Administrative Law Judge**

7

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,
                    Petitioner,

v.                                                        Civil Action No: 17-AA-94
                                                          Judge Carrie Webster
WEST VIRGINIA UNIVERSITY

and

PUBLIC EMPLOYEES GRIEVANCE BOARD,
                    Respondents.

## FINAL ORDER

This matter comes before the Court pursuant to a Petition filed by Heimo Riedel, *pro se* Petitioner

below ("Petitioner"), appealing a *Dismissal Order* of the West Virginia Public Employees Grievance Board

("Grievance Board") dated October 31, 2017, by Administrative Law Judge Ronald L. Reece ("ALJ"),

which Dismissed Petitioner's grievances pursuant to his retirement from employment.  Petitioner denies

that he retired.

On a previous date, the Court issued an *Order Setting Administrative Briefing Schedule.* Thereafter,

Petitioner submitted his brief.  Respondent did not file brief in response, but in lieu thereof advised the

Court of the ruling entered in *Heimo Riedel v. West Virginia University,* Case No. 18-AA-235, pursuant to

which on July 29, 2019, Hon. Judge Tera Salango entered a *Final Order* dismissing the action, finding that

Petitioner voluntarily retired which rendered any and all pending or future grievances as moot.

The Court has concluded that the facts and legal issues are fully developed such that oral argument

is not required for resolution of the Petition.  Accordingly, the matter is ripe for decision.

The Court has reviewed the record and briefs of the parties, and for the reasons set forth below,

concludes that Petitioner's appeal must be **DENIED**, and the *Dismissal Order* of the West Virginia Public

Employees Grievance Board, dated October 31, 2017, be **AFFIRMED**.

## STANDARD OF REVIEW

West Virginia Code §6C-2-5 defines enforcement and reviewability of decisions conducted before

the West Virginia Public Employees Grievance Board.  Judicial review of such decisions is similar to the

EXHIBIT
G

standard of review under the <u>Administrative Procedure Act</u>, § 29A-5-4, in that both require that findings of fact made at an administrative hearing not be reversed unless they are clearly wrong. <u>Parham v. Raleigh County Bd. of Educ. v. Scalia</u>, 192 W. Va. 540, 453 S.E.2d 374 (1994).

The decision of an Administrative Law Judge can be reversed on appeal to the circuit court if the decision is:

(1) Is contrary to law or a lawfully adopted rule or written policy of the employer;
(2) Exceeds the administrative law judge's statutory authority;
(3) Is the result of fraud or deceit;
(4) Is clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or
(5) Is arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W. Va. Code § 6C-2-5. *See* <u>Board of Educ. v. Wirt</u>, 192 W. Va. 568, 453 S.E.2d 402 (1994). A final order of the Grievance Board made pursuant to W. Va. Code § 18-29-1 [6C-2-5] *et seq.*, and based upon findings of fact should not be reversed unless clearly wrong. <u>Hanlon v. Logan County Bd. of Educ.</u>, 201 W. Va. 305, 496 S.E.2d 447 (1997); <u>Quinn v. W. Va. Northern Community College</u>, 197 W. Va. 313, 475 S.E.2d 405 (1996); <u>W. Va. Dep't of Health and Human Resources/Welch Emergency Hosp. v. Blankenship</u>, 189 W. Va. 342, 431 S.E.2d 681 (1993); <u>Randolph County Bd. of Educ. v. Scalia</u>, 182 W. Va. 289, 387 S.E.2d 524 (1989).

The circuit court's scope of review of an Administrative Law Judge's decision under the grievance statute is limited to the five grounds enumerated above. <u>Parker v. Summers County Bd. of Educ.</u>, 185 W.Va. 313, 406 S.E.2d 744 (1991). A court will not reverse the evidentiary findings of an Administrative Law Judge unless they are clearly wrong. <u>Parham v. Raleigh County Bd. of Educ.</u>, *supra*; <u>Randolph Co. Bd. of Educ. v. Scalia</u>, *supra*. Findings should be sustained if they are supported by substantial evidence. *See* <u>Hanlon v. Logan County Bd. of Educ.</u>, *supra*. The appellate court is not to substitute its judgment for that of the Administrative Law Judge. <u>Keatley v. Mercer County Bd. of Educ.</u>, 200 W. Va. 487, 490 S.E.2d 306 (1997); <u>Martin v. Randolph County Bd. of Educ.</u>, 195 W. Va. 297, 465 S.E.2d 399 (1995);

2

Randolph County Bd. of Educ. v. Scalia, *supra*. If the lower tribunal's conclusion is plausible when viewing the evidence in its entirety, the appellate court may not reverse even if it would have weighed the evidence differently. Hanlon v. Logan County Bd. of Educ., *supra*; Board of Educ. v. Wirt, *supra*. Conclusions of law and application of the law are reviewed *de novo*. Univ. of W. Va. Bd. of Trustees v. Fox, 197 W. Va. 91, 475 S.E.2d 91 (1996); Martin v. Randolph Co. Bd. of Educ., *supra*.

## FINDINGS OF FACT

1.    Petitioner was a Professor in the Department of Biochemistry of WVU's School of Medicine.

2.    On May 12, 2017, Petitioner received correspondence from WVU Provost and Vice President of Academic Affairs captioned, "Intent to Terminate Faculty Appointment/Employment," effective June 30, 2017. The correspondence detailed the issues with Petitioner's performance in his department and with his Department Chair, and also established a May 25, 2017, meeting date to discuss the contents of the correspondence.

3.    When Petitioner received the "Intent to Terminate Faculty Appointment/Employment" letter, he had twelve grievance matters pending before the Grievance Board, alleging retaliation, harassment, and discrimination against him by his Department Chair. All grievances were ordered consolidated and set for a Level III hearing under one case number, Docket Number 2015-1774-CONS.

4.    The consolidated Level III hearing was scheduled for September 28, 2017.

5.    On June 5, 2017, Petitioner received correspondence from WVU Provost and Vice President of Academic Affairs captioned "Notice of Termination of Employment," which served as a follow-up to the May 25, 2017 meeting, and confirmed that Petitioner's termination would be effective June 30, 2017.

6.    On June 26, 2017, Petitioner filled out a form titled, "State of West Virginia Public Employees Retirement Agency Retirement Health Benefit and Basic Life Insurance Enrollment Form."

3

The form is filled out in Petitioner's handwriting. On the form, Petitioner listed his last day of employment as June 30, 2017, and the effective date of retirement as July 1, 2017.

7.    On June 29, 2017, counsel for Respondent emailed Petitioner to advise that he had become aware that Petitioner submitted paperwork to retire from employment. Counsel for Respondent asked Petitioner to confirm that he was being processed for retirement.

8.    Petitioner replied to Counsel for Respondent via email that he would not formally respond to the inquiry, and that he was in "the process of setting up a legal response to the termination to result in his full reinstatement and compensation for any resulting losses and damages which would make the relief sought available again." *See Dismissal Order*.

9.    The *Dismissal Order* reflects that no such response was received by Petitioner or his representative.

10.    Prior to the consolidated Level III hearing, Respondent filed a "Motion to Dismiss," citing that Petitioner had submitted retirement paperwork, and failure to otherwise respond.

11.    Petitioner's separation from employment was processed by Respondent as retirement and all relevant state agencies were notified as such.

12.    On October 31, 2017, the Grievance Board entered a *Dismissal Order,* finding that based upon Petitioner's retirement, all pending grievance proceedings were rendered moot and were accordingly dismissed.

13.    On December 6, 2017, Petitioner appealed the *Dismissal Order* to this Court and requested that the matter be remanded to the Grievance Board for another hearing.

14.    While this matter was pending, Petitioner pursued a separate grievance proceeding related to his release from employment with WVU. On August 24, 2018, Petitioner's appeal of the subsequent grievance matter was assigned Case No. 18-AA-235, and assigned to Judge Tera Salango.

15.    On July 29, 2019, Judge Tera Salango entered a *Final Order* finding that Petitioner voluntarily retired which rendered any and all pending or future grievances as moot. As a result of his

4

retirement, Judge Salango found that the petition failed to raise a claim upon which relief can be granted and the case was dismissed.

16.    Petitioner tendered various documents relating to Case No. 18-AA-235 for the Court's consideration herein. The Court has not given consideration to any documents that are not part of the underlying record in this case. This action has been determined solely upon the record made in this matter.

## DISCUSSION AND CONCLUSIONS OF LAW

It is true that plenary review is conducted as to the conclusions of law and application of law to the facts which are reviewed de novo. Syllabus Point 1 *Cahill v. Mercer County Board of Education*, 208 W.Va. 177, 539 S.E.2d 437 (2000). However, the law is clear that a reviewing court is obligated to give deference to factual findings rendered by an administrative law judge and a circuit court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations. Therefore, in the instant matter, this Court must give deference to the factual findings of the ALJ and this Court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations.

Petitioner maintains that he did not retire. Petitioner maintains this argument despite the fact that he did, in fact, fully fill out and endorse the "State of West Virginia Public Employees Retirement Agency Retirement Health Benefit and Basic Life Insurance Enrollment Form."[1] The ALJ found that Petitioner voluntarily retired on June 23, 2017.

Our Court has established that retirement and/or resignation moots pending proceedings scheduled before the Grievance Board at the time of separation. The Court has opined that because the grievance system provides a procedure for public employees to resolve grievances with regard to their employment, when an employee retires or resigns, the matters contained in pending grievances become moot questions or abstract propositions, the decisions of which would avail nothing in the determination of controverted rights of persons or property, are therefore not proper issues before the Grievance Board. " 'Courts are not

---

[1] The form bears a received date/time stamp of "June 26, 2017, 2:35 p.m.," is two pages in length, and is fully filled out in Petitioner's hand writing and bears his signature. Petitioner has not contested the validity of the form or argued that it is a forgery. *See* Public Employees Grievance Board Record, page 41.

constituted for the purpose of making advisory decrees or resolving academic disputes....' Syllabus point 2, in part, *Harshbarger v. Gainer*, 184 W.Va. 656, 403 S.E.2d 399 (1991)." Syl. Pt. 4, *Huston v. Mercedes–Benz USA, LLC*, 227 W.Va. 515, 711 S.E.2d 585 (2011). " 'Courts will not ordinarily decide a moot question.' Syl. pt. 1, *Tynes v. Shore*, 117 W.Va. 355, 185 S.E. 845 (1936)." Syl. Pt. 4, *Bland v. State*, Nos. 11 0746, 110747, 111146, 2012 WL 5898071 (W.Va.2012). *See also: Joseph Komorowski v. Marshall County Board of Education*, No. 11-1659 and 11-1767 (W. Va. Supreme Court, February 22, 2013) (memorandum decision), where the Court found that the grievances were moot because grievant voluntarily resigned while his grievance was pending.

Accordingly, the Court **FINDS** that the Board of Review's decision reflected in the *Dismissal Order* is correct:  Petitioner retired from employment.  The Court **FINDS** that the ALJ's ruling in this matter is neither contrary to law nor contrary to lawfully adopted rule; the decision does not exceed the Board of Review's statutory authority; the decision is not the result of fraud or deceit; the decision is not clearly wrong in view of the reliable, probative and substantial evidence on the whole record; and, the decision is not arbitrary or capricious nor is it characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.

## ORDER

It therefore **ORDERED** that the *Dismissal Order* dated October 31, 2017, dismissing the underlying grievances pursuant to Petitioner's retirement from employment, is hereby **AFFIRMED**.

It is further **ORDERED** that this matter be dismissed and stricken from the docket of the Court.

The Clerk of Court is **ORDERED** to transmit a copy of this order, duly certified, to the following:

Heimo Riedel
760 Northwest Dr.
Morgantown, WV 26505
heimoriedel@gmail.com

Samuel R. Spatafore
Assistant Attorney General
WV Higher Education Policy Commission
1018 Kanawha Blvd., East
Charleston, WV 25301
Sam.Spatafore@wvhepc.edu

Entered this 20th day of May, 2020.

Carrie Webster, Judge

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF CIRCUIT COURT OF SAID COUNTY AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE COPY FROM THE RECORDS OF SAID COURT.
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS 21
DAY OF May 2020

6

## THE WEST VIRGINIA PUBLIC EMPLOYEES GRIEVANCE BOARD

**HEIMO RIEDEL,**

        **Grievant,**

**v.**                                  **Docket No. 2017-2469-WVU**

**WEST VIRGINIA UNIVERSITY**

        **Respondent.**

### <u>DISMISSAL ORDER</u>

Grievant, Dr. Heimo Riedel, was employed by Respondent, West Virginia University. On June 23, 2018, Grievant filed *pro se*[1] a grievance against Respondent stating the following:

> This grievance addresses the termination of my employment effective 6/30/2017 that was communicated by WVU provost McConnell. I have filed a considerable number grievances addressing various violations by WVU mostly by the department chair over more than two years (that have not been heard) including the violation of my academic freedom – and the termination is retaliatory to my grievance activity. The stated allegations of insubordination and substantial and manifest neglect of duty are false. The notice represents a wrongful termination since my tenured appointment supports my academic freedom and protects me from capricious dismissal. The termination was recommended by the department chair (in contradiction to the recommendation of the departmental annual review committee) and my appeals were not properly reviewed at subsequent levels – instead the chair's recommendation was simply signed off at higher levels.

The relief sought states:

> I request to be reinstated to resume my appointment as Professor with tenure and to be compensated for all lost income, lost benefits and any other disadvantages, damages and losses that have resulted or will result in the future to me or to my academic activities as a result of the actions at WVU. In addition, I request to be compensated for the distress and suffering that I am and have been exposed to. The termination and its recommendation specifically violate WVU BOG policy 2 and the WV grievance code as shown below. I request that appropriate disciplinary

---

[1] "Pro se" is translated from Latin as "for oneself" and in this context means one who represents oneself in a hearing without a lawyer or other representative. *BLACK'S LAW DICTIONARY*, 8th Edition, 2004 Thompson/West, page 1258.

EXHIBIT
H

action to be taken in response to these and other violations of policy and procedure.

Grievant had previously filed twelve grievances against West Virginia University. The assigned administrative law judge consolidated these under West Virginia Public Employees Grievance Board Docket No. 2015-1774-CONS. He then disposed of them via a Dismissal Order dated October 31, 2017 after finding that "[o]n June 23, 2017, Grievant submitted paperwork to retire from employment," that "[a]fter filing his grievance, Dr. Riedel retired," and that Grievant "retired from employment with West Virginia University and was not terminated from employment."

At level one of the current grievance, the hearing examiner issued a dismissal order on November 17, 2017, without hearing. Grievant appealed to level two on December 2, 2017. Respondent filed Respondent's Motion to Dismiss on December 20, 2017 along with a document[2] signed by Grievant on June 23, 2017, evidencing Grievant's retirement election. On January 4, 2018, Grievant filed his Response to Respondent's Motion to Dismiss with Notification of Termination of Employment[3] containing an effective termination date of June 30, 2017. On January 8, 2018, the Chief Administrative Law Judge declined to rule on Respondent's Motion to Dismiss, as a ruling would be premature due to the existence of a factual dispute regarding the nature of Grievant's separation from employment. A mediation session was held on March 16, 2018. An Order of Unsuccessful Mediation was entered on March 20, 2018. Grievant appealed to

---

[2] This document was titled "State of West Virginia – Public Employees Insurance Agency Retirement Health Benefits and Basic Life Insurance Enrollment Form" and had a processing date of June 26, 2017.
[3] The Notice of Termination of Employment was issued on June 5, 2017 by Joyce McConnell, Provost and Vice President for Academic Affairs.

2

level three of the grievance process on April 5, 2018.  A telephone hearing was held on June 29, 2018.  Both parties appeared by phone:  Grievant *pro se* and Respondent by Assistant Attorney General Samuel Spatafore.  The parties were notified in person and by email that the level three hearing was cancelled and that the undersigned would issue a ruling on Respondent's Motion to Dismiss.

### Synopsis

Grievant filed a grievance premised on the same claim of wrongful termination that had been dismissed in Docket No. 2015-1774-CONS.  Respondent filed a motion to dismiss.  A preponderance of the evidence establishes that the parties are precluded from relitigating the issue of whether Grievant retired or was terminated from his employment.  Accordingly, this grievance is dismissed.

The following Findings of Fact have been proven by a preponderance of the evidence based on the Respondent's motion to dismiss, Grievant's response thereto, and the findings of fact and conclusions of law made in Docket No. 2015-1774-CONS.  The Findings of Fact 1 – 17 have been adopted from the Dismissal Order issued on October 31, 2017, Docket No. 2015-1774-CONS.

### Findings of Fact

1.      Grievant was a Professor in the Department of Biochemistry of West Virginia University's School of Medicine.

2.      On March 30, 2015, Grievant filed an action challenging the ratings given to him by the chairman of the Department of Biochemistry in his most recent annual review.  Grievant disagreed with the good ratings provided by his chairman in the areas of teaching and service.

3

3.      On April 24, 2015, Grievant filed his second grievance, assigned Docket No. 2015-1194-WVU, which alleged retaliation, harassment and discrimination.

4.      On May 7, 2015, Grievant filed his third grievance, assigned Docket No. 2015-1246-WVU, which alleged retaliation and denial of academic freedom.

5.      On August 7, 2015, Grievant filed his fourth grievance, assigned Docket No. 2016-0124-WVU, which alleged retaliation when his Department Chair required that he follow directives related to teaching.

6.      On August 10, 2015, Grievant filed his fifth grievance, assigned Docket No. 2016-0115-WVU, which alleged retaliation when Grievant was questioned about the contents of his leave form.

7.      On November 10, 2015, Grievant filed his sixth grievance, assigned Docket No. 2016-0838-WVU, which alleged retaliation related to teaching issues.

8.      On November 11, 2015, Grievant filed his seventh grievance, assigned Docket No. 2016-0839-WVU, which alleged retaliation related to a photography assignment.

9.      On December 16, 2015, Grievant filed his eighth grievance, assigned Docket No. 2016-1031-WVU, which alleged retaliation pursuant to the request for him to limit repetitive use of exam questions.

10.      On February 16, 2016, the parties and the hearing examiner met for a pre-hearing conference on the above grievances. During the conference, Grievant's request that he be allowed to conduct extensive discovery prior to scheduling a hearing was denied. Grievant's refusal to accept the ruling made further progress in the procedure

unattainable.  On February 16, 2016, Grievant was advised that the grievances would be waived to the Grievance Board.  Grievant stated no objection to the waiver at that time.

11.      On February 24, 2016, at the conclusion of the pre-hearing conference, grievances one through eight were waived to level three.

12.      On March 17, 2016, Grievant filed his ninth grievance, assigned Docket No. 2016-1440-WVU, which alleged retaliation and harassment pursuant to an issue regarding his teaching.

13.      On March 21, 2016, Grievant filed his tenth grievance, assigned Docket No. 2016-1455-WVU, which alleged retaliation in relation to an evaluation received by his Department Chair.

14.      On March 25, 2016, the Grievance Board consolidated level three grievances one through ten into Docket No. 2015-1774-CONS.

15.      On April 12, 2016, Grievant filed his eleventh grievance, assigned Docket No. 2016-1530-WVU, which alleged retaliation pursuant to teaching issues.

16.      On April 19, 2016, Grievant filed his twelfth grievance, assigned Docket No. 2016-1568-WVU, which alleged Respondent failed to notify his Department Chair that Grievant had filed another grievance against him.

17.      The eleventh and twelfth grievances were consolidated into Docket No. 2015-1774-CONS.

18.      On October 31, 2017, the assigned administrative law judge made the following findings of fact in his Dismissal Order in Docket No. 2015-1774-CONS:  "On June 23, 2017, Grievant submitted paperwork to retire from employment" and that Grievant "retired from employment with West Virginia University and was not terminated

5

from employment." Grievant appealed this Dismissal Order to the Circuit Court of Kanawha County, which has yet to address the appeal.

19.     The termination alleged in the current action is the same termination alleged in Docket No. 2015-1774-CONS.

## Discussion

"A grievance may be dismissed, in the discretion of the administrative law judge, if no claim on which relief can be granted is stated or a remedy wholly unavailable to the grievant is requested." W. VA. CODE ST. R. § 156-1-6.11. "Grievances may be disposed of in three ways: by decision on the merits, nonappealable dismissal order, or appealable dismissal order." W. VA. CODE ST. R. § 156-1-6.19. "Nonappealable dismissal orders may be based on grievances dismissed for the following: settlement; withdrawal; and, in accordance with Rule 6.15, a party's failure to pursue." W. VA. CODE ST. R. § 156-1-6.19.2. "Appealable dismissal orders may be issued in grievances dismissed for all other reasons, including, but not limited to, failure to state a claim or a party's failure to abide by an appropriate order of an administrative law judge. Appeals of any cases dismissed pursuant to this provision are to be made in the same manner as appeals of decisions on the merits." W. VA. CODE ST. R. § 156-1-6.19.3.

The Grievance Board is renewing its consideration of Respondent's Motion to Dismiss. As the grievances in the current action are the same grievances that were dealt with in Docket No. 2015-1774-CONS, any dismissal analysis must include consideration of the concepts of *res judicata* and *collateral estoppel*. "'Res judicata' bars relitigation of the same cause of action between the same parties where there is a prior judgment,

whereas 'collateral estoppel' bars relitigation of a particular issue or determinative fact." BLACK'S LAW DICTIONARY 1306 (6th ed. 1990).

*Res judicata* and *collateral estoppel* are affirmative defenses. "Any party asserting the application of an affirmative defense bears the burden of proving that defense by a preponderance of the evidence." W. VA. CODE ST. R. § 156-1-3 (2008). The burden of proof is on the Respondent to demonstrate that its motion to dismiss should be granted by a preponderance of the evidence. "The preponderance standard generally requires proof that a reasonable person would accept as sufficient that a contested fact is more likely true than not." *Leichliter v. W. Va. Dep't of Health and Human Res.*, Docket No. 92-HHR-486 (May 17, 1993).

The grievances in the instant matter are the same grievances previously dealt with in Docket No. 2015-1774-CONS. Grievant alleged in both the prior and current grievance that Respondent wrongfully terminated him in retaliation for his grievance activity. In his response to Respondent's Motion to Dismiss, Grievant alleged that on June 5, 2017, he was notified that his employment termination by Respondent would be effective on June 30, 2017. Respondent alleged in Respondent's Motion to Dismiss, to which it attached a document signed by Grievant on June 23, 2017, evidencing his retirement, that Grievant had retired (prior to his termination date) and that his grievance is therefore moot. This Grievance Board previously determined in a Dismissal Order entered in Docket No. 2015-1774-CONS that Grievant retired and had not been terminated. In this Dismissal Order, issued on October 31, 2017, it determined that the issues raised in the grievance were moot because Grievant had retired.

While the Respondent's Motion to Dismiss did not specifically use the terms *collateral estoppel* or *res judicata*, it did state as an apparent basis for dismissal of the current action the Grievance Board's prior Dismissal Order issued on October 31, 2017, due to Grievant's retirement. "Each administrative law judge has the authority and discretion to control the processing of each grievance assigned such judge and to take any action considered appropriate consistent with the provisions of W. Va. Code § 6C-2-1 *et seq.*" W. VA. CODE ST. R. § 159-1-6.2 (2008). A judge may construe a pleading "as to do substantial justice." W. VA. R. CIV. P. 8 (f).

The Grievance Board has the authority to dispose of claims using *res judicata* or *collateral estoppel*. "For issue or claim preclusion to attach to quasi-judicial determinations of administrative agencies, at least where there is no statutory authority directing otherwise, the prior decision must be rendered pursuant to the agency's adjudicatory authority and the procedures employed by the agency must be substantially similar to those used in a court. In addition, the identicality of the issues litigated is a key component to the application of administrative res judicata or collateral estoppel." Syl. Pt. 2, *Vest v. The Board of Education of the County of Nicholas*, 193 W.Va. 222, 455 S.E. 2d 781(1995).

"Before the prosecution of a [grievance] may be barred on the basis of res judicata, three elements must be satisfied. First, there must have been a final adjudication on the merits in the prior action by a court having jurisdiction of the proceedings. Second, the two actions must involve either the same parties or persons in privity with those same parties. Third, the cause of action identified for resolution in the subsequent proceeding either must be identical to the cause of action determined in the prior action or must be

such that it could have been resolved, had it been presented, in the prior action." Syl. pt. 4, *Blake v. Charleston Area Medical Center, Inc*. 201 W. Va. 469, 498 S.E.2d 41 (1997); *Harmon v. Fayette County Bd. of Educ.*, Docket No. 03-10-035 (May 6, 2003). Because there was not a final adjudication of the entire grievance on the merits in Docket No. 2015-1774-CONS, *res judicata* does not apply to the current action.

Grievant's claim of wrongful termination is premised on the termination of his employment. Therefore, the application of the Board's prior determination that Grievant retired in June of 2017 would render moot Grievant's claim of wrongful termination and thereby preclude this Board from hearing the grievance under the doctrine of *collateral estoppel*. "'Collateral estoppel [or issue preclusion] will bar a claim if four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a prior action; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.' Syllabus Point 1, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995)." Syllabus point 1, *Haba v. The Big Arm Bar and Grill, Inc.*, 196 W. Va. 129, 468 S.E.2d 915 (1996). An analysis shows that each of the above conditions is satisfied. First, the issue in the current action regarding whether Grievant retired or was terminated by Respondent in June of 2017 is the identical issue decided in Docket No. 2015-1774-CONS. Grievant acknowledged at the July 29, 2018 phone conference that the grievances and termination alleged in the current action are the same grievances and termination alleged in Docket No. 2015-1774-CONS. Second, even though the prior action was not fully litigated, it was a final adjudication on the question of whether Grievant

retired or was terminated by Respondent in June of 2017.  Third, Grievant was a party to the prior action.  Fourth, Grievant had fair opportunity to litigate the issue of termination and retirement in the prior action and is continuing to exercise this opportunity through his ongoing appeal of the prior Dismissal Order.  To allow the current grievance to move forward would grant Grievant a second chance to litigate the issue of whether he retired or was terminated.

As the current grievance is premised on Grievant's allegation that he was terminated by Respondent, and as this Board previously determined that Grievant retired and was not terminated, this grievance is moot and therefore dismissed.

The following Conclusions of Law support the dismissal of this grievance.

### Conclusions of Law

1.      "Each administrative law judge has the authority and discretion to control the processing of each grievance assigned such judge and to take any action considered appropriate consistent with the provisions of W. Va. Code § 6C-2-1 et seq." W. VA. CODE ST. R. § 159-1-6.2 (2008).  "A grievance may be dismissed, in the discretion of the administrative law judge, if no claim on which relief can be granted is stated or a remedy wholly unavailable to the grievant is requested." W. VA. CODE ST. R. § 156-1-6.11.

2.      "Any party asserting the application of an affirmative defense bears the burden of proving that defense by a preponderance of the evidence." W. VA. CODE ST. R. § 156-1-3 (2008).  "The preponderance standard generally requires proof that a reasonable person would accept as sufficient that a contested fact is more likely true than not." *Leichliter v. W. Va. Dep't of Health and Human Res.*, Docket No. 92-HHR-486 (May 17, 1993).

3.      "Grievances may be disposed of in three ways: by decision on the merits, nonappealable dismissal order, or appealable dismissal order." W. VA. CODE ST. R. § 156-1-6.19. "Nonappealable dismissal orders may be based on grievances dismissed for the following: settlement; withdrawal; and, in accordance with Rule 6.15, a party's failure to pursue." W. VA. CODE ST. R. § 156-1-6.19.2. "Appealable dismissal orders may be issued in grievances dismissed for all other reasons, including, but not limited to, failure to state a claim or a party's failure to abide by an appropriate order of an administrative law judge. Appeals of any cases dismissed pursuant to this provision are to be made in the same manner as appeals of decisions on the merits." W. VA. CODE ST. R. § 156-1-6.19.3.

4.      "For issue or claim preclusion to attach to quasi-judicial determinations of administrative agencies, at least where there is no statutory authority directing otherwise, the prior decision must be rendered pursuant to the agency's adjudicatory authority and the procedures employed by the agency must be substantially similar to those used in a court. In addition, the identicality of the issues litigated is a key component to the application of administrative res judicata or collateral estoppel." Syl. Pt. 2, *Vest v. The Board of Education of the County of Nicholas*, 193 W.Va. 222, 455 S.E. 2d 781(1995).

5.      "'Collateral estoppel [or issue preclusion] will bar a claim if four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a prior action; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.' Syllabus Point 1, *State v. Miller*, 194 W. Va. 3, 459

11

S.E.2d 114 (1995)." Syllabus point 1, *Haba v. The Big Arm Bar and Grill, Inc.*, 196 W. Va. 129, 468 S.E.2d 915 (1996).

6.      The Grievance Board may properly consider exhibits attached to a grievance form or motion.  See Syl. Pt. 1, *Forshey v. Jackson*, 222 W.Va. 743, 671 S.E.2d 748 (2008).

7.      Respondent has proven by a preponderance of the evidence that this grievance is precluded by the doctrine of *collateral estoppel*.

Accordingly, this grievance is **DISMISSED**.

Any party may appeal this Dismissal Order to the Circuit Court of Kanawha County. Any such appeal must be filed within thirty (30) days of receipt of this Dismissal Order. See W. VA. CODE § 6C 2 5. Neither the West Virginia Public Employees Grievance Board nor any of its Administrative Law Judges is a party to such appeal and should not be so named. However, the appealing party is required by W. Va. Code § 29A 5 4(b) to serve a copy of the appeal petition upon the Grievance Board. The Civil Action number should be included so that the certified record can be properly filed with the circuit court.  See also 156 C.S.R. 1 § 6.20 (2008).

**DATE:  July 20, 2018**

_____
**Joshua Fraenkel**
**Administrative Law Judge**

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

FILED

2019 JUL 22 PM 3: 39

**HEIMO RIEDEL,**

      **Petitioner,**

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

v.

      **Civil Action No.: 18-AA-235**
      **Judge Tera L. Salango**

**WEST VIRGINIA UNIVERSITY,**

      **Respondent.**

**RECEIVED**

JUL 2 9 2019

WV HEPC
LEGAL DIVISION

## FINAL ORDER

    This matter comes before this Court pursuant to a Petition filed by Heimo Riedel, Petitioner below, appealing a Decision of the West Virginia Public Employees Grievance Board dated July 20, 2018 which Dismissed Petitioner's grievance pursuant to his retirement from employment.

    This Court has reviewed the record and briefs of the parties, and for the reasons set forth below, concludes that Petitioner's appeal must be DENIED, and the Decision of the West Virginia Public Employees Grievance Board, dated July 20, 2018 be AFFIRMED.

## FINDINGS OF FACT

    1.    Petitioner was a Professor in the Department of Biochemistry of WVU's School of Medicine.

    2.    On June 30, 2017, Petitioner submitted paperwork to retire from employment. Petitioner is now currently retired.

    3.    Petitioner's separation from employment was processed by Respondent as retirement and all relevant state agencies were notified as such.

1

**EXHIBIT**
**I**

4.      Petitioner acted on his own volition to pursue retirement, signed the relevant retirement document and was thereafter entitled to all the benefits attendant thereto.

5.      Due to Petitioner's retirement, an anticipated termination of his employment did NOT occur.

6.      After Petitioner officially retired he filed a grievance with the West Virginia Public Employees Grievance Board and claimed he was terminated.

7.      Thereafter, Respondent filed a motion to dismiss in that Petitioner's retirement rendered the grievance moot.  Petitioner filed a response to Respondent's motion.

8.      On June 29, 2018 a telephonic hearing was conducted by Judge Joshua Fraenkel with the West Virginia Public Employee's Grievance Board.

9.      On July 20, 2018, after a thorough analysis of the facts and relevant legal authority, Judge Fraenkel issued a Dismissal Order pursuant to Grievant's retirement from employment.

10.     Petitioner thereafter appealed to this Honorable Court and requests that the matter be remanded to the Grievance Board for another hearing.

## **STANDARD OF REVIEW**

1.      West Virginia Code §6C-2-5 defines enforcement and reviewability of decisions conducted before the West Virginia Public Employees Grievance Board.  Judicial review of such decisions is similar to the standard of review under the Administrative Procedure Act, § 29A-5-4, in that both require that findings of fact made at an administrative hearing not be reversed unless they are clearly wrong.  Parham v. Raleigh County Bd. of Educ. v. Scalia, 192 W. Va. 540, 453 S.E.2d 374 (1994).

The decision of an Administrative Law Judge can be reversed on appeal to the circuit court if the decision is:

2

(1) Is contrary to law or a lawfully adopted rule or written policy of the employer;

(2) Exceeds the administrative law judge's statutory authority;

(3) Is the result of fraud or deceit;

(4) Is clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or

(5) Is arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W. Va. Code § 6C-2-5. *See* Board of Educ. v. Wirt, 192 W. Va. 568, 453 S.E.2d 402 (1994). A final order of the Grievance Board made pursuant to W. Va. Code § 18-29-1 [6C-2-5] *et seq.*, and based upon findings of fact should not be reversed unless clearly wrong. Hanlon v. Logan County Bd. of Educ., 201 W. Va. 305, 496 S.E.2d 447 (1997); Quinn v. W. Va. Northern Community College, 197 W. Va. 313, 475 S.E.2d 405 (1996); W. Va. Dep't of Health and Human Resources/Welch Emergency Hosp. v. Blankenship, 189 W. Va. 342, 431 S.E.2d 681 (1993); Randolph County Bd. of Educ. v. Scalia, 182 W. Va. 289, 387 S.E.2d 524 (1989).

2.     The circuit court's scope of review of an Administrative Law Judge's decision under the grievance statute is limited to the five grounds enumerated above. Parker v. Summers County Bd. of Educ., 185 W. Va. 313, 406 S.E.2d 744 (1991). A court will not reverse the evidentiary findings of an Administrative Law Judge unless they are clearly wrong. Parham v. Raleigh County Bd. of Educ., *supra*; Randolph Co. Bd. of Educ. v. Scalia, *supra*. Findings should be sustained if they are supported by substantial evidence. *See* Hanlon v. Logan County Bd. of Educ., *supra*. The appellate court is not to substitute its judgment for that of the Administrative Law Judge. Keatley v. Mercer County Bd. of Educ., 200 W. Va. 487, 490 S.E.2d 306 (1997); Martin v. Randolph County Bd. of Educ., 195 W. Va. 297, 465 S.E.2d 399 (1995); Randolph County Bd. of Educ. v. Scalia, *supra*. If the lower tribunal's conclusion is

3

plausible when viewing the evidence in its entirety, the appellate court may not reverse even if it would have weighed the evidence differently. Hanlon v. Logan County Bd. of Educ., supra; Board of Educ. v. Wirt, supra. Conclusions of law and application of the law are reviewed de novo. Univ. of W. Va. Bd. of Trustees v. Fox, 197 W. Va 91, 475 S.E.2d 91 (1996); Martin v. Randolph Co. Bd. of Educ., supra.

3.      It is true that plenary review is conducted as to the conclusions of law and application of law to the facts which are reviewed de novo. *Syllabus Point 1* Cahill v. Mercer County Board of Education, 208 W.Va. 177. 539 S.E.2d 437 (2000). However, the law is clear that a reviewing court is obligated to give deference to factual findings rendered by an administrative law judge and a circuit court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations. Cahill. *supra* Therefore, in the instant matter, this Honorable Court must give deference to the factual findings of the ALJ and this Court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations. Cahill. *Supra.*

4.      "Each administrative law judge has the authority and discretion to control the processing of each grievance assigned such judge and to take any action considered appropriate consistent with the provisions of W. VA. CODE § 6C-2-1 et seq." Rules of Practice and Procedure of the West Virginia Public Employees Grievance, 156 C.S.R. 1 § 6.2 (2018). "Grievances may be disposed of in three ways: by decision on the merits, nonappealable dismissal order, or appealable dismissal order." W. VA. CODE ST. R. § 156-1-6.19. "Nonappealable dismissal orders may be based on grievances dismissed for the following: settlement; withdrawal; and, in accordance with Rule 6.15, a party's failure to pursue." W. VA. CODE ST. R. § 156-1-6.19.2. "Appealable dismissal orders may be

4

issued in grievances dismissed for all other reasons, including, but not limited to, failure to state a claim or a party's failure to abide by an appropriate order of an administrative law judge. Appeals of any cases dismissed pursuant to this provision are to be made in the same manner as appeals of decisions on the merits." W. VA. CODE ST. R. § 156-1 6.19.3.

5.    Petitioner voluntarily retired on June 23, 2018 which rendered any and all pending or future grievances as moot. Accordingly, this petition fails to raise a claim on which relief can be granted. *See* Joseph Komorowski v. Marshall County Board of Education, No. 11-1659 and 11-1767 (W. Va. Supreme Court, February 22, 2013) (memorandum decision), In Komorowski, the Court found that the grievances were moot because Grievant voluntarily resigned while his grievance was pending. Moot questions or abstract propositions, the decisions of which would avail nothing in the determination of controverted rights of persons or property, are not proper issues before the Grievance Board. *Id.*

The Decision of the West Virginia Public Employees Grievance Board was not clearly wrong, contrary to law, or arbitrary and capricious. Accordingly, the Decision dated July 20, 2018 dismissing the grievance pursuant to Grievant's retirement from employment, is hereby **AFFIRMED**.

The Court ORDERS that this administrative appeal is hereby **DISMISSED** and **STRICKEN** from the active docket of this Court. The Clerk is directed to mail a certified copy of this Order to all counsel of record.

ENTERED this /9ᵗ day of ___July___, 2019.

_____
Tera L. Salango, Judge

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF CIRCUIT COURT OF SAID COUNTY
AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE COPY FROM THE RECORDS OF SAID COURT
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS
DAY
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

5

Policy No.   GL 379-66-63
Renewal of No. GL 957-51-60

CG DS 01 10 01



Coverage is provided by

# National Union Fire Insurance Company of Pittsburgh, PA.

(a capital stock company)
175 Water Street, New York, NY 10038

(212) 458-5000

## COMMERCIAL GENERAL LIABILITY DECLARATIONS

**NAMED INSURED & MAILING ADDRESS**
THE STATE OF WEST VIRGINIA
(See Named Insured Endt. #1)
90 MACCORKLE AVE., SUITE 203
SOUTH CHARLESTON, WV 25303

**PRODUCER'S NAME & MAILING ADRESS**
ISI INSURANCE SERVICES LLC
ONE HILLCREST DR. EAST
P. O. BOX 1551
CHARLESTON, WV 25311-1687

**POLICY PERIOD:** From   07/01/2016 to 07/01/2017 at 12:01 A.M. Standard Time at your mailing address shown above.

**FORM OF BUSINESS:**
☐ CORPORATION ☐ PARTERNSHIP ☐ LIMITED LIABILITY COMPANY ☐ INDIVIDUAL ☒ OTHER MUNICIPALTY and OTHER

**BUSINESS DESCRIPTION:**

**LOCATION OF ALL PREMISES YOU OWN, RENT OR OCCUPY:**    ON FILE WITH COMPANY

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**POLICY PREMIUM:  ***            $32,797,495

**PREMIUM SHOWN IS PAYABLE:**         $32,797.495    at inception
This policy is subject to annual audit.

**Premium for Certified Acts of Terrorism Coverage Under Terrorism Risk Insurance Act 2002 as amended by:
the Terrorism Risk Insurance Program Reauthorization Act 2007:**
Coverage Provided At No Additional Charge

**SCHEDULE OF STATE TAXES, FEES AND SURCHARGES, IF APPLICABLE:****

** State Taxes, Fees and Surcharges shown are in addition to the above referenced Policy Premium.

**ENDORSEMENTS ATTACHED TO THIS POLICY:  SEE ATTACHED FORMS SCHEDULE**

THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORMS, AND FORMS AND ENDORSEMENTS IF ANY ISSUED TO FORM A PART THEREOF COMPLETE THE ABOVE NUMBERED POLICY

Date Issued:  07/01/2016

**93837 (12/06)**
CG DS 01 10 01        Includes copyrighted material of insurance Services Office, Inc., with its permission.©        ISO Properties, Inc., 2000        Page 1 of 1



EXHIBIT J

## FORMS SCHEDULE

**Effective Date:** 07/01/2016
**Policy Number:** GL 379-66-63

DEC-PG.DOC
WVCLP-FORMS.DOC
WVCLP-07/01/16 (State Agencies)

| | |
|---|---|
| Endorsement # 1 | Named Insured |
| Endorsement # 2 | Amendatory Endorsement |
| Endorsement # 3 | Exclusion of Claims, Awards, or Judgments Rendered by Human Rights Commissions or Grievance Boards or Governmental Agencies or Administrative Bodies |
| Endorsement # 4 | Exclusion of Claims for Attorneys' Fees, Costs, Expenses, Fines, or Penalties Arising From Criminal Proceedings |
| Endorsement # 5 | Exclusion of Non-Pecuniary Relief Claims |
| Endorsement # 6 | Exclusion of Claims Seeking Non-Specific or General Demands |
| Endorsement # 7 | Excluded Premises-Operations |
| Endorsement # 8 | Absolute Asbestos Exclusion |
| Endorsement # 9 | Absolute Lead Exclusion |
| Endorsement # 10 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| Endorsement # 11 | Directive of "Named Insured" to Insurer Regarding Section 19-25-7 of the Code of West Virginia |
| Endorsement # 12 | Selection of Counsel |
| Endorsement # 13 | Joint Venture Clause |
| Endorsement # 14 | Subrogation |
| Endorsement # 15 | Wrongful Acts Liability Coverage Extended for "Prior Acts" |
| Endorsement # 16 | Limitation of Claims to Fault Attributable to State Entity |
| Endorsement # 17 | Denial of First Party Claims Upon Default Endorsement |
| Endorsement # 18 | Exclusion – Named Insured vs. Insured Claims |
| Endorsement # 19 | Exclusion – New River Gorge Bridge Tours |
| Endorsement # 20 | Exclusion - Selection of Contractors |
| Endorsement # 21 | Physicians Appointed and Designated as State of West Virginia Emergency Services Level I/II Trauma Physicians |
| Endorsement # 22 | Silicosis Exclusion Endorsement |
| Endorsement # 23 | Foreign Liability Reimbursement Endorsement |
| Endorsement # 24 | Absolute Mold and Fungus Exclusion |
| Endorsement # 25 | Fraud, Dishonesty or Criminal Act Exclusion |
| Endorsement # 26 | Exclusion of Coverage for Persons Accused or Convicted of Crimes and subject to the Orders of a Court |
| Endorsement # 27 | Exclusion – Volunteer for Nonprofit Youth Organizations Act |
| Endorsement #28 | Medical Professional Liability Endorsement |
| 89644  (07/05) | Coverage Territory Endorsement |
| 81461 (08/04) | Large Risk Rating Plan Endorsement (Long Form) |

EXHIBIT
J

## WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

In consideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof and subject to all of the terms of this policy, the Company designated in the Declarations (A Stock Insurance Company, herein called the Company) agrees with the **"Named Insured"** as follows:

### SECTION I - COVERAGES

**COVERAGE A. - COMPREHENSIVE GENERAL LIABILITY INSURANCE**

1. **Coverage - "BODILY INJURY" AND "PROPERTY DAMAGE" LIABILITY**

    The Company will pay on behalf of the **"insured"** all sums which the **"insured"** shall become legally obligated to pay as damages because of **"bodily injury"** or **"property damage"** to which this insurance applies, caused by an **"occurrence"**, and the Company shall have the right and duty to defend any suit against the **"insured"** seeking damages on account of such **"bodily injury"** or **"property damage"**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

2. **Exclusions**

    This insurance does not apply to:

A. To liability assumed by the **"insured"** under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the **"Named Insured's products"** or a warranty that work performed by or on behalf of the **"Named Insured"** will be done in a workmanlike manner.

B. To **"bodily injury"** or **"property damage"** arising out of the ownership, maintenance, operation, use, entrustment, loading or unloading of

    1) Any **"automobile"** or aircraft owned or operated by or rented or loaned to any **"insured"**, or
    2) Any **"mobile equipment"** owned or operated by or rented or loaned to any **"insured"**, or
    3) Any other **"automobile"**, **"mobile equipment"** or aircraft operated by any person in the course of his employment by an **"insured"**;

    but this exclusion does not apply to the parking of an **"automobile"** on premises owned by, rented to or controlled by the **"Named Insured"** or the ways immediately adjoining, if such **"automobile"** is not owned by or rented or loaned to any **"insured"**.

C. To **"bodily injury"** or **"property damage"** arising out of and in the course of the transportation of **"mobile equipment"** by an **"automobile"** owned or operated by or rented or loaned to any **"insured"**.

D. 1)    To **"bodily injury"** or **"property damage"** arising out of the actual, alleged or threatened    discharge, dispersal, seepage, migration, release or escape of pollutants:

    (a)    At or from any premises, site or location which is or was at any time owned, rented, loaned or otherwise occupied or used by the **"Insured"**;
    (b)    At or from any site or location used by or for the **"Named Insured"** or others for the handling, storage, disposal, processing or treatment of waste;

(c)      Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for the **"Named Insured"** or any person or organization for whom the **"Named Insured"** may be legally responsible; or

(d)      At or from any site or location on which the **"Named Insured"** or any contractors or subcontractors working directly or indirectly on behalf of the **"Named Insured"** are performing operations:

     (i) If the pollutants are brought on or to the site or location in connection with such      operations; or
     (ii) If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

2)      To any loss, cost or expense arising out of any governmental direction or request that the **"Named Insured"** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed

E.    To **"bodily injury"** or **"property damage"** due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act condition incident to any of the foregoing, with respect to

1)      Liability assumed by the **"insured"** under an **"incidental contract"**, or
2)      Expenses for first aid under the Supplementary Payments provision.

F.    To any obligation for which the **"insured"** or any carrier as his insurer may be held liable under any Workers' Compensation, Unemployment Compensation or Disability Benefits law, or under any similar law.

G.    To **"bodily injury"** to any employee of the **"insured"** arising out of and in the course of his employment by the **"insured"** or to any obligation of the **"insured"** to indemnify another because of damages arising out of such injury, but this exclusion does not apply to liability assumed by the **"insured"** under an **"incidental contract"**.

H.    To **"property damage"** to

1)      Property owned or occupied by or rented to the **"insured"**,
2)      Property used by the **"insured"**, or
3)      Property in the care, custody or control of the **"insured"** or as to which the **"insured"** is for any purpose exercising physical control.

But parts 2) and 3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part 3) of this exclusion does not apply with respect to **"property damage"** (other than to **"elevators"**) arising out of the use of an **"elevator"** at premises owned by, rented to or controlled by the **"Named Insured"**.

I.    To loss of use of tangible property which has not been physically injured or destroyed resulting from:

1)      A delay in or lack of performance by or on behalf of the **"Named Insured"** or any contract or agreement, or
2)      The failure of the **"Named Insured's products"** or work performed by or on behalf of the **"Named Insured"** to meet the level of performance, quality, fitness or durability warranted or represented by the **"Named Insured"**.

But this exclusion does not apply to loss of use of other tangible property from the sudden and accidental physical injury to or destruction of the **"Named Insured's products"** or work performed by or on behalf of the **"Named Insured"** after such products or work have been put to use by any person or organization other than an **"insured"**.

J.    To **"property damage"** to the **"Named Insured's products"** arising out of such products or any part of such products.

K.   To **"property damage"** to work performed by or on behalf of the **"Named Insured"** arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.

L.   To damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the **"Named Insured's products"** or work completed by or for the **"Named Insured"** or any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

M.   To **"bodily injury"** or **"property damage"** arising out of the ownership, maintenance, use and all operations necessary or incidental thereto of any airport.

**3.    Persons Insured**

Each of the following is an **"insured"** under this insurance to the extent set forth below:

A.   The **"Named Insured"**,
B.   Any elected or appointed official, executive officer, commissioner, director, or member of the **"Named Insured"** while acting within the scope of his duties as such,
C.   Any faculty member, employee, volunteer worker or student teacher of the **"Named Insured"** while acting within the scope of their duties as such, but the insurance afforded such individuals does not apply to **"bodily injury"** to another faculty member, employee, volunteer worker or student teacher of the **"Named Insured"** arising out of or in the course of his employment.  Employee shall not include any person working on a retainer or contractual agreement.
D.   Any student or resident of the **"Named Insured"** in medicine, osteopathy, nursing, dentistry, Pharmacy or Allied health fields while acting within the scope of their curriculum as such.

This insurance does not apply to **"bodily injury"** or **"property damage"** arising out of the conduct of any partnership or joint venture of which the **"insured"** is a partner or member and which is not designated in this policy as a **"Named Insured"**.

**4.    Policy Territory**

**"Policy territory"** means:

a.   The United States of America, its territories or possessions, or Canada or
b.   International waters or airspace, provided the **"bodily injury"** or **"property damage"** does not occur in the course of travel or transportation to or from any other country, state or nation, or
c.   Anywhere in the world with respect to damages because of **"bodily injury"** or **"property damage"** arising out of a product which was sold for use or consumption within the territory described in paragraph (a) above, provided the original suit for such damages is brought within such territory.

**5.    Combined Additional Coverages**

It is agreed that with respect to such insurance as is afforded by the provisions of the policy relating to Comprehensive General Liability Insurance, this endorsement adds or modifies such insurance as follows:

**A.    Contractual Liability**

**"Bodily Injury"** and **"Property Damage"** for which the "insured" has assumed liability under any contract or agreement subject to the following additional provisions:

1)   The definition of **"incidental contract"** is amended to read as follows:
**"Incidental contract"** means any written contract or agreement relating to the conduct of the **"Named Insured's"** business.

2)      The following additional exclusions apply to liability assumed by the **"insured"** under any **"incidental contract"**:

This insurance does not apply:

(a)  To **"bodily injury"** or **"property damage"** for which the **"insured"** has assumed liability under any contract or agreement, if such injury or damage occurred prior to the execution of the contract or agreement.

(b)  If the **"insured"** is an architect, engineer or surveyor, to **"bodily injury"** or **"property damage"** arising out of professional services performed by such **"insured"** , including

   (i)  The preparation or approval of maps, drawings, opinions, reports, surveys,    change of orders, designs or specifications, and

   (ii)  Supervisory, inspection or engineering services.

(c)  If the indemnitee of the **"insured"** is an architect, engineer or surveyor, to the liability of the indemnitee, his agents or employees, arising out of

   (i)  The preparation or approval of maps, drawings, opinions, reports, surveys,    change of orders, designs or specifications, or

   (ii)  The giving of or the failure to give directions or instructions by the indemnitee,    his agents or employees, provided such giving or failure to give is the primary cause of the to **"bodily injury"** or **"property damage"**.

(d)  To any obligation for which the **"insured"** may be held liable in an action on a contract by a third party beneficiary for **"bodily injury"** or **"property damage"** arising out of a project for a public authority; but this exclusion does not apply to an action by the public authority or any other person or organization engaged in the project.

3)      The following additional condition applies:
The Company shall be entitled to exercise all of the **"insured's"** rights in the choice of arbitrators and in the conduct of any arbitration proceeding.

**B.    Broad Form Property Damage Coverage Including Completed Operations**

The **"Property Damage" Liability Coverages** applies to **"property damage"** to property in the care, custody or control of the **"insured"** and to **"property damage"** to work performed by or on behalf of the **"Named Insured"** subject to the following additional provisions:

1)      Exclusion (a) below is added and Exclusions H. and K. of the Comprehensive General Liability Insurance Coverage are replaced by the following exclusions:

(a)  To liability assumed by the insured under any contract or agreement;

(b)  To **"property damage"**

   (i)   Property owned or occupied by or rented to the **"insured"** or, except with respect to the use of **"elevators"**, to property held by the **"insured"** for sale or entrusted to the **"insured"** for storage or safekeeping;

   (ii) Except with respect to liability under a sidetrack agreement or the use of **"elevators"** to:

a.  Property while on premises owned by or rented to the **"insured"** for the purpose of having operations performed on such property by or on behalf of the **"insured"**;

b.  Tools or equipment while being used by the **"insured"** in  performing his operations;

c.  Property in the custody of the **"insured"** which is to be installed, erected or  used  in construction by the **"insured"**;

(iii) That particular part of any property not on premises owned by or rented to the **"insured"**:

a.  Upon which operations are being performed by or on behalf of the **"insured"** at the time or the **"property damage"** arising out of such operations,    or

b.  Out of which any **"property damage"** arises, or

c.  The restoration, repair or replacement of which has been made or is  necessary  by reason of faulty workmanship thereon by or on behalf of the **"insured"**;

(c)    With respect to the **"completed operations hazard"**, to **"property damage"** to work performed by the **"Named Insured"** arising out of the work or any portion thereof, or out of materials, part or equipment furnished in connection therewith.

2)    The **Broad Form Property Damage Coverage** shall be excess insurance over any valid and collectible property insurance (including any deductible portion thereof) available to the **"insured"**, such as, but not limited to, Fire and Extended Coverage, Builder's Risk Coverage and or Installation Risk Coverage, and the **"Other Insurance"** condition of the policy is amended accordingly.

## C.    Foreign Liability Reimbursement Coverage

As respects employees of the **"Named Insured"** hired in the United States of America or the Dominion of Canada and traveling for the **"insured"** outside of the United States of America, its territories or possessions, or the Dominion of Canada, such insurance as is afforded by the policy for liability imposed upon the **"Named Insured"** arising out of the ownership, maintenance or use of premises and all operations necessary or incidental thereto applies subject to the following additional conditions:

1)  It is agreed that with respect to any proceeding or suit brought in foreign countries against the **"Named Insured"** arising out of the action of employees of the **"Named Insured"** while acting within the scope of their duties as such, the Company shall have the right but not the duty to investigate and settle such claims and to defend such suits.  In any case in which the Company elects not to investigate, settle or defend, the **"insured"** under the supervision of the Company will make or cause to be made such investigation and defense as are reasonably necessary, and subject to prior authorization by the Company will effect to the extent possible such settlement or settlements as the Company and the **"insured"** deem prudent.  The Company shall reimburse the **"insured"** for the reasonable costs of such investigation and defense within the applicable limit of liability of the policy for the amount of such authorized settlements.

2)  In the event the **"insured"** is otherwise insured with respect to such coverage as is afforded by this endorsement, the provisions of this endorsement shall be null and void.

3)  Such insurance as afforded by this endorsement shall not apply to any employees with respect to injury or destruction of property owned, occupied or used by or rented to the **"Named Insured"**.

**D.    Fire and/or Explosion Legal Liability Coverage - Real Property**

The **Property Damage Liability Coverage** applies to **"property damage"** to structures or portion thereof rented to or occupied by the **"Named Insured"**, including fixtures permanently attached thereto, if such **"property damage"** arises out of fire and/or explosion, subject to the following additional provisions:

1)    With respect to the insurance provided by these provisions, all of the exclusions of the policy, other than the Nuclear Energy exclusion (Broad Form), are deleted and replaced by the following:

   (a)  This insurance does not apply to liability assumed by the **"insured"** under any contract or agreement;

   (b)  As respects coverage afforded by the exploration hazard, the insurance does not apply to loss by explosion of steam boilers, steam pipes, steam turbines or steam engines.

2)    The following are not "explosions" within the intent or meaning of the explosion coverage:

   (a)      Electric arcing
   (b)      Rupture or bursting or rotating or moving parts of machinery caused by centrifugal force or mechanical breakdown
   (c)      Water hammer
   (d)      Rupture or bursting of water pipes
   (e)      Rupture or bursting due to expansion or swelling of the contents of any buildings   or   structures, caused by or resulting from water
   (f)      Rupture, bursting or operation of pressure relief devices

3)    The limit of Property Damage Liability in the Declarations of the policy as applicable to **"each occurrence"** is, as respects this **fire and/or explosion legal liability coverage - real property** amended to read $250,000 each occurrence.

**E.    Watercraft**

It is agreed that the insurance afforded by the policy as respects watercraft shall be excess over any other valid and collectible insurance as respects the use of rental or watercraft by concessionaires.

It is further agreed that the **"Person Insured"** provision includes any person or organization legally responsible for the use of any such watercraft owned by the **"Named Insured"**, provided the actual use thereof is with the permission of the **"Named Insured"**.

**F.    Host Liquor Law Liability Coverage**

The **"bodily injury"** and **"property damage"** coverages apply to **"bodily injury"** or **"property damage"** arising out of the serving or giving of alcoholic beverages, by or on behalf of the **"Named Insured"**, provided the **"Named Insured"**:

1)    Is not a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages, or

2)    Is not an owner or lessor of premises used for such purpose if liability is imposed by, or because of the violation of, any statute, ordinance or regulation pertaining to the sale, gift, distribution or use of any alcoholic beverage.

Damages include damages for loss of support resulting from **"bodily injury"**.

G.    **Vehicles Owned or Leased by Public Bodies**

It is agreed that any land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto) owned or leased by the **"Named Insured"** shall be deemed an **"automobile"** and not **"mobile equipment"** if the sole reasons for considering it **"mobile equipment"** are either or both of the following:

1)    That it is exempt from motor vehicle registration because the **"Named Insured"** is a public body not subject to the registration requirements applicable to private persons or organizations, or

2)    That it is maintained for use exclusively on streets or highways owned by the **"Named Insured"**.

H.    **Additional Insured – Teams, Draft or Saddle Animals**

It is agreed that with respect to the ownership, maintenance, operation, use, loading or unloading of draft or saddle animals and vehicles for use therewith, the **"Persons Insured"** provision includes any person or organization legally responsible for the use of such animals or vehicles, other that a person or organization or any employee thereof to whom the **"Named Insured"** has rented such animals or vehicles;  provided that the actual use of such animals or vehicles is by the **"Named Insured"** or with his permission.

**COVERAGE B.  PERSONAL INJURY LIABILITY INSURANCE**

1.  **Coverage - Personal Injury Liability**

The Company will pay on behalf of the **"insured"** all sums which the **"insured"** shall become legally obligated to pay as **"damages"** because of injury (herein called **"personal injury"**) sustained by any person or organization and arising out of one or more of the following **"offenses"** committed in the conduct of the **"Named Insured's"** business:

Group A -    False arrest, detention or imprisonment, **"corporal punishment"** or malicious prosecution

Group B -    The publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy;

Group C -    Wrongful entry or eviction, or other invasion of the right of private occupancy.

If such **"offense"** is committed during the policy period within the United States of America, its territories or possessions, or the Dominion of Canada, and the Company shall have the right and duty to defend any suit against the **"insured"** seeking **"damages"** on account or such **"personal injury"** even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

2.  **Exclusions**

This insurance does not apply to:

A.   To liability assumed by the **"insured"** under any contract or agreement;

B.   To **"personal injury"** arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of any **"insured"**, but this exclusion shall only apply to such person, persons or entities as have committed such willful violation or consented thereto;

C.   To **"personal injury"** arising out of any publications or utterance described in Group B, if the first injurious publication or utterance of the same or similar material by or on behalf of the **"Named Insured"** was made prior to the effective date of this insurance;

D.   To **"personal injury"** arising out of a publication or utterance described in Group B concerning any organization or business enterprise, or its products or services, made by or at the discretion of any **"insured"** with knowledge of the falsity thereof;

E.        (1)    To **"personal injury"** arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

          (a)    At or from any premises, site or location which is or was at any time owned, rented, loaned or otherwise occupied or used by the **"Insured"**;

          (b)    At or from any site or location used by or for the **"Named Insured"** or others for the handling, storage, disposal, processing or treatment of waste;

(c)    Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for the **"Named Insured"** or any person or organization for whom the **"Named Insured"** may be legally responsible; or

(d)    At or from any site or location on which the **"Named Insured"** or any contractors or subcontractors working directly or indirectly on behalf of the **"Named Insured"** are performing operations:

(i)  If the pollutants are brought on or to the site or location in connection with such operations; or

(ii)  If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

(2)    To any loss, cost or expense arising out of any governmental direction or request that the **"Named Insured"** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed

**3.    Persons Insured**

Each of the following is an **"insured"** under this insurance to the extent set forth below:

A.    The **"Named Insured"**;
B.    Any elected or appointed official, executive officer, commissioner, director, or member of the **"Named Insured"** while acting within the scope of his duties as such;
C.    Any faculty member, employee, volunteer worker or student teacher of the **"Named Insured"** while acting within the scope of their duties as such.  Employee shall not include any person working on a retainer or contractual agreement.

This insurance does not apply to **"personal injury"** arising out of the conduct of any partnership or joint venture of which the **"insured"** is a partner or member and which is not designated in this policy as a **"Named Insured"**.

**4.    Amended Definitions**

When used in reference to this insurance:

**"Damages"** means only those damages which are payable because of **"personal injury"** arising out of an offense to which this insurance applies.

**"Corporal punishment"** means the infliction by an insured of physical pain upon a student as a disciplinary penalty for actual or alleged misbehavior.

**"Offense"** means an event which results in damages to someone other than an **"insured"**.  An offense can involve a single sudden event or the continuous or repeated exposure to conditions.  If the latter, the exposure shall constitute a single offense and shall be deemed to have been committed as of the most recent exposure to said conditions.

**COVERAGE C.  PROFESSIONAL LIABILITY INSURANCE**

1.        **Coverage - Professional Liability**

The Company will pay on behalf of the **"insured"** all sums which the **"insured"** shall become legally obligated to pay as **"damages"** because of injury to any person or animal arising out of the rendering of or failure to render, during the policy period any professional services, and the Company shall have the right and duty to defend any suit against the **"insured"** seeking such **"damages"**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and, with the written consent of the Board of Risk and Insurance Management of The State of West Virginia, such settlement of any claim or suit as it deems expedient but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

2.        **EXCLUSIONS**

This insurance does not apply to:

A.    **"Bodily injury"** to any employee of the **"insured"** arising out of and in the course of employment by the **"insured".**

B.    Any obligation for which the **"insured"** or any carrier of the **"insured"** may be held liable under any Workers' Compensation, disability benefits or unemployment compensation law or any similar law.

C.    The ownership, maintenance, operation, use loading or unloading of any aircraft, motor vehicle or trailer.

D.    1)    To injury arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

(a)        At or from any premises, site or location which is or was at any time owned, rented, loaned or otherwise occupied or used by the **"Insured"**;

(b)        At or from any site or location used by or for the **"Named Insured"** or others for the handling, storage, disposal, processing or treatment of waste;

(c)        Which are at any time transported, handled, stored, treated, disposed of, or processed as  waste by or for the **"Named Insured"** or any person or organization for whom the **"Named Insured"** may be legally responsible; or

(d)        At or from any site or location on which the **"Named Insured"** or any contractors or subcontractors working directly or indirectly on behalf of the **"Named Insured"** are performing operations:

(i)    If the pollutants are brought on or to the site or location in connection with such operations; or

(ii)    If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

2)        To any loss, cost or expense arising out of any governmental direction or request that the **"Named Insured"** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed

3.      **Persons Insured**

Each of the following is an **"insured"** under this insurance to the extent set forth below:

A.      The **"Named Insured"**;

B.      Any elected or appointed official, executive officer, commissioner, director, or member of the **"Named Insured"** while acting within the **"scope of his duties as such"**;

C.      Any faculty member, employee, volunteer worker or student teacher of the **"Named Insured"** while acting within the **"scope of their duties as such"**.  Employee shall not include any person working on a retainer or contractual agreement;

D.      Any student or resident of the **"Named Insured"** in medicine, osteopathy, nursing, dentistry, pharmacy, post first professional degree, allied health fields, or other fields of a professional nature, while acting within the scope of their curriculum as such.

This insurance does not apply to injury arising out of the conduct of any partnership or joint venture of which the **"insured"** is a partner or member and which is not designated in this policy as a **"Named Insured"**.

4.      **Extensions of Coverage**

The insurance afforded by this endorsement is extended to cover **"Good Samaritan Acts"** rendered away from the premises of the **"Named Insured"** provided that this insurance will be excess over any valid and collectible insurance available to an **"insured"**.

5.      **Additional Definitions**

When used in reference to this insurance:

**"Damages"** means all damages, including damages for death, which are payable because of injury to which this insurance applies.

The phrase **"scope of their duties as such"** also includes those duties that are authorized and defined in any employment agreement with the **"Named Insured"**.

The phrase **"Good Samaritan Acts"** means assistance of a medical nature rendered in an emergency situation, but only for the duration of the emergency, for which no remuneration is demanded or received, and if such assistance were not given, would result in probable additional injury or death to the injured party.

6.      **Additional Conditions**

A.      **"Insured's"** Duties in the Event of Injury, Claim or Suit.
When an injury occurs written notice shall be given by or on behalf of the **"insured"**, in accordance with the **"Insured's"** Duties in the Event of Injury, Claim or Suit condition.

B.      First Aid Expenses Exclusion
The insurance shall not apply to expenses incurred by the **"insured"** for first aid at the time of the accident and the **"Supplementary Payments"** provision and the **"Insured's"** Duties in the Event of Injury, Claim or Suit condition are amended accordingly.

C.      Limitation of Coverage Under Any Other Liability Insurance
Except as stated in this part, the policy does not apply to injury arising out of the rendering of or failure to render the professional services described in **1. Coverage - Professional Liability**.

**COVERAGE D.  STOP GAP LIABILITY INSURANCE**

1.    **Coverage - Stop Gap Liability Insurance**

The Company will pay on behalf of the **"insured"** all sums which the **"insured"** shall become legally obligated to pay as damages because of **"bodily injury"** to which this insurance applies, caused by an **"occurrence"**, to any employee of the **"insured"** whose remuneration has been reported and declared under a **"Workers' Compensation Law"** of the State of West Virginia and who has been injured in the course of his employment, but is not entitled to receive (or elects not to accept) the benefits provided by the aforementioned law and the Company shall have the right and duty to defend any suit against the **"insured"** seeking damages on account of such **"bodily injury"** even if any of the allegations of the suit are groundless, false or fraudulent, and the Company may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

2.    **Exclusions**

This insurance does not apply to:

A.  Liability assumed by the **"insured"** under any contract or agreement.

B.  Any premium, assessment, penalty, fine, or other obligation imposed by any **"Workers' Compensation law"**.

C.  **"Bodily injury"** suffered or caused by any person knowingly employed by the **"insured"** in violation of any law as to age, or under the age of 14 years, regardless of any such law.

D.  Aircraft operations or the performance of any duty in connection with aircraft while in flight.

E.  Any damages for **"bodily injury"** with respect to which the **"insured"** is deprived of any defense or defenses, or is otherwise subject to penalty because of default in premium payment under, or any other failure to comply with the provisions of a **"Workers' Compensation law"**.

3.    **Persons Insured**

Each of the following is an **"insured"** under this insurance to the extent set forth below:

A.    The **"Named Insured"**;
B.    Any elected or appointed official, executive officer, commissioner, director, member, or managerial or supervisory personnel of the **"Named Insured"** while acting within the scope of his duties as such.

This insurance does not apply to **"bodily injury"** arising out of the conduct of any partnership or joint venture of which the **"insured"** is a partner or member and which is not designated in this policy as a **"Named Insured"**.

4.      **Policy Period; Policy Territory**

This insurance applies only to injury within the **"Policy territory"** (a) by accident occurring during the policy period or (b) by sickness or disease caused by or aggravated by exposure of which the last day of the last exposure, in the employment of the **"insured"**, to conditions causing the sickness or disease during the policy period.

5.      **Extensions of Coverage**

The insurance afforded by this coverage part is extended to include damages for which the **"insured"** is liable under Section 23-4-2 of the West Virginia Compensation Act.

6.      **Additional Definitions**

When used in reference to this insurance (including endorsements forming a part of the policy):

**"Workers' Compensation Law"** means the Workers' Compensation law and any Occupational Disease law but does not include those provisions of any such law which provide non-occupational disability benefits.

7.      **Additional Conditions**

A.   <u>Excess Insurance</u>
     This insurance shall be excess over any other valid and collectible insurance.

**COVERAGE E.   WRONGFUL ACT LIABILITY INSURANCE**

**1.**        **Coverage - Wrongful Act Liability Insurance**

It is agreed that:

A.     The Company will pay on behalf of the **"insureds"**, individually or collectively, or their executors, administrators or assignees, in accordance with the terms of this coverage part, all sums which said **"insureds"** shall become legally obligated to pay as damages for a **"loss"** arising from any **"Wrongful Act"** of the **"insured"** or of any other person for whose actions the **"insured"** is legally responsible, and the Company shall have the right and duty to defend any suit against the **"insured"** seeking such damages, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and, with the consent of the Board of Risk and Insurance Management of The State of West Virginia, such settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

B.   The Company will pay on behalf of the **"Named Insured"**, in accordance with the terms of this coverage part, all sums which the **"Named Insured"** may be required or permitted by law to indemnify any **"insured"** for damages the **"insured"** shall become legally obligated to pay as damages for a **"loss"** arising from any **"Wrongful Act"** of the **"insured"** or of any other person for whose actions the **"insured"** is legally responsible, and the Company shall have the right and duty to defend any suit against the **"insured"** seeking such damages, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and, with the consent of the Board of Risk and Insurance Management of The State of West Virginia, such settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

C.   The Company will pay on behalf of the **"Named Insured"**, in accordance with the terms of this coverage part, all sums which the **"Named Insured"** shall become legally obligated to pay as damages for a **"loss"** arising from any **"Wrongful Act"** of the **"Named Insured"** or of any other person for whose actions the **"Named Insured"** is legally responsible, and the Company shall have the right and duty to defend any suit against the **"Named Insured"** seeking such damages, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and, with the consent of the Board of Risk and Insurance Management of The State of West Virginia, such settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

It is further agreed that this insurance applies only to **"losses"** arising from **"Wrongful Acts"** occurring in or that were committed in the **"policy territory"** during the policy period.

**2.**        **EXCLUSIONS**

This insurance does not apply to:

A.   Any claim based upon or attributable to the **"insured"** gaining in fact any personal profit or advantage to which they were not legally entitled, including remuneration paid in violation of law as determined by the courts.

B.   Any claim arising out of the levy, imposition, collection, payment or failure to pay, or refund of, taxes, assessments, fees and charges or the valuation of property for assessment purposes.

C.  Any claim which is insured on a primary basis by another valid policy or coverage parts A, B, C, or D of this policy.

D.  Any claim which is based upon or attributable to the rendering or failure to render any opinion, treatment, consultation or service if such opinion, treatment, consultation or service was rendered or failed to have been rendered while such **"insureds"** were engaged in any activity for which they received compensation from any source other than the **"Named Insured"** or were gratuitously engaged with other than by specific direction of the **"Named Insured"**.

E.  Any claim arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

(a)  At or from any premises, site or location which is or was at any time owned, rented, loaned or otherwise occupied or used by the **"Insured"**;

(b)  At or from any site or location used by or for the **"Named Insured"** or others for the handling, storage, disposal, processing or treatment of waste;

(c)  Which are at any time transported, handled, stored, treated, disposed of, or processed as   waste by or for the **"Named Insured"** or any person or organization for whom the **"Named Insured"** may be legally responsible; or

(d)  At or from any site or location on which the **"Named Insured"** or any contractors or subcontractors working directly or indirectly on behalf of the **"Named Insured"** are performing operations:

(i)  If the pollutants are brought on or to the site or location in connection with such operations; or

(ii)  If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.   Waste  includes  materials  to  be  recycled, reconditioned or reclaimed

F.  To any loss, cost or expense arising out of any governmental direction or request that the **"Named Insured"** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.   Waste  includes  materials  to  be  recycled, reconditioned or reclaimed

G.  To any claims(s) made against the **"insured"** for damages arising out of or attributable to:

Any failure to integrate or desegregate the student enrollment or participation in any school district, school or educational or extracurricular program on the basis of race, ethnic background or national origin, or,

The bussing or other transportation of students to or from school or extracurricular events in connections with a program or plan of such integration or desegregation, or,

Causing or allowing the student enrollment or participation in any school district, school or education or extracurricular program to be operated or administered on a discriminatory basis because of race, ethnic background or national origin.

H.  To any claim(s) made against the **"insured"** for damages attributable to wages, salaries and benefits.

I.  To any claim(s) based upon or attributable to any allegations or claims that the **"insured"** breached the terms of any type or any form of contract, either express or implied, written or oral.

**3.      Persons Insured**

Each of the following is an **"insured"** under this insurance to the extent set forth below:

A.      The **"Named Insured"**,

B.      Those persons who were, are now or shall be duly elected or appointed officials, executive officers, commissioners, directors or members of the **"Named Insured"** while acting within the scope of his duties as such,

C.      Any faculty member, employee, volunteer worker or student teacher of the **"Named Insured"** while acting within the scope of their duties as such, but the insurance afforded such individuals does not apply to **"bodily injury"** to another faculty member, employee, volunteer worker or student teacher of the **"Named Insured"** arising out of or in the course of his employment. Employee shall not include any person working on a retainer or contractual agreement.

This insurance does not apply to **"bodily injury"** or **"property damage"** arising out of the conduct of any partnership or joint venture of which the **"insured"** is a partner or member and  which is not designated in this policy as a **"Named Insured"**.

**4.      Additional Definitions**

When used in reference to this insurance:

A.      **"Wrongful Act"** shall mean any actual or alleged act, breach of duty, neglect, error, misstatement, misleading statement or omission by the **"insured(s)"** in the scope of duties for the **"Named Insured"**, individually or collectively.

B.      **"Loss"** shall mean any amount which the **"insured(s)"** are legally obligated to pay, including, but not limited to, any amounts which the **"Named Insured"** may be required or permitted to pay as indemnity to any **"insured"**, for a claim or claims made against an **"insured"** for a Wrongful Act and shall include but not be limited to damages, judgments, settlements and costs, cost of investigation and defense of legal actions (excluding salaries of officers or employees of the **"Named Insured"** or any other governmental body), claims or proceedings and appeals therefrom, premium on bonds to release attachments or similar bonds but without any obligation to apply for or furnish such bonds, provided always, however, **"loss"** shall not include fines imposed by law and any such amount due or payable under the terms of any contractual obligation.

**5.   Additional Duties In The Event Of Occurrence, Offense, Claim Or Suit - Notice of Claim**

A.   If the **"Named Insured"** or any **"insured"** shall receive written or oral notice from any party that it is the intention of such party to hold the **"insured"** responsible for a **"Wrongful Act"**, they shall give written notice to the Company of the receipt of such written or oral notice as soon as practicable, but in no event exceeding one year.

B.   The **"Named Insured"** or any **"insureds"** , or the named designee shall, as a condition precedent to their rights under this policy, give the Company notice in writing as soon as practicable of any claim made and shall give the Company such information and cooperation as it may reasonably require.

C.   For the purpose of the above clauses, notice to the  Claims Manager, State Board of Risk and Insurance Management, shall constitute notice to the **"Named Insured"** or to any **"insureds"**.

D.   In the event of any claim occurring hereunder, notice to the Company shall be given to AIG Claims, Inc. at P.O. Box 293206, Nashville, TN 37229-3206.  Notice shall be deemed to be received, if sent by prepaid mail properly addressed.

**6.   General Conditions**

A.   Severability Clause

The insurance afforded by this coverage part shall be construed as a separate agreement with each **"insured"**.

B.   Subrogation Clause

In the event of any payment under this coverage part, the Company shall be subrogated to the extent of such payment to rights of recovery therefor, and the **"insureds"** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights including the execution of such documents necessary to enable the Company effectively to bring suit in the name of the **"insureds"**.

C.   Public Entity Authorization Clause

By acceptance of this coverage part, the State Board of Risk and Insurance Management agrees to act on behalf of all **"insureds"** with respect to the giving and receiving of notice of claim or cancellation, the payment of premiums and the receiving of any return premiums, that may become due under this coverage part and the **"insureds"** agree that the State Board of Risk and Insurance Management shall act on their behalf.

D.   Conformity Clause

Terms of this coverage part which are in conflict with the statutes of those states wherein certain provisions and coverages included under this coverage part are not permitted are hereby amended to cover only those provisions and coverages as apply and conform to such statutes.

E.    Action Against Company

No action shall lie against the Company, unless as a condition precedent thereto, the **"insured"** shall have fully complied with all terms of this coverage part.  In the event of the bankruptcy or insolvency of the **"insureds"**, the Company shall not be relieved of the payment of such indemnity hereunder as would have been payable but for such bankruptcy or insolvency.

F.   Changes

Notices of any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this coverage part, nor shall the terms of this coverage part be waived or changed, except by endorsement issued to form part of this coverage part.

G.   Assignment

Assignment of interest under this coverage part shall not bind the Company until its consent is endorsed hereon.

## SECTION II - LIMITS OF INSURANCE

Regardless of the number of:

a.   **"Insureds"** under this policy;
b.   Persons or organizations who sustain **"bodily injury"** or **"property damage"**; or
c.   Claims made or suits brought on account of damages to which this policy applies,

It is agreed that the Company's liability is limited as follows:

1.   The limit of the Company's liability for damages arising out of any one **"occurrence"** is $1,000,000 combined - West Virginia Parkways, Economic Development and Tourism Authority (West Virginia Turnpike), $1,000,000 Combined - The State of West Virginia (State Agencies). The **"occurrence"** limit applies to Coverages A, B, C, D, and E combined and not separately thereto.  It is expressly understood and agreed that if an **"occurrence"** is insured under more than one coverage part, the each **"occurrence"** limit of liability will not stack.

This limit of liability will apply to **"occurrences"** to which this policy applies and to accidents or **"occurrences"** covered under:

West Virginia Comprehensive Liability Policy number GL 379-66-62 issued to The State of West Virginia, and
Commercial Automobile Liability Policy number CA 293-58-36 issued to The State of West Virginia, and
Commercial Automobile Liability Policy number CA 293-58-35 issued to The State of West Virginia covering Senate Bill #3 Entities.

If this Coverage Form and any other Coverage Form or policy issued to you by us or any of our affiliated companies apply to the same **"occurrence"**, the maximum limit of the Company's liability under all the Coverage Forms or policies will not exceed the highest applicable limit of liability available under any one Coverage Form or policy.  This condition does not apply to any other Coverage Form or policy issued by us or any of our affiliated companies specifically to apply as excess insurance over this Coverage Form.

2.   For the purpose of determining the limit of the Company's liability:

a.  Under coverage parts A and D all damages arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one **"occurrence"**,

b.  Under coverage part C, **"occurrence"** means an act or omission or a series of related acts or omissions in the rendering of or failure to render professional services by one or more **"insureds"**, and

c.  Under coverage part E, **"occurrence"** means a **"Wrongful Act"** or a series of related **"Wrongful Acts"** of one or more **"insureds"**.

## SECTION III - SUPPLEMENTARY PAYMENTS

The Company will pay, in addition to each occurrence limit of liability:

1.  All expenses incurred by the Company, all costs taxed against the **"insured"** in any suit defended by the Company and prejudgment interest awarded against the **"insured"** on that part of the judgment the Company pays.  If the Company makes an offer to pay the applicable limit of insurance, the Company will not pay any prejudgment interest based on that period of time after the offer.

2.  Premium on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this policy, and the cost of bail bonds required of the **"insured"** because of accidents or traffic law violation arising out of the use of any vehicle to which this policy applies, not to exceed $250. per bail bond, but the Company shall have no obligation to apply for or furnish any such bonds.

3.  Expenses incurred by the **"insured"** for first aid to others at the time of an accident, for **"bodily injury"** to which this policy applies.

4.  Reasonable expenses incurred by the **"insured"** at the Company's request in assisting the Company in the investigation or defense of the claim or suit, including actual loss of earnings up to $100 a day because of time off from work.

## SECTION IV - DEFINITIONS

When used in this policy (including endorsements forming a part hereof):

**"Allocated Claims Expenses"** means that expense which can be allocated to individual claims and shall include, but not be limited to all administrative agency and court costs, fees and expenses; fees for service of process; fees to attorneys; the cost of services of undercover operatives and detectives; fees or cost for expert testimony; cost of copies of transcripts of testimony at coroner inquests or criminal or civil proceedings; cost of copies of public records; costs of depositions and court reporters or recorded statement and any similar costs or expenses properly chargeable to defense of a particular claim or to protect the right of subrogation of the **"insured"**.  It does not include the cost of investigation and adjustment of claims by salaried employees of the company or independent adjusters substituted therefor.

**"Automobile"** means a land motor vehicle, trailer or semitrailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include **"mobile equipment"**.

**"Bodily injury"** means bodily injury, sickness or disease sustained by any person, which occurs during the policy period, including death at any time resulting therefrom.

**"Collapse hazard"** includes **"structural property damage"** as defined herein and **"property damage"** to any other property at any time resulting therefrom. **"Structural property damage"** means the collapse of or structural injury to any building or structure due to (1) grading of land, excavating, burrowing, filling, back-filling, tunneling, pile driving, cofferdam work or caisson work or (2) moving, shoring, underpinning, raising or demolition of any building or structure or removal or rebuilding of any structural support thereof.  The **"collapse hazard"** does not include **"property damage"** (1) arising out of operations performed for the **"Named Insured"** by independent contractors, or (2) included within the **"completed operations hazard"** or the **"underground property damage hazard"**, or (3) for which liability is assumed by the **"insured"** under an incidental contract.

**"Completed operations hazard"** includes **"bodily injury"** and **"property damage"** arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the **"bodily injury"** or **"property damage"** occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the **"Named Insured"**.  Operations include materials parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

1.  When all operations to be performed by or on behalf of the **"Named Insured"** under the contract have been completed,
2.  When all operations to be performed by or on behalf of the **"Named Insured"** at the site of the operations have been completed, or
3.  When the portion of the work out or which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The **"Completed operations hazard"** does not include **"bodily injury"** or **"property damage"** arising out of

(a)  Operations in connection with the transportation of property, unless the **"bodily injury"** or **"property damage"** arises out of a condition in or on a vehicle created by the loading or unloading thereof,
(b)  The existence of tools, uninstalled equipment or abandoned or unused materials, or
(c)  Operations for which the classifications stated in the policy or in the Company's manual specifies "including completed operations".

**"Elevator"** means any hoisting or lowering device to connect floors or landings, whether or not in service, and all appliances thereof including any car, platform, shaft, hoistway, stairway, runway, power equipment and machinery; but does not include an **"automobile"** servicing hoist or a hoist without a platform outside a building if without mechanical power or if not attached to building walls, or a hod or material hoist used in alteration construction or demolition operations, or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet.

**"Explosion hazard"** includes **"property damage"** arising out of blasting or explosion.  The **"explosion hazard"** does not include **"property damage"** (1) arising out of the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment, or (2) arising out of operations performed for the **"Named Insured"** by independent contractors, or (3) included within the **"completed operations hazard"** or the **"underground damage hazard"**, or (4) for which liability is assumed by the **"insured"** under an **"incidental contract"**.

**"Incidental contract"** means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) **"elevator"** maintenance agreement.

**"Insured"** means any person or organization qualifying as an insured in the **"persons insured"** provision of the applicable insurance coverage.  The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the Company's liability.

**"Mobile equipment"** means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled,

(1) not subject to motor vehicle registration, or
(2) maintained for use exclusively on premises owned by or rented to the **"Named Insured"**, including the ways immediately adjoining, or
(3) designed for use principally off public roads, or
(4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle:  power cranes, shovels, loaders, diggers and drills; concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators, including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment.

**"Named Insured"** means the organization named in Item 1. of the Declarations of this policy.

**"Named Insured's products"** means goods or products manufactured, sold, handled or distributed by the **"Named Insured"** or by others trading under his name, including any container thereof (other than a vehicle), but **"Named Insured's products"** shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold.

**"Occurrence"** means an accident, including continuous or repeated exposure to conditions, which results in **"bodily injury"** or **"property damage"** neither expected nor intended from the standpoint of the **"insured"**.

**"Policy territory"** means:

    a.  The United States of America, its territories or possessions, or Canada or
    b.  International waters or airspace, provided the **"bodily injury"** or **"property damage"** does not occur in the course of travel or transportation to or from any other country, state or nation, or
    c.  Anywhere in the world with respect to damages because of **"bodily injury"** or **"property damage"** arising out of a product which was sold for use or consumption within the territory described in paragraph (a) above, provided the original suit for such damages is brought within such territory.

**"Products hazard"** includes **"bodily injury"** and **"property damage"** arising out of the **"Named Insured's products"** or reliance upon a representation or warranty made at the time with respect thereto, but only if the **"bodily injury"** or **"property damage"** occurs away from premises owned by or rented to the **"Named Insured"** and after physical possession of such products has been relinquished to others.

**"Property damage"** means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **"occurrence"** during the policy period.

**"Underground property damage hazard"** includes underground **"property damage"** as defined herein and **"property damage"** to any other property at any time resulting therefrom.  **"Underground property damage"** means **"property damage"** to wires, conduits, pipes, mains, sewers, tanks, tunnels, any similar property, and any apparatus in connection therewith, beneath the surface of the ground or water, caused by and occurring during the use of mechanical equipment for the purpose of grading land, paving, excavating, drilling, burrowing, filling, back-filling or pile driving.  The **"Underground property damage hazard"** does not include **"property damage"** (1) arising out of the operations performed for the **"Named Insured"** by independent contractors, or (2) included within the **"completed operations hazard"**, or (3) for which liability is assumed by the **"insured"** under an **"incidental contract"**.

## SECTION V - CONDITIONS

1. **Premium**

   All premiums for this policy shall be computed in accordance with the Company's rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein.

   The premium designated in this policy is a flat premium charge not subject to audit.

   The **"Named Insured"** shall maintain records of such information as is necessary for premium computation, and shall send copies of such records to the Company at the end of the policy period as the Company may direct.

2. **Inspection and Audit**

   The Company shall be permitted but not obligated to inspect the **"Named Insured's"** property and operations at any time. Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the **"Named Insured"** or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

   The Company may examine and audit the **"Named Insured's"** books and records at any time during the policy period and extension thereof and within three years after the final termination of the policy, as far as they relate to the subject matter of this insurance.

3. **Financial Responsibility Laws**

   When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by this policy for **"bodily injury"** liability or for **"property damage"** liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law. The **"insured"** agrees to reimburse the Company for any payment made by the Company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

4. **Insured's Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. The **"insured"** must see to it that we are notified as soon as practicable of an **"occurrence"** or an offense which may result in a claim. To the extent possible, notice should include:

      1) How, when and where the **"occurrence"** or offense took place;
      2) The names and addresses of any injured persons and witnesses; and
      3) The nature and location of any injury or damage arising out of the **"occurrence"** or offense.

   b. If a claim is made or suit is brought against the **"insured"**, the **"insured"** shall immediately record the specifics of the claim, suit, demand, notice, summons or other process and the date received.

   c. The **"insured"** shall:

      1) Immediately send the Company copies of any demands, notices, summonses or legal papers received in connection with the claim or suit.
      2) Authorize the Company to obtain records and other information.
      3) Cooperate with and, upon the Company's request, assist the Company in the investigation, settlement or defense of the claim or suit.
      4) Assist the Company, upon the Company's request, in the enforcement of any right of contribution or indemnity against any person or organization which may be liable to the **"insured"** because of injury or damage with respect to which insurance is afforded under this policy.

5) The **"insured"** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

No **"insureds"** shall, except at their own cost, voluntarily make a payment, assume any obligation, waive any statutory or common law immunity, or incur any expense, other than for first aid, without the consent of the Company.

5. **Legal Action Against Company**

No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **"insured's"** obligation to pay shall have been finally determined by judgment against the **"insured"** after actual trial or by written agreement of the **"insured"**, the claimant and the Company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No other person or organization shall have any right under this policy to join the Company as a party to any action against the **"insured"** to determine the **"insured's"** liability, nor shall the Company be impleaded by the **"insured"** or his legal representative. Bankruptcy or insolvency of the **"insured"** or of the **"insured's"** legal estate shall not relieve the Company of any of its obligations hereunder.

6. **Other Insurance**

The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the **"insured"** has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

A. <u>Contribution By Equal Shares.</u> If all of such other valid and collectible insurance provides for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

B. <u>Contribution By Limits.</u> If any of such other insurance does not provide for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

7. **Subrogation**

In the event of any payment under this policy, the Company shall be subrogated to all of the **"insured's"** rights to recovery therefore against any person or organization and the **"insured"** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **"insured"** shall do nothing after loss to impair or prejudice such rights. At the Company's request, the **"insured"** will bring suit or transfer those rights to the Company and help the Company enforce them.

WVCLP-07/16
State Agencies

8. **Changes**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the Company for asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

9. **Assignment**

Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon; if, however, the **"Named Insured"** shall die, such insurance as is afforded by this policy shall apply (1) to the **"Named Insured"** but only while acting within the scope of his duties as such, and (2) with respect to the property of the **"Named Insured"**, to the person having proper temporary custody thereof, as **"insured"**, but only until the appointment and qualification of the legal representative.

10. **Nonrenewal by the Company**

If the Company decides not to renew this policy, the Company shall mail or deliver to the first **"Named Insured"** shown in the Declarations written notice of the nonrenewal not less than 120 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

11. **Cancellation**

This policy may be canceled by the **"Named Insured"** by surrender thereof to the Company or any of its authorized agents or by mailing to the Company written notice stating when thereafter the cancellation shall be effective. This policy may be canceled by the Company by mailing to the **"Named Insured"** at the address shown in the Declarations of this policy, written notice stating when not less than one hundred twenty (120) days thereafter such cancellation shall be effective, unless the policy is being canceled for non-payment of premium, in which case the Company shall provide not less than thirty (30) days notice. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the **"Named Insured"** or by the Company shall be equivalent to mailing.

If the **"Named Insured"** cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the Company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

12. **Declarations.**

By accepting this policy, the **"Named Insured"** agrees:
a.   The statements in the Declarations are the **"Named Insured's"** agreements and representations;
b.   Those statements are accurate and complete;
c.   The Company has issued this policy in reliance upon the truth of such representations;
d.   This policy embodies all agreements existing between the **"Named Insured"** and the Company or any of its agents relating to this insurance.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 1**

This endorsement, effective 12:01 A.M.     July 1, 2016         forms a part of

Policy No. GL 379-66-63              issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**NAMED INSURED**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Item 1 of the Declarations is completed to read as follows:**

A.       The State of West Virginia;

B.       West Virginia Parkways, Economic Development and Tourism Authority;

It is agreed that the "The State of West Virginia" means:

"The Legislative, Judicial and Executive Branches of the State of West Virginia, including all of its Boards, Commissions, Councils, Authorities, Institutions, Universities, Colleges, Schools, Departments, Divisions and Agencies; provided however, The State of West Virginia shall not be considered to include County Commissions, Municipalities, County Boards of Education, or other Political Subdivisions of the State regardless of any State Aid that may be provided."

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 2**

This endorsement, effective 12:01 A.M.     July 1, 2016        forms a part of

Policy No. GL 379-66-63            issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**AMENDATORY ENDORSEMENT**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Various provisions of the policy are amended as follows:**

It is agreed that:

A.     The terms of this policy which are in conflict with the statutes of the State of West Virginia are hereby amended to conform to such statutes.

B.     Except with respect to the Limits of Liability, and any rights or duties specifically assigned in this Coverage part to the first **"Named Insured"**, this insurance applies:

    1.   As if each **"Named Insured"** were the only **"Named Insured"**; and
    2.   Separately to each **"insured"** against whom claim is made or suit is brought.

C.     As respects all facilities operated by Concessionaires, the insurance afforded by this policy form shall be excess over any other valid and collectible insurance.

D.     If a **"Named Insured"** has other primary insurance for the hazards covered by this policy, this policy does not apply to losses occurring before the expiration or termination date of the other insurance except to the extent that the amount of loss exceeds the limit of liability of the insurance, but then only for an amount not exceeding the difference between any higher applicable limit of liability stated in the schedule of this policy and the limit of liability of the other insurance.

E.     It is agreed that the provisions of the certificate of liability insurance issued by the State of West Virginia Board of Risk and Insurance Management to insureds covered under this policy are incorporated into this policy.

F.     As stated in the Certificate of Insurance, which was incorporated into this policy by "E." above, it is a condition precedent of coverage under this policy that the additional insured does not waive any statutory or common law immunity conferred upon it.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 4**

This endorsement, effective 12:01 A.M.    July 1, 2016         forms a part of

Policy No. GL 379-66-63          issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**EXCLUSION OF CLAIMS FOR  ATTORNEYS' FEES, COSTS, EXPENSES,
FINES, OR PENALTIES ARISING FROM CRIMINAL PROCEEDINGS**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

No coverage exists for attorneys' fees, costs, expenses, fines and penalties submitted to, or incurred in defending any criminal proceedings or charges, threatened or prosecuted against an **"insured"** or its employees, agents and servants.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 5**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63        issued to  The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**EXCLUSION OF NON-PECUNIARY RELIEF CLAIMS**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

No insurance coverage exists for any and all claims, demands or actions seeking relief in any non-pecuniary form, including but not limited to injunctions, equitable relief, and declaratory judgments, and to any claims, demands, or actions seeking relief in the form of attorney's fees, expenses, or other costs against the insured made in conjunction with, or as a result of, any claim for non-pecuniary relief.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 6**

This endorsement, effective 12:01 A.M.    July 1, 2016    forms a part of

Policy No. GL 379-66-63        issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**EXCLUSION OF CLAIMS SEEKING NON-SPECIFIC OR GENERAL DEMANDS**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

No insurance coverage exists for any and all claims, demands or actions unless the specific demand for relief seeks compensatory or punitive damages (to the extent such punitive damages are allowed under existing law).  Non-specific or general demands for judgment or relief, such as "for any other such relief as the court deems just and proper" and other similar types of demands, do not create a duty to either defend or pay under the terms and conditions of this policy.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 3**

This endorsement, effective 12:01 A.M.     July 1, 2016          forms a part of

Policy No. GL 379-66-63          issued to  The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.


**EXCLUSION OF CLAIMS, AWARDS, OR JUDGMENTS RENDERED BY
HUMAN RIGHTS COMMISSION OR GRIEVANCE BOARDS OR
GOVERNMENTAL AGENCIES OR ADMINISTRATIVE BODIES**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

No insurance coverage shall be applicable to any and all claims, awards, settlements, or judgments, that are filed with, rendered or accepted or adjudicated by any federal, state, county or municipal Human Rights Commission or any other federal, state, county or city administrative agency or grievance board. This exclusion applies to any form of grievance proceeding before an administrative agency or forum, including investigation by and litigation initiated by the Equal Employment Opportunity Commission. This exclusion applies whether the agency or commission is public, private, quasi-judicial or quasi-governmental.  This exclusion applies to any appeals from any such commission, agency or administrative body.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 7**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63            issued to  The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**EXCLUDED PREMISES-OPERATIONS**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

It is agreed that the insurance afforded under this policy does not apply to any claim resulting from the ownership, design, selection, installation, maintenance, location, supervision, operation, construction, use, or control of streets (including sidewalks, highways or other public thoroughfares), bridges, tunnels, dams, culverts, storm or sanitary sewers, rights-of-way, signs, warnings, markers, markings, guardrails, fences, or related or similar activities or things but it is agreed that the insurance afforded under this policy does apply (1) to claims of **"bodily injury"** or **"property damage"** which both directly result from and occur while employees of the State of West Virginia are physically present at the site of the incident at which the **"bodily injury"** or **"property damage"** occurred performing construction, maintenance, repair, or cleaning (but excluding inspection of work being performed or materials being used by others) and (2) to claims of **"bodily injury"** or **"property damage"** which arise out of the maintenance or use of sidewalks which abut buildings covered by the policy.

It is further agreed that this exclusion does not apply to any **"Named Insured"** which is not immune under the Constitution of the State of West Virginia.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 8**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63            issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**ABSOLUTE ASBESTOS EXCLUSION**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

This insurance does not apply to:

Any liability for **"bodily injury"**, **"property damage"** or "personal injury as defined in Coverage B" at any time arising out of:

1) the manufacture, transportation, storage or disposal of to asbestos products, asbestos fibers or asbestos dust or any goods or products containing asbestos;
2) the mining of, use of, sales of, installation of, distribution of, or exposure to asbestos products, asbestos fibers or asbestos dust or any goods or products containing asbestos;
3) inhaling, ingesting or prolonged physical exposure to asbestos products, asbestos fibers or asbestos dust or any goods or products containing asbestos;
4) the use of asbestos in constructing or manufacturing any good(s), product(s) or structure(s);
5) the removal of asbestos products, asbestos fibers or asbestos dust from any good(s), product(s) or structure(s);
6) any obligation of the insured to indemnify any party because of damages arising out of such **"bodily injury"**, **"property damage"** or "personal injury as defined in Coverage B" at any time arising out of the manufacture of, mining of, use of, sales of, installation of, distribution of, or exposure to asbestos products, asbestos fibers or asbestos dust or any goods or products containing asbestos.

The insurance afforded by the policy does not apply to payment for the investigation or defense of any loss, injury or damage or any cost, fine or penalty or for any expense or claim or suit related to any of the above.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 9**

This endorsement, effective 12:01 A.M.     July 1, 2016       forms a part of

Policy No. GL 379-66-63          issued to  The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**ABSOLUTE LEAD EXCLUSION**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

This insurance does not apply to:

Any liability for **"bodily injury"**, **"property damage"** or "personal injury as defined in Coverage B" at any time arising out of:

   1)   the presence, ingestion, inhalation, or absorption of, or exposure to, lead in any form or products containing lead; or

   2)   the presence of, or exposure to, lead in any form or products containing lead.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 10**

This endorsement, effective 12:01 A.M.     July 1, 2016          forms a part of

Policy No. GL 379-66-63          issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT**
**(Broad Form)**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

I.      The insurance does not apply:

      A.      Under any Liability Coverage to **"bodily injury"** or **"property damage"**:

            1.      With respect to which an **"insured"** under the policy is also and insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

            2.      Resulting from the **"hazardous properties"** of **"nuclear material"** and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **"insured"** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

      B.      Under any Liability Coverage, to **"bodily injury"** or **"property damage"** resulting from **"hazardous properties"** of **"nuclear material"**, if:

            1.      The **"nuclear material"** (a) is at any **"nuclear facility"** owned by, or operated by or on behalf of, an **"insured"** or (b) has been discharged or dispersed therefrom;

            2.      The **"nuclear material"** is contained in **"spent fuel"** or **"waste"** at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an **"insured"**; or

3.  The **"bodily injury"** or **"property damage"** arises out of the furnishing by an **"insured"** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **"nuclear facility"**, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion 3. applies only to **"property damage"** to such **"nuclear facility"** and any property thereat.

II.  As used in this endorsement:

**"Hazardous properties"** includes radioactive, toxic or explosive properties.

**"Nuclear material"** means **"source material"**, **"Special nuclear material"** or **"by-product material"**.

**"Source material"**, **"Special nuclear material"**, and **"by-product material"** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

**"Spent fuel"** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **"nuclear reactor"**.

**"Waste"** means any waste material (a) containing **"by-product material"** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **"source material"** content, and (b) resulting from the operation by any person or organization of any **"nuclear facility"** included under the first two paragraphs of the definition of **"nuclear facility"**.

**"Nuclear facility"** means:

(a)  Any **"nuclear reactor"**;

(b)  Any equipment or devise designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing **"spent fuel"**, or (3) handling, processing or packaging **"waste"**;

(c)  Any equipment or devise designed or used for the processing, fabricating or alloying of **"special nuclear material"** if at any time the total amount of such material in the custody of the **"insured"** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d)  Any structure, basin , excavation, premises or place prepared or used for the storage or disposal of **"waste"**;

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**"Nuclear reactor"** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**"Property damage"** includes all forms of radioactive contamination of property.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 11**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63        issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**DIRECTIVE OF "NAMED INSURED" TO INSURER REGARDING SECTION 19-25-7 OF THE CODE OF WEST VIRGINIA**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

Pursuant to Section 19-25-7 of the Code of West Virginia, the State of West Virginia on behalf of itself and all other **"insureds"** under this policy, hereby rejects an endorsement or any other provision in its policy which waives the defenses and immunities given to owners of land used for recreational, wildlife propagation or military purposes by Sections 19-25-1 through 19-25-7 inclusive (and as amended) of the Code of West Virginia and hereby directs the Insurer to utilize such defenses and immunities against any claim against the State of West Virginia and all other persons, organizations and public agencies or bodies which are  **"insureds"** under this policy.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 12**

This endorsement, effective 12:01 A.M.     July 1, 2016         forms a part of

Policy No. GL 379-66-63              issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.


**SELECTION OF COUNSEL**

*This endorsement modifies insurance provided under the following:*


WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM


**Section V - Conditions, is amended to add:**

13. **Selection of Counsel**

    The Company shall have the sole right, obligation and duty to determine, retain and appoint legal counsel to defend any claim or suit to which this policy applies.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 13**

This endorsement, effective 12:01 A.M.    July 1, 2016    forms a part of

Policy No. GL 379-66-63    issued to  The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**JOINT VENTURE CLAUSE**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 3. Persons Insured** are amended to add:

It is hereby understood and agreed that, as respects any liability of the insurance that is insured under this policy and arises in any manner whatsoever out of the operations or existence of any joint venture, co-venture, joint lease, joint operating, agreement or partnership (hereinafter called **"joint venture"**) in which the **"insured"** has an interest, the liability under this policy shall be limited to the products of

(1)    The percentage interest of the **"insured"** in the said **"joint venture"** and

(2)    The total limit of liability insurance afforded by this policy.

Where the percentage interest of the **"insured"** in said **"joint venture"** is not set forth in writing, this percentage to be applied shall be that which would be imposed by law at the inception of the **"joint venture"**.  Such percentage shall not be increased by the insolvency or bankruptcy of others interested in said **"joint venture"**.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 14**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63          issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**SUBROGATION**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section V - Conditions, 7. - Subrogation is amended to add:**

However, as respects Schirmer Engineering Corporation, it is agreed that with respect to such insurance as is afforded by the policy, the Company, in the event of any claims under this policy, waives the right of subrogation, as respects the **"insured's"** right to recovery therefrom.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 15**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63           issued to  The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**WRONGFUL ACTS LIABILITY COVERAGE
EXTENDED FOR "PRIOR ACTS"**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage E. Wrongful Act Liability Insurance is amended to add the following:**

This insurance shall cover loss arising from any claim made against the **"Named Insured"**, the estates, heirs, legal representative or assigns of deceased persons who were **"insureds"** at the time of the **"Wrongful Act"** upon which such claims are based for **"Wrongful Acts"** that were committed in the **"policy territory"** during the period July 1, 1977 to July 1, 1995 for State of West Virginia agencies and during the period July 1, 1980 to July 1, 1986 for Boards of Education which are reported to the Company, so long as the claim made against the **"insured"** for a loss arising from any **"Wrongful Act"** of the **"insured"** or of any other person for whose actions the **"insured"** is legally responsible was never reported to the **"Named Insured's"** prior carrier(s) and the Board of Risk and Insurance Management of The State of West Virginia had no knowledge of the claim during the pendency of your claims made policy(ies).

However, this insurance does not apply to:

1.  Claims made against the **"insured"** for a loss arising from any **"Wrongful Act"** of the **"insured"** or of any other person for whose actions the **"insured"** is legally responsible which occurred during the period July 1, 1977 to July 1, 1995 for State of West Virginia agencies and during the period July 1, 1980 to July 1, 1986 for Boards of Education and are:

    1)    Covered under a prior claims made policy or any extended reporting period thereof issued to the **"insured"**;
    2)    Not covered under any prior claims made policy issued to the **"insured"** because the limits of liability are exhausted;
    3)    Not covered under any prior claims made policy because it is within a deductible or self-insured retention; or
    4)    Not covered under any prior claims made policy because of the bankruptcy or insolvency of the insurer(s).

2.  Claims made against the **"insured"** for a loss arising from any **"Wrongful Act"** of the **"insured"** or of any other person for whose actions the **"insured"** is legally responsible which occurred prior to July 1, 1977 for State of West Virginia agencies and prior to July 1, 1980 for Boards of Education.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 16**

This endorsement, effective 12:01 A.M.    July 1, 2016    forms a part of

Policy No. GL 379-66-63            issued to  The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**LIMITATION OF CLAIMS TO FAULT ATTRIBUTABLE
TO STATE ENTITY**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

Pursuant to the laws of the State of West Virginia including, but not limited to, Article 10, Section 6 of the Constitution of the State of West Virginia:

No coverage exists as to claims, demands or actions seeking relief or damages from any state agency or entity or from its employees, agents and servants in their official capacities (referred to collectively as "state entity") except as to the percentage of fault or negligence attributable to such "state entity" in relation to the total fault or negligence causing or claimed to have caused such damages, but in no event may recovery be had in an amount exceeding the state policy limit.

This endorsement does not, however, extinguish or in any way affect a "state entity's" right to contribution or indemnity or affect its right against any other actual or potential joint tortfeasor or its right to assert any defenses it may have against a plaintiff or a claimant in a civil action either threatened or pending.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 17**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63            issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**DENIAL OF FIRST PARTY CLAIMS UPON DEFAULT ENDORSEMENT**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section V – Conditions, is amended to add:**

13. We may withhold payment of first party claims to **you** or any **Insured** under this policy if **you** or any
    **Insured** fails to perform within 10 days after its due date any obligation **you** or any **Insured** has
    under this policy or any other agreement with us.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 18**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63        issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**EXCLUSION – NAMED INSURED VS. INSURED CLAIMS**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

No insurance coverage exists for any and all claims, demands or actions brought by the **"Named Insured"** as defined in Endorsement #1 against any insured that derives coverage under the same Certificate of Liability insurance issued by the Board of Risk & Insurance Management to the **"Named Insured"** as defined in Endorsement #1.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 19**

This endorsement, effective 12:01 A.M.      July 1, 2016         forms a part of

Policy No. GL 379-66-63            issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**EXCLUSION – NEW RIVER GORGE BRIDGE TOURS**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I – Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

No insurance coverage exists for any and all claims, demands or actions arising out of guided or unguided tours of the New River Gorge Bridge in Fayette County, West Virginia conducted by, or on behalf of, or with the approval of the West Virginia Department of Transportation, Division of Highways and or the "**Named Insured**" as defined in Endorsement #1.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 20**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63        issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**EXCLUSION – SELECTION OF CONTRACTORS**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I – Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

It is agreed that the insurance afforded  under this policy does not apply to any claim, demand or action resulting from the negligent selection or retention of contractors or bidders for state funded construction projects related to streets (including sidewalks, highways, or other thoroughfares), bridges, tunnels, dams, culverts, storm or sanitary sewers, rights-of-way, signs warnings, markers, markings, guardrails, fences, or related similar activities or things for the West Virginia Department of Transportation, Division of Highways and or the **"Named Insured"** as defined in Endorsement #1.

It is further agreed that this exclusion does not apply to any **"Named Insured"** which is not immune under the Constitution of the State of West Virginia.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 21**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63        issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**POLICY PROVISIONS APPLICABLE TO PHYSICIANS APPOINTED AND DESIGNATED AS STATE OF WEST VIRGINIA EMERGENCY SERVICES LEVEL I/II TRAUMA PHYSICIANS BY THE COMMISSIONER OF THE BUREAU FOR PUBLIC HEALTH OF THE WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

1.    **Section I - Coverages, Coverage C, 3. Persons Insured is amended to add:**

    E.    Any licensed physician, while acting within the scope of their duties and appointment, who has been appointed and designated as a State of West Virginia Emergency Services Level I or Level II Trauma Physician by the Commissioner of the Bureau for Public Health of the West Virginia Department of Health and Human Resources.

2.  It is agreed that no insurance coverage exists for any and all claims, demands or actions, under Coverage A, B, D, and E, of the Policy for any individual who qualifies as an insured under the terms of this Endorsement.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 22**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63            issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**SILICOSIS EXCLUSION ENDORSEMENT**

*This endorsement modifies insurance provided under the following:*

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**Section I. - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

**"Bodily injury", "property damage", "personal injury as defined in Coverage B"** or any other loss, cost or expense arising out of the presence, ingestion, inhalation or absorption of or exposure to silica products, silica fibers, silica dust or silica in any form, or to any obligation of the insured to indemnify any party because of damages arising out of the presence, ingestion, inhalation or absorption of or exposure to silica products, silica fibers, silica dust or silica in any form.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 23**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63          issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**FOREIGN LIABILITY REIMBURSEMENT COVERAGE ENDORSEMENT**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I. - Coverages, Coverage A, B, C, D, & E, 1. Coverages are amended to add:**

As respects employees of the **"Named Insured"** hired in the United States of America or the Dominion of Canada and traveling for the **"insured"** outside of the United States of America, its territories or possessions, or the Dominion of Canada, such insurance as is afforded by the policy for liability imposed upon the **"Named Insured"** arising out of the ownership, maintenance or use of premises and all operations necessary or incidental thereto applies subject to the following additional conditions:

1)   It is agreed that with respect to any proceeding or suit brought in foreign countries against the **"Named Insured"** arising out of the action of employees of the **"Named Insured"** while acting within the scope of their duties as such, the Company shall have the right but not the duty to investigate and settle such claims and to defend such suits.  In any case in which the Company elects not to investigate, settle or defend, the **"insured"** under the supervision of the Company will make or cause to be made such investigation and defense as are reasonably necessary, and subject to prior authorization by the Company will effect to the extent possible such settlement or settlements as the Company and the **"insured"** deem prudent.  The Company shall reimburse the **"insured"** for the reasonable costs of such investigation and defense within the applicable limit of liability of the policy for the amount of such authorized settlements.

2)   In the event the **"insured"** is otherwise insured with respect to such coverage as is afforded by this endorsement, the provisions of this endorsement shall be null and void.

3)   Such insurance as afforded by this endorsement shall not apply to any employees with respect to injury or destruction of property owned, occupied or used by or rented to the **"Named Insured"**.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 24**

This endorsement, effective 12:01 A.M.      July 1, 2016          forms a part of

Policy No. GL 379-66-63            issued to  The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**ABSOLUTE MOLD AND FUNGUS EXCLUSION**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

This insurance does not apply to:

Any liability for **"bodily injury"**, **"property damage"**, or "personal injury as defined in Coverage B", including but not limited to claims, losses, **occurrences**, suits, costs, or expenses, related to, arising from or associated with inhaling, ingesting, or any physical exposure to, or clean-up, or remediation, or containment, or abatement, caused directly or indirectly at any time arising out of:

     a.    Any "fungus(i), "mold(s)", mildew or yeast, or

     b.    Any "spore(s)" or toxins created or produced by or emanating from such "fungus(i)", "mold(s)", mildew or yeast, or

     c.    Any substance, vapor, gas or other emission or organic or inorganic body or substance produced by or arising from any "fungus(i), "mold(s)", mildew or yeast, or

     d.    Any material, product, building component, building or structure, or any concentration of moisture, water or other liquid within such material, product, building component, building or structure, that contains, harbors, nurtures or acts as a medium for any "fungus(i), "mold(s)", mildew, yeast, or "spore(s)" or toxins emanating therefrom,

Regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that **"bodily injury"**, **"property damage"**, "personal injury as defined in coverage B", loss, cost or expense.

For the purposes of this exclusion, the following definitions are added to the Policy:

"Fungus(i)" includes, but is not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including "mold(s)", rusts, mildews, smuts, and mushrooms.

    "Mold(s)" includes, but is not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and "fungi" that produce molds.

    "Spore(s)" means any dormant or reproductive body produced by or arising or emanating out of any "fungus(i)", "mold(s)", mildew, plants, organisms or microorganisms.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 25**

This endorsement, effective 12:01 A.M.     July 1, 2016          forms a part of

Policy No. GL 379-66-63          issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**FRAUD, DISHONESTY OR CRIMINAL ACT EXCLUSION**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

Any claim brought about or contributed to by fraud, dishonesty or criminal act of any **"insured"**; however, notwithstanding the foregoing, the **"insured"** shall be protected under the terms of this coverage part as to any claims upon which suit may be brought against them by reason of any alleged fraud, dishonesty or criminal act on the part of any **"insured(s)"**, unless a judgment or other final adjudication thereof adverse to such **"insured(s)"** shall establish that acts of active or deliberate fraud, dishonesty or criminal act committed by such **"insured(s)"** or unless there was an admission of guilt by the **"insured"**.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 26**

This endorsement, effective 12:01 A.M.     July 1, 2016          forms a part of

Policy No. GL 379-66-63          issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**EXCLUSION OF COVERAGE FOR PERSONS ACCUSED OR CONVICTED OF CRIMES AND SUBJECT TO THE ORDERS OF A COURT**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I-Coverages, Coverages A, B, C, D & E, 3. Persons Insured** are amended to add:

No person committed to the custody of the Division of Corrections, the Regional Jail and Correctional Facility Authority or other state agency as a result of a finding of probable cause that a crime has been committed or a criminal conviction, and while still under order of the court, shall qualify as an insured under this policy.

This endorsement will apply irrespective of whether the person receives payment or consideration of any type from the state while in custody, and shall apply whether the custody be incarceration, probation or parole.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 27**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63        issued to   The State of West Virginia

by National Union Fire Insurance Company of Pittsburgh, Pa.

**EXCLUSION – VOLUNTEER FOR NONPROFIT YOUTH ORGANIZATIONS ACT**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E.**

No insurance coverage exists for any and all claims, demands or actions arising out of any actual or alleged act, error, neglect or omission resulting from a person or persons volunteering services as contemplated by and outlined in Chapter 29, Article 29 of the Code of West Virginia of 1931, as amended, known as the Volunteer for Nonprofit Youth Organizations Act.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 24**

This endorsement, effective 12:01 A.M.     July 1, 2016          forms a part of

Policy No. GL 379-66-63            issued to  The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**ABSOLUTE MOLD AND FUNGUS EXCLUSION**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

This insurance does not apply to:

Any liability for **"bodily injury"**, **"property damage"**, or "personal injury as defined in Coverage B", including but not limited to claims, losses, **occurrences**, suits, costs, or expenses, related to, arising from or associated with inhaling, ingesting, or any physical exposure to, or clean-up, or remediation, or containment, or abatement, caused directly or indirectly at any time arising out of:

     a.     Any "fungus(i), "mold(s)", mildew or yeast, or
     b.     Any "spore(s)" or toxins created or produced by or emanating from such "fungus(i)", "mold(s)", mildew or yeast, or
     c.     Any substance, vapor, gas or other emission or organic or inorganic body or substance produced by or arising from any "fungus(i), "mold(s)", mildew or yeast, or
     d.     Any material, product, building component, building or structure, or any concentration of moisture, water or other liquid within such material, product, building component, building or structure, that contains, harbors, nurtures or acts as a medium for any "fungus(i), "mold(s)", mildew, yeast, or "spore(s)" or toxins emanating therefrom,

Regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that **"bodily injury"**, **"property damage"**, "personal injury as defined in coverage B", loss, cost or expense.

For the purposes of this exclusion, the following definitions are added to the Policy:

"Fungus(i)" includes, but is not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including "mold(s)", rusts, mildews, smuts, and mushrooms.

    "Mold(s)" includes, but is not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and "fungi" that produce molds.

    "Spore(s)" means any dormant or reproductive body produced by or arising or emanating out of any "fungus(i), "mold(s)", mildew, plants, organisms or microorganisms.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 25**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL 379-66-63            issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**FRAUD, DISHONESTY OR CRIMINAL ACT EXCLUSION**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E, 2. Exclusions are amended to add:**

> Any claim brought about or contributed to by fraud, dishonesty or criminal act of any **"insured"**; however, notwithstanding the foregoing, the **"insured"** shall be protected under the terms of this coverage part as to any claims upon which suit may be brought against them by reason of any alleged fraud, dishonesty or criminal act on the part of any **"insured(s)"**, unless a judgment or other final adjudication thereof adverse to such **"insured(s)"** shall establish that acts of active or deliberate fraud, dishonesty or criminal act committed by such **"insured(s)"** or unless there was an admission of guilt by the **"insured"**.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 26**

This endorsement, effective 12:01 A.M.    July 1, 2016         forms a part of

Policy No. GL 379-66-63          issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.


**EXCLUSION OF COVERAGE FOR PERSONS ACCUSED OR CONVICTED OF CRIMES AND
SUBJECT TO THE ORDERS OF A COURT**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I-Coverages, Coverages A, B, C, D & E, 3. Persons Insured** are amended to add:

No person committed to the custody of the Division of Corrections, the Regional Jail and Correctional
Facility Authority or other state agency as a result of a finding of probable cause that a crime has been
committed or a criminal conviction, and while still under order of the court, shall qualify as an insured
under this policy.

This endorsement will apply irrespective of whether the person receives payment or consideration of any
type from the state while in custody, and shall apply whether the custody be incarceration, probation or
parole.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT # 27**

This endorsement, effective 12:01 A.M.    July 1, 2016    forms a part of

Policy No. GL 379-66-63    issued to   The State of West Virginia

by National Union Fire Insurance Company of Pittsburgh, Pa.

**EXCLUSION – VOLUNTEER FOR NONPROFIT YOUTH ORGANIZATIONS ACT**

*This endorsement modifies insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

**Section I - Coverages, Coverage A, B, C, D, & E.**

No insurance coverage exists for any and all claims, demands or actions arising out of any actual or alleged act, error, neglect or omission resulting from a person or persons volunteering services as contemplated by and outlined in Chapter 29, Article 29 of the Code of West Virginia of 1931, as amended, known as the Volunteer for Nonprofit Youth Organizations Act.

THIS ENDORESEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

**ENDORSEMENT # 28**

This endorsement, effective 12:01 A.M.    July 1, 2016    forms a part of

Policy No.  GL 379-66-63                     issued to    The State of West Virginia

By National Union Fire Insurance Company of Pittsburgh, PA.

**MEDICAL PROFESSIONAL LIABILITY ENDORSEMENT FOR MEDICAL AND DENTAL SCHOOLS AND FOR CLINICAL PRACTICE PLANS AND PERSONNEL ASSOCIATED WITH MEDICAL AND DENTAL SCHOOLS AS MANDATED BY WEST VIRGINIA CODE §55-7H-4 AS ENACTED BY THE REGULAR SESSION OF THE 2015 WEST VIRGINIA LEGISLATURE**

*This endorsement modifies Insurance provided under the following:*

WEST VIRGINIA COMPREHENSIVE LIABILITY COVERAGE FORM

1.  **SECTION II – LIMITS OF INSURANCE** is amended to add:

    3.  As regards the following listed insured only,

        - WEST VIRGINIA UNIVERSITY
        - MARSHALL UNIVERSITY
        - WEST VIRGINIA SCHOOL OF OSTEOPATHIC MEDICINE
        - WEST VIRGINIA UNIVERSITY DENTAL CORPORATION
        - WEST VIRGINIA UNIVERSITY MEDICAL CORPORATION
        - WVU MEDICAL CORP CHARLESTON DIV DBA WVU PHYSICIANS OF CHARLESTON
        - UNIVERSITY HEALTHCARE PHYSICIANS INC
        - UNIVERSITY PHYSICIANS AND SURGEONS
        - WVSOM CLINIC INC DBA ROBERT C BYRD CLINIC

    the limit of the Company's liability under SECTION I – COVERAGES, COVERAGE C is $1,500,000 combined for damages arising out of any one "occurrence' for claims arising from a "**medical injury**" to a "**patient**", including death resulting, in whole or in part, from the "**medical injury**", either through act or omission, or whether actual or imputed.  The provisions of this endorsement apply to the acts and omissions of the following while acting within their "**scope of authority or employment**" for a "**state's medical and dental school or state medical school**" or a "**clinical practice plan**" regardless of whether the persons are engaged in teaching, research, clinical, administrative or other duties giving rise to the medical injury and regardless of whether the activities were performed on behalf of a state medical school, dental school or clinical practice plan: all full-time, part-time, visiting and volunteer directors, officers, faculty members, residents, fellows, students, "**employees**", agents and "**contractors**" of a "**state's medical and dental school or state medical school**" or a "**clinical practice plan.**"

    The bold/underlined words in the previous paragraph shall be given the meanings ascribed to them in West Virginia Code §55-7H-2. Definitions.

The limits of insurance that are modified by the terms of this endorsement will be automatically adjusted annually on July 1, pursuant to West Virginia Code §55-7H-4, to account for inflation by an amount equal to the most recently published Consumer Price Index published by the United States Department of Labor. These annual adjustments will continue until such time as the limit of insurance equals $2,000,000 for any one "occurrence".

This endorsement does not modify the $1,000,000 limit of the Company's liability for any and all claims, demands or actions, under SECTION I – COVERAGES, COVERAGE A, B, D and E of the Policy or for any claim under COVERAGE C except those specifically delineated in this endorsement.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**ENDORSEMENT**

This endorsement, effective 12:01 A.M.    July 1, 2016        forms a part of

Policy No. GL  379-66-63            issued to   The State of West Virginia

By  National Union Fire Insurance Company of Pittsburgh, PA.

**COVERAGE TERRITORY ENDORSEMENT**

*This endorsement modifies insurance provided under the following:*

    Payment of loss under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

89644 (7/05)

**EXHIBIT K**

KeyCite Yellow Flag - Negative Treatment
Distinguished by St. John's University, New York v. Bolton, E.D.N.Y., December 10, 2010

245 A.D.2d 728
Supreme Court, Appellate Division,
Third Department, New York.

James MAAS, Appellant.

v.

CORNELL UNIVERSITY, Respondent.

Dec. 11, 1997.

**Synopsis**

College professor disciplined for harassing students brought action against college alleging breach of contract, fiduciary duty and promise of confidentiality, intentional interference with economic advantage, and Title IX gender discrimination claims and he sought declaratory judgment that college was without authority to conduct its own sexual harassment procedures. The Supreme Court, Rumsey, J., partially granted college's motion to dismiss. Professor appealed. The Supreme Court, Appellate Division, Carpinello, J., held that: (1) college was not precluded from adopting its own rules and regulations regarding sexual harassment; (2) professor failed to state breach of contract or fiduciary duty claims; (3) professor's breach of promise of confidentiality was barred by statute of frauds; and (4) professor failed to state intentional interference with economic advantage or Title VII claims.

Affirmed.

**West Headnotes (7)**

**[1]    Education** ☞ Duration of Employment and Removal or Other Discipline

College code of conduct was not exclusive means by which sexual harassment complaints against university employees were to be reviewed, and, thus, college was not precluded from adopting its own rules and regulations regarding harassment, where code specifically stated that it was not exclusive and that other university regulations and procedures could also apply.

1 Cases that cite this headnote

**[2]    Education** ☞ Judicial Review

College professor's conclusory allegations that as a tenured professor he had contractual relationship with college were insufficient to allege specific contract for purposes of his breach of contract claim against college.

1 Cases that cite this headnote

**[3]    Education** ☞ In general; eligibility

Affiliation between educational institution as employer and tenured professor as employee does not create cognizable fiduciary relationship.

4 Cases that cite this headnote

**[4]    Education** ☞ Employment in general

College professor failed to show that he had fiduciary relationship with college for purposes of breach of fiduciary duty claim against college.

**[5]    Frauds, Statute Of** ☞ Miscellaneous particular cases, in general

College professor did not produce written contract or other memorandum memorializing college's alleged promise to keep sexual harassment proceedings against professor confidential, and, thus, professor's breach of promise of confidentiality was barred by statute of frauds. McKinney's General Obligations Law § 5–701.

1 Cases that cite this headnote

**[6]    Torts** ☞ Business relations or economic advantage, in general

College professor failed to show that college acted with malice towards him with respect to disciplinary proceedings arising out of multiple complaints of his sexual harassment of students as would support intentional interference with economic advantage claim against college.

5 Cases that cite this headnote

[7]    **Civil Rights** 🔗 Employment practices

College professor did not allege gender bias or gender-based discrimination arising out of disciplinary proceedings against professor as required to state Title IX claim under provision mandating gender equality at educational institutions receiving Federal financial assistance. Education Amendment of 1972, § 901, 20 U.S.C.A. § 1681.

**Attorneys and Law Firms**

**744 Michael E. Rosman, Center For Individual Rights, Washington, D.C. and David A. Stoll, New York City, and Lo Pinto, Schlather, Solomon & Salk, Ithaca, for appellant.

Nelson E. Roth, Cornell University, Ithaca, for respondent.

Before CARDONA, P.J., and MIKOLL, CASEY, YESAWICH and CARPINELLO, JJ.

**Opinion**

*728 CARPINELLO, Justice.

Appeal from that part of an order of the Supreme Court (Rumsey, J.), entered October 30, 1996 in Tompkins County, which partially granted defendant's motion to dismiss the complaint and dismissed the first, second, third, sixth, seventh and eighth causes of action in said complaint.

Plaintiff, a tenured psychology professor in defendant's College of Arts and Sciences (hereinafter the College), was accused of sexually harassing four female undergraduate **745 students. The complaints were reviewed under procedures entitled "Procedures to Handle Accusations of Sexual Harassment against Faculty Members of Cornell University's College of Arts and Sciences" (hereinafter the Procedures). The College faculty, of which plaintiff is a member, approved the Procedures on April 24, 1991.

After the College's Senior Sexual Harassment Counselor determined that the complaints against plaintiff had merit, hearings were held before the College's Professional Ethics Committee. The Committee unanimously found that plaintiff "repeatedly behaved both unprofessionally and inappropriately in his relationship with [three of] these students and that in effect this behavior constituted sexual harassment" and that plaintiff "committed harassment of a more manifestly sexual *729 and egregious sort" with the fourth student. The Committee recommended, inter alia, that plaintiff's relationship with students be conditioned and that its finding of sexual harassment be taken into account for a five-year period in determining increases in plaintiff's salary and any honors or assignments for which he might be considered.

The College's Dean sustained the Committee's determination, modifying in some respects the recommended sanctions, and plaintiff's subsequent administrative appeal to the Provost was rejected. Plaintiff commenced this plenary action alleging, as relevant here, six causes of action. Defendant's preanswer motion to dismiss the complaint on numerous alternative grounds was partially granted, prompting this appeal.

If, within the four corners of a complaint, factual allegations are discerned which, taken together, manifest any cause of action cognizable at law, a motion to dismiss will fail (see, Fourth Branch Assocs. Mechanicville v. Niagara Mohawk Power Corp., 235 A.D.2d 962, 964, 653 N.Y.S.2d 412; see also, Guggenheimer v. Ginzburg, 43 N.Y.2d 268, 275, 401 N.Y.S.2d 182, 372 N.E.2d 17). While Supreme Court may have erred in its factual assessment of when the period of limitations began to run for the purposes of a CPLR article 78 proceeding, the court correctly dismissed the six causes of action.

[1]   In his first cause of action, plaintiff seeks a declaration that the College was without authority under defendant's charter, bylaws or Campus Code of Conduct[1] to create its own sexual harassment procedures. Because the documentary evidence in the record resolves all factual issues as a matter of law and definitively disposes of this cause of action (see, Unadilla Silo Co. v. Ernst & Young, 234 A.D.2d 754, 755, 651 N.Y.S.2d 216), Supreme Court did not err in dismissing it (see, CPLR 3211[a][1] ). Although plaintiff strenuously argues that defendant's Code of Conduct provides the exclusive mechanism for the resolution of all sexual harassment claims, thereby precluding the College from adopting its own rules and regulations, the documentary evidence in the record, particularly the Code of Conduct itself, negates this argument. The Code of Conduct plainly states that its "Regulations and the penalties imposed hereunder

*shall not be deemed exclusive of and shall not preclude resort to any applicable * * * other University regulations and procedures* " (emphasis supplied). The Code of Conduct also contains a provision entitled "Dual Jurisdiction", which states:

Should any complaint of * * * a violation [of the Code of Conduct] be **\*730** made to a supervisor, department head or the Judicial Administrator, or should a supervisor or department head accuse an employee or faculty member of a violation which involves conduct clearly arising in the course of employment, *determination of guilt or innocence shall be made by the appropriate University administrative authority or department head who shall also assess penalties and/or remedies where appropriate* (emphasis supplied).

These provisions demonstrate quite clearly that the Code of Conduct is not the exclusive means by which sexual harassment complaints are to be reviewed. Moreover, upon our review of the other documentation in the record, particularly defendant's bylaws, it is equally clear that the College acted within **\*\*746** the confines of its authority in establishing the Procedures.

**[2]**  Plaintiff's second cause of action seeks recovery for breach of an alleged contract. Even liberally construing the complaint and assuming all factual allegations to be true, it does not allege a specific contract which defendant breached; rather, it merely states that "[a]s a tenured professor at [defendant], plaintiff had a contractual relationship with [defendant]". While plaintiff now asserts that "the procedures contained in the Campus Code and those set forth in the [College's] Procedures" were implicit terms of a contract between himself and defendant, we are unpersuaded. The rules and regulations outlined in these documents constitute academic and administrative prerogatives and this court will not strain to convert them into a contract. While defendant can be held accountable for the improper discharge of its self-imposed obligations and any procedural flaws in the administrative process (*see, Gertler v. Goodgold,* 107 A.D.2d 481, 486, 487 N.Y.S.2d 565, *aff'd* 66 N.Y.2d 946, 498 N.Y.S.2d 779, 489 N.E.2d 748), plaintiff's claims in this regard remain intact since the fourth cause of action, which restates verbatim all allegations in the second cause of action, was not dismissed.

**[3]    [4]    [5]**  The third cause of action for breach of the promise of confidentiality was properly dismissed under the Statute of Frauds (*see, CPLR 3211[a][5]* ) because there was no written contract or other memorandum memorializing

defendant's alleged promise to keep the sexual harassment proceedings confidential (*see, General Obligations Law § 5–701*). Moreover, given defendant's inability to control the actions of third persons over whom it had no control and plaintiff's published letter to the editor of an educational journal commenting on the proceedings against him, defendant's conduct cannot be deemed so egregious or unconscionable to estop it from invoking this defense (*see, Long Is. Pen Corp. v. Shatsky Metal* **\*731** *Stamping Co.,* 94 A.D.2d 788, 463 N.Y.S.2d 39). Nor has plaintiff successfully alleged a cause of action for breach of fiduciary duty as the affiliation between the parties—educational institution as employer and tenured professor as employee—does not create a cognizable fiduciary relationship (*see generally, Northeast Gen. Corp. v. Wellington Advertising,* 82 N.Y.2d 158, 162–165, 604 N.Y.S.2d 1, 624 N.E.2d 129; *Michnick v. Parkell Prods.,* 215 A.D.2d 462, 626 N.Y.S.2d 265). Thus, the sixth cause of action was also properly dismissed.

**[6]    [7]**  Plaintiff's allegations are also insufficient to state a cause of action for intentional interference with economic advantage (the seventh cause of action). There is no factual allegation whatsoever, conclusory or otherwise, that defendant's conduct was motivated solely by malice (*compare, John R. Loftus, Inc. v. White,* 150 A.D.2d 857, 860, 540 N.Y.S.2d 610) or to inflict injury by unlawful or wrongful means (*see, NBT Bancorp v. Fleet/Norstar Fin. Group,* 215 A.D.2d 990, 628 N.Y.S.2d 408, *aff'd* 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492; *Entertainment Partners Group v. Davis,* 198 A.D.2d 63, 64, 603 N.Y.S.2d 439; *cf., Butler v. Delaware Otsego Corp.,* 218 A.D.2d 357, 361, 638 N.Y.S.2d 805). Nor does the vague reference to defendant's actions "undermin[ing] plaintiff's ability to successfully negotiate contracts with a number of outside sources" satisfy the strict requirement that specific allegations be pleaded establishing that plaintiff would have consummated a contract but for defendant's interference (*see, Brown v. Bethlehem Terrace Assocs.,* 136 A.D.2d 222, 225, 525 N.Y.S.2d 978). Finally, the instant action having nothing to do with gender bias or gender-based discrimination, Supreme Court did not err in dismissing the eighth cause of action alleging violations of Title IX of the Education Amendment of 1972 (*see,* 20 U.S.C. § 1681), which mandates gender equality at educational institutions receiving Federal financial assistance.

ORDERED that the order is affirmed, with costs.

**Maas v. Cornell University, 245 A.D.2d 728 (1997)**

666 N.Y.S.2d 743, 123 Ed. Law Rep. 819, 1997 N.Y. Slip Op. 10818

CARDONA, P.J., and MIKOLL, CASEY and YESAWICH, JJ., concur.

**All Citations**

245 A.D.2d 728, 666 N.Y.S.2d 743, 123 Ed. Law Rep. 819, 1997 N.Y. Slip Op. 10818

Footnotes

1       Enacted in 1987, the Code of Conduct sets forth rules and regulations applicable to all persons and registered organizations on any campus of the University.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Lasher v. Albion Cent. School Dist., 38 A.D.3d 1197 (2007)
833 N.Y.S.2d 791, 2007 N.Y. Slip Op. 02179

38 A.D.3d 1197
Supreme Court, Appellate Division,
Fourth Department, New York.

Charlotte LASHER and Laurice Taillie, on
behalf of themselves and all other Employees
similarly situated, Plaintiffs–Respondents,
v.
ALBION CENTRAL SCHOOL
DISTRICT, Ron Sodoma AND Ada
Grabowski, Defendants–Appellants.

March 16, 2007.

**Synopsis**
**Background:** Tenured school teachers commenced action to
recover damages for fraud, constructive fraud and negligent
misrepresentation. The Supreme Court, Orleans County,
James P. Punch, A.J., denied defendants' motion to dismiss,
and they appealed.

**Holdings:** The Supreme Court, Appellate Division, held that:

[1] affiliation between educational institution as employer and
teachers as employees did not create a cognizable fiduciary
relationship, as was required for constructive fraud claim, and

[2] statute of limitations on negligent misrepresentation claim
began to run from date on which teachers relied upon the
alleged misrepresentation.

Affirmed as modified.

West Headnotes (2)

[1]    **Fraud** ⟸ Fiduciary or Confidential Relations
       Affiliation between educational institution as
       employer and tenured teachers as employees did
       not create a cognizable fiduciary relationship, as
       was required for constructive fraud claim.

[2]    **Limitation of Actions** ⟸ Fraud as Ground for
       Relief
       Statute of limitations on tenured teachers' claim
       of negligent misrepresentation began to run from
       the date on which teachers relied upon the
       alleged misrepresentation.

       2 Cases that cite this headnote

**Attorneys and Law Firms**

**791** O'Connell & McClaren, LLP, East Aurora (Colleen
O'Connell Jancevski of Counsel), for Defendants–Appellants.

Dolin, Thomas & Solomon LLP, Rochester (Patrick J.
Solomon of Counsel), for Plaintiffs–Respondents.

PRESENT: SCUDDER, P.J., HURLBUTT, SMITH, LUNN,
AND GREEN, JJ.

**Opinion**

MEMORANDUM:

***1197** Plaintiffs, individually and on behalf of other
employees similarly situated, commenced this action to
recover damages for fraud, constructive fraud and negligent
misrepresentation. Defendants appeal from an order denying
that part of their motion to dismiss the amended complaint for
failure to state a cause of action and denying without prejudice
that part of their motion to dismiss the constructive fraud and
negligent misrepresentation claims as time-barred.

**792** We reject the contention of defendants that Supreme
Court erred in denying that part of their motion seeking
dismissal of the amended complaint for failure to state
a cause of action insofar as it alleges claims for fraud
and negligent misrepresentation. In determining whether the
amended complaint stated a cause of action based on those
claims, the court was required to construe the amended
complaint "liberally ..., and accept as true the facts alleged in
the [amended] complaint and any submissions in opposition
to the ... motion[,] ... accord[ing] plaintiffs the benefit of every
possible favorable inference" that may be drawn from the
allegations (*511 W. 232nd Owners Corp. v. Jennifer Realty
Co.,* 98 N.Y.2d 144, 152, 746 N.Y.S.2d 131, 773 N.E.2d
496; *see Parker v. Leonard,* 24 A.D.3d 1255, 807 N.Y.S.2d
774; *Gibraltar Steel Corp. v. Gibraltar Metal Processing,* 19

Case 1:22-cv-00155-TSK    Document 3    Filed 12/19/22    Page 238 of 314  PageID #: 558

Lasher v. Albion Cent. School Dist., 38 A.D.3d 1197 (2007)
833 N.Y.S.2d 791, 2007 N.Y. Slip Op. 02179

A.D.3d 1141, 1142, 796 N.Y.S.2d 814). Viewing the amended complaint in that light, we conclude that it sufficiently states claims for fraud and negligent misrepresentation. Also **\*1198** contrary to defendants' contention, the statements that form the basis of the fraud claim "constitute 'material existing fact[s], sufficient to support a fraud action' " (*CPC Intl. v. McKesson Corp.,* 70 N.Y.2d 268, 286, 519 N.Y.S.2d 804, 514 N.E.2d 116, quoting *Channel Master Corp. v. Aluminum Ltd. Sales,* 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 151 N.E.2d 833; *see generally Wright v. Selle,* 27 A.D.3d 1065, 1067–1068, 811 N.Y.S.2d 525; *cf. Inside Swing v. LeChase,* 236 A.D.2d 884, 653 N.Y.S.2d 474).

**[1]**  We agree with defendants, however, that the court erred in denying that part of their motion seeking dismissal of the amended complaint for failure to state a cause of action insofar as it alleges a claim for constructive fraud, and we therefore modify the order accordingly. A necessary element of a claim for constructive fraud is the existence of "a fiduciary or confidential relationship" (*Del Vecchio v. Nassau County,* 118 A.D.2d 615, 618, 499 N.Y.S.2d 765). Here, "the affiliation between the parties—educational institution as employer and tenured [teacher] as employee—does not create a cognizable fiduciary relationship" (*Maas v. Cornell Univ.,* 245 A.D.2d 728, 731, 666 N.Y.S.2d 743).

**[2]**  We reject defendants' further contention that the court erred in denying that part of their motion seeking dismissal of the negligent misrepresentation claim as time-barred. "[T]he period of limitations for purposes of [the negligent misrepresentation claim] began to run from ... the date on which the plaintiff[s] relied upon the alleged misrepresentation" (*Fandy Corp. v. Lung–Fong Chen,* 262 A.D.2d 352, 353, 691 N.Y.S.2d 572), and that date has not yet been established at this preanswer stage of the proceedings. We thus conclude that the court properly denied that part of defendants' motion without prejudice.

We have considered defendants' remaining contentions and conclude that they either are without merit or are moot in light of our determination.

It is hereby ORDERED that the order so appealed from be and the same hereby is unanimously modified on the law by granting the motion in part and dismissing the claim for constructive fraud and as modified the order is affirmed without costs.

**All Citations**

38 A.D.3d 1197, 833 N.Y.S.2d 791, 2007 N.Y. Slip Op. 02179

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Hansen v. Residential Development, Ltd., Wash.App.
Div. 1, August 8, 2005

171 F.R.D. 189
United States District Court,
M.D. North Carolina
,
Rockingham Division.
.

Willie J. BREEDEN, Plaintiff,

v.

RICHMOND COMMUNITY COLLEGE,
Joseph W. Grimsley, Individually and
as President and Chief Administrative
Officer of Richmond Community College,
David A. Adeimy, Individually, Vice
President for Instruction, James Chavis,
Jr., Individually, Vice President for
Continuing Education, Defendants.

No. 3:96CV00054.
|
Feb. 14, 1997.

**Synopsis**
Community college instructor filed amended complaint
against college and various of its officers, alleging
fraudulent misrepresentation and negligent misrepresentation
in connection with alleged failure to offer him positions
for which he was qualified and failure to inform him of
temporary nature of position he accepted. All defendants
moved to dismiss. The District Court, Russell A. Eliason,
United States Magistrate Judge, held that: (1) court would
consider instructor's claim for fraudulent misrepresentation
as claim for fraudulent omission or concealment; (2)
instructor failed to plead either fraudulent omission or
negligent omission under North Carolina law with sufficient
particularity; (3) court would consider instructor's claim for
negligent misrepresentation as claim for negligent omission
or concealment; (4) claims for negligent misrepresentation
and negligent omission come within heightened pleading
requirements of Federal Rule of Civil Procedure governing
pleadings involving allegations of fraud; and (5) tort of

negligent omission does not presently exist under North
Carolina law.

Motion granted.

West Headnotes (27)

**[1]    Fraud**  ⟜  **Fraudulent Concealment**
Under North Carolina law, concealment or
nondisclosure may be considered akin to
positive misrepresentation and serve as basis for
actionable fraud.

2 Cases that cite this headnote

**[2]    Fraud**  ⟜  **Elements of Actual Fraud**
Under North Carolina law, to state actionable
claim of fraud, plaintiff must allege: false
representation of material fact; that was
reasonably calculated to deceive; which was
made with intent to deceive; that did in fact
deceive; and resulted in damage.

42 Cases that cite this headnote

**[3]    Fraud**  ⟜  **Duty to disclose facts**
Under North Carolina law, silence is fraudulent
only if there is duty to speak, and therefore
plaintiff alleging fraudulent concealment or
nondisclosure must allege that all or some of
the defendants had duty to disclose material
information to him.

32 Cases that cite this headnote

**[4]    Fraud**  ⟜  **Statements, acts, or conduct
constituting fraud**
For purpose of determining whether community
college instructor's allegation of fraudulent
misrepresentation against college and its officers
survived defendant's motion to dismiss for
failure to state claim, District Court would
consider such claim as one for fraudulent
omission or concealment; it was clear from
allegations contained in complaint that instructor
had merely mislabeled his claim, as claim

alleged no specific misrepresentations and alleged all basic elements of claim for fraudulent concealment or fraudulent omission. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

2 Cases that cite this headnote

**[5]**    **Federal Civil Procedure** ⬥ Fraud, mistake and condition of mind

In construing Federal Rule of Civil Procedure setting forth requirement of heightened particularity with respect to pleading fraud or mistake, courts generally require that plaintiff plead time, place and contents of alleged fraudulent misrepresentation, as well as identity of each person making misrepresentation and what was obtained thereby. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

20 Cases that cite this headnote

**[6]**    **Federal Civil Procedure** ⬥ Fraud, mistake and condition of mind

To comply with Federal Rule of Civil Procedure requiring heightened particularity with respect to pleading fraud or mistake, plaintiff alleging fraud by omission will generally be required to allege with reasonable particularity: relationship or situation giving rise to duty to speak; event or events triggering duty to speak and/or general time period over which relationship arose and fraudulent conduct occurred; general content of information withheld and reason for its materiality; identity of those under duty who failed to make such disclosures; what those defendants gained by withholding information; why plaintiff's reliance on omission was both reasonable and detrimental; and damages proximately flowing from such reliance. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

74 Cases that cite this headnote

**[7]**    **Fraud** ⬥ Duty to disclose facts

Under North Carolina law, in order for silence or omission by defendants to constitute actionable fraud, it must relate to material matter known

by defendants which they had legal duty to communicate to plaintiff, whether such duty arose from relation of trust, from confidence, from inequality of condition or knowledge, or other attendant circumstances.

23 Cases that cite this headnote

**[8]**    **Fraud** ⬥ Duty to disclose facts

Under North Carolina law, duty to disclose, violation of which may constitute actionable fraud, may arise in situations in which parties are dealing at arm's length and one party has taken affirmative steps to conceal material facts from the other, or in which one party has knowledge of latent defect in subject matter of dealings about which other party is both ignorant and unable to acquire notice through reasonable diligence.

15 Cases that cite this headnote

**[9]**    **Fraud** ⬥ Duty to disclose facts

Under North Carolina common law of fraud by omission, full and fair disclosure may be required of party otherwise without duty to disclose particular matter, once that party speaks about such matter.

3 Cases that cite this headnote

**[10]**    **Federal Civil Procedure** ⬥ Fraud, mistake and condition of mind

Allegation that community college and its officials had duty to present material employment information to instructor honestly and accurately was insufficient to allege duty to speak, as required to support claim of fraud by omission under North Carolina law and federal pleading rules pertaining to allegations of fraud; instructor failed to allege source of purported duty on part of any defendant, any factual basis supporting imposition of such duty, facts from which it could be inferred that defendants concealed information which instructor could not obtain upon exercising due diligence, that defendants knowingly contributed to instructor's misapprehension, or that defendants knowingly misled instructor by speaking without full

Breeden v. Richmond Community College, 171 F.R.D. 189 (1997)

disclosure. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

4 Cases that cite this headnote

**[11]    Federal Civil Procedure ⟶ Fraud, mistake and condition of mind**

Allegation that community college instructor was denied positions through failure of college and its officials to inform instructor of availability of such positions or to give instructor opportunity to apply for such positions, was deficient for lack of clarity as to time and place of alleged fraudulent omission, and thus insufficient to support claim of fraud by omission under North Carolina law and federal pleading rules pertaining to allegations of fraud; at minimum, instructor was required to specifically identify times at which other positions were available, and at what time and for what reason defendants should have disclosed information to him. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[12]    Federal Civil Procedure ⟶ Fraud, mistake and condition of mind**

Community college instructor's allegation that college and its officials knew that position accepted by instructor "would be temporary . . . but failed to advise plaintiff at that time," was sufficiently clear as to time and place of alleged fraudulent omission to support instructor's claim of fraud by omission under North Carolina law and federal pleading rules pertaining to allegations of fraud; while allegation was not explicit as to time and place of alleged omission, it was implicitly clear that instructor was alleging that such omission occurred at time he accepted position in question. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

1 Cases that cite this headnote

**[13]    Federal Civil Procedure ⟶ Fraud, mistake and condition of mind**

Community college instructor's allegation that college and its officials failed to tell him about availability of a number of positions was sufficiently clear as to content of information allegedly withheld to support instructor's claim of fraud by omission under North Carolina law and federal pleading rules pertaining to allegations of fraud. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[14]    Federal Civil Procedure ⟶ Fraud, mistake and condition of mind**

Community college instructor's allegation, made upon information and belief, that college and its officials knew that position accepted by instructor was temporary and failed to advise instructor that position was temporary, was insufficient to allege content of information withheld from instructor, as required to support claim of fraud by omission under North Carolina law and federal pleading rules pertaining to allegations of fraud, where instructor failed to allege any factual basis for his belief. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[15]    Federal Civil Procedure ⟶ Fraud, mistake and condition of mind**

Allegations of fraud made "upon information and belief" are sufficient for purpose of Federal Rule of Civil Procedure requiring heightened particularity with respect to pleading fraud or mistake only if matters alleged are particularly within defendants' knowledge and facts are stated upon which belief is founded. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

8 Cases that cite this headnote

**[16]    Federal Civil Procedure ⟶ Fraud, mistake and condition of mind**

Plaintiff pleading fraudulent omission and alleging content of material allegedly withheld "upon information and belief" may not entirely dispense with statement of facts upon which his belief is founded; however, courts may be more lenient in determining whether such allegations meet heightened pleading requirements of Federal Rules of Civil Procedure applicable to fraud, due to nebulous nature of fraudulent

omissions as compared to misrepresentations. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

7 Cases that cite this headnote

**[17]  Federal Civil Procedure** 👉 Fraud, mistake and condition of mind

Complaint asking multiple defendants to respond to allegations of fraudulent omission should inform each defendant of nature of his or her alleged participation in fraud; each defendant must be informed of time at which his or her duty to disclose material information to plaintiff arose and of his or her role in alleged fraudulent omission of such information. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

5 Cases that cite this headnote

**[18]  Federal Civil Procedure** 👉 Fraud, mistake and condition of mind

Community college instructor's description, in complaint against college and its officials alleging fraud by omission, of alleged concealment or omissions solely in terms of what "defendants" or "they" failed to do, was insufficient to permit individual defendants to determine specific omissions in which they were alleged to have participated or what role they were alleged to have played in fraud, as required to support claim of fraud by omission under North Carolina law and federal pleading rules pertaining to allegations of fraud. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

6 Cases that cite this headnote

**[19]  Federal Civil Procedure** 👉 Fraud, mistake and condition of mind

General averments in community college instructor's complaint against college and its officials, which could be read to indicate instructor's belief that defendants withheld information from him in attempt to remove him from their employ, or to imply that defendants benefitted by terminating him in that they were thus able to satisfy desire to commit racist act, were insufficient to allege what any defendant

gained or hoped to gain from withholding information from instructor, as required to support claim of fraud by omission under North Carolina law and federal pleading rules pertaining to allegations of fraud. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

2 Cases that cite this headnote

**[20]  Federal Civil Procedure** 👉 Fraud, mistake and condition of mind

Community college instructor's allegation that he relied upon omissions of material fact on part of college and its officers in accepting position which proved to be temporary in nature was in nature of legal conclusion and therefore failed to set forth specific factual allegations showing both that it was reasonable for him to rely on alleged omissions and how he was injured by such omissions, as required to support claim of fraud by omission under North Carolina law and federal pleading rules pertaining to allegations of fraud. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[21]  Federal Civil Procedure** 👉 Fraud, mistake and condition of mind

Pleading that only avers technical elements of fraud does not have sufficient informational content to satisfy requirements of Federal Rule of Civil Procedure requiring heightened particularity with respect to pleading fraud or mistake. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

1 Cases that cite this headnote

**[22]  Federal Civil Procedure** 👉 Fraud, mistake and condition of mind

Dismissal of fraud claim is proper if reasonable reliance has not been pleaded with particularity. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[23]  Fraud** 👉 Statements, acts, or conduct constituting fraud

For purpose of determining whether community college instructor's allegation of negligent misrepresentation against college and its officers survived defendant's motion to dismiss for failure to state claim, District Court would consider such claim as one for negligent omission or concealment; negligence claim was based upon same facts as alternative claim designated by instructor as being for fraudulent misrepresentation, which court previously determined was in fact claim for fraudulent omission or concealment. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

6 Cases that cite this headnote

[24]  **Federal Civil Procedure** ⮑ Fraud, mistake and condition of mind

Claims for negligent misrepresentation and negligent omission come within heightened pleading requirements of Federal Rule of Civil Procedure governing pleadings involving allegations of fraud; based upon rule's historical foundations, its text, and nature of actions based upon fraud or mistake to which rule specifically applies, extension of rule to actions wherein major component involves significant delusion or confusion of party, whether or not such delusion or confusion is intentional, is appropriate. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

12 Cases that cite this headnote

[25]  **Fraud** ⮑ Statements recklessly made; negligent misrepresentation

Under North Carolina law, tort of negligent misrepresentation is primarily fraud-based; such tort is premised upon making of false assertion of material fact. Restatement (Second) of Torts § 552.

7 Cases that cite this headnote

[26]  **Fraud** ⮑ Statements recklessly made; negligent misrepresentation

In claim for negligent misrepresentation, misrepresentation need only arise from want

of reasonable care or competence in obtaining or communicating information, as opposed to "knowing" or "reckless" communication required for finding of fraud.

7 Cases that cite this headnote

[27]  **Negligence** ⮑ Nature

Tort of negligent omission does not presently exist under North Carolina law.

9 Cases that cite this headnote

**Attorneys and Law Firms**

*193 Willie J. Breeden, Laurel Hill, NC, Pro Se.

Richard A. Schwartz, Stratton C. Strand, Brian C. Shaw, Richard Schwartz & Associates, Raleigh, NC, for Defendants.

***ORDER***

RUSSELL A. ELIASON, United States Magistrate Judge.

Defendants request dismissal of plaintiff's amendments to his complaint. A brief factual background may be helpful. Plaintiff, Willie Breeden, was employed as an instructor at Richmond Community College (hereinafter "College") through a series of one-year contracts from 1976 to 1995. In June 1995, the College decided not to reappoint plaintiff for the 1995–96 academic year.[1] The College contends that the decision not to reappoint plaintiff was made because the grant which funded his position was not renewed. Plaintiff believes he was not reappointed due to racial discrimination.

The original complaint named defendants Richmond Community College, Joseph Grimsley, David Adeimy, and James Chavis, Jr., and alleged racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* and the North Carolina Constitution; wrongful discharge in violation of N.C.Gen.Stat. § 143–422.2; tortious and malicious interference with economic relations; and civil conspiracy. (Pleading No. 1) The individual defendants were listed in both their individual and official capacities. The College and the individual defendants moved to dismiss the majority of plaintiff's claims. Plaintiff

opposed the motion and also made a motion to amend his complaint.

The Court granted defendants' first motion to dismiss in substantial part, and also granted plaintiff's motion to amend. (Pleading No. 16) On the same day, plaintiff filed the amended complaint now under scrutiny, which alleged two new claims: fraudulent misrepresentation and negligent misrepresentation. (Pleading No. 17). The College and the individual defendants have filed the present motion to dismiss these two claims.[2]

**\*194 A. Fraudulent Concealment/Omission**

**[1]**    Defendants seek dismissal of plaintiff's fraudulent misrepresentation claim pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, and pursuant to Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity. The Court agrees that the claim is deficient under Rule 9(b), but not under Rule 12(b)(6). The source of the apparent deficiency under Rule 12(b)(6) and the actual deficiency under Rule 9(b) lies in the fact that although plaintiff has termed his claim as one of "fraudulent misrepresentation," it is clear in this case that he really is alleging "fraudulent concealment" or fraud by omission.[3] (*See* Am.Compl. ¶¶ 14–15, 51). In some circumstances, such concealment or nondisclosure may be considered akin to a positive misrepresentation and serve as a basis for actionable fraud. *Rosenthal v. Perkins,* 42 N.C.App. 449, 452, 257 S.E.2d 63, 66 (1979) (citing *Setzer v. Old Republic Life Ins. Co.,* 257 N.C. 396, 126 S.E.2d 135 (1962)).

**[2]    [3]**    In order to state an actionable claim of fraud under North Carolina law, plaintiff must allege the following essential elements: (1) a false representation or concealment of a material fact, (2) that was reasonably calculated to deceive, (3) which was made with the intent to deceive, (4) that did in fact deceive, and (5) resulted in damage. *Liner v. DiCresce,* 905 F.Supp. 280, 288 (M.D.N.C.1994) (citing *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.,* 323 N.C. 559, 374 S.E.2d 385 (1988)). And, because this is a case of fraudulent concealment or nondisclosure, plaintiff must additionally allege that all or some of the defendants had a duty to disclose material information to him as silence is fraudulent only when there is a duty to speak. *Griffin v. Wheeler–Leonard & Co.,* 290 N.C. 185, 198, 225 S.E.2d 557, 565 (1976). *Marlen C. Robb & Son Boatyard & Marina, Inc. v. Vessel Bristol,* 893 F.Supp. 526, 542 (E.D.N.C.1994); *see*

*also Brickell v. Collins,* 44 N.C.App. 707, 710, 262 S.E.2d 387, 389, *review denied,* 300 N.C. 194, 269 S.E.2d 622 (1980).

In North Carolina, the general rule is that:

> [s]ilence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other ... party, whether the duty arises from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances.... [T]he silence must, under the conditions existing, amount to fraud, because it amounts to an affirmation that a state of things exists which does not, and the uninformed party is deprived to the same extent that he would have been by positive assertion.

*Setzer v. Old Republic Life Ins. Co.,* 257 N.C. 396, 399, 126 S.E.2d 135, 137 (1962) (citing 23 Am.Jur. *Fraud and Deceit* § 77).[4]

**\*195 [4]**    While the Court agrees that plaintiff has not pled a misrepresentation claim, it is clear that he merely mislabeled his claim and intends to proceed on the basis of fraudulent omission or concealment. In paragraphs 50 through 54 of his amended complaint, plaintiff alleges the basic elements of an actionable fraudulent concealment or fraudulent omission.[5] For this reason, the Court will deny defendants' Rule 12(b)(6) motion to dismiss the claim labeled fraudulent misrepresentation. However, even in a case of fraudulent concealment or omission, a plaintiff must comply with the heightened pleading requirements of Fed.R.Civ.P. 9(b). For the reasons set forth below, the Court finds that plaintiff has failed to comply with this obligation.

**[5]**    Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity...." In construing Rule 9(b), courts generally require that a plaintiff plead the "time, place, and contents of the alleged fraudulent misrepresentation, as well as the identity of each person making the misrepresentation and what was obtained thereby." *Liner v. DiCresce,* 905 F.Supp. at 287 (quoting *Riley v. Murdock,* 828 F.Supp. 1215, 1225 (E.D.N.C.1993)); *see also* Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1297, at 590 (1990). This construction works well for cases of affirmative misrepresentations because such discrete, observable events which can be particularized. An affirmative misrepresentation involves a specific statement made at a specific place and time and involves specific persons.

In contrast to affirmative misrepresentations, fraudulent concealment, or fraud by omission, as alleged in paragraphs 14, 15, and 49–54 of plaintiff's amended complaint, "is by its very nature, difficult to plead with particularity." *Daher v. G.D. Searle & Co.,* 695 F.Supp. 436, 440 (D.Minn.1988). Fraud by omission consists of non-action. The duty of a specific person to speak is determined through consideration of a number of factors to find when, where, how and what duty was created. Nevertheless, these factors should be known by the time the complaint is filed, and must be stated with particularity to fairly apprise the defendant of the charges.

**[6]**   In order to comply with the pleading requirements of Rule 9(b) with respect to fraud by omission, a plaintiff usually will be required to allege the following with reasonable particularity: (1) the relationship or situation giving rise to the duty to speak, (2) the event or events triggering the duty to speak, and/or the general time period over which the relationship arose and the fraudulent conduct occurred, (3) the general content of the information that was withheld and the reason for its materiality, (4) the identity of those under a duty who failed to make such disclosures, (5) what those defendant(s) gained by withholding information, (6) why plaintiff's reliance on the omission was both reasonable and detrimental, and (7) the damages proximately flowing from such reliance. *See, e.g., Chrysler Credit Corp. v. Whitney Nat'l Bank,* 824 F.Supp. 587, 598 (E.D.La.1993); **\*196** *Frank M. McDermott, Ltd. v. Moretz,* 898 F.2d 418, 421 (4th Cir.1990) (citation omitted); *see also Learning Works, Inc. v. The Learning Annex, Inc.,* 830 F.2d 541, 546 (4th Cir.1987) (stating that a plaintiff must plead with particularity reasonable, detrimental reliance upon a misrepresentation). Plaintiff's amended complaint fails to satisfy this test.

*1. Duty to Speak*

**[7]    [8]    [9]**   Under the North Carolina law which governs this case, in order for silence or an omission by the defendants to be actionable fraud, it must relate to a material matter known by the defendants which they had a legal duty to communicate to plaintiff, "whether that duty arose from a relation of trust, from confidence, inequality of condition or knowledge, or other attendant circumstances." *Setzer,* 257 N.C. at 399, 126 S.E.2d at 137. Generally such legal duty to disclose will arise where a fiduciary relationship exists between the parties. Outside of a fiduciary relationship, a duty to disclose may also arise in situations where parties are

dealing at arm's length and one party has taken affirmative steps to conceal material facts from the other, or where one party has knowledge of a latent defect in the subject matter of the dealings about which the other party is both ignorant and unable to discover through reasonable diligence. *Harton v. Harton,* 81 N.C.App. 295, 297–298, 344 S.E.2d 117, 119, *review denied,* 317 N.C. 703, 347 S.E.2d 41 (1986) (citations omitted). Finally, even if a party otherwise has no duty to disclose a particular matter, should that party speak about it, then a full and fair disclosure may be required. *Shaver v. N.C. Monroe Construction Co.,* 63 N.C.App. 605, 614, 306 S.E.2d 519, 525 (1983), *review denied,* 310 N.C. 154, 311 S.E.2d 294 (1984) (citing *Ragsdale v. Kennedy,* 286 N.C. 130, 209 S.E.2d 494 (1974)).

**[10]**   When considering a motion to dismiss, the Court must distinguish between well-pled facts and conclusory allegations. Although paragraph 50 of plaintiff's amended complaint alleges that "[d]efendants ... had a duty to present material employment information to plaintiff honestly and accurately," plaintiff fails to allege the source of such duty owed by any defendant to plaintiff, and fails to allege any factual basis supporting the imposition of such a duty. Plaintiff has not alleged facts supporting the existence of a fiduciary relationship.[6] Nor has plaintiff detailed a factual basis for concluding that defendants concealed the availability of other positions for which he was qualified, or that they concealed the fact that the HRD/JTPA position was temporary and contingent upon funding. That is, plaintiff fails to state facts from which it could be inferred that defendants concealed information which plaintiff could not obtain upon exercising due diligence, or that defendants knowingly contributed to plaintiff's misapprehension. Nor has plaintiff alleged facts from which it would be reasonable to infer that defendants knowingly misled plaintiff by speaking without full disclosure. Accordingly, plaintiff fails to satisfy the pleading requirements of Rule 9(b) with respect to alleging a duty to speak.

*2. Time Period or Events Triggering the Duty to Speak*

**[11]**   In paragraph 14 of his amended complaint, plaintiff generally states that "Mr. Breeden was denied other positions that were not dependent upon federal funding," apparently because "[d]efendants never told plaintiff about the availability of [such] positions and never gave plaintiff the opportunity to apply." However, the allegation is deficient because it is not clear from this general averment when

or where the alleged fraudulent omission occurred. The uncertainty of the time and place of these alleged omissions makes it difficult, if not impossible, for defendants to specifically address this allegation in adverse pleadings. At a minimum, plaintiff **\*197** must specifically identify when the other positions were available, and when and why the defendants should have disclosed the information to him.

**[12]**    In contrast, it is true that plaintiff's allegation in paragraph 15a of his amended complaint that defendants "knew the HRD/JTPA position would be temporary ... but failed to advise plaintiff at that time," is also not explicit as to the time and place of the alleged fraudulent omission. Nevertheless, it is implicitly clear plaintiff is alleging that such omission occurred at the time he accepted the HRD/JTPA position.

### 3. General Content of the Information Withheld

**[13]    [14]**    Viewed in the light most favorable to plaintiff, paragraph 14 sufficiently alleges the content of the withheld information by stating the defendants failed to tell him about the availability of a number of other positions.[7] However the omission alleged in paragraph 15 of plaintiff's amended complaint is a closer call. There, plaintiff alleges that "upon information and belief" defendants knew the HRD/JTPA position would be temporary and failed to advise him that such position was temporary. (Because the position was always a one-year contract, plaintiff must be alleging that defendants knew the funding would come to an end by his use of the term "temporary.") Although the general content of the omission seems clear, i.e. failure to advise plaintiff that the funding for the position would be temporary and end in 1995, this statement is still too general. Allegations based "upon information and belief" are generally insufficient to meet the requirements of Rule 9(b). *Andrews v. Fitzgerald*, 823 F.Supp. 356, 375 (M.D.N.C.1993).

**[15]    [16]**    Allegations of fraud may be made "upon information and belief" only when the matters are particularly within the defendants' knowledge, and facts are stated upon which the belief is founded. *Id.* Because of the more nebulous nature of fraudulent omissions as compared to misrepresentations, the Court may be more lenient in determining whether allegations based upon information and belief satisfy the pleading requirements of Rule 9(b). Notwithstanding, even in a fraudulent omission case, a plaintiff may not entirely dispense with the statement of facts

upon which his belief is founded. Plaintiff must state the *factual basis* for his belief that defendants had knowledge that the funding for the HRD/JTPA position would be temporary and end in 1995 and that they failed to so advise him. Plaintiff's amended complaint in this case lacks any such factual allegations, and therefore fails the particularity requirement of Rule 9(b) with respect to the content of the information withheld.

### 4. Identity of Those Failing to Disclose Material Facts

**[17]**    More significantly, plaintiff fails to identify the role of the specific persons involved in the alleged fraudulent concealment. One of "[t]he purpose[s] behind the specificity requirement of Rule 9(b) is to give defendants sufficient notice of the particular misconduct alleged to constitute fraud so they can adequately prepare for defense ... [t]o that end, 'where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.'"[8] *Andrews,* 823 F.Supp. at 373 **\*198** (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987)). Each defendant must be informed of when his or her duty to disclose material information to plaintiff arose and of his or her role in the alleged fraudulent omission of such information.

**[18]**    In the present case, plaintiff's amended complaint is completely devoid of allegations as to how any individual defendant participated in the alleged fraud. Plaintiff merely describes the alleged concealment or omissions in terms of what "defendants" or "they" failed to do. It is impossible for either the College or any of the individual defendants to determine from these allegations which of the omissions they are specifically responsible for or what role they are alleged to have played in the fraud.

### 5. What Defendants Gained by Withholding Information

**[19]**    Plaintiff's amended complaint also lacks any allegations concerning what any defendant obtained or hoped to gain by withholding information from the plaintiff. Although his amended complaint contains general averments which might be read to indicate that defendants withheld certain information from plaintiff in an attempt to remove him from their employ, the precise nature of any defendant's gain is unclear from the pleadings. It is possible that plaintiff wishes

the Court to assume he is charging that defendants benefitted by terminating plaintiff in order to satisfy a desire to commit a racist act. However, that is an extremely serious charge to be leveled at an individual. A court should not be readily inclined to *sua sponte* imply such a motive and risk sullying the reputation of potentially innocent persons. Rather, plaintiff himself must clearly and directly make the allegation as to each defendant. Plaintiff has failed to make such an allegation in this case and, therefore, the complaint is deficient.

*6. Reliance and Damages Proximately Flowing Therefrom*

**[20]  [21]  [22]**  Finally, plaintiff fails to set forth specific factual allegations showing both that it was reasonable for him to rely on the alleged omissions and how he was in fact injured by such omissions. He merely alleges that in taking the HRD/JTPA position, he relied upon omissions of material fact. Such legal conclusions do not satisfy the requirements of Fed.R.Civ.P. 9(b). *See Riley v. Murdock*, 828 F.Supp. 1215, 1225 (E.D.N.C.1993). A pleading that only avers the technical elements of fraud does not have sufficient informational content to satisfy the requirements of Rule 9(b). Wright & Miller, *supra*, § 1297, at 608, 612.[9] Dismissal of a fraud claim is proper where reasonable reliance has not been pleaded with particularity. *Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d at 546.

In conclusion, plaintiff's amended complaint contains only general, vague allegations of fraud by omission, with most of the allegations being legal conclusions rather than specific statements of fact. Such allegations do not meet the pleading requirements of Fed.R.Civ.P. 9(b). Accordingly, defendants' motion to dismiss plaintiff's sixth cause of action for fraudulent concealment/omission is granted. However, considering plaintiff's *pro se* status, the Court will grant plaintiff leave to amend his complaint to conform to the particularity requirements of Rule 9(b). Such amended complaint must be filed within twenty days.

**B. Negligent Misrepresentation**

**[23]**  Defendants have moved to dismiss plaintiff's negligent misrepresentation claim pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, and pursuant to Fed.R.Civ.P. 9(b) for failure to satisfy the particularity pleading requirements. Plaintiff's negligent misrepresentation claim is based upon the same

factual allegations upon which he predicated his claim of fraudulent misrepresentation. **\*199**  Thus, defendants argue that plaintiff essentially is pleading fraud, and, like the fraudulent misrepresentation claim, this claim also should be dismissed for failing to satisfy the particularity requirements of Rule 9(b). In fact, plaintiff's negligent misrepresentation claim is in reality a claim of negligent omission, and it does suffer from the same defects discussed with respect to plaintiff's fraudulent omission claim.

First, the Court will start with the Rule 9(b) deficiency. The Court has not located any controlling authority in the Fourth Circuit as to whether a claim for negligent misrepresentation or omission must be pled with particularity. Some federal courts do not require that allegations of negligent misrepresentation meet the pleading requirements of Rule 9(b). *See In re LILCO Sec. Litig.*, 625 F.Supp. 1500, 1504 (E.D.N.Y.1986); *Masso v. United Parcel Serv. of Am., Inc.*, 884 F.Supp. 610, 615 (D.Mass.1995); *but see Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F.Supp. 49, 57 (D.Mass.1995) ("[T]his district has 'clearly held that Rule 9(b) applies to claims of negligent misrepresentations' "). Other courts hold that "the requirements of [Rule 9(b) ] apply to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud." *Pitten v. Jacobs*, 903 F.Supp. 937, 951 (D.S.C.1995) (gravamen of negligent misrepresentation claim is fraud) (quoting *Toner v. Allstate Ins. Co.*, 821 F.Supp. 276, 283 (D.Del.1993)); *see also In re Leslie Fay Companies, Inc. Sec. Litig.*, 918 F.Supp. 749, 766 (S.D.N.Y.1996) (negligent misrepresentation); *Arndt v. Prudential Bache Sec., Inc.*, 603 F.Supp. 674, 676 (S.D.Cal.1984) (negligent misrepresentation).

**[24]**  This Court adopts the second approach that negligent misrepresentation (omission) claims come within Rule 9(b). That interpretation more accurately comports with the basis behind the rule and its original rationale. First, and most obvious, the rule covers fraud *and mistake* and, thus, on its face is not limited to willful misrepresentations.[10] *United States v. $3,216.59 in United States Currency*, 41 F.R.D. 433, 435–36 (D.S.C.1967) (mistake). Rather, the rule was designed to govern claims premised upon a party's misrepresentation, misapprehension, or misunderstanding; in short, arising out of either mutual or unilateral confusion, whether intentionally or carelessly generated.

Courts and commentators have advanced a variety of reasons for the heightened pleading standard in cases of fraud or

mistake. These are: (1) protecting defendants' reputation by discouraging conclusory claims charging acts of moral turpitude which impugn defendants' reputation; (2) as a corollary, protecting defendants from baseless suits filed for nuisance or settlement value; (3) providing defendants the details of the wide variety of conduct which can constitute fraud and mistake, in order that they may adequately prepare a response; (4) preventing the filing of fraud actions merely in the hopes of finding some actual fraud through the discovery process; and (5), recognizing that claims of fraud and mistake historically have been disfavored actions because they often involve attempts to reopen settled transactions or set aside previously issued judicial orders. *See* Wright & Miller, *supra,* § 1296, at 577–81; *see also Toner v. Allstate Ins. Co.,* 821 F.Supp. 276, 284 (D.Del.1993).

The Seventh Circuit, adopting the position of some commentators, has suggested that most of the aforementioned reasons for the particularity pleading requirements are "makeweights." *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992); *see also* William M. Richman, Donald E. Lively, Patricia Mell, *The Pleading of Fraud: Rhymes without Reason,* 60 S.Cal.L.Rev. 959 (1987); Jeff Sovern, *Reconsidering* **\*200** *Federal Civil Rule 9(b): Do We Need Particularized Pleading in Fraud Cases?,* 104 F.R.D. 143 (1985). Notwithstanding, the Seventh Circuit did recognize that these rationales have "a germ of sense."

Changing times likely have cast a different light on the policy reasons behind Rule 9(b) so that they now appear as little more than "makeweights" with all but the "germ of sense" hidden. Once the original basis and rationale behind the particularized pleading requirement for fraud and mistake is understood, it becomes easier to accept Rule 9(b)'s continued existence. Therefore, it will be helpful to see if a more general policy reason for Rule 9(b)'s existence can be discovered.

Rule 9(b) can be traced directly back to the common-law pleading rules. At common law, a higher degree of certainty and more specific details were required in the pleadings of actions which, because of their nature, were disfavored, and in particular, those in which the defendant's morality was brought into question. Charles E. Clark, *Handbook of the Law of Code Pleading,* § 48, at 312 (2d ed. 1947).[11] Actions for fraud or deceit were disfavored because " '[t]his is a class of allegations concerning the morality of the defendant's conduct in which he is entitled to know fully the grounds on which the allegations are made, so that he may have every opportunity to prepare his case to clear himself at the trial.' " Clark, § 48,

at 313 & n. 87 (citation omitted). Thus, because the nature of such claim was to implicate defendant's morality and hence, reputation, the common law pleading requirements entitled defendant to the fullest particulars of the claim. Clark, *supra,* § 48, at 312; *In re Rica Gold Washing Co.,* [1879] 11 C.D. 36, 43 (Eng.C.A.); *see also Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972) (echoing the common law rationale: "[i]t is a serious matter to charge a person with fraud and hence no one is permitted to do so unless he is in a position and is willing to put himself on record as to what the alleged fraud consists of specifically.").

With the adoption of the Federal Rules of Civil Procedure in 1938, American pleading practice became more liberalized. Unlike the original pleading codes which required "facts constituting the cause of action," the new rules only required "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed.R.Civ.P. 8(a) (2). However, Rule 9(b) followed the English practice and the Model Code of the American Judicature Society, and preserved for fraud and mistake the rules of common-law fraud pleading that applied more generally to claims of deceit, dishonesty, **\*201** and over-reaching. *See* Clark, *supra,* § 48, at 313 (citing to Eng.Rules of Supreme Court, O. 19, rr. 6, 22, at 359, 386 (Annual Practice, 1945); 14 Am. Judicature Soc'y Bull. art. 15, § 18 (1919): 'In all cases in which the party pleading relies on any misrepresentation, fraud, breach of trust, wilful default, or undue influence, the facts must be stated with full particularity ...').[12] This class of cases under the English practice all appear to involve the common element of a party's delusion or confusion. Fraud and deceit would appear to be the more morally repugnant charges and perhaps this is why fraud was still given special preference when notice pleading was adopted in the United States.[13] This does not explain why mistake was added to Rule 9(b), but that too appears to have a common law origin.

Claims of "mistake" appear to have been disfavored for a different reason than fraud and deceit. An action based on mistake arose from the ancient chancery or equity courts of England, which at first followed ecclesiastical law. Clark, *supra,* at 16. The chancery or equity court could grant the remedy of specific performance, cancellation or reformation of a contract, but a heavier quantum of proof was necessary. Clark, *supra,* at 331–332 n. 127. Cancellation and reformation of contracts are the foundation of modern actions for mistake.

In modern times, the word "mistake" is generally used in the law to refer to an erroneous belief not in accord with the

facts. Restatement (Second) of Contracts § 151. Traditionally, an agreement may be rescinded or reformed where there is a mutual mistake of material fact—where each party labors under the same misconception, and the mistake is a common one that neither party intended. Although mistake has been recognized as a justification for reforming or rescinding agreements, the law has been careful to preserve written agreements or other instruments recognized as memorials of a transaction. *See Marriott Financial Servs., Inc. v. Capitol Funds, Inc.,* 288 N.C. 122, 138, 217 S.E.2d 551, 561–62 (1975) (citation omitted); *Davis v. Robinson,* 288 Ala. 381, 261 So.2d 393, 397 (1972) (citation omitted). Indeed, it has been said:

> "[t]he policy of the law is to administer relief to the vigilant, and to put all parties to the exercise of a proper diligence. In like manner, where the fact is equally unknown to both parties, or where each has equal and adequate means of information, or when the fact is doubtful from its own nature, in any such case ... [w]here each party is equally correct and there is no concealment of facts, mistake or ignorance is no foundation for equitable interference."

*Marriott Financial Servs.,* 288 N.C. at 139, 217 S.E.2d at 562. Thus, equitable relief in the nature of reformation or recision on grounds of mutual mistake is only afforded "when the circumstances justify such relief," **\*202** because courts "jealously guard the stability" of settled transactions. *Id.* (referring specifically to real estate transactions).

As noted earlier, chancery or equity courts required a heightened standard of proof to prevail on claims of specific performance, reformation, or recision of a contract. In modern times, to prevail on a claim of mistake, a plaintiff must show mistake by clear, cogent, and convincing evidence. *Hice v. Hi–Mil, Inc.,* 301 N.C. 647, 651, 273 S.E.2d 268, 270 (1981); *Isley v. Brown,* 253 N.C. 791, 117 S.E.2d 821 (1961); *Hege v. Sellers,* 241 N.C. 240, 247, 84 S.E.2d 892, 897 (1954); *see also Estate of Hysinger v. Heeney,* 785 S.W.2d 619, 624 (Mo.Ct.App.1990); *Minor v. Fincher,* 206 Ga. 721, 58 S.E.2d 389, 395 (1950); *Collier v. Ogburn–Davison Co.,* 231 Ala. 344, 164 So. 741 (1935). The disfavored nature of the action (because it overturns existing agreements) as evidenced by the heightened burden of proof appears to be the reason for the inclusion of mistake in Rule 9(b).

There is a common thread between fraud and mistake which may explain the modern retention of the particularity requirement as to both fraud and mistake and help in deciding which actions should be included in Rule 9(b). Unlike other intentional or negligent acts, both fraud and

mistake are claims which, by their nature, involve mutual or unilateral confusion and/or delusion. Both claims derive from a party's own subjective misperception, misapprehension or misunderstanding and subsequent reliance. Such claims often may not be readily apparent to others and may appear to contradict existing facts or contracts. Unless defendant and others share plaintiff's view of the situation, they will find it difficult to grasp plaintiff's claim. *See Miller v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 572 F.Supp. 1180, 1184 (N.D.Ga.1983). Allegations of fraud and mistake seek to undermine the reality of presumed facts and are by their nature unsettling to the parties and their agreements. In conclusion, from the rule's historical foundations, its text, and the nature of fraud and mistake actions, this Court finds that Rule 9(b) applies to actions wherein the major component involves significant delusion or confusion of a party, whether intentional or not.

**[25]    [26]**    To return to the problem of the instant case, a claim for negligent misrepresentation falls within Rule 9(b). Like a claim for fraud or mistake, it is based upon some confusion or delusion of a party such as by some misrepresentation, omission, misapprehension or misunderstanding. Indeed, the only essential distinction between the torts of fraudulent and negligent misrepresentation is the state of mind of the purported actor(s).[14] The misrepresentation in a negligent misrepresentation claim need only arise from a want of "reasonable care or competence in obtaining or communicating information," as opposed to a "knowing" or a "reckless" communication for fraud. *Constitution Bank v. DiMarco,* 155 B.R. 913, 919 (E.D.Pa.1993). Accordingly, plaintiff's negligent misrepresentation claim will be dismissed for insufficient pleading.

**[27]**    The above dismissal will be with prejudice. Plaintiff has alleged a negligent omission, not a negligent misrepresentation claim. The Court has not been cited to, nor has it located, a case wherein North Carolina has extended the tort of negligent misrepresentation to cover "negligent omissions," much less to an employer-employee relationship. Other states when presented with claims of "negligent omissions" have rejected it. *See, e.g., Mason v. Burkett,* 756 F.Supp. 679, 682 (D.Conn.1991) (no false information; rather, defendant provided no information at all). The Court finds the tort of negligent **\*203** omission does not presently exist in North Carolina.[15] It would be futile for plaintiff to attempt to replead his claim of negligent omission.[16]

IT IS THEREFORE ORDERED that defendants' motion to dismiss plaintiff's sixth cause of action for fraudulent concealment pursuant to Fed.R.Civ.P. 9(b) is GRANTED, and plaintiff's fraudulent concealment claim is DISMISSED WITHOUT PREJUDICE to plaintiff refiling within twenty days an amended complaint setting forth the allegations of fraud by omission with particularity as required under Fed.R.Civ.P. 9(b).

IT IS FURTHER ORDERED that defendants' motion to dismiss plaintiff's seventh cause of action for negligent misrepresentation pursuant to Fed.R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 9(b) is GRANTED, and DISMISSED WITH PREJUDICE.

**All Citations**

171 F.R.D. 189

## Footnotes

1    Plaintiff held a position as a Human Resources Development ("HRD") instructor, which was funded in substantial part by a Job Training Partnership Act ("JTPA") grant.

2    In their reply brief, defendants also move to strike plaintiff's "Response" to their second motion to dismiss (Pleading No. 22) for failure to comply with Local Rules. Plaintiff's response does violate Local Rule 202(f), which requires that a response to a motion be accompanied by a brief. Plaintiff has only submitted a stack of documents, the purpose of which is not entirely clear to the Court. An examination of these documents fails to inform the Court about plaintiff's legal position, aside from the fact that he opposes defendants' motion. Nevertheless, the Court declines to strike plaintiff's "response" and consider defendants' motion as being uncontested. The filing of some sort of "response" by plaintiff clearly indicates that he contests defendants' position; he has just failed to support it with legal argument.

3    Plaintiff alleges that defendants neither told him about the availability of, nor gave him the opportunity to apply for, at least six positions for which he claims he was qualified. (Am.Compl. ¶ 14 (emphasis added)). He also alleges that defendants *failed to advise him* that the HRD/JTPA position was temporary and contingent upon funding. (Am.Compl. ¶ 15 (emphasis added)).

4    In contrast to fraudulent misrepresentation cases where the standard of duty is fixed, in fraudulent omission cases the obligation imposed on parties is not always so easy to ascertain because the scope of the duty to disclose can vary between different situations and jurisdictions. For example, in *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), the Supreme Court reaffirmed its recognition that the common law duty to disclose whenever there was a fiduciary or like relationship of trust and confidence between parties extended to the relationship between corporate insiders and the shareholders of the corporation. *Id.* at 228, 100 S.Ct. at 1114–15. The Supreme Court expressly noted that it had never held that a duty to disclose arose merely because one party had superior information vis-a-vis another party and, accordingly, declined to extend the duty to disclose to cover all participants in market transactions trading on material, nonpublic information. *Id.* at 228, 233, 100 S.Ct. at 1114–15, 1117. On the other hand, the court in *Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1484 (2d Cir.1995), indicated that a duty to disclose in the absence of a fiduciary relationship could arise if a party makes partial ambiguous statements which require other disclosures to prevent confusion, or if the party acquires superior knowledge not readily available to the other and known that the other is acting on the basis of the misinformation. In that same vein, the court in *American Computer Trust Leasing v. Jack Farrell Implement Co.,* 763 F.Supp. 1473, 1486 (D.Minn.1991), *aff'd and remanded,* 967 F.2d 1208 (8th Cir.1992), *cert. denied,* 506 U.S. 956, 113 S.Ct. 414, 121 L.Ed.2d 338 (1992), held that under Minnesota law, a special circumstance requiring disclosure arises when the failure to disclose would render misleading statements which have already been made. Notwithstanding, all these cases do start from the general rule that normal arms-length bargaining does not entail any special duty to disclose.

The duty of disclosure may arise not only under common law but under statutory law. *Williams v. East Coast Sales, Inc.,* 59 N.C.App. 700, 298 S.E.2d 80 (1982) (duties of mobile home sellers). In addition, under some state unfair trade practice laws, when the duty to disclose is imposed by statute, unlike common law, the plaintiff need not prove detrimental reliance. *Celex Group, Inc. v. Executive Gallery, Inc.,* 877 F.Supp. 1114 (N.D.Ill.1995).

**Breeden v. Richmond Community College, 171 F.R.D. 189 (1997)**

5    Plaintiff states the defendants knew about the availability of other positions and knew that the position in controversy which he accepted was temporary and contingent upon funding. He claims that the defendants were aware that these facts were material to him; that defendants withheld the information with the intent that plaintiff rely on the concealment; that he did so rely when he accepted the position; and that he suffered damages when the position ended.

6    Even if plaintiff had alleged a fiduciary relationship, that would not have helped his cause. In a somewhat similar situation, the Fourth Circuit held that the failure of a medical school to inform a faculty member that its tenure policy differed from that of the American Association of University Professors did not violate a duty of the school to its teachers because the relationship does not impose such a fiduciary duty. *Sabet v. Eastern Virginia Medical Authority,* 775 F.2d 1266 (4th Cir.1985). Although decided under Virginia law, there is no reason to think North Carolina law would call for a different result.

7    Plaintiff claims that he was denied certain positions that were not dependent upon federal funding such as: Literacy Instructor, GED Tester, Occupational Extension Instruction [sic], Assessment/Retention Specialist, Assistant/Retention Specialist, and Literacy Skills Recruiter/Instructor (Am.Compl. ¶ 14).

8    Indeed with respect to affirmative misrepresentations it has been stated that:

>The identity of those making the misrepresentations is crucial. Courts have been quick to reject pleadings in which multiple defendants are "lumped together" and in which "no defendant can determine from the complaint which of the alleged representations it is specifically charged with having made, nor the identity of the individual by whom and to whom the statements were given, nor the situs and circumstances of the conversation, nor ... the date of the utterance."

*McKee v. Pope Ballard Shepard & Fowle, Ltd.,* 604 F.Supp. 927, 931 (N.D.Ill.1985) (quoting *Lincoln Nat'l Bank v. Lampe,* 414 F.Supp. 1270, 1278 (N.D.Ill.1976)).

9    The failure of plaintiff to allege how he was damaged by the alleged omission would not necessarily call for dismissal of the claim in this case. It might be inferred that plaintiff was damaged when he took a temporary position instead of a permanent one, if plaintiff had also alleged defendants knew at that time that the funding of the temporary position would expire. He then might have the basis for a valid claim for damages. He has not alleged this.

10    *See, e.g., Brown v. Chaffee,* 612 F.2d 497 (10th Cir.1979) ( Rule 9(b) applies to a cause of action which alleges that the opposing party made misrepresentations that were either intentional or negligent); *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433 (9th Cir.1987) (Rule 9(b) uniformly applied to claims of securities fraud, common law fraud, and negligent misrepresentation); *Hershey v. MNC Financial, Inc.,* 774 F.Supp. 367, 375–76 (D.Md.1991) (applying Rule 9(b) to claimed violations of securities laws, noting that "[t]he mere fact that plaintiffs need not prove scienter to recover under § 11 and 12(2) does not mean that § 11 and 12(2) claims can never 'sound in fraud.' ").

11    Disfavored actions included fraud and deceit, libel and slander, and malicious prosecution. Charles E. Clark, *Handbook of the Law of Code Pleading,* § 48, at 311 (2d ed. 1947). While false imprisonment is included with malicious prosecution as a disfavored claim, such a connection seems out of place because of its different nature and history.

The two actions have a different nature. Malicious prosecution requires proof of malice as well as want of probable cause. *Id.* at 314. The requirement of malice makes malicious prosecution more akin to actions for fraud, deceit, libel and slander because it impugns defendant's reputation. The same is not true for the tort of false imprisonment.

The two actions also have different historical antecedents. Malicious prosecution, fraud, deceit, libel and slander were known under common law as actions on the case, whereas false imprisonment was known as a trespass. *Id.;* James A. Pike, *Cases & Other Materials on New Federal and Code Procedure, (Summary of Common–Law Pleading)* § 37 at 842–44 (1939). At common law, civil actions were divided into three subject matters: (1) real, dealing with land, tenements, etc., (2) personal, meaning recovery of chattels or damages, and (3) mixed. As to personal actions,

>The common law divided personal actions according to the nature of the wrong to be redressed, into actions *ex contractu,* which are for the breach of a contract, and actions *ex delicto,* which are for wrongs not connected with

contract. The actions in form *ex contractu* are debt, covenant, assumpsit, and detinue; those in form *ex delicto* are trespass, trespass on the case, trover, and replevin.

*Id.* at 837.

Trespass was a direct action because it usually involved force and violence. Instances of such are assault and battery, false imprisonment, trespass, forced debauchery, etc. "Trespass on the case," on the other hand, came about in the thirteenth century because societal evolution produced a need for a remedy for indirect type actions which did not come within the existing original writs required for commencing a civil action. Pike, *supra*, at 843. These new actions came to encompass deceit, libel, slander, malicious prosecution, interference with contracts or business situations, etc.

12    Indeed, the Advisory Committee Notes to Rule 9(b) cite to the English Rules requiring particularized pleading in fraud cases. *See* Fed.R.Civ.P. 9, note to subdivision (b).

13    Because the major purpose behind particularized pleadings was to protect against charges of immorality, this may account in large part for the current dissension among modern commentators as to the necessity of particularized pleading under Rule 9(b). In a more litigious environment, less deference may be given by society to attacks on an individual's reputation. Mores and customs change with time, and the need for Rule 9(b)'s protection may have become less obvious or important to the twentieth century, more secular and more corporate, American society.

Consider this example. In 1850, the phrase "beyond a reasonable doubt was equated with proof to a "moral certainty." *Commonwealth v. Webster,* 59 Mass. 295, 320 (1850); *see also Fidelity Mutual Life Assn. v. Mettler,* 185 U.S. 308, 317, 22 S.Ct. 662, 665, 46 L.Ed. 922 (1902) (stating that "[p]roof to a 'moral certainty' is an equivalent phrase with 'beyond a reasonable doubt.' ") The Supreme Court recently recognized that the common meaning and understanding of the phrase "moral certainty" has changed since its original use, so that the reliability of the term in conveying a heightened standard of consideration may be in doubt. *Victor v. Nebraska,* 511 U.S. 1, 12–19, 114 S.Ct. 1239, 1248, 127 L.Ed.2d 583 (1994). Likewise, attacks on an individual's reputation or morality may now seem less serious. Consider the fact that the law actually encourages the filing of some lawsuits. *Christiansburg Garment Co. v. E.E.O.C.,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) (civil rights); *U.S. ex rel. Stinson v. Prudential Ins.,* 944 F.2d 1149, 1154 (3d Cir.1991) (*qui tam* suits); *Chrysler Corp. v. General Motors Corp.,* 596 F.Supp. 416, 419 (D.D.C.1984) (anti-trust).

14    The tort of negligent misrepresentation in North Carolina is primarily a fraud-based claim. North Carolina has adopted the definition of negligent misrepresentation outlined in the Restatement (Second) of Torts § 552. As the Restatement (Second) definition suggests, this tort is premised upon the making of a false assertion of a material fact. *See Vernon v. Steven L. Mabe Builders,* 110 N.C.App. 552, 557, 430 S.E.2d 676, 679 (1993), *rev'd in part on other grounds,* 336 N.C. 425, 444 S.E.2d 191 (1994) ("[B]oth false misrepresentation (i.e. fraud) and negligent misrepresentation share two essential elements: (1) the supplying by the defendant of false information, and (2) reliance on the false statement by the plaintiff.") (citing *Fulton v. Vickery,* 73 N.C.App. 382, 388, 326 S.E.2d 354, 358, *disc. rev. denied,* 313 N.C. 599, 332 S.E.2d 178 (1985); *Forbes v. Par Ten Group, Inc.,* 99 N.C.App. 587, 595, 394 S.E.2d 643, 647 (1990), *disc. rev. denied,* 328 N.C. 89, 402 S.E.2d 824 (1991)).

15    It is well-recognized that when deciding a question of state law, federal courts must rule upon state law as it exists, and not surmise or suggest its expansion. *Burris Chemical, Inc. v. USX Corp.,* 10 F.3d 243 (4th Cir.1993). *See also Ball v. Joy Technologies, Inc.,* 958 F.2d 36, 39 (4th Cir.1991), *cert. denied,* 502 U.S. 1033, 112 S.Ct. 876, 116 L.Ed.2d 780 (1992) (declining to extend damages for emotional distress to exposure to toxic chemicals where such damages were not recognized by state law); *Washington v. Union Carbide Corp.,* 870 F.2d 957, 962 (4th Cir.1989) (declining to recognize a new cause of action for retaliatory discharge not recognized by state law); *Guy v. Travenol Lab., Inc.,* 812 F.2d 911, 917 (4th Cir.1987) (declining to recognize an anti-retaliation cause of action to protect employees who refuse to violate the pure food laws which was not recognized by state law).

16    Because plaintiff's negligent misrepresentation claim is dismissed with prejudice, the Court declines to address defendants' immunity argument.

Breeden v. Richmond Community College, 171 F.R.D. 189 (1997)

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

775 F.2d 1266
United States Court of Appeals,
Fourth Circuit.

Dr. Sohair F. SABET, Appellant,

v.

EASTERN VIRGINIA MEDICAL

AUTHORITY, c/o Dr. William D. Mayer,
President; Board of Commissioners of the
Eastern Virginia Medical Authority, c/
o Lawrence Smith, Chairman; Lawrence
Smith, in his official capacity as Chairman
of the Board of Eastern Virginia Medical
Authority; Dr. William D. Mayer, in his
official capacity as President of the Eastern
Virginia Medical Authority; and Donald J.
Merchant, Ph.D., Chairman of the Department
of Microbiology and Immunology of
Eastern Virginia Medical School, Appellees.

No. 85–1219.
|
Argued Sept. 11, 1985.
|
Decided Nov. 4, 1985.

## Synopsis

Former professor in state-operated medical school filed civil rights action against school and its officials, claiming that the defendants had violated her Fourteenth Amendment due process rights when her teaching contract was not renewed, as well as setting forth a pendent state cause of action for fraudulent misrepresentation. The United States District Court for the Eastern District of Virginia, Norfolk, 611 F.Supp. 388, Robert G. Doumar, J., granted summary judgment for defendants, and professor appealed. The Court of Appeals, Murnaghan, Circuit Judge, held that: (1) school's practice of uniformly renewing faculty contracts during its nine-year existence could not alone support conclusion that school had fostered implicit understanding that it would grant its faculty de facto "permanent" tenure, for purposes of Fourteenth Amendment due process protections; (2) professor had no entitlement to permanent tenure and no property right to be protected by the due process clause based

on the prevalence of particular type of tenure policies at other institutions and professor's alleged understanding that same policy prevailed at her school; and (3) defendants could not be held liable for fraud based on school's failure to inform her that its tenure policy differed from the prevailing type.

Affirmed.

West Headnotes (11)

[1]     **Constitutional Law** ☞ Procedural due
        process in general
        Fourteenth Amendment due process clause
        protects against deprivations of property without
        constitutionally adequate procedures. U.S.C.A.
        Const.Amend. 14.

[2]     **Constitutional Law** ☞ Benefits, rights and
        interests in
        **Constitutional Law** ☞ Rights and Interests
        Protected in General
        Category of property protected under the
        Fourteenth Amendment due process clause
        encompasses government benefit such as public
        employment. U.S.C.A. Const.Amend. 14.

        5 Cases that cite this headnote

[3]     **Constitutional Law** ☞ Rights and Interests
        Protected in General
        Property rights in public employment are not
        created by the Constitution, but rather they are
        created and defined by existing laws, rules, or
        understandings, usually defined by state law, that
        support enforceable claims of entitlement, for
        purposes of Fourteenth Amendment due process
        protections. U.S.C.A. Const.Amend. 14.

        1 Cases that cite this headnote

[4]     **Constitutional Law** ☞ Benefits, rights and
        interests in
        Property right in government benefit sufficient
        for    Fourteenth    Amendment    due    process

protection can arise out of informal or implicit rule or understanding. U.S.C.A. Const.Amend. 14.

**[5]  Constitutional Law** ⬤ Benefits, rights and interests in

There can be no property right in government benefit sufficient for Fourteenth Amendment due process protections from informal or implicit rule or understanding unless the government entity in question has adopted the asserted rule or entered into the asserted understanding. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[6]  Constitutional Law** ⬤ Benefits, rights and interests in

Unilateral expectation of property right in government benefit on part of the would-be recipient cannot create entitlement sufficient to make Fourteenth Amendment due process protections available. U.S.C.A. Const.Amend. 14.

4 Cases that cite this headnote

**[7]  Constitutional Law** ⬤ Tenure

State-operated medical school's practice of uniformly renewing faculty contracts during its nine-year existence could not alone support conclusion that medical school had fostered implicit understanding that it would grant its faculty de facto "permanent" tenure so as to make Fourteenth Amendment due process protections applicable and provide basis for 42 U.S.C.A. § 1983 civil rights action, where contact renewals always contained explicit notice of length of time of the appointment. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[8]  Constitutional Law** ⬤ Rights and interests protected in general

Whether claim of entitlement to employment is sufficient to make Fourteenth Amendment due

process protection available must be decided by reference to state law. U.S.C.A. Const.Amend. 14.

**[9]  Constitutional Law** ⬤ Rights and interests protected in general

Claim of entitlement to employment based on alleged understanding of parties is enforceable under the Fourteenth Amendment only if the parties' understanding is mutual, that is, both parties have assented to it. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[10]  Constitutional Law** ⬤ Tenure

**Education** ⬤ Medical school faculty

**Public Employment** ⬤ Persons entitled

Associate professor at state-operated medical school had no entitlement to permanent tenure and no property right to be protected by the Fourteenth Amendment due process clause for purposes of 42 U.S.C.A. § 1983 civil rights action based on Association of American University Professors-recommended tenure policies prevalent at other institutions and her alleged understanding that she would be considered for permanent tenure in accordance with those prevalent tenure guidelines, where the school never agreed to any policy of permanent tenure and did not adopt informal policy of tenure along those lines. U.S.C.A. Const.Amend. 14.

9 Cases that cite this headnote

**[11]  Fraud** ⬤ Duty to disclose facts

State-operated medical school and its officials were not liable to associate professor for fraud based on school's failure to inform professor that its tenure policy differed from the Association of American University Professors-recommended tenure policy prevalent at other institutions, where the school was under no duty of disclosure to the professor.

12 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1267** Girard C. Larkin, Jr., Norfolk, Va. (Stanley E. Sacks; Sacks, Sacks & Larkin, Norfolk, Va., on brief) for appellant.

Richard A. Saunders (Donnell P. Davis, Furniss, Davis & Rashkind, Norfolk, Va., on brief) for appellees.

Before JAMES DICKSON PHILLIPS and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

**Opinion**

MURNAGHAN, Circuit Judge:

The appellant, Dr. Sohair Sabet, is a microbiologist who held academic positions at the Eastern Virginia Medical School (EVMS) from May, 1977, until May, 1984. EVMS is operated by the Eastern Virginia Medical Authority (EVMA), one of the appellees here. Dr. Sabet claims that EVMS's termination of her employment deprived her of property without due process of law. The case presents the question whether an employee's unilateral understanding of the terms of her employment as to tenure may give rise to a property interest in that employment, where her understanding is based on the widespread acceptance by other employers of policies as to tenure at odds with those of her own employer.

**I.**

Prior to her employment at EVMS, Dr. Sabet was employed as an assistant professor of microbiology at the Medical College of Virginia in Richmond. In 1976, Dr. Sabet was contacted by Dr. Merchant, the chairman of the microbiology department **\*1268** at EVMS, and an individual appellee here. Dr. Merchant informed Dr. Sabet that EVMS was interested in considering her for a teaching position, and he invited Dr. Sabet to present a seminar before EVMS faculty members. Dr. Sabet was subsequently offered a one-year appointment as an assistant professor of microbiology at EVMS, beginning in May, 1977, which she accepted.

Dr. Sabet did not discuss EVMS's tenure policy with EVMS officials before accepting her appointment. She assumed that EVMS had adopted the tenure policy recommended by the Association of American University Professors, which provides for a probationary period followed by tenure for the duration of the teacher's professional life. Somewhat imprecisely that type of tenure is frequently denominated "permanent". Under the terms of the AAUP policy, a tenured professor's employment, insofar as is relevant here, may be terminated only for "cause."[1] Dr. Sabet based her assumption that EVMS had adopted the AAUP policy on the widespread acceptance of that policy by other colleges and universities.

EVMS, in fact, had never bound itself to observe the AAUP proposed guidelines as to tenure. Actually, EVMS's tenure policy was quite different. Permanent tenure was not available at EVMS. Instead, a faculty member received "tenure" only for a contractual period of appointment. Assistant professors received such a limited form of tenure for two years, associate professors for three years, and full professors for five years.[2] The limited tenure policy, which had been adopted in 1973, was set forth in the EVMS faculty handbook **\*1269** at the time of Dr. Sabet's acceptance of employment at EVMS.

In March or April of 1978, Dr. Sabet was assigned to an *ad-hoc* faculty committee on school governance. In the course of her service on that committee, Dr. Sabet learned of EVMS's limited tenure policy and read the provisions in the faculty handbook. However, in the face of the explicit two-, three-, or five-year limitations, she continued to believe that EVMS maintained a *de facto* tenure policy similar to the policy recommended by the AAUP guidelines. Her belief was based upon EVMS's practice of renewing faculty appointments. In the five years of its operation from 1973 to 1978, EVMS had repeatedly renewed the contracts of all faculty members who chose to stay.

In the summer of 1978, Dr. Sabet was offered a three-year "tenured" appointment as an associate professor. In 1981, her appointment was renewed for another three-year period. In each case, the letter advising her of her renewed appointment specified the three-year duration of the appointment.

In 1982, the EVMA administration decided that budgetary constraints required a reduction in the medical school's expenses. Cuts were made in a number of areas, including security, building maintenance, energy, and technical and secretarial support. In addition, eleven faculty positions, including Dr. Sabet's, were eliminated. Dr. Sabet was accordingly advised that her contract would not be renewed in 1984. The decision to eliminate Dr. Sabet's position was due to the administration's perception that her field

of microbiology could be covered by other professors, not because of any dissatisfaction with Dr. Sabet's performance.

Dr. Sabet subsequently brought the instant action pursuant to 42 U.S.C. § 1983, alleging that EVMA and several individual defendants had violated her constitutional rights, adding a pendant state claim for fraudulent misrepresentation. The district court, 611 F.Supp. 388, granted summary judgment for defendants. The court rejected Dr. Sabet's due process claim on the ground that she had no property interest in her employment beyond the fixed year terms spelled out in her contracts with EVMS. The district court also held that Dr. Sabet's fraud claim was barred by the applicable statute of limitations.

II.

[1]    [2]    [3]    The Due Process clause of the Fourteenth Amendment protects against deprivations of property without constitutionally adequate procedures. The category of protected property encompasses government benefits such as public employment. *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Perry v. Sindermann,* 408 U.S. 593, 599–603, 92 S.Ct. 2694, 2698–2700, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972). However, property rights in public employment are not created by the Constitution. Rather they are created and defined by existing laws, rules, or understandings, usually defined by state law, that support enforceable claims of entitlement. *Board of Regents v. Roth,* 408 U.S. at 577, 92 S.Ct. at 2709.

[4]    [5]    [6]    A property right in a government benefit can arise out of an informal or implicit rule or understanding. *Bishop v. Wood,* 426 U.S. at 344, 96 S.Ct. at 2077. *Perry v. Sindermann,* 408 U.S. at 601–02, 92 S.Ct. at 2699–2700; *Colm v. Vance,* 567 F.2d 1125, 1128 (D.C.Cir.1977). But there can be no property right unless the government entity in question has adopted the asserted rule or entered into the asserted understanding. A unilateral expectation on the part of the would-be recipient cannot create an entitlement. *Leis v. Flynt,* 439 U.S. 438, 442, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (1979); *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

[7]    Dr. Sabet has failed to show that EVMS adopted an informal policy of traditional tenure modeled after the AAUP guidelines. Indeed, the record almost inescapably **\*1270** shows the exact opposite. It is unlikely in the extreme that an institution which has a formal tenure policy stated with precision in writing in a generally circulated and available faculty handbook has also developed an altogether inconsistent informal policy. *See Beitzell v. Jeffrey,* 643 F.2d 870, 877 (1st Cir.1981); *Haimowitz v. University of Nevada,* 579 F.2d 526, 528 (9th Cir.1978). At the time of EVMA's decision to eliminate faculty positions, EVMS had been in existence for only nine years. Its prior practice of uniformly renewing faculty contracts, always, however, with explicit notice of the length of time of the appointment, cannot alone support a conclusion that the medical school had fostered an implicit understanding that it would grant its faculty *de facto* "permanent" tenure.[3]

[8]    [9]    [10]    Dr. Sabet argues, nevertheless, that the prevalence of AAUP-type tenure policies at other institutions entitled her to assume that EVMS had a similar policy. Therefore, Dr. Sabet argues, EVMS's failure more explicitly to explain that it had adopted a different policy created an understanding between her and the medical school that she would be considered for permanent tenure in accordance with the AAUP guidelines. Dr. Sabet proposes a novel theory of contract law, which would bind a party to perform an action that it never agreed to perform and which is totally inconsistent with what it had stated it would do. The law is otherwise. A claim of entitlement based on an understanding is enforceable in Virginia,[4] as in all other Anglo-American jurisdictions only if the understanding is mutual, *i.e.,* both parties have assented to it. *Valjar, Inc. v. Maritime Terminals, Inc.,* 220 Va. 1015, 265 S.E.2d 734 (Va.1980); *Humble Oil Co. v. Cox,* 207 Va. 197, 148 S.E.2d 756 (1966). EVMS never agreed to any policy of permanent tenure, let alone the one advocated by Dr. Sabet. Therefore, Dr. Sabet has no entitlement to permanent tenure, and no property right to be protected by the Due Process Clause.

III.

[11]    We need not address the district court's holding that Dr. Sabet's fraud claim is barred by the applicable statute of limitations, because it is clear on the record before us that Dr. Sabet has put forward no facts sufficient to support her claim. Dr. Sabet bases her claim on EVMS's failure to inform her that its tenure policy differed from the policy recommended by the AAUP. Arguably, by making its faculty handbook available to her, EVMS did take reasonable steps to inform Dr. Sabet

**Sabet v. Eastern Virginia Medical Authority, 775 F.2d 1266 (1985)**

28 Ed. Law Rep. 334

    b. Associate professor—three years.

    c. Assistant professor—two years.

    5. Annual appointments will be made on a fiscal year basis from July 1st to June 30th. Tenured appointments will ordinarily be from July 1st to June 30th of the separation year.

    6. Renewal of annual appointments will be made by March 31st of each year. Renewal of tenured appointments will be made by December 31st of the last fiscal year of the tenured period.

3    Our conclusion that no such understanding existed is further bolstered by the fact that the nature and terms of the alleged understanding are extremely unclear. Dr. Sabet argues that EVMS's practice of renewing contracts created an understanding that the school had adopted an AAUP-type tenure policy. However, the AAUP guidelines do not provide for automatic contract renewal. Instead, the guidelines require a probationary period of several years before permanent tenure is granted. The extensive gap between Dr. Sabet's belief and EVMS's actual practice indicates that there was no mutual agreement concerning an informal tenure policy.

4    The sufficiency of a claim of entitlement to employment must be decided by reference to state law. *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Goetz v. Windsor Central School District,* 698 F.2d 606, 608 (2d Cir.1983).

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

of its tenure policy. In any event, under Virginia law, silence cannot give rise to liability for fraud in the absence of a duty of disclosure. *Ware v. Scott,* 220 Va. 317, 320–21, 257 S.E.2d 855, 858 (1979); Restatement (Second) of Torts, § 551 (1977). Because EVMS was under no duty of disclosure to Dr. Sabet, the appellees cannot be held liable for fraud. The judgment of the district court is

AFFIRMED.

**All Citations**

775 F.2d 1266, 28 Ed. Law Rep. 334

## Footnotes

1    The AAUP guidelines provide:

*Academic Tenure*

(a) After the expiration of a probationary period, teachers or investigators should have permanent or continuous tenure, and their service should be terminated only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of financial exigencies.

In the interpretation of this principle it is understood that the following represents acceptable academic practice:

(1) The precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated.

(2) Beginning with appointment to the rank of full-time instructor or a higher rank, the probationary period should not exceed seven years, including within this period full-time service in all institutions of higher education; but subject to the provision that when, after a term of probationary service in one or more institutions, a teacher is called to another institution, it may be agreed in writing that his new appointment is for a probationary period of not more than four years, even though thereby the person's total probationary period in the academic profession is extended beyond the normal maximum of seven years. Notice should be given at least one year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period.

Association of American University Professors, *Statement of Principles on Academic Freedom and Tenure* (1940) *reprinted in* Association of American University Professors, *Policy Documents and Reports* 4 (1984).

2    EVMS's tenure policy, as set forth in its faculty handbook, was as follows:

*Tenure Policy*

1. Only full-time faculty may attain tenured status. (Full-time faculty implies 100 per cent of the funding and time is controlled through the Dean's office).

2. Any faculty appointment may be made without tenure, provided the appointment is so designated by the Dean and the Commissioners.

3. Tenured status will be conferred after a probationary period as follows:

a. Professors at the time of their appointment.

b. Associate professors at the time of their appointment.

c. Assistant professors after two years employment.

4. Tenure in the Eastern Virginia Medical School is limited according to the following schedule:

a. Professor—five years.

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

   *Plaintiff,*

  v.                **Case No. 19-C-190**
                 **Honorable Cindy S. Scott, Judge**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

   *Defendant.*

## NOTICE OF HEARING

  PLEASE TAKE NOTICE that the Court will hear oral arguments from counsel on the

Defendant's Motion to Dismiss on Monday, the 19th day of September, 2022, at 9:00 a.m. at the

Monongalia County Justice Center located at 75 High Street, Morgantown, WV 26505.

  Dated this 8th day of July, 2022.

            *Julie A. Moore*
           Julie A. Moore (WVSB #11315)
           Bowles Rice LLP
           125 Granville Square, Suite 400
           Morgantown, WV 26501
           Telephone: (304) 285-2524
           Fax: (304) 285-2575
           jamoore@bowlesrice.com

**F I L E D**

JUL 1 1 2022

JEAN FRIEND, CLERK

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

   *Plaintiff,*

  v.          **Case No. 19-C-190**
               **Honorable Cindy S. Scott, Judge**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

   *Defendant.*

## CERTIFICATE OF SERVICE

   I hereby certify that on the 8th day of July 2022, I served a true and exact copy of the foregoing *"Notice of Hearing"* upon counsel of record via U.S. Postal Service as follows:

       David M. Grunau, Esquire
       Grunau Law Offices PLLC
       244 Pleasant Street
       Morgantown, WV 26505
       grunaulaw@gmail.com

           Julie A. Moore (WVSB #11315)
           Lindsay M. Gainer (WV Bar No. 12046)

           *Counsel for Defendant, West Virginia*
           *University Board of Governors, for and on*
           *behalf of West Virginia University*

13682236.1

3

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV 25325
T: 304-347-1128
F: 304-347-1746
lgainer@bowlesrice.com

*Counsel for Defendant*
*West Virginia University Board of Governors*
*on behalf of West Virginia University*

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

        *Plaintiff,*

v.                                      Civil Action No.: 19-C-190

**WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS,**

        *Defendant.*

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Comes now the Plaintiff, and responds to the Defendant's Motion to Dismiss, as follows:

### Collateral Estoppel Issue

1.      The Plaintiff did not retire or resign. Instead, he was terminated by letter which stated his termination date. In contrast to this written evidence, the Plaintiff never submitted any written retirement or resignation letter, never announced by email, orally or in any other way that he was retiring or resigning.

2.      This civil action is not subject to foreclosure by the doctrine of collateral estoppel because the finding that he had retired was made during administrative grievance proceedings which applied an entirely separate standard of proof. The Circuit Court of Kanawha County was not a finder of fact and did not find, as a matter of fact, that the Plaintiff had retired. In fact, the Circuit Court of Kanawha County was acting in a purely appellate capacity and established no facts whatsoever. Indeed, the Circuit Court expressly stated it was not a finder of fact, as follows:

It is true that plenary review is conducted as to the conclusions of law and application of law to the facts which are reviewed de novo. Syllabus Point I *Cahill v. Mercer County Boa,-d of Education*, 208 W.Va. 177. 539 S.E.2d 437 (2000).

**F I L E D**

SEP 1 6 2022

JEAN FRIEND, CLERK

However, the law is clear that a reviewing court is obligated to give deference to factual findings rendered by an administrative law judge and a circuit court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations. Therefore, in the instant matter, this Court must give deference to the factual findings of the ALJ and <u>this Court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations</u>. (emphasis added).

3.    Collateral estoppel will not bar a claim unless four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a prior action; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action. Syllabus Point 1, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

4.    Here, the Court need go no farther than number (1).  The issues presented in this civil action are not identical to the issues presented during the grievance.  Administratively, the Plaintiff was only grieving his termination.  The ALJ found, by clinging to the thinnest of reeds, that in signing an insurance form typically completed for retirement purposes, the Plaintiff had retired. However, the Plaintiff did not raise, nor did the grievance adjudicate, constructive discharge, breach of contract, Human Rights Act claims, or anything else.

5.    Moreover, "[t]he Legislature designed the grievance process to be simple and expeditious. Consequently, the process is streamlined and lacks many of the adversarial accoutrements found in judicial [and Human Rights Commission's] proceedings. In the vast majority of grievances, for example, the grievant is not represented by a lawyer. Moreover, and

more importantly, the grievance process does not provide for any of the discovery mechanisms available under the Rules of Civil Procedure and the Commission's procedural rules." *Vest v. Bd. of Educ. of Cnty. of Nicholas*, 193 W. Va. 222, 455 S.E.2d 781, 786 (W. Va. 1995).

6.    Significantly, in *Page v. Columbia Nat. Res.*, 198 W. Va. 378, 480 S.E.2d 817 (1996), the Supreme Court of Appeals of West Virginia refused to apply collateral estoppel to unemployment proceedings, because they lacked formality, formal rules of evidence did not apply, and there was no discovery. 480 S.E.2d at 832.

7.    In fact, "only rarely, if at all, will administrative proceedings provide the same full and fair opportunity to litigate matters as will a judicial proceeding involving the complexity, intensity, and specific inquiries common to a wrongful discharge case." *Id.* at 393. The same is true of the Grievance Board proceedings at issue in this case. See *Durstein v. Todd*, No. 3:19-0029, 2022 U.S. Dist. LEXIS 156119 (S.D. W. Va. Aug. 30, 2022)

8.    Collateral Estoppel cannot be applied to the facts of this case.

**Public Policy Wrongful Discharge (Actual and/or Constructive)**

9.    No West Virginia Supreme Court of Appeals decision expressly limits application of the Public Policy Wrongful Discharge cause of action to at-will employees.

10.    Indeed, case after case, directly applicable to this civil action, makes clear that a tenured professor such as the Plaintiff have a protected property interest in their tenured positions: "A ***tenured*** teacher has a protected property interest in his/her position, which raises constitutional due process considerations when a teacher is faced with ***termination*** of his/her employment. *W. Va. Const. art. III, § 10*." Trimble v. W. Va. Bd. of Dirs., 209 W. Va. 420, 549 S.E.2d 294 (2001).

11.    "The Due Process Clause, *Article III, Section 10 of the West Virginia Constitution*, requires procedural safeguards against State action which affects a liberty or property interest,"

Syllabus point 1, *Waite v. Civil Service Commission*, 161 W. Va. 154, 241 S.E.2d 164 (1977).

12.    Constitutional due process principles may be used to determine whether disciplinary action taken by a public higher educational institution against a **_tenured_** teacher is too severe for the infraction occasioning such discipline. *W. Va. Const. art. III, § 10.*

13.    "Indeed, it is well- settled, and we so hold, that a tenured teacher has a protected property interest in his/her position, which raises constitutional due process considerations when a teacher is faced with termination of his/her employment." Id. At 427. Citing W. Va. Const. art. III, § 10. *See Gilbert v. Homar*, 520 U.S. 924, 928, 117 S. Ct. 1807, 1811, 138 L. Ed. 2d 120, 126 (1997); *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 578, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548, 561 (1972); *Perry v. Sindermann*, 408 U.S. 593, 602-03, 92 S. Ct. 2694, 2700, 33 L. Ed. 2d 570, 580 (1972); [***23] *California Teachers Ass'n. v. California*, 84 Cal. Rptr. 2d 425, 20 Cal. 4th 327, 975 P.2d 622 (1999); *Farner v. Idaho Falls Sch. Dist. No. 91*, 135 Idaho 337, 17 P.3d 281 (Idaho 2000); *Smith v. Ouachita Parish Sch. Bd.*, 702 So. 2d 727 (La. App. Ct. 1997).

14.    We recognize that the purpose of tenure is to protect competent and worthy teachers against arbitrary dismissal and to promote conditions which will encourage their professional growth. Id. At 428.

15.    Constitutional due process is denied when a **_tenured_** public higher education teacher, who has a previously unblemished record, is immediately **_terminated_** for an incident of insubordination that is minor in its consequences. Under such circumstances, due process requires the educational institution to impose progressive disciplinary sanctions in an attempt to correct the teacher's insubordinate conduct before it may resort to **_termination_**. Id., citing *W. Va. Const. art. III, § 10.*

16.    To the extent that the lack of liability coverage for breach of contract claims against

the state or its subdivisions precludes such claims under sovereign immunity principles, a tenured professor with recognized constitutionally-protected property rights in the tenured position would have no recourse absent a public policy type cause of action. This would render the constitutionally protected property interest and attendant due process protections meaningless.

17.   A contract which can be breached at will by a state subdivision, with no recourse by an injured party, is no contract at all. Thus, a public policy wrongful discharge action is entirely appropriate.

### Breach of Contract, Breach of Fiduciary Duty, Violation of Statute

18.   WVU is attempting to frame the issues in such a way as to elicit the absurd decision that, even if terminated wrongfully (and having fulfilled their legal duty to exhaust administrative remedies), tenured professors have no cause of action at all, ever—despite the wealth of legal authority cited above which unequivocally recognizes and protects a tenured professor's property interest in the tenured position. WVU argues that the relationship is not contractual, as evidenced by the complete lack of recourse for breach of contract by a state subdivision, but also not at-will so as to preclude a public policy wrongful discharge action.

19.   However, a tenured professor such as the Plaintiff does in fact have property and due process rights, and does in fact have recourse if those rights are violated—regardless of how the various counts in a civil action happen to be titled.

20.   The Complaint and Amended Complaint in this action both contain numerous references to the Plaintiff's protected status as tenured professor, and further assert that his separation from termination was involuntary—whether he was fired or was compelled to resign involuntarily based on the termination letter does not really matter.

21.   A finder of fact and/or the Court must determine whether the Plaintiff's separation

from employment was wrongful, in violation of due process rights, and proportional.

22.    Plaintiff respectfully asks that this Court DENY the motion presented by the Defendant.

Respectfully Submitted,
Heimo Riedel
By Counsel,

David M. Grunau, Esq.
[WV State # 9197]
244 Pleasant Street
Morgantown, WV 26505
304.291.6166 Telephone
304.291.6266 Facsimile
grunaulaw@gmail.com

**IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA**

**HEIMO RIEDEL,**

              *Plaintiff,*

    **v.**                                   **Civil Action No.: 19-C-190**

**WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS,**

              *Defendant.*

## <u>CERTIFICATE OF SERVICE</u>

I, David M. Grunau, Counsel for the Plaintiff, hereby certify that on this, the 16th day of September 2021, I served the *Plaintiff's Response in Opposition* via email, upon the following:

Julie Moore, Esq.
Bowles Rice LLP
University Town Center
125 Granville Square
Morgantown, WV 26501
304-285-2530

                                      David M. Grunau, Esq.
                                      WV State Bar # 9197
                                      244 Pleasant Street
                                      Morgantown, WV 26505
                                      304.291.6166 Telephone
                                      304.291.6266 Facsimile

# IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

     *Plaintiff,*

    v.                           **Case No. 19-C-190**
                                 **Honorable Cindy S. Scott, Judge**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS**
**for and on behalf of**
**WEST VIRGINIA UNIVERSITY,**

     *Defendant.*

## ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANT'S MOTION TO DISMISS AND SETTING AMENDED SCHEDULING ORDER DEADLINES

On the 19th day of September, 2022, came the parties, Plaintiff, Heimo Riedel, and Defendant, West Virginia University Board of Governors for and on behalf of West Virginia University ("WVUBOG"), by their respective counsel, for a hearing on *Defendant's Motion to Dismiss* that was filed on June 10, 2022, in response to *Plaintiff's First Amended Complaint* that was filed on May 11, 2022.

Upon consideration of the *Defendant's Motion to Dismiss* and *Memorandum of Law in Support*, *Plaintiff's Response in Opposition to Defendant's Motion to Dismiss*, and the oral arguments advanced by counsel at the hearing, the Court hereby **ORDERS** as follows:

The Court **GRANTS** *Defendant's Motion to Dismiss* as it pertains to Count I of *Plaintiff's First Amended Complaint* which asserts a claim for breach of contract. The Court finds that such claim barred by the sovereign immunity afforded by Article VI, Section 35 of the West Virginia Constitution since the State's policy of insurance expressly excludes claims for breach of contract. Thus, Count I is hereby **DISMISSED WITH PREJUDICE.**

15188353.1

The Court **GRANTS** *Defendant's Motion to Dismiss* as it pertains to Count II of *Plaintiff's First Amended Complaint* which asserts a claim for breach of fiduciary duty. The Court concludes that West Virginia law does not recognize the existence of a fiduciary duty flowing from an institution of higher education as an employer to its tenured faculty as employees. Accordingly, Count II fails to state a claim upon which relief may be granted. Thus, Count II is hereby **DISMISSED WITH PREJUDICE**.

The Court **DENIES** *Defendant's Motion to Dismiss* as it pertains to Count III of *Plaintiff's First Amended Complaint* which asserts a claim for retaliatory discharge in violation of statute. However, Plaintiff is hereby **ORDERED** to file a *Second Amended Complaint* within which he is to clarify the nature of the claim he is intending to assert in Count III. Specifically, Plaintiff is directed to cite to the specific statutory provision(s) that he contends was violated by his alleged termination and affords him a private cause of action and to make clear that he is not intending to assert a common law *Harless* claim for wrongful/retaliatory discharge in violation of public policy. As discussed during the hearing, the statute that was cited in ¶ 30 of *Plaintiff's First Amended Complaint*, *i.e.*, W.Va. Code § 18-29-1, *et seq.*, was repealed effective March 7, 2007. Based upon the Court's ruling regarding Count V, set forth *infra*, finding that the common law *Harless* claim for wrongful/retaliatory discharge in violation of public policy is unavailable to Plaintiff, he cannot utilize the *Harless* cause of action, which was the claim asserted by the plaintiff in *Wounaris v. W. Virginia State Coll.*, 214 W. Va. 241, 248, 588 S.E.2d 406, 413 (2003) cited in ¶ 30 of *Plaintiff's First Amended Complaint*, as the basis of his claim in Count III.

Plaintiff shall have **ten (10) days** from the date of entry of this Order to file and serve his *Second Amended Complaint*. The Defendant shall have a period of **thirty (30) days** after service of the *Second Amended Complaint* to file its answer or other response thereto.

15188353.1

The Court **DENIES** *Defendant's Motion to Dismiss* as it pertains to Count IV of *Plaintiff's First Amended Complaint* advancing a claim for age discrimination under the West Virginia Human Rights Act, W.Va. Code § 5-11-1, *et seq.*

The Court **GRANTS** *Defendant's Motion to Dismiss* as it pertains to Count V of *Plaintiff's First Amended Complaint* which asserts a claim for public policy wrongful discharge (actual and/or constructive). The Court finds that the common law cause of action for wrongful/retaliatory discharge in violation of public policy that was first recognized in *Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978) as an exception to the doctrine of at-will employment, is unavailable to Plaintiff since he was not an at-will employee but instead a tenured professor. Accordingly, Count V fails to state a claim upon which relief may be granted. Therefore, Count V is hereby **DISMISSED WITH PREJUDICE**.

The Court hereby **AMENDS** the Scheduling Order that was previously entered on January 31, 2022, by setting the following new deadlines:

- Medical examinations/inspections:  August 1, 2023

- Plaintiff's expert disclosure:  June 1, 2022

- Defendant's expert disclosure:  August 1, 2023

- Discovery completion:  November 30, 2023

- Mediation deadline:  December 15, 2023

- Pretrial motions (MSJ/MILs):  January 31, 2024

  o Responses:  February 21, 2024

  o Replies:  March 6, 2024

- Final witness and exhibit lists:  March 15, 2024

- Pretrial conference:  May 8, 2024 at 10:30 a.m.

15188353.1

Entered: *November 4, 2022*

_____
Honorable Cindy S. Scott, Judge

Prepared by:

ENTERED: *Nov 4, 2022*
DOCKET LINE ___47___, Jean Friend, Clerk

_____
Julie A. Moore (WV Bar No. 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV  26501
T:  (304) 285-2524
F:  (304) 285-2575
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV  25325
T: 304-347-1128
F: 304-347-1746
lgainer@bowlesrice.com

*Counsel for Defendant West Virginia University  Board of Governors*

Approved as to Form By:       by Julie A. Moore #11315
                             w/permission

_____
David M. Grunau (WV Bar No. 9197)
Grunau Law Offices PLLC
244 Pleasant Street
Morgantown, WV  26505

*Counsel for Plaintiff*

15188353.1

## IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

**HEIMO RIEDEL,**

*Plaintiff,*

v.                                                          Civil Action No.: 19-C-190

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS for and on behalf of**
**WEST VIRGINIA UNIVERSITY, and**

**MICHAEL SCHALLER, PhD,**
**Individually,**

*Defendants.*

### PLAINTIFF'S SECOND AMENDED COMPLAINT

Comes now the Plaintiff, by and through counsel, David M. Grunau, and for his Second Amended Complaint alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      The Plaintiff, Heimo Riedel, is, and at all times relevant to this Complaint was, a resident of Monongalia County, West Virginia, and a contract employee of West Virginia University as a tenured faculty member.

2.      University of West Virginia Board of Governors ("BOG") is the governing body for West Virginia University, and is responsible for the control, supervision and management of the financial, business, education and other policies and affairs of West Virginia University ("WVU"). Defendant Michael Schaller was the Plaintiff's Department Chair at all times relevant to this Amended Complaint.

1

**FILED**

DEC - 6 2022

**JEAN FRIEND, CLERK**

3.      A preponderance of acts and omissions alleged in this Complaint occurred in Monongalia County in violation of West Virginia State statutes and common law, a federal question is raised in the form of a 42 U.S.C. §1983 claim, no diversity exists, and therefore this Court has proper jurisdiction.

4.      Venue is proper before the Monongalia Circuit Court pursuant to W. Va. Code § 56-1-1 et seq.

5.      As used in this complaint, "Defendants" or "West Virginia University Board of Governors" or "WVU" refers also to all agents and representatives of West Virginia University acting in the scope of their employment, apparently and/or actually. The doctrine of *respondeat superior* is hereby invoked and alleged, except with respect to the 42 U.S.C § 1983 asserted herein. Accordingly, the Defendants are liable for the acts and omissions of all such employees, agents and/or representatives, and those acting under their command or at their behest, apparently and/or actually.

6.      WVU is not immune from suit in this case because the Plaintiff seeks no recovery of state funds, but instead seeks recovery under and up to the policy limits of the state's liability insurance policy in accordance with the mandates of Pittsburgh Elevator Co. v. West Virginia Board of Regents, 172 W.Va.743, 310 S.E.2d 675 (1983).

7.      All conditions precedent to the bringing of this action, including placing WVU and the West Virginia Attorney General on notice pursuant to W.Va. Code §55-17-3, have been performed, waived, or excused.

**FACTS COMMON TO ALL COUNTS**

The Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

2

8.     The Plaintiff was a tenured professor at WVU with contract rights to employment, as well as a constitutionally protected property interest in his tenured position and salary, and a constitutionally protected liberty interest in pursuing his career.

9.     It is well settled in West Virginia Supreme Court of Appeals decisions, federal appeals court decisions, including the 4th Circuit, and United States Supreme Court decisions that the Plaintiff's protected property interest in his tenured position is entitled to procedural due process protection under both the West Virginia Constitution and the United States Constitution.

10.     Specifically, The Due Process Clause, Article III, Section 10 of the West Virginia Constitution, requires procedural safeguards against State action which affects a liberty or property interest. Syllabus point 1, *Waite v. Civil Service Commission*, 161 W. Va. 154, 241 S.E.2d 164 (1977). The 14th Amendment to the United States Constitution affords corresponding federal procedural due process protections to a tenured professor due to the clearly established property interests recognized and affirmed by the United States Supreme Court.

11.     On information and belief, WVU made a deliberate, premeditated decision to retaliate against the Plaintiff for having filed multiple grievances over his years of employment, and further disregarded and violated established law prohibiting the termination of tenured professors during the pendency of an active grievance, as Professor Riedel was pursuing a grievance or grievances at the time of his discharge.

12.     The decision to retaliate against the Plaintiff also violated his state and federal due process protections in threatening, and ultimately extinguishing, the Plaintiff's state and federal property rights in his tenured position.

13.     Constitutional due process principles may be used to determine whether disciplinary action taken by a public higher educational institution against a tenured teacher is

3

too severe for the infraction occasioning such discipline. *Trimble v. W. Va. Bd. of Dirs.*, 209 W. Va. 420 (2001) citing to W. Va. Const. art. III, § 10.

14.     In June of 2017, Professor Riedel received a letter from Joyce McConnell, Provost and Vice President of Academic Affairs at WVU, notifying him that his employment was being terminated effective June 30, 2017. This termination was based on allegations set forth in a preceding letter of Intent to Terminate from the Provost instigated by Professor Riedel's Department Chair, who had previously recommended termination in a memo to the Dean dated January 30, 2017.

15.     In so doing, the Chair misapplied or misinterpreted policies, discriminatorily applied unwritten policies, and intentionally acted in bad faith and contrary to the WVU BOG Faculty Rule requiring "cause" before a tenured faculty can be terminated.

16.     Indeed, Schaller's January 30, 2017 memo to the Dean recommending termination of the Plaintiff *actually opens with a reference to the Plaintiff's "contentious" history with previous Chairs and Administrators*, which can only refer to the Plaintiff's multiple prior grievances, since such prior grievances represent the only contentiousness between Plaintiff and WVU.

17.     As a result, Professor Riedel was wrongfully terminated from his position as tenured professor as of June 30, 2017. Any alleged shortcomings on the part of the Plaintiff were not dischargeable in nature, and indeed were manufactured by WVU via a calculated, intentional campaign to set the Plaintiff up for failure. WVU regarded the Plaintiff as a nuisance due to his willingness to resort to the grievance process (contentiousness) to force WVU to follow its own rules and policy, and for this reason had already decided to find a way to fire the Plaintiff, even on pretext if necessary.

4

18.     Professor Riedel did not voluntarily retire in lieu of termination. He submitted no retirement/resignation letter, informed no one at WVU, in writing or orally, of any intent to retire or resign, and in fact continued to pursue his active grievances regarding the termination announced in Provost McConnell's June 5, 2017 termination letter—something no one with the genuine intent to retire would do.

19.     Instead, WVU relies on a single form involving health and life insurance coverage, allegedly signed by Plaintiff on June 23, 2017, in attempting to make the case that Plaintiff retired effective June 30, 2017. In fact, although captioned with the word "retirement," this form does not seek a retirement date but instead simply asks the date last worked, which the Plaintiff listed as his effective termination date, June 30, 2017. There was no intent to retire via this incidental insurance document, there was only intent to protect himself and his wife with access to health insurance, given his termination.

20.     A representative of the WVU even emailed the Plaintiff to obtain confirmation of the supposed retirement, and the Plaintiff declined to confirm it despite having a clear opportunity to do so if that had truly been his decision.

21.     Significantly, on June 28, 2017—two days before the effective termination date, and four days after the alleged retirement, WVU extended the following offer to the Plaintiff: "*WVU will allow you to resign and retire in lieu of termination (the termination letter would be rescinded upon submission of the resignation/retirement).*"

22.     Had the Plaintiff actually resigned and retired, as WVU has claimed and is expected to continue to claim, he would have received notice that the termination had been rescinded. Such notice never came; the termination was never officially rescinded. It remained and remains in full force and effect.

5

23. Prior to his termination, the Plaintiff was never afforded a pre-termination hearing as due process requires under both the West Virginia and United States Constitutions, as articulated by state and federal case law construing due process requirements in the case of a tenured professor with protected property rights in his employment.

24. Prior to his termination, the Plaintiff never received graduated sanctions, or any disciplinary sanctions, to address alleged deficiencies in his performance, or his alleged insubordination, all of which would have been readily apparent to WVU early on in the teaching assignments to which WVU, by and through Department Chair Michael Schaller, evidently took exception.

25. Since 2014, Schaller had frequently interfered with the Plaintiff's teaching assignments, repeatedly and unreasonably altering Plaintiff's assignments to which Plaintiff objected as documented in repeated grievances. However, Plaintiff did not receive any graduated disciplinary sanctions and had never been warned about his job security before he received formal notification on January 30, 2017 that termination proceedings had started.

26. Indeed, regarding the final teaching assignments of 2016, Schaller had ample opportunity to reprimand or discipline the Plaintiff formally if Schaller believed that the teaching assignments were not progressing as expected, so as to get the Plaintiff back on track (or into compliance if Schaller had thought it necessary and warranted), but he never did. Instead, Schaller took no formal progressive disciplinary action, and otherwise allowed the Plaintiff to persist in approaching the final teaching assignments exactly as he had been.

27. It is believed, and it is fairly obvious, that Schaller took no corrective action regarding the final teaching assignments of August 2016, despite knowing in the early stages of the assignments how the Plaintiff was handling these such assignments, because Schaller wanted

6

the Plaintiff to fail, and wished to wait as long as possible so as to be able to make the allegation that the Plaintiff was "insubordinate," rather than merely subpar, thus ostensibly justifying the Plaintiff's termination.

28.     Schaller's had already decided, in conjunction with the Provost's Office, to terminate the Plaintiff in order to be rid of what Schaller considered to be a "contentious" professor based, at least in part, on the Plaintiff's history of filing grievances. However, as a tenured professor, the Plaintiff could not openly be fired on such grounds.

29.     Accordingly, Schaller gave the Plaintiff academically untenable, superfluous, and unjustifiable teaching assignments, and then simply watched and waited and avoided further communication with the Plaintiff or warnings. In keeping with his (now) apparent plan, Schaller calculatingly bided his time until January 12, 2017 when he summarily declared that Plaintiff had "not completed these assignments" although all assignments were to be completed only by the end of the Spring semester months in the future. Notably, Schaller never demanded that Plaintiff hurry to complete his assignments in the remaining time frame to his satisfaction. Thus, very prematurely in January 2017 Schaller felt that the time was right to characterize the Plaintiff's performance as having advanced from merely substandard to "insubordinate"—the only basis on which Schaller believed a termination might seem defensible.

30.     Regardless, it is plain that Schaller orchestrated the entire purported teaching assignment insubordination from start to finish. Similarly, Plaintiff was not informed of the alleged "continued neglect of duty" until he received the Provost's letter of intent to terminate his appointment dated May 12, 2017 that makes that allegation.

31.     At no time did the Plaintiff's performance, substandard or not, affect WVU as a whole or threaten the University in any way. The teaching assignments at issue were insignificant

7

and unprecedented, and indeed one assigned course was entirely duplicative of another course being taught by more than four professors during the same semester. There were no consequences of any significance to WVU, nor could there be – and very significantly, WVU never claimed that serious consequences ensued.

32.      One highly reliable indicator of the unimportance and triviality of the teaching assignments at issue and the Plaintiff's alleged insubordination is Schaller's own silence and seeming unconcern about how the assignments were unfolding. Had the teaching assignments been of any significance, had the alleged insubordination been anything but minor in its nature or consequences, one would have expected Schaller, the Department Chair, to intervene timely to admonish the Plaintiff and remedy any issues, rather than remaining aloof, indifferent, and reticent. Schaller had every opportunity to caution the Plaintiff or even impose progressive discipline in an effort to correct the Plaintiff, yet Schaller made no inquiries until January 12, 2017 and never any demands—despite his  direct actual knowledge of the status of the assignments.

33.      Constitutional due process is denied where, as here, "a tenured public higher education teacher, who has a previously unblemished record, is immediately terminated for an incident of insubordination that is minor in its consequences. Under such circumstances, due process requires the educational institution to impose progressive disciplinary sanctions in an attempt to correct the teacher's insubordinate conduct before it may resort to termination." Syllabus Point 6, *Trimble v. W. Va. Bd. of Dirs.*, 209 W. Va. 420 (2001).

34.      Moreover, in order for an act to be characterized as insubordination in the first place, even a non-tenured professor must have willfully disobeyed a *valid and reasonable* rule, regulation or order issued by a superior.

8

35.     The teaching assignments conceived by Schaller and given to the Plaintiff were never academically valid or reasonable, and this was by design.  Schaller's assignments were arbitrary and capricious at best—but they did serve his purpose of generating what he believed to be an outwardly passable basis for terminating the Plaintiff despite his tenure, without endangering or adversely affecting WVU in any way.

36.     After being dismissed from his position as tenured professor, the Plaintiff applied for unemployment benefits. The Plaintiff was granted benefits, after the Board of Review determined that the Plaintiff had not retired but had been discharged for *simple* misconduct, not gross misconduct or any other type of misconduct that could have affected WVU adversely.

### COUNT I:  VIOLATION OF DUE PROCESS RIGHTS UNDER THE WEST VIRGINIA CONSTITUTION – WRONGFUL ACTUAL AND/OR CONSTRUCTIVE TERMINATION

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

37.     The Plaintiff was a tenured professor with a previously unblemished record and an indisputable property interest in his tenure which gave rise to various due process protections under the West Virginia Constitution.

38.     The decision to terminate the Plaintiff was made in bad faith and in retaliation for what Defendant Schaller considered the Plaintiff's "contentious" history with past Chairs and WVU Administrators, as evidenced by the Plaintiff's past filing of numerous grievances, which was and is an improper basis to fire *any* professor, let alone a tenured professor. Such improper motive was in itself a violation of due process and an unconstitutional deprivation of the Plaintiff's vested property rights in and to his tenured position.

9

39.     Prior to terminating the Plaintiff, WVU denied the Plaintiff a formal pre-termination hearing of any kind, in violation of his due process rights, which include the right to such pre-termination hearing: "The constitutional guarantee of procedural due process requires 'some kind of hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 [105 S. Ct. 1487, 1493, 84 L. Ed. 2d 494] (1985)." Syl. Pt. 3, *Fraley v. Civil Serv. Comm'n*, 177 W. Va. 729, 356 S.E.2d 483 (1987).

40.     WVU terminated the Plaintiff in violation of its own Faculty Rules regarding tenure and dismissal of tenured faculty, in that none of the "cause" requirements enumerated in the Rules were present in this case, and WVU knew it. As the statutorily-enabled Rules set forth required due process before a tenured professor can be fired, these rules essentially codify due process protections contained in the West Virginia Constitution.

41.     In addition, Plaintiff was deprived of the benefit of progressive discipline to address the alleged deficiencies in the quality of his work or the "insubordination" into which such deficiencies were ultimately alleged to have grown. Instead, he was immediately terminated for alleged insubordination that was plainly minor (if it existed at all), based, for one thing, on Department Chair Schaller's failure to intervene, or otherwise guide the Plaintiff, despite Schaller's full knowledge of the Plaintiff's assignment status.

42.     Constitutional due process is denied when a tenured public higher education teacher, who has a previously unblemished record, is immediately terminated for an incident of insubordination that is minor in its consequences. Under such circumstances, due process requires the educational institution to impose progressive disciplinary sanctions in an attempt to

10

correct the teacher's insubordinate conduct before it may resort to termination. *Trimble*, Syl Pt. 6.

43.     There was actually no insubordination at all, because in order to constitute insubordination, the conduct at issue must involve disregarding a rule, regulation or order from a superior which is *valid and reasonable.* 212 W. Va. 209; 569 S.E.2d 456; 2002 W. Va. LEXIS 8 (2002). Schaller's assignments to the Plaintiff were neither.

44.     Moreover, the question of whether a particular directive from a superior is "valid and reasonable" can be decided by the employee without being willful insubordination, so long as the employee's belief that an order is invalid and unreasonable is a good-faith belief and not mere defiance or contumaciousness or contempt for authority. *Id.*

45.     In the present case, the Plaintiff is a tenured Professor with decades of involvement in academia and other scholarly pursuits. He is quite capable of making good-faith, well-reasoned judgments as to the reasonableness or validity of any given teaching assignment. The Plaintiff was just as well aware that Schaller's assignments were not academically valid or reasonable as Schaller himself was. The Plaintiff had no interest in defiance for the sake of defiance.

46.     Indeed, as a tenured professor, the Plaintiff also had a constitutionally protected liberty interest in the pursuit of his career and profession, including the academic freedom to question and challenge the academic viability, legitimacy or reasonableness of any given teaching assignment by a Department Chair. Such liberty interest in the pursuit of his career according to established and accepted standards of academic freedom and academic integrity, being constitutional rights attendant to tenure, is also protected by due process requirements. See *Bd. of Educ. of Cnty. of Mercer v. Wirt*, 192 W.Va. 568, 574, 453 S.E.2d 402, 408

11

(1994) ("There can be little doubt that tenured employees have . . . liberty interests in their employment.")

47.     Moreover, a liberty interest is implicated where, as here, the State makes a false charge against an individual that might seriously damage his standing and associations in his community or places a stigma or other disability on him that forecloses future employment opportunities. *Waite v. Civil Serv. Comm'n*, 161 W. Va. 154, 241 S.E.2d 164 (1977), as overruled in part and thereby clarified by *W. Va. Dep't of Educ. v. McGraw*, 239 W. Va. 192, 800 S.E.2d 230 (2017). The false charge of dischargeable insubordination was of exactly this nature, and undoubtedly damages the Plaintiff's standing in the academic world, places stigma upon him, and forecloses future employment opportunities, which the Plaintiff did in fact experience subsequent to his termination.

48.     Like a constitutionally protected property interest, a protected liberty interest is subject to procedural due process requirements. WVU ignored such due process in the present case by summarily and immediately terminating the Plaintiff without a formal pre-termination hearing, without progressive sanctions, without a showing that the alleged insubordination rose to the level of dischargeable insubordination by causing any negative consequences at all to WVU.

49.     Regarding both the Plaintiff's protected property interest and his protected liberty interest, WVU characterized as dischargeable insubordination acts or omissions that were not insubordinate at all, and certainly not sufficiently egregious to affect the University as a whole or cause any harm or other consequence.

50.     The assignments at issue were throw-away assignments manufactured by Schaller specifically to entrap the Plaintiff and elicit a response which Schaller hoped could be

characterized as insubordination and used as a basis to discharge a tenured professor who had been far too willing for WVU's liking to file grievances or otherwise take WVU to task.

51. In terminating the Plaintiff based on a spurious claim of insubordination that WVU knew was not present, and certainly not present to the extent and in the degree required by law to justify termination of a tenured professor without first having imposed progressive sanctions to improve performance, WVU knowingly stripped the Plaintiff of a constitutionally protected property and liberty rights without due process of law or other protections afforded the Plaintiff by virtue of his tenured faculty position—including the Rules for Dismissal of Tenured Faculty promulgated by the WVU BOG pursuant to various state enabling statues.

52. Moreover, under WVU BOG Faculty Rule 4.2, 6.6.1 (Notice), even a tenure-track faculty member is entitled to written notice of at least one year of a non-reappointment decision; a faculty member with full tenure is surely entitled to at least this much protection, but certainly not less. In the present case, the Plaintiff did not receive such notice, and thus was deprived of even the minimum protections to which mere tenure-track faculty are entitled.[1]

53. WVU's deprivation of the Plaintiff's due process rights, as stated above, directly and proximately caused extreme financial and other harm to the Plaintiff, including tarnishing his professional reputation, subjecting him to career-impacting stigma, and directly and

---

[1] WVU BOG Faculty Rule 4.2, 6.6.1 provides as follows: "After the decision regarding reappointment or non-reappointment for the following academic year has been made by the President, the tenure-track Faculty Member shall be notified in writing of the decision by letter post-marked and mailed at least one year before the expiration of an appointment."

13

demonstrably diminishing if not essentially eliminating his ability to find and obtain employment opportunities.

54.     Whether intentional or negligent, WVU's violations of the Plaintiff's due process rights were egregious and actionable. Accordingly, the Plaintiff therefore seeks all damages available to him pursuant to his deprivation of due process claims, including lost wages, attorney fees, general damages for emotional and mental distress, anguish, embarrassment, humiliation, damages for foreclosed future employment opportunities, and any other relief that Judge or Jury deem proper and just. The Plaintiff seeks immediate reinstatement as well.

## COUNT II:  RETALIATORY DISCHARGE (ACTUAL AND/OR CONSTRUCTIVE IN VIOLATION OF STATUTE

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

55.     West Virginia Code §55-7-9 (Violation of Statutes) grants a private cause of action to individuals who suffer harm due to another's violation of statute: "Any person injured by the violation of any statute may recover from the offender such damages as he may sustain by reason of the violation, although a penalty or forfeiture for such violation be thereby imposed, unless the same be expressly mentioned to be in lieu of such damages." W. Va. Code § 55-7-9

56.     At the time of his wrongful termination, the Plaintiff had grievances active against WVU, and had filed grievances previously.

57.     A public employee subject to grievance procedures under W. Va. Code § 18-29-1 cannot be fired in retaliation for having filed a grievance while the grievance procedures are ongoing. See *Wounaris v. West Virginia State College*, 588 S.E.2d 406 (W. Va. 2003).

14

58.     Although *Wounaris* was decided on an admittedly narrow set of facts, the *Wounaris* Court does note that Mr. Wounaris, like the Plaintiff, "when employed by the College, was subject to the requirements of W. Va. Code § 18-29-1, *et seq.*, which establishes a grievance procedure for, among others, employees of state institutions of higher learning."

59.     After reviewing the stated legislative intent in enacting the Public Employees Grievance Act (W. Va. Code § 18-29-1 (1992)), the *Wounaris* Court further notes that "We believe that the Legislature intended employers and employees to be encouraged, and not discouraged [as by retaliatory discharge], from using this process."

60.     Although *Wounaris* does not stand for the proposition that no public employee with a pending grievance may be terminated, *Wounaris* does most assuredly stand for the proposition that in order to terminate an employee actively engaged in a grievance, the employer must have a compelling reason to do so. *Wounaris* also stands for the proposition that retaliation simply for filing a grievance or grievances is always improper on its face.

61.     It is hereby alleged that WVU had no compelling reason to fire the Plaintiff while his grievance was pending, and in fact did so as an act of retaliation for the number of grievances the Plaintiff filed, including the grievances that were pending at the time of his termination. In essence, WVU considered the Plaintiff, with all his persistent grievance activity, an annoyance, a troublemaker, and an intolerable source of "contention" (as Department Chair Schaller characterized it), who simply had to go, even if WVU and Schaller had to concoct a pretextual basis to accomplish this.

62.     In addition, W. Va. Code § 6C-2-2(o) defines "reprisal" as the retaliation of an employer toward a grievant, witness, representative, or any other participant in the grievance procedure either for an alleged injury itself or for any lawful attempt to redress it.

15

63.     In general, a grievant alleging reprisal or retaliation in violation of W. Va. Code § 6C-2-2(o), to establish a prima facie case, must establish by a preponderance of the evidence: (1) that he or she was engaged in activity protected by the statute (e.g., filing a grievance); (2) that the employer's official or agent had actual or constructive knowledge that the employee engaged in the protected activity; (3) that, thereafter, an adverse employment action was taken by the employer; and (4) that the adverse action was the result of retaliatory motivation or the adverse action followed the employee's protected activity within such a period of time that retaliatory motive can be inferred. Once a prima facie case of retaliation has been established, the inquiry shifts to determining whether the employer has shown legitimate, non-retaliatory reasons for its actions. *Frost v. Bluefield State Coll.*, No. 14-0841, 2015 W. Va. LEXIS 737 (June 12, 2015).

64.     In the present case, the Plaintiff was (1) engaged in activity protected by the statute (e.g., filing a grievances which were still pending at the time of his discharge); (2) WVU's official or agent had actual or constructive knowledge that the Plaintiff was engaged in the protected grievance activity; (3) Thereafter, an adverse employment action (termination) was taken by the WVU; and (4) The termination was the result of retaliatory motivation and followed the Plaintiff's grievance within such a period of time (grievance actually still pending) that retaliatory motive can be inferred.

65.     The Plaintiff is easily able to establish a prima facie case of reprisal or retaliation under W. Va. Code § 6C-2-2(o), and upon failure of WVU to furnish a credible non-retaliatory basis for the termination, the Plaintiff will have demonstrated that § 6C-2-2(o) was violated, triggering the relief available under West Virginia Code §55-7-9 (Violation of Statutes).

16

66. Likewise, Plaintiff can demonstrate violation of W. Va. Code § 18-29-1, as construed by *Wounaris* and other West Virginia Supreme Court cases.

67. Other violations of statutes exist in this case as well. The West Virginia Higher Education Act W. Va. Code § 18B-1-1a et seq. contains various enabling features which authorizes and directs the Higher Education Policy Commission to work with the governing boards of various higher education institutions, including the WVU BOG, to promulgate rules relating to faculty hiring, retention, salaries, and discipline such as termination.

68. Such rules are generally contained in BOG Faculty Rule 4.2 - Appointment, Promotion, Tenure, and Dismissal for Cause. Section 8 of Rule 4.2 enumerates the various grounds upon which tenured faculty may be terminated for cause.

69. All 4.2 provisions are subject to interpretation, construction and clarification by the West Virginia Supreme Court of Appeals, and all Rules are also subject to constitutional requirements and protections.

70. Section 8 can be said to provide statutory (by virtue of the enabling effect of the Higher Education Act) recognition of the due process protections inherent in the Due Process Clause, Article III, Section 10 of the West Virginia Constitution. Section 8 enumerates all the grounds on which a tenured professor may potentially be dismissed.

71. However, all such grounds remain subject to construction and even qualification by the West Virginia Supreme Court of Appeals, including definitions of "insubordination" and limitations on dismissal based on this ground.

72. The Plaintiff hereby alleges that his actions did not rise to the level of even simple insubordination, as this term is defined by the West Virginia Supreme Court. For example, insubordination must be "willful," in order to be insubordination at all. "Willful" means the

17

motivation for the disobedience must be "contumaciousness or a defiance of, or contempt for authority, rather than a legitimate disagreement over the legal propriety or reasonableness of an order." *Butts v. Higher Educ. Interim Governing Board/Shepherd College*, 212 W. Va. 209, 212 W. Va. 209; 569 S.E.2d 456 (2002).

73.    In the present case, there was no finding, even by WVU, that the Plaintiff took exception to the teaching assignments at issue based solely on some innate defiance or contempt for authority.  On information and belief, WVU never even performed the appropriate analysis under *Butts*, possibly because WVU denied the Plaintiff the due process pre-termination impartial hearing at which such inquiry could have been effectuated.

74.    In any case, the Plaintiff was not being contumacious, he was expressing a legitimate challenge, with a sound factual basis, to teaching assignments which were either academically unjustifiable, academically superfluous, or some combination of both.  Plaintiff did so in the sound exercise of his academic freedom and discretion, and his evaluation of the proffered assignments was based strictly upon the academic validity and reasonableness of the assignments themselves—and not on the Department Chair's authority.  At no time did the Plaintiff attack or disparage Department Chair Schaller, or engage in any speech or conduct which even intimated defiance for the sake of defiance.

75.    "Where there is a factual basis for a teaching employee's alleged belief that an order of a superior is unreasonable, and where there is evidence that she refused to obey in the belief the order was unreasonable, the act of refusing to obey the supervisor's order is not contumacious and does not constitute the type of "willful" refusal to obey which is inherent in the definition of "insubordination." An employee's refusal to obey a superior's order, based on a

18

good faith belief that the order violates a law, regulation, or policy, is not a willful refusal to obey and is not insubordination." *Butts*.

76.    Nevertheless, despite the lack of inquiry and evidence on the issue of insubordination, and indeed in the absence of an actual valid finding of insubordination, WVU terminated the Plaintiff. Because no insubordination was ever demonstrated or even alleged, at least as it is defined by the *Butts* opinion, the Plaintiff was terminated in violation of the provisions of BOG Faculty Rule 4.2 - Appointment, Promotion, Tenure, and Dismissal for Cause, Section 8 (and by extension the Higher Education Act, which enables, authorizes and directs development of Section 8) in that none of the enumerated grounds for dismissal for cause were ever present. West Virginia Code §55-7-9 provides a remedy for this violation.

77.    Indeed, the West Virginia Constitution itself, having been enacted by the Legislature during Constitutional Convention, is the ultimate legislative enactment, is essentially statutory in nature, and direct violations thereof can be redressed through West Virginia Code §55-7-9.

78.    As noted above, Defendant WVU engaged in a systematic deprivation of the Plaintiff's due process rights under the Due Process Clause of the West Virginia Constitution,

79.    For these violations, the Plaintiff seeks relief under West Virginia Code §55-7-9.

## COUNT III:  WRONGFUL DISCHARGE (ACTUAL AND/OR CONSTRUCTIVE) IN VIOLATION OF THE WEST VIRGINIA HUMAN RIGHTS ACT

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

80.    The Plaintiff is in a protected class under the Human Rights Act, namely age.

19

81.     On information and belief, the Plaintiff would not have been terminated based on the allegations of trivial insubordination made by his Department Chair had he been a younger tenured professor.

82.     On further information and belief, based on his age, WVU considered the Plaintiff to be set in his ways, including his willingness to file grievances and be "contentious," as Department Chair Schaller so tellingly put it, and unlikely to change in this regard.

83.     WVU did not wish to have to tolerate such a "contentious," grievance-filing professor, especially given the Plaintiff's age and what WVU believed to be his diminishing usefulness in light of the numerous grievances.   On information and belief, the Plaintiff's reputation as being litigious with grievances made him controversial to an extent that WVU was unwilling to accept given his age.

84.     Professor Riedel's age was an improper consideration in the decision to terminate him, even if it was only indirectly implicated.

85.     Professor's termination on age-related grounds violates the Human Rights Act.

86.     The Plaintiff's wrongful, retaliatory discharge in violation of the Human Rights Act led to foreseeable damages, including the substantial loss of income.

87.     The Plaintiff demands all sustained damages occasioned by WVU's wrongful retaliatory discharge in violation of the Act, including lost income, attorney fees, general damages for emotional suffering, and pre and post judgment interest.

## COUNT IV: ABUSE OF PROCESS

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

88.      Generally, abuse of process consists of the willful or malicious misuse or misapplication of lawfully issued process to accomplish some purpose not intended or warranted by that process. See *Preiser v. MacQueen*, 177 W. Va. 273, 352 S.E.2d 22 (1985).

89.      In the case at bar, the Defendant deliberately commenced termination proceedings even though it knew at all times that none of the termination for cause grounds under 4.2 Section 8 were present, and that the primary motive was to be rid of a professor who filed too many grievances for WVU's taste, and who had generally had become to be seen as a nuisance.

90.      At no time was the Plaintiff's termination desired for any legitimate reason. At all times, WVU misused the termination for cause provisions contained in the Faculty Rules in order to rationalize the Plaintiff's termination, which was actually being sought in order to rid WVU of an extremely exasperating tenured professor who had filed too many grievances and become a thorn in WVU's side.

91.      The Plaintiff's discharge was thus unrelated to the purpose for which the Faculty Rules governing termination grounds and procedure were promulgated, which was to give WVU the latitude to separate from substandard professors, or professors who were unable or unwilling to perform their job functions, among other reasons.

92.      The purpose of promulgation of 4.2 Section 8 was never to allow WVU to wash its hands of a tenured professor who complained too much or who frequently asserted his rights through the grievance process.

93.      In terminating the Plaintiff, WVU engaged in the willful or malicious misuse or misapplication of lawfully issued process (termination procedure) to accomplish some purpose not intended or warranted by that process (to be rid of a considerable source of irritation in the form of the Plaintiff).

21

94.     As the direct and proximate result of WVU's egregious abuse of process, the Plaintiff suffered, and continued to suffer, foreseeable harm including lost wages and other financial detriment, emotional distress, attorney fees, and other damages which are hereby demanded as compensation.

## COUNT V: DEPRIVATION OF CONSTITUTIONAL RIGHTS UNDER COLOR OF STATE LAW – U.S.C. §1983

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

95.     Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . 42 U.S.C. § 1983.

96.     As described above, public college professors have a constitutionally protected property interest in their teaching positions when they have a legitimate expectation of continued employment (tenure). *Board of Regents v. Roth*, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972); *Perry v. Sindermann*, 408 U.S. 593, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972)

97.     A professor subject to a continuing contract has a legitimate expectation of continued employment and, therefore, has a protected property interest. *Whitsel v. Southeast Local School District*, 484 F.2d 1222, 1229 (6th Cir. 1973), *citing Perry v. Sindermann*, 408 U.S. 593, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972).

22

98.     In addition, a public college professor with tenure, such as the Plaintiff, also has a legitimate expectation of continued employment and, therefore, has a protected property interest which can only be terminated in accordance with due process under the fourteenth amendment. *Roth*, 408 U.S. at 576, citing *Slochower v. Board of Education*, 350 U.S. 551, 100 L. Ed. 692, 76 S. Ct. 637 (1956).

99.     Given that the Plaintiff possessed a protected property interest in his continued employment with WVU, it is necessary to determine what due process was constitutionally required to protect that interest.

100.    According to the United States Supreme Court, "the law is quite clear on this question. Professors with tenure may not be discharged without receiving a hearing in which they are informed of the grounds for their dismissal and given the opportunity to challenge the sufficiency of those grounds." *Johnston-Taylor v. Gannon*, 907 F.2d 1577 (6th Cir. 1990) citing to *Whitsel*, 484 F.2d at 1228, *citing Perry*, 408 U.S. 593, 33 L. Ed. 2d 570, 92 S. Ct. 2694.

101.    In order to establish a procedural due process claim in a Section 1983 action, plaintiffs must establish three elements: (1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment, (2) that they were deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 826 (4th Cir. 1995).

102.    "[I]n order for an individual to be liable under Section 1983, it must be affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Garraghty v. Virginia, Dep't of Corrections*, 52 F.3d 1274, 1280 (4th Cir.

23

1995) (quoting *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985)) [*32] (internal citations omitted); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

103. Liability will attach if a defendant plays an active role in a constitutional deprivation. *Rizzo v. Goode*, 423 U.S. 362, 377, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976).

104. "The constitutional guarantee of procedural due process requires '"some kind of hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment.' *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 [105 S. Ct. 1487, 1493, 84 L. Ed. 2d 494] (1985).

105. To succeed on a *§ 1983* claim for a deprivation of property without due process in violation of the *Fourteenth Amendment*, the Plaintiff must establish (1) that he has a constitutionally protected property interest, and (2) that he has been deprived of that interest by state action. See *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988); *Board of Regents v. Roth*, 408 U.S. 564, 569-70, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).

106. Persons receiving a "benefit created and defined by a source independent of the Constitution, such as state law," are vested with a property interest entitled to procedural due process protections under the *Fourteenth Amendment. Huang*, 902 F.2d at 1141 (citing *Roth*, 408 U.S. at 577; *Bradley v. Colonial Mental Health & Retardation Servs. Bd.*, 856 F.2d 703, 707 (4th Cir. 1988)).

107. Here, regarding his tenured teaching position, Plaintiff was contractually employed with WVU and clearly protected under the tenure system pursuant to the Rules. Therefore, his "position as a tenured professor is indisputably a property right entitled to procedural due process protection." *Huang*, 902 F.2d at 1141.

24

108.    Defendants violated Plaintiff's 14th Amendment rights by failing to afford him with an impartial pretermination hearing. Although the *Loudermill* Court notes that the Fourteenth Amendment does not require that an employee necessarily receive the full panoply of due process rights at a pretermination hearing where the available post-termination procedures protect those rights, in the present case the Plaintiff was afforded no post-termination protections, including from the grievance he filed, which was decided on procedural and not substantive grounds.

109.    Although qualified immunity protects a government official from liability in Section 1983 actions arising from the performance of discretionary actions, so long as the official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982), in this case Dr. Schaller knew or should have known that the Plaintiff's statutory and constitutional rights were being violated by virtue of Dr. Schaller's actions.

110.    Dr. Schaller is being named individually and in his former capacity as Department Chair with dominion and authority over the Plaintiff.  Moreover, although State subdivisions, agencies and the like ordinarily do not constitute a "person" for the purposes of §1983, it is hereby alleged that WVU's treatment of the Plaintiff in violation of his rights as a tenured professor is unfortunately customary at WVU, and the notion that WVU can do anything it wants with any faculty it wants, tenure or no tenure, represents de facto official policy and/or custom.

111.    Although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, state subdivisions and local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to

governmental "custom" even though such a custom has not received formal approval through the body's official decision-making channels. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978)(applying § 1983 as to municipalities, which are analogous to other state subdivisions such as WVU).

112. Qualified Immunity is not available to the Defendants in this case because: 1. There is no question "whether a constitutional right would have been violated on the facts alleged" herein. *Saucier v. Katz*, 533 U.S. 194, 200, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001); *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003); and 2. Any "reasonable person in the defendant's position would know that his actions would violate a clearly established right." *Simmons v. Poe*, 47 F.3d 1370, 1385 (4th Cir. 1995).

113. Plaintiff hereby alleges that the actions of the Defendants, as aforesaid, deprived him of his property and liberty interests in his tenured employment, and further deprived him of due process under the 14th Amendment to the United States Constitution, in that no impartial pre-termination hearing was held on the merits of the termination; no post-termination hearing was held on the merits of the termination; the assignments themselves were specifically created for the purpose of setting the Plaintiff up for failure and were either impossible to perform, duplicative of other simultaneously-occurring course(s), or academically untenable; the Plaintiff, despite his unblemished record, was immediately fired rather than having progressive discipline imposed to correct any alleged issues with his job performance.

114. Highly significantly, the Plaintiff was actually fired prematurely, _months_ before the time period allotted for the assignments were to expire at the end of the Spring semester 2017. Although Dr. Schaller had ample knowledge of the teaching assignments' progress, ample time, and ample opportunity to request completion of the assignments during the remainder of the

Spring semester, he elected not to do so. So eager was Schaller to instigate and hasten the Plaintiff's dismissal, that he was actually unable to wait until the teaching assignments were even due to be completed, before he reached the conclusion that the assignments were not completed and informed the Dean as much. This fact alone is unmistakably revealing of Schaller's ulterior motives, bad faith, and arbitrary and capricious decision making concerning the Plaintiff.

115.    As a direct and proximate result of the Defendants' constitutional deprivations, the Plaintiff suffered, and continues to suffer fallout and harm.

116.    Procedural and substantive due process violations are thus hereby alleged, as are deprivations of the Plaintiff's constitutionally-created rights involving property and liberty interests.

117.    Such constitutional deprivations occurred under color of state law.

118.    The question of the Plaintiff's reasons for signing a boilerplate insurance form related to insurance benefits for retiring employees is irrelevant, as the Plaintiff has alleged constructive as well as actual termination herein. There can be no question that the insurance form was signed after WVU sent the Plaintiff a notice of termination, and there is no dispute that the Plaintiff made no oral or written statement announcing his retirement. To the contrary, he grieved his dismissal instead, and even after the form in question was signed, WVU's representative offered the Plaintiff the choice to either retire or be terminated, indicating that even WVU did not believe a simple boilerplate insurance form denoted retirement.

119.    As the direct and proximate result of the Defendants' deprivations of his constitutional rights, the Plaintiff suffered, and continues to suffer, extreme financial and other harm to the Plaintiff, including tarnishing his professional reputation, subjecting him to career-

27

impacting stigma, and directly and demonstrably diminishing if not essentially eliminating his ability to find and obtain employment opportunities.

120. The Plaintiff therefore seeks all damages available to him pursuant to 42 U.S.C. § 1983 claim, including lost wages, attorney fees, general damages for emotional and mental distress, anguish, embarrassment, humiliation, damages for foreclosed future employment opportunities, and any other relief that Judge or Jury deem proper and just. The Plaintiff seeks immediate reinstatement as well.

## COUNT VI: NEGLIGENCE

The Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as if fully set forth herein.

121. Defendants had a duty to the Plaintiff, as a tenured professor with no disciplinary history and unblemished record, to exercise due care to ensure that his due process right under the U.S. and W.Va. Constitutions were respected, protected, and followed by WVU and its agents.

122. Defendants likewise had a duty to the Plaintiff to exercise due care to ensure that all WVU rules and regulations, including WVU BOG Faculty Rule 4.2 were complied with by WVU.

123. Defendants failed to exercise such due care in any way with respect to the observance of Plaintiff's constitutional, statutory, regulatory or administrative rule-based rights.

124. Instead, Defendants acted negligently, grossly negligently, and recklessly in their zeal to terminate the Plaintiff, breaching virtually all duties with respect to due care and reasonable prudence as Department Chair and major University.

28

125.    Specifically, Defendants failed to examine WVU's own rules, as well as case law interpreting such rules—and also interpreting and establishing the constitutional protections and due process owed tenured professors—before arbitrarily and capriciously terminating the Plaintiff, and/or giving Plaintiff the impossible choice between resigning or being terminated.

126.    Had Defendants conducted a good faith review of pertinent legal authority in discharging their duties of due care and reasonable prudence, they may well have realized that Plaintiff had protections that were being ignored, including right to progressive discipline, proper notice, formal pre-termination hearing, and other substantive and due process rights.

127.    In addition, had Defendants conducted themselves with due care and reasonable prudence, it would have become clear that the Plaintiff's conduct did not amount to insubordination under the law, and even if it did, was not sufficiently egregious to justify immediate termination.

128.    Instead, the Defendants shirked and breached all duties, as aforesaid, and the Plaintiff suffered harm and damages as a direct and proximate result.

129.    Defendants' acts and omissions, as stated above, constitute negligence.

130.  Accordingly, Defendant hereby seeks all damages occasioned by the Defendants' negligence, including monetary loss, damage to reputation and standing in the academic community, emotional distress, and other damages.

### THE PLAINTIFF DEMANDS A TRIAL BY JURY

David Grunau, Esq,
[WV State Bar ID # 9197]

29

## IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

<em>Plaintiff,</em>

v.                                                    Civil Action No.: 19-C-190

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS,

<em>Defendant.</em>

### CERTIFICATE OF SERVICE

I, David M. Grunau, Counsel for the Plaintiff, hereby certify that on this, the 7th day of December 2022, I served the *Plaintiff's Second Amended Complaint* via email, upon the following:

> Julie Moore, Esq.
> Lindsay Gainer, Esq.
> BOWLES RICE LLP
> University Town Center
> 125 Granville Square
> Morgantown, WV 26501
> Fax: (304) 347-1746

David M. Grunau, Esq.
WV State Bar # 9197
244 Pleasant Street
Morgantown, WV 26505
304.291.6166 Telephone
304.291.6266 Facsimile
grunaulaw@gmail.com

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

HEIMO RIEDEL,

       Plaintiff,

    v.                           Case No.: 19-C-190

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS for and on behalf of
WEST VIRGINIA UNIVERSITY, and
MICHAEL SCHALLER, Ph.D., Individually,

       Defendants.

### NOTICE OF FILING OF NOTICE OF REMOVAL

TO:   Jean Friend, Circuit Clerk                David M. Grunau, Esq.
       Monongalia County Circuit Court      244 Pleasant Street
       Monongalia County Justice Center     Morgantown, West Virginia 26505
       75 High Street, Suite 12
       Morgantown, West Virginia 26505

Please take notice that on December 15, 2022, the Defendants, West Virginia University

Board of Governors ("WVUBOG") and Michael Schaller, Ph.D., jointly filed a *Notice of Removal*

effecting the removal of this action from the Circuit Court of Monongalia County, West Virginia,

to the United States Court for the Northern District of West Virginia. A true and accurate copy of

the *"Notice of Removal"* is attached to this Notice. Pursuant to 28 U.S.C. §1446(d), this Court

may proceed no further with this action unless and until the case is remanded.

                                   Julie A. Moore (WV Bar No. 11315)
                                   Bowles Rice LLP
                                   125 Granville Square, Suite 400
                                   Morgantown, WV 26505
                                   T: 304-285-2524
                                   F: 304-285-2575
                                   jamoore@bowlesrice.com

                                   Lindsay M. Gainer (WV Bar No. 12046)
                                   Bowles Rice LLP
                                   600 Quarrier Street

**FILED**

DEC 16 2022

JEAN FRIEND, CLERK

Post Office Box 1386
Charleston, WV 25325
T: 304-347-1128
lgainer@bowlesrice.com

*Counsel for Defendants West Virginia University Board of Governors and Michael Schaller, Ph.D.*

**IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA**

**HEIMO RIEDEL,**

      **Plaintiff,**

      **v.**                       **Case No.: 19-C-190**

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS for and on behalf of**
**WEST VIRGINIA UNIVERSITY, and**
**MICHAEL SCHALLER, Ph.D., Individually,**

      **Defendants.**

## CERTIFICATE OF SERVICE

      I hereby certify that on the 15th day of December, 2022, I served the foregoing "*Notice of Filing of Notice of Removal*" on all counsel of record by first class U.S. Mail, postage pre-paid, in an envelope addressed as follows:

David M. Grunau, Esq.
244 Pleasant Street
Morgantown, West Virginia 26505
*Counsel for Plaintiff*

Julie A. Moore (WV Bar No. 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV  26505
T: 304-285-2524
F: 304-285-2575
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV  25325
T: 304-347-1128
F: 304-347-1746
lgainer@bowlesrice.com

*Counsel for Defendants West Virginia University Board of Governors and Michael Schaller, Ph.D.*

15304576.1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**HEIMO RIEDEL,**

     **Plaintiff,**

    **v.**                                       **Civil Action No.**_____

**WEST VIRGINIA UNIVERSITY**
**BOARD OF GOVERNORS, for and on behalf of**
**WEST VIRGINIA UNIVERSITY, and**
**MICHAEL SCHALLER, Ph.D., Individually,**

     **Defendants.**

## <u>NOTICE OF REMOVAL</u>

Pursuant to 28 U.S.C. §§ 1331, 1367, 1441, and 1446, Defendants, West Virginia University Board of Governors ("WVUBOG") and Michael Schaller, Ph.D., hereby jointly remove this civil action from the Circuit Court of Monongalia County, West Virginia, to the United States District Court for the Northern District of West Virginia.  As grounds for removal, Defendants state as follows:

## I.     NATURE OF REMOVED ACTION

1.     The removed case is a civil action initially filed on October 29, 2019, in the Circuit Court of Monongalia County, West Virginia, assigned Civil Action No. 19-C-190 and captioned as *Heimo Riedel v. West Virginia University Board of Governors for and on behalf of West Virginia University*.  In accordance with 28 U.S.C. §1446(a), a complete copy of the court file in Civil Action 19-C-190, is attached hereto as **Exhibit A**.  No other summonses, processes, pleadings, or orders have been served on Defendants as of this date.

2.       By Order dated November 7, 2022, the Circuit Court of Monongalia County, West Virginia, entered an Order in Civil Action No. 19-C-190, which, in part, granted Plaintiff leave to file a Second Amended Complaint.

3.       On December 6, 2022, Plaintiff filed and served his Second Amended Complaint. A copy of the Second Amended Complaint is attached hereto as **Exhibit B**.   Within his Second Amended Complaint, Plaintiff asserts, for the first time, a federal claim for deprivation of constitutional rights under color of state law – U.S.C. § 1983 (Count V).  Second Am. Compl. ¶¶ 95-120.

## II.    TIMELINESS OF REMOVAL

4.       Under the procedure for removal set out in 28 U.S.C. § 1446(b), "[i]f the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by Section 1332 of this Title [28 U.S.C. § 1332] more than one year after commencement of the action."

5.       Plaintiff first advanced his claim under 42 U.S.C. § 1983 in his Second Amended Complaint.

6.       Service of the Second Amended Complaint was effectuated on WVUBOG and Michael Schaller, Ph.D., on December 6, 2022, by service upon their counsel.

7.       Thus, notice of removal is timely.

### III.    VENUE

8.     Venue for this removal action is proper pursuant to 28 U.S.C. § 1441(a) because the Circuit Court of Monongalia County, West Virginia, is located within the Northern District of West Virginia, Clarksburg Division.

### IV.    BASIS FOR REMOVAL – FEDERAL QUESTION JURISDICTION

9.     In Count V of his Second Amended Complaint, Plaintiff advances a federal claim for deprivation of constitutional rights under color of state law pursuant to 42 U.S.C. § 1983. *See* Second Am. Compl. at ¶¶ 95-120.  Specifically, Plaintiff alleges that the actions of Defendants deprived him of his property and liberty interests in his tenured employment, and further deprived him of due process under the Fourteenth Amendment to the United States Constitution. *Id.* at ¶ 113.

10.     Pursuant to 28 U.S.C. § 1331, which provides that, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," this Court has original jurisdiction over Plaintiff's claims in Count V of the Second Amended Complaint.  Indeed, federal jurisdiction exists where, as here, a federal question is presented "on the fact of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987).

11.     Since Plaintiff's cause of action in Count V of his Second Amended Complaint arises expressly under federal law, *i.e.*, 42 U.S.C. § 1983, this Court has original jurisdiction over such claim.

### V. SUPPLEMENTAL JURISDICTION

12.     Plaintiff's Second Amended Complaint alleges five additional counts that arise under state law.

3

13.     In Count I of his Second Amended Complaint, Plaintiff advances a claim for violation of due process rights under the West Virginia Constitution.  *See* Second Am. Compl. ¶¶ 37-54.

14.     In Count II of his Second Amended Complaint, Plaintiff advances a claim under West Virginia Code § 55-7-9. *See* Second Am. Compl. ¶¶55-79.

15.     In Count III of his Second Amended Complaint, the Plaintiff advances a claim under the West Virginia Human Rights Act ("WVHRA"), W.Va. Code §5-11-1, *et seq.*  *See* Second Am. Compl. ¶¶ 80-87.

16.     In Count IV of his Second Amended Complaint, Plaintiff advances a claim for abuse of process. *See* Second Am. Compl. ¶¶88-94.

17.     In Count VI of his Second Amended Complaint, Plaintiff advances a claim for common law negligence. *See* Second Am. Compl. ¶¶121-130.

18.     Pursuant to 28 U.S.C. § 1367(a), the Court has supplemental jurisdiction over Plaintiff's state law claims in Counts I, II, III, IV, and VI because such claims are related to his claim in Count V over which the Court has original jurisdiction.  Indeed, all of Plaintiff's claims concern alleged treatment he claims to have experienced during the course of his employment and related to his alleged termination; thus, such claims form part of the same case in controversy.

19.     Pursuant to 28 U.S.C. § 1367(a), a district court may decline to exercise supplemental jurisdiction over the state law claim only if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

4

20.     Here, Plaintiff's WVHRA claim does not present a complex or novel issue of state law and is premised upon the exact same operative factual allegations that form the basis of his predominate claim under 42 U.S.C. § 1983. Moreover, it is well established that West Virginia federal courts should resolve WVHRA claims consistent with the Title VII framework. *Gilbert v. Penn-Wheeling Closure Corp.*, 917 F. Supp. 1119 (N.D. W. Va. 1996).

21.     Further, each of Plaintiff's state law claims arise from the same set of facts as the Plaintiff's federal claim under 42 U.S.C. § 1983, and therefore fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367. With respect to his claim under 42 U.S.C. § 1983, Plaintiff alleges that Defendants' actions "deprived him of his property and liberty interests in his tenured employment, and further deprived him of due process under the 14th Amendment to the United States Constitution, in that no impartial pre-termination hearing was held on the merits of the termination; no post-termination hearing was held on the merits of the termination; the assignments themselves were specifically created for the purpose of setting the Plaintiff up for failure and were either impossible to perform, duplicative of other simultaneously-occurring course(s), or academically untenable ..." Second Am. Compl. ¶113. Similarly, with respect to his state law claims, Plaintiff avers that his alleged termination was in bad faith, in retaliation for his prior filing of numerous grievances, and accomplished in a way that misused the termination for cause provisions of the Faculty Rules. In sum, Plaintiff's state law claims arise from his employment with WVUBOG and his alleged termination therefrom and, thus, form part of the same case or controversy as his federal claim under 42 U.S.C. § 1983.

22.     Therefore, this Court has supplemental jurisdiction over Plaintiff's claims.

5

## IX.    OTHER REMOVAL REQUIREMENTS

23.    In compliance with 28 U.S.C. § 1446(b)(2)(A), all Defendants join in the removal of this action.

24.    In compliance with 28 U.S.C. § 1446(d), notice of filing this notice of removal is being filed with the Circuit Court of Monongalia County, West Virginia, and served upon all adverse parties.  A copy of such notice is attached hereto as **Exhibit C**.

WHEREFORE, Defendants, West Virginia University Board of Governors and Michael Schaller, Ph.D., hereby jointly remove this action from the Circuit Court of Monongalia County, West Virginia, to the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 15th day of December 2022.

/s/ Lindsay M. Gainer
Julie A. Moore (WV Bar No. 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV  26505
T: 304-285-2524
F: 304-285-2575
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV  25325
T: 304-347-1128
lgainer@bowlesrice.com

*Counsel for Defendants West Virginia University Board of Governors and Michael Schaller, Ph.D.*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

HEIMO RIEDEL,

      Plaintiff,

v.                                        Civil Action No._____

WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS, for and on behalf of
WEST VIRGINIA UNIVERSITY, and
MICHAEL SCHALLER, Ph.D., Individually,

      Defendants.

## CERTIFICATE OF SERVICE

      I hereby certify that on the 15th day of December, 2022, I electronically filed the foregoing *"Notice of Removal"* with the Clerk of the Court using the CM/ECF system. In addition, I have mailed complete copies of these filings to counsel for Plaintiff via First Class U.S. Mail as follows:

David M. Grunau, Esq.
244 Pleasant Street
Morgantown, West Virginia 26505
*Counsel for Plaintiff*

*/s/ Lindsay M. Gainer*_____
Julie A. Moore (WV Bar No. 11315)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV 26505
T: 304-285-2524
jamoore@bowlesrice.com

Lindsay M. Gainer (WV Bar No. 12046)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, WV 25325
T: 304-347-1128
lgainer@bowlesrice.com

*Counsel for Defendants West Virginia University Board of Governors and Michael Schaller, Ph.D.*

15296027.1

## OFFICE OF THE CIRCUIT CLERK OF MONONGALIA COUNTY



### JEAN FRIEND, CIRCUIT CLERK
75 HIGH STREET, SUITE 12

**17th Judicial Circuit**        MORGANTOWN WV 26505        **20th Family Court**
Telephone: 304-291-7240
Fax: 304-291-7273

December 16, 2022

Cheryl Dean Riley
United States District Court
Post Office Box 2857
Clarksburg, WV 26301

IN RE:   Heimo Riedel
Vs.
West Virginia University Board of Governors
Civil Action No. 19-C-190

Dear Ms. Riley:

Enclosed please find copies of all pleadings filed in the above styled civil action that are being forwarded to you since this action has been removed to your Court.

Please contact this office if we can be of any further assistance in this matter.

Very truly yours,

Jean Friend
Circuit Clerk of Monongalia County

Enclosures

syt